UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------  x
                                                     :
                                                     :
                                                     :
**UNITED STATES OF AMERICA**                         :
                                                     :
- v -                                                :         22 Cr. 644     (JSR)
                                                     :
**STEVEN PEREZ,**                                    :
                                                     :
                              Defendant.             :
---------------------------------------------------  :
                                                     x


### STEVEN PEREZ (LUCHA EL POR LIBERTAD'S)
### PRETRIAL MOTIONS


      **DAVID E. PATTON, ESQ.**
      Federal Defenders of New York, Inc.
      Attorney for Defendant
      **STEVEN PEREZ**
      **(LUCHA    EL    POR**
      **LIBERTAD)**
      52 Duane Street - 10th Floor
      New York, New York 10007
      Tel.: (212) 417-8735


      **ZAWADI BAHARANYI**
      <u>Of Counsel</u>


TO:  **DAMIAN WILLIAMS, ESQ**.
     United States Attorney
     Southern District of New York
     One. St. Andrew's Plaza
     New York, New York 10007
     Attn:  **ASHLEY NICOLAS, ESQ.**
         Assistant United States Attorney

# TABLE OF AUTHORITIES

**Cases**

California v. Hodari D., 499 U.S. 621 (1991) ....................................................................15

District of Columbia v. Heller, 554 U.S. 570 (2008) ............................................................4

Florida v. J.L., 529 U.S. 266 (2000) ....................................................................................17

McDonald v. City of Chicago, 561 U.S. 767 (2010) .............................................................4

Navarette v. California, 572 U.S. 393 (2014) ......................................................................19

New York State Rifle & Pistol Ass'n, Inc. v. Bruen, 142 S. Ct. 2111 (2022) ......................5

Terry v. Ohio, 392 U.S. 1 (1968) .........................................................................................15

United States v. Baldwin, 496 F.3d 215 (2d Cir. 2007) .......................................................15

United States v. Cacace, 796 F.3d 176 (2d Cir. 2015) ........................................................21

United States v. Elmore, 482 F.3d 172 (2d Cir. 2007) ........................................................16

United States v. Freeman, 735 F.3d 92 (2d Cir. 2013) ........................................................17

United States v. Jackson, No. 10 CR 783 NRB (S.D.N.Y. Apr. 12, 2011) ..........................18

United States v. Jarvis, No. 18 CR. 475 (PAC) (S.D.N.Y. Apr. 30, 2019) ..........................21

United States v. Lee, 916 F.2d 814 (2d Cir. 1990) ..............................................................15

United States v. Mendenhall, 446 U.S. 544 (1980) ..............................................................15

United States v. Morales, 788 F.2d 883 (2d Cir. 1986) .......................................................21

United States v. Muhammad 463 F.3d 115 (2d Cir. 2006) .............................................17, 20

United States v. Simmons, 560 F.3d 98 (2d Cir. 2009) ........................................................15

United States v. Sokolow, 490 U.S. 1 (1989) .......................................................................17

United States v. Weaver, 9 F.4th 129 (2d Cir. 2021) ...........................................................15

United States v. Zayas, No. 22 Cr. 178 (NSR), 2022 WL 16737223 ...................................21

Wong Sun v. United States, 371 U.S. 471 (1963) ................................................................21

**Statutes**

18 U.S.C. § 922(a)(3) ............................................................................5

Fed. R. Crim. Pro. 12(b) ........................................................................6

**Constitutional Provisions**

U.S. Const. amend. IV ..........................................................................15

U.S. Const. amends. II, V ........................................................................6

## MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMIS AND MOTION TO SUPPRESS PHYSICAL AND TESTIMONIAL EVIDENCE

Defendant Lucha El Por Libertad (a/k/a Steven Perez; hereinafter "Mr. Lucha") respectfully moves this Court for an order dismissing the indictment against him, as it was obtained in violation of his Second Amendment rights, and such other and further relief as the Court deems just and proper.

Moreover, Mr. Lucha moves to suppress the firearm seized by police on June 23, 2021, along with his cellphone and post-arrest statements to law enforcement because they were obtained through a violation of his Fourth Amendment rights. In the alternative, the Court should hold an evidentiary hearing.

### I.       Motion to Dismiss

The Second Amendment to the United States Constitution confers an "individual right to keep and bear arms" for self-defense.  District of Columbia v. Heller, 554 U.S. 570, 595 (2008).  That enumerated right is "fundamental to our scheme of ordered liberty." McDonald v. City of Chicago, 561 U.S. 742, 767 (2010) (emphasis omitted).  Courts therefore may not treat it "as a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees."  Id. at 780.

This year, the Supreme Court gave unequivocal guidance about how courts must interpret whether gun regulations are permissible under the Second Amendment.  Rejecting lower courts' previous approach, which balanced the strength of the government's interest in regulating gun ownership against the degree of infringement on an individual's Second Amendment rights, the Supreme Court instead directed courts to consider only the

"constitutional text and history."  New York State Rifle & Pistol Ass'n, Inc. v. Bruen, 142 S. Ct. 2111, 2128-29 (2022).  Under the Supreme Court's new approach, gun regulations are unconstitutional unless the government can prove that they are "consistent with this Nation's historical tradition of firearm regulation."  Id. at 2126.   The burden is squarely on the government.

On June 23, 2021, Mr. Lucha was arrested by NYPD officers for unlawful possession of a Canik TP9 9 mm handgun in the Bronx, New York.[1]  The following week, on July 3, 2021, Mr. Lucha was arrested by Massachusetts state troopers for unlawful possession of a firearm, Glock Model 44, .22 caliber pistol, in Wakefield, Massachusetts.[2]  Ex. A (Excerpt from Search Warrant Affidavit).  On November 30, 2022, Mr. Lucha was indicted by a federal grand jury for violating 18 U.S.C. § 922(a)(3), which prohibits any person who is not a licensed importer, manufacturer, dealer or collector, from receiving in their state of residence a firearm purchased or obtained from another state.  The government alleges that Mr. Lucha violated § 922(a)(3) through his unlawful receipt and possession of the firearm he alleged possessed in the Bronx and Wakefield.

§ 922(a)(3), which bans regular citizens from receiving firearms obtained from other states for any use—including self-defense—is plainly not "consistent with this Nation's historical tradition of firearm regulation."  While it is solely the Government's burden to "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms," Bruen, 142 S.Ct. at 2127, undersigned

---

[1] Mr. Lucha was charged in Bronx County in this matter. These charges have been dismissed and the arrest is sealed.
[2] Mr. Lucha was charged in Massachusetts in this matter. The charge in this case is pending and trial is set for May 2023.

counsel is aware of no laws proscribing the receipt of lawfully procured firearms from another state when the Second Amendment was adopted in 1791, despite the existence of fourteen states within the Union.[3]

Since the Government cannot prove that § 922(a)(3) is consistent with this nation's historical tradition, the statute violates Mr. Lucha's Second Amendment rights.  Mr. Lucha therefore respectfully moves this Court for an order dismissing the indictment and granting such other and further relief as the Court deems just and proper.  U.S. Const. amends. II, V; Fed. R. Crim. Pro. 12(b).

   a. **Legal Framework**

Adopted in 1791, the Second Amendment provides that "the right of the people to keep and bear Arms [ ] shall not be infringed."  There is "no doubt, on the basis of both text and history, that the Second Amendment conferred an individual right to keep and bear arms."  Heller, 554 U.S. at 595.  That right stands on the same footing as all enumerated constitutional rights, which "are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad."  Id. at 634-35.

Last year, the Supreme Court invalidated the Second Circuit's existing framework for adjudicating Second Amendment challenges – known as "means-end scrutiny" – and instead gave detailed instructions on how courts should resolve such claims going forward. In Bruen, the Court explained that "the standard for applying the Second Amendment is as follows":

---

[3] Order of States' Admission into Union:
https://www.sos.arkansas.gov/education/arkansas-history/history-of-the-flag/order-of-states-admission

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command.

142 S. Ct. at 2129–30 (internal quotation marks omitted).

The Court then identified two different classes of gun regulations, each carrying a distinct analytical approach.  First, when analyzing a gun regulation directed at "a general societal problem that has persisted since the 18th century," courts are to conduct a "straightforward historical inquiry."  Id. at 2131.  Under that approach, the government bears the burden of identifying a tradition of "distinctly similar" regulations from the founding era. Id. at 2137-38.  Relevant evidence that a modern regulation is unconstitutional includes "the lack of a distinctly similar historical regulation," earlier generations' attempts to regulate the conduct at issue "by materially different means," or the rejection of "analogous regulations" at the time of the founding.  Id.  Put differently, if "the Founders themselves could have adopted" a particular regulation to "confront" a problem that existed in 1791, but did not do so, then that regulation is unconstitutional.  See id.

Courts may only resort to the second type of analysis – a "more nuanced" form of "analogical reasoning" – when a challenged regulation implicates "unprecedented societal concerns or dramatic technological changes."  Id. at 2132.  Under that approach, the Government must "identify a well-established and representative historical *analogue*, not a historical twin."  Id. at 2133 (emphasis in original).  But such analogical reasoning, which is arguably easier for the government to satisfy, only applies to "modern regulations that were unimaginable at the founding."  Id. at 2132.

Here, Mr. Lucha is charged under 18 U.S.C. § 922(a)(3), which prohibits anyone who is not a licensed dealer, manufacturer or collector, from receiving and possessing a firearm from out of state for any purpose– including for purposes of self-defense.  Under Bruen's analytical framework, it is the government's burden – and its burden alone – to identify a tradition of "distinctly" similar founding-era regulations.  See id.  Because no such historical tradition exists, prosecuting Mr. Lucha under § 922(a)(3) violates his constitutional rights.

### b. **The Second Amendment's plain text covers Mr. Lucha's alleged conduct.**

"When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct."  Bruen, 142 S. Ct. at 2129-30.  Here, Mr. Lucha's alleged conduct falls squarely within the Second Amendment's plain text.  Mr. Lucha was arrested for possession of a handgun while standing outside of his home in the Bronx, New York. Separately, Mr. Lucha was arrested in Massachusetts for unlawful possession of a pistol. Both firearms were allegedly purchased in South Carolina and received by Mr. Lucha in New York. The firearms that Mr. Lucha is accused of receiving and possessing from out of state are the type of "arm" to which the Second Amendment indisputably applies.  Heller, 554 U.S. at 628 (D.C.'s handgun ban amounted "to a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for" the lawful purpose of self-defense).

Mr. Lucha, an American citizen and resident of New York with no prior felony convictions, is unquestionably among "the people" the Second Amendment protects.  As used in the Second Amendment, "the people" "unambiguously refers to all members of the political community, not an unspecified subset." Id. at 580.  The Court in Heller determined

that the Second Amendment right—like the rights of "the people" in the First, Fourth, Ninth, and Tenth Amendments—"is exercised individually and belongs to *all* Americans." Id. (emphasis added); see also Bruen, 142 S. Ct. at 2156 ("The Second Amendment guaranteed to *all Americans* the right to bear commonly used arms in public subject to certain reasonable, well-defined restrictions." (emphasis added)).

Therefore, Mr. Lucha's alleged conduct is plainly covered by the Second Amendment, and is "presumptively protected" on constitutional grounds.

**c.** **There is no historical tradition of banning regular citizens from receiving and possessing guns obtained from a different state.**

Since the Second Amendment plainly protects Mr. Lucha's right to bear arms, his alleged conduct is presumptively unconstitutional.   The burden therefore falls on the government to establish that § 922(a)(3) "is consistent with the Nation's historical tradition of firearm regulation." Bruen, 142 S. Ct. at 2129–30.  It will not be able to do so.

*i.* *Bruen's "straightforward historical analysis" test applies.*

In the 17th and 18th centuries, Great Britain established thirteen colonies along the Atlantic Coast in North America. These thirteen colonies would become the first thirteen states of the United States of America, upon their declaration of independence in 1776.  Just as the existence of distinct political states and territories in the United States is not a modern phenomenon, the "problem" of people receiving and possessing property and guns from outside of their state of residence is not new to modern America nor could regulations of such be considered "unimaginable" to the nation's founders. As such, the question of whether regular citizens (who are not licensed firearms dealers) should be allowed to possess guns obtained from out of state is "a general societal problem that has persisted since the 18th

9

century."  See Bruen, 142 S. Ct. at 2137-38.

As the Supreme Court made clear in Bruen, such "general societal problems" are analyzed utilizing a strict test.  Rather than engaging in the "analogical reasoning" reserved for novel issues, the Court must instead conduct a "straightforward historical analysis," and the government must demonstrate a tradition of "distinctly similar historical regulation[s]" from the founding era.  Id.  A "tradition" of regulation requires more than one or two isolated examples. It instead demands a robust, "widespread" historical practice "broadly prohibiting" the conduct in question.  Id.  Although the Bruen Court did not establish what rises to the level of a "tradition," it did hold that "a single law in a single State" is insufficient, and doubted that regulations of three of the thirteen colonies "could suffice."  Id. at 2142-45 (noting that the three colonial regulations the government identified were not analogous to the challenged New York public-carry restriction).

ii.     There is no American historical tradition of regulation analogous to § 922(a)(3).

When it comes to the Second Amendment, "not all history is created equal."  Id. at 2136.  The most relevant historical evidence is the law as it existed at the time of the founding; "less informative" is "history from Reconstruction to the late nineteenth century." Range, 53 F.4th at 274.  The Supreme Court has paid practically no attention to twentieth-century laws; indeed, it has considered even late-nineteenth century laws to have an unacceptable "temporal distance from the founding."  Bruen, 142 S. Ct. at 2154.  And regardless of the historical record, the Amendment's text is always paramount: post-ratification laws that "are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text."  Id. at 2137 (quotations and emphasis omitted).

Although it is the government's burden – **and its burden alone** – to prove a founding-era tradition of prohibiting citizens from receiving, transporting and possessing firearms from other states or jurisdictions, the simple truth is this: such regulations did not exist in the founding era.

Robert H. Churchill, a history professor at the University of Hartford, has taken "a full survey of printed session laws pertaining to gun regulation in the thirteen colonies and Vermont between 1607 and 1815." See Robert H. Churchill, Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment, 25 Law & Hist. Rev. 139, 143 & n.11 (2007).  Based on that survey, Professor Churchill concluded that "at no time between 1607 and 1815 did the colonial or state governments of what would become the first fourteen states exercise a police power to restrict the ownership of guns by members of the body politic.  In essence, American law recognized a zone of immunity surrounding the privately owned guns of citizens." Id. at 142.

In the aftermath of Heller, Second Amendment history and law scholar Mark Frasetto took on the monumental task of compiling a comprehensive survey of state firearms legislation from the colonial era until the start of the twentieth century.  See Mark Frasetto, Firearms and Weapons Legislation up to the Early 20th Century (January 15, 2013). Available at:  http://dx.doi.org/10.2139/ssrn.220099.  Frasetto's comprehensive analysis reveals no founding-era regulations prohibiting regular citizens from obtaining firearms in other states. Id.

That the federal government passed the first prohibition on unlicensed individuals receiving and possessing firearms obtained from out of state in 1968[4], is fatal to any argument

---

[4] This was the Gun Control Act of 1968.

the government may make regarding a founding-era historical tradition of regulations "distinctly similar" to § 922(a)(3).  Those twentieth-century laws are simply insufficient to overcome the presumption of unconstitutionality that attaches to § 922(a)(3).  <u>See</u> <u>Bruen</u>, 142 S. Ct. at 2154 (treating twentieth-century regulations as carrying practically no weight in the Second Amendment analysis).

As a political matter, Americans continue to debate issues surrounding the Second Amendment.  But as a legal matter, the Supreme Court has been clear: the Second Amendment means what it says, and that meaning is determined by reference to the founding era.  In 1791, the right of a person to "keep and bear arms" was not contingent on the geographical source of the "arms" or whether the person was afforded a special license to receive and carry that arm. For this reason, prosecuting Mr. Lucha under 18 U.S.C. § 922(a)(3) violates his Second Amendment rights.  The Court should therefore dismiss count three of the indictment

## II.     Motion to Suppress Physical and Testimonial Evidence

On June 23, 2021, Mr. Lucha was standing outside of his apartment in the Bronx, speaking with neighbors from his building, when uniformed officers from the New York City Police Department ("NYPD") surrounded him, grabbed his arms and searched a bag strapped across his body.[5] During their search, the officers discovered and recovered a firearm and cellphone.

NYPD officers lacked reasonable suspicion to stop Mr. Lucha. They conducted the seizure based on a single anonymous tip reporting that a person matching Mr. Lucha's description, had a firearm in his bag.  This description of conduct by an anonymous caller did not provide the police with reasonable suspicion, and all fruits of this unlawful stop must be suppressed. The Court should grant Mr. Lucha's motion to suppress or hold a hearing.

### a.  <u>Statement of Relevant Facts</u>

Mr. Lucha is charged by indictment with the unlawful transportation or receipt of a firearm into his state of residence, in violation of Title 18, United States Code, Sections 922(a)(3) and 924 (a)(1). One of the firearms at issue in the indictment is a Canik 9mm handgun seized from Mr. Lucha during his unlawful seizure and arrest by NYPD officers on June 23, 2021.

One June 23, an anonymous caller contacted 911 to report a man with a firearm walking down Gun Hill Road towards Perry Avenue.  Ex. B (Audio of 911 Call). The caller described the person as a Hispanic man, wearing a white shirt, black pants, a black and

---

[5] The factual circumstances surrounding Mr. Lucha's encounter with NYPD officers is captured in body worn camera footage attached as <u>Exhibit C</u> to this motion.

white turban on his head, and a blue bag. Id. The caller further stated that the man went by

the name of "Lucha." Id. When asked, the caller admitted that she did not know where the

individual was headed. Id at 2:20-2:27. Moreover, the caller refused to provide her name

when asked. Id. At 3:08.

NYPD Officers Cotter and Smalls were on patrol when they were alerted of the call

regarding a possible firearm.  Officer Cotter and Officer Smalls, accompanied by two other

uniformed officers, approached Mr. Lucha outside of his home at 3318 Perry Avenue,

Bronx, New York. Ex. C (Body Worn Camera Footage from Officer Cotter) at 0:55- 1:10;

Ex. D (NYPD Paperwork With Mr. Lucha's Home Address).  As Officer Cotter and

Officer Smalls approached, Mr. Lucha remained in place—he made no efforts to run or

avoid officers. Id. Officer Smalls grabbed Mr. Lucha's left arm, while Officer Cotter

grabbed his right arm and a blue bag strapped across Mr. Lucha's body.  Officer Cotter

frisked this bag before searching it and recovering a firearm.

While Mr. Lucha remained detained, NYPD officers attempted to locate the 911

caller to have her participate in a show up identification but had difficulty reaching her and

twice described her as being "uncooperative." Ex. E (Radio Run) at 5:47-6:10. By the time

officers located the caller and orchestrated a show up identification procedure, Mr. Lucha

had already been seized for nearly ten minutes. See Ex. C at 10:15-10:20 (Another

uniformed officer can be heard saying "positive" regarding the positive ID of Mr. Lucha by

the caller).

**b.** **The seizure of Mr. Lucha violated the Fourth Amendment because NYPD officers lacked reasonable suspicion to believe that he had committed a crime.**

  *i.  Mr. Lucha was seized when NYPD officers physically restrained him.*

   The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. A "seizure" occurs "when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." Terry v. Ohio, 392 U.S. 1, 19 n.16 (1968). The Supreme Court and Second Circuit have identified two hallmarks of a seizure. First, "[t]he word 'seizure' readily bears the meaning of a laying on of hands or application of physical force to restrain movement." California v. Hodari D., 499 U.S. 621, 626 (1991) (quoting U.S. Const. amend. IV). Thus, "[e]xamples of circumstances that might indicate a seizure … would be … some physical touching of the person of the citizen." United States v. Mendenhall, 446 U.S. 544, 554 (1980). See also, e.g., United States v. Lee, 916 F.2d 814, 819 (2d Cir. 1990) ("physical touching of the person by the officer"). That is true even of de minimis physical contact. See Hodari D., 499 U.S. at 626 n.2 ("mere touching of a person would suffice" to constitute "seizure"). Second, apart from physical contact, a seizure occurs when a person submits to a show of police authority. United States v. Baldwin, 496 F.3d 215, 218 (2d Cir. 2007). That is, "[a] seizure occurs when … a person obeys a police officer's order to stop." United States v. Simmons, 560 F.3d 98, 105 (2d Cir. 2009).

   With respect to a search, a police officer's conduct constitutes a search within the meaning of the Fourth Amendment when the officer physically intrudes on a constitutionally protected area. United States v. Weaver, 9 F.4th 129, 141 (2d Cir. 2021).

Generally, the search of a suspect must be supported by probable cause, however the
Supreme Court carved out an exception to this rule in <u>Terry</u>. Under <u>Terry</u>, an officer who
reasonably believes that a suspect poses a risk of danger to the officer or others may
"conduct a carefully limited search of the *outer clothing* of [the suspect] … to discover
weapons which might be used to assault him." <u>Terry</u>, 392 U.S. at 30 (emphasis added).
This <u>Terry</u> frisk may occur **<u>only after</u>** a lawful seizure, supported at a minimum by
reasonable suspicion. <u>Id</u>. at 29.

Here, there is no question that Officers Cotter and Smalls seized Mr. Lucha when
they physically grabbed and pinned his arms in the air. This is readily observable in the
body worn camera footage attached as Exhibit A. The officers physically, and substantially,
restrained Mr. Lucha's freedom of movement.

Immediately after seizing Mr. Lucha, Officer Cotter grabbed Mr. Lucha's blue bag
and felt a firearm.

ii.     *Officers lacked reasonable suspicion to seize Mr. Lucha based on an
        anonymous 911 call.*

Under <u>Terry</u>, law enforcement officials may initiate an investigatory detention if
they have a reasonable, articulable suspicion that a person is engaged in criminal activity.
392 U.S. at 21; <u>see also</u> <u>United States v. Elmore</u>, 482 F.3d 172, 178 (2d Cir. 2007) ("A
<u>Terry</u> stop represents an intermediate response allowing police to pursue a <u>limited
investigation</u> when they lack the precise level of information necessary for probable cause
to arrest.") (emphasis added).  This lesser "reasonable suspicion" standard "is considerably
less than proof of wrongdoing by a preponderance of the evidence," but nonetheless

requires "more than an 'inchoate and unparticularized suspicion or 'hunch.'" United States v. Sokolow, 490 U.S. 1, 7 (1989) (quoting Terry, 392 U.S. at 27).

Whereas here, a seizure is based on an anonymous tip, Courts must consider "whether the 'tip, suitably corroborated, exhibits 'sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop.'" United States v. Muhammad 463 F.3d 115, 121 (2d Cir. 2006) (quoting Florida v. J.L., 529 U.S. 266, 270 (2000). Generally, anonymous tips "without further corroboration by the police… are insufficient to provide the reasonable suspicion necessary for a valid Terry stop." United States v. Freeman, 735 F.3d 92, 97 (2d Cir. 2013). Allegations of illegality from known informants are considered reliable because of the ability to "assess the credibility and reputation for honesty of the tipper and …hold[] the informant accountable for false reporting." United States v. Freeman, 735 F.3d 92, 97 (2d Cir. 2013). The ability to assess the reliability and credibility of a tipster is missing when that person is unknown, hence Courts require that "anonymous calls be supported by additional indicia of reliability" if the police intend to act on them. Id. at 98. Finally, while details about an individual's appearance and observable location serve to "identify a determinate person" they fail to bolster the reliability of an anonymous informant's "assertion of illegality" and are therefore not sufficient to confer reasonable suspicion to conduct a stop.

Here, the anonymous tip did not give officers reasonable suspicion to stop Mr. Lucha. At the point at which officers physically seized Mr. Lucha, they were doing so on the word of an individual who had refused to provide her name, reluctantly provided a phone number, and failed to provide any predictive information that could be used to "test the informant's knowledge or credibility." Id. at 97.

The details provided by the 911 caller served only as an "[a]n accurate description of a suspect's readily observable location and appearance" which is not sufficient to render an anonymous tip reliable or confer reasonable suspicion that would justify a Terry stop. See Id.; United States v. Jackson, No. 10 CR 783 NRB, 2011 WL 1431983, at *10 (S.D.N.Y. Apr. 12, 2011).

The Second Circuit's ruling in United States v. Freeman is particularly illustrative and should guide this Court's analysis. In Freeman, an anonymous caller contacted 911 twice to report a man with a gun arguing with a woman. The caller described the man's race and clothing. Moreover, the caller detailed the person's location, explaining that he was "'walking towards' and then 'standing on the corner of Burke [Avenue].'" Freeman, 735 F.3d at 95. The 911 caller refused to identify herself but her 911 call was recorded as was her phone number. Id. at 94. Police approached Mr. Freeman based solely on this tip and wrestled him to the ground after he ignored their commands to stop. Freeman moved to suppress the firearm taken from his person during his arrest. While the District Judge denied his motion to suppress, the Second Circuit reversed this decision, finding that the circumstances of the anonymous tip did not confer reasonable suspicion for the officers to stop Freeman. The Court held that even though the informant's phone number was known and her call was recorded, this did not change the fact that the caller was unknown and the police had no ability to assess the informant's credibility. See Id. at 98. Moreover, the detailed information about Mr. Freeman's physical appearance and location only served to "correctly identify the person whom the tipster means to accuse" and failed to show that the tipster had "knowledge of concealed criminal activity." Id. at 99. Finally, the Court found that the caller's real time description of Mr. Freeman's location failed to serve as a

"prediction of future behavior" enhancing the reliability of the tip. Id.

The facts here are strikingly similar. In stopping and restraining Mr. Lucha, officers relied solely on the information that had been provided to them in the 911 call— a description and location of Mr. Lucha. Later, after Mr. Lucha had already been seized and was surrounded by at least a dozen officers on the sidewalk, Ex. C at 9:00, other officers attempted to reach the caller to convince her to participate in a show up identification of Mr. Lucha. These officers had difficulty reaching her and described the caller as "uncooperative." Ex. E. While the caller was eventually located, though never identified by name, it was already too late— the NYPD had already significantly infringed on Mr. Lucha's liberty.

Like in Freeman, the caller's detailed description of Mr. Lucha and his location only served to correctly identify Mr. Lucha but did not render the accusation credible. Even if the police were to believe that the caller really was a former friend or neighbor of the Mr. Lucha, they had no way of assessing whether this was true and took no steps to do so before stopping him. By refusing to identify herself when asked, the caller actively tried to ensure that the police could not hold *her* accountable if she had been falsely accusing Mr. Lucha, to harass him or further a personal grudge.

Significantly, here, as in Freeman, this was not a report of an "ongoing emergency" such as an assault in progress or a reckless and dangerous drunk driver on the road entitling the anonymous tip to "a higher degree of reliability" or removing the need for additional corroboration.  Freeman, 735 F.3d at 100; cf. Navarette v. California, 572 U.S. 393 (2014) (finding that a 911 call about a drunk driver running a motorist off the highway conferred

reasonable suspicion under the circumstances).[6]  The caller here simply reported that Mr.

Lucha was in possession of a firearm inside of his bag— conduct that is not necessarily

unlawful.[7] The caller did not allege that Mr. Lucha had used or wielded the gun in any way

that would create an emergency. See Ex. B. The lack of exigency or even illegality means

that the police could have and should have investigated and attempted to assess the

credibility of the informant and the totality of the circumstances before infringing on Mr.

Lucha's rights. See United States v. Muhammad, 463 F.3d 115 (2d Cir. 2006) (holding that

if Mr. Muhammad had been stopped based on the a 911 tip about a firearm alone, the stop

would have been invalid under the Fourth Amendment, however, under the totality of the

circumstances, the arresting officers had reasonable suspicion because of Muhammad's

evasive behavior and flight, the officers' personal observations of Muhammad prior to the

stop, and two of the arresting officers' prior knowledge and suspicions of Muhammad.)

Nothing about Mr. Lucha's behavior as officers approached was suspicious and the

officers were not justified in stopping him based on the tip or the overall totality of the

circumstances.

c. **The evidence obtained from Mr. Lucha as a result of an unlawful seizure must be suppressed as "fruit of the poisonous tree."**

Because the police did not have reasonable suspicion to stop and seize Mr. Lucha,

---

[6]Notably, the call at issue in Navarette was never actually anonymous—the caller provider her name in her 911 call to the original dispatcher— however this call was not played at the suppression hearing at issue in this case. See THE PEOPLE OF THE STATE OF CALIFORNIA, Plaintiff and Respondent, v. Lorenzo Prado NAVARETTE and Jose Prado Navarette, Defendants and Appellants., 2012 WL 10206269 (Cal.App. 1 Dist.), 9, fn. 2.
[7] The New York Handgun Application, available here:
https://licensing.nypdonline.org/new-app-instruction/,  details circumstances in which an individual may lawfully be permitted to carry a firearm.

the resulting search, which yielded a handgun and a cellphone, was unlawful. These

materials, along with statements made by Mr. Lucha after the stop, must be suppressed. See

United States v. Jarvis, No. 18 Cr. 475 (PAC), 2019 WL 1932758, at *4 (S.D.N.Y. Apr. 30,

2019) (suppressing handgun recovered following unlawful stop and arrest); Bristol, 819 F.

Supp. 2d at 144–45 ("Because the vehicle stop in this case was impermissible, the Officers'

search of [the defendant's] person and the subsequent seizure of the firearm are tainted as

fruit of the poisonous tree.").

     "Evidence obtained by exploitation of a primary illegality is regularly excluded

under traditional taint analysis as the 'fruit of the poisonous tree.'" United States v.

Morales, 788 F.2d 883, 885 (2d Cir. 1986) (citing Wong Sun v. United States, 371 U.S.

471, 487–88 (1963)). See also United States v. Zayas, No. 22 Cr. 178 (NSR), 2022 WL

16737223, at *5 (quoting United States v. Cacace, 796 F.3d 176, 188 (2d Cir. 2015)). Both

the "fruit of the poisonous tree" doctrine and the policy underlying it require suppression of

the evidence seized from Mr. Lucha. "[W]hen there is a close causal connection between

illegal conduct and evidence obtained as a result of that conduct, 'not only is exclusion of

the evidence more likely to deter similar police misconduct in the future, but use of the

evidence is more likely to compromise the integrity of the courts.'" Id. at 552 (internal

citation omitted).

     For these reasons, this Court should suppress the firearm and cellphone recovered

from Mr. Lucha, as well as his statements after the seizure. To the extent that the

Government raises factual disputes as to the information available to and known by NYPD

officers before they seized and searched Mr. Lucha, the Court should hold an evidentiary

hearing.

Dated: New York, New York
February 3, 2023

DAVID E. PATTON, ESQ.

Federal Defenders of New York, Inc.
Attorney for Defendant
**LUCHA EL LIBERTAD**
52 Duane Street - 10th Floor
New York, New York 10007
Tel.:  (212) 417-8735


/s/ _____
**ZAWADI S. BAHARANYI, ESQ.**
Of Counsel.


TO:  **DAMIAN WILLIAMS, ESQ**.

United States Attorney

Southern District of New York
One St. Andrew's Plaza
New York, New York 10007
Attn.: **ASHLEY NICOLAS**, **ESQ.**
Assistant United States Attorney

# EXHIBIT A

The PEREZ Gun Recoveries

11.      As described above, at least six of the Firearms have been recovered outside South Carolina.  On two occasions, PEREZ was present at the time the firearms were seized:

a.      Based on my review of NYPD reports and 911 reports as well as ATF trace reports, I have learned that, on or about October 1, 2020 —during October Purchase-1 — VEREEN purchased a Canik TP9 9mm hand gun, Serial Number 20CB25810 (the "Canik").  On or about June 23, 2021, the NYPD arrested PEREZ after a 911 caller reported that a man matching PEREZ's description was carrying a handgun in a blue "man bag" in the vicinity of Gun Hill Road in the Bronx, New York.  The 911 caller reported that the caller knew the man as "Lucha."  The NYPD responded and apprehended PEREZ shortly thereafter.  At the time of his arrest, law enforcement seized and searched a small blue bag being carried by PEREZ and recovered the Canik, which was loaded.

b.      Based on my review of ATF trace reports and reports prepared by law enforcement officers in Wakefield, Massachusetts (the "Massachusetts Officers"), I know that, on or about July 23, 2020, VEREEN purchased a Glock Model 44, .22 caliber pistol, Serial Number AELY222 (the "Glock .22"), from an FFL in South Carolina.  On or about July 3, 2021, the Massachusetts Officers recovered the Glock .22, along with seven other firearms, during a traffic stop and vehicle search in Wakefield, Massachusetts.[2]  The individuals arrested by the Massachusetts Officers during the

---

[2] During a search of the vehicles, the Massachusetts Officers recovered, among other things, a total of eight firearms, over 1,000 rounds of ammunition of different calibers, and 11 bulletproof vests.

2017.08.02

USAO_0004815

# EXHIBIT B

# 911 Call

# EXHIBIT C

Body Worn
Camera

# EXHIBIT D

# PBBX Gun Enhancement Check List

Boro Log#: _____

A/O Cmd/Name/ Tax #: PO Cotter  962327  52pot

Arrest #/Pct/Location: B21616962        Radio Run : Yes/No # 201062322503

Perp Pedigree        Type of Gun  .9mm  Century Arms

Name        Steven Perez

Address        3318 Perry Ave  Apt 4C  Bronx, NY

DOB        5/7/90

NYSID #        10636087J

E-Justice Check:  Det  Lito

Open Fel Cases        8

Fel Convictions        Ø

Brief Description        radio run of man with firearm, stopped perp matching
of Arrest        description gun recovered with positive ID by caller

Video Canvass        YES/NO        Cameras Observed at: 3318 Perry ave.
Conducted?                Supervisor Conducting Canvass : NO

Video Obtained?        YES/NO

Location Obtained

Cellphone Possessed?  YES/NO        Vouchered as Evidence? YES/NO

ECT Responded to        YES/NO        If Yes; Tech Name PO Corda
swab Gun?

PDU Dat Notified        Det Zito

Trigger-Lock Del        6/03/21
Notified

Perp Debriefed By        Det Zito

## Must be faxed to the Boro Wheel 718-716-9452,
## the Boro PIMS Unit 718-901-0491
## and send to the ADA writing up the gun arrest

USAO_0012163

# EXHIBIT E

Radio Run