UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

STEVEN PEREZ, a/k/a "Lucha,"

Defendant.

22 Cr. 644 (JSR)

**MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA IN OPPOSITION TO DEFENDANT STEVEN PEREZ'S MOTION TO DISMISS AND MOTION TO SUPRESS**

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Ashley C. Nicolas
Madison Reddick Smyser
Lucas Issacharoff
Assistant United States Attorneys
    *Of Counsel*

# TABLE OF CONTENTS

**PRELIMINARY STATEMENT** ................................................................ 1

**FACTUAL BACKGROUND** ................................................................... 2

**ARGUMENT** ........................................................................................ 3

   I. Section 922(a)(3) Is Constitutional ................................................... 3

   A.  Legal Standard—*Heller*, *McDonald*, and *Bruen* ............................. 4

   B.  The Second Amendment's Text Does Not Cover Lucha's Conduct ................. 7

   C.  Section 922(a)(3) Fits Within This Nation's Historical Tradition of Firearms Regulation 12

   II. The Court Should Deny Lucha's Motion to Suppress ........................ 16

   A.  Relevant Facts ............................................................................... 17

   B.  Legal Standard .............................................................................. 18

   C.  There Was Reasonable Suspicion to Support the *Terry* Stop ................ 20

      1.  The 911 Call Was Reliable and Justified the Stop ........................ 20

      2.  The Officer's Personal Observations Justified the Stop ................. 23

**CONCLUSION** .................................................................................... 24

# TABLE OF AUTHORITIES

## Cases

*Alabama v. White*, 496 U.S. 325 (1990) .......................................................................... 25, 26, 28

*Bucklew v. Precythe*, 139 S. Ct. 1112 (2019) ................................................................. 4

*Dancy v. McGinley*, 843 F.3d 93 (2d Cir. 2016)............................................................. 25

*District of Columbia v. Heller*, 554 U.S. 570 (2008)............................................... passim

*Florida v. J.L.*, 429 U.S. 266 (2000).................................................................... 27, 28

*Heller v. Bedford Cent. Sch. Dist.*, 665 F. App'x 49 (2d Cir. 2016) ............................ 6

*Mance v. Sessions*, 896 F.3d 699 (5th Cir. 2018) ..................................................... 12, 21

*McDonald v. City of Chicago*, 561 U.S. 742 (2010)................................................. 5, 10

*Miller v. Bonta*, No. 3:19 Civ. 1537 (S.D. Cal. 2022) .................................................. 18

*Navarette v. California*, 572 U.S. 393 (2014)........................................... 25, 26, 27, 28

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022)........................ passim

*Robertson v. Baldwin*, 165 U.S. 275 (1897) ................................................................. 9

*Teixeira v. County of Alameda*, 873 F.3d 670 (9th Cir. 2017) ......................................... 16, 17, 18

*Terry v. Ohio*, 392 U.S. 1 (1968) ................................................................... 24, 26, 29

*United States v. Arvizu*, 534 U.S. 266 (2002) .............................................................. 29

*United States v. Bailey*, 743 F.3d 322 (2d Cir. 2014) .................................................. 25

*United States v. Bogle*, 717 F.3d 281 (2d Cir. 2013)....................................................... 6

*United States v. Bold*, 19 F.3d 99 (2d Cir. 1994).......................................................... 29

*United States v. Bryant*, 711 F.3d 364 (2d Cir. 2013) ................................................... 4

*United States v. Cortez*, 449 U.S. 411 (1981)............................................................... 26

*United States v. Decastro*, 682 F.3d 160 (2d Cir. 2012)........................................... passim

*United States v. Flores*, No. H-20-427, 2023 WL 361868 (S.D. Tex. Jan. 23, 2023)............ 12, 14

*United States v. Focia*, 869 F.3d 1269 (11th Cir. 2017)........................................... 11, 12

*United States v. Freeman*, 735 F.3d 92 (2d Cir. 2013) ......................................................... 27, 28

*United States v. Gonzales*, No. 22 Cr. 54, 2022 WL 17583769 (D. Utah Dec. 12, 2022) .......... 14

*United States v. Gonzalez*, 111 F. Supp. 3d 416 (S.D.N.Y. 2015) ................................................ 30

*United States v. Hawkins*, 37 F.4th 854 (2d Cir. 2022) ............................................................... 24

*United States v. Holton*, No. 21 Cr. 482-B, 2022 WL 16701935 (N.D. Tex. Nov. 3, 2022)........ 14

*United States v. King*, No. 22 Cr. 215, 2022 WL 17668454 (E.D. Pa. Dec. 14, 2022).......... 13, 14

*United States v. Reyna*, No. 21 Cr. 41, 2022 WL 17714376 (N.D. Ind. Dec. 15, 2022)........ 14, 15

*United States v. Salerno*, 481 U.S. 739 (1987) .............................................................................. 4

*United States v. Tita*, No. RDB-21-0334, 2022 WL 17850250 (D. Md. Dec. 22, 2022) ....... 12, 14

*United States v. Twiss*, 758 F. App'x 127 (2d Cir. 2018) ............................................................. 27

*United States v. Weaver*, 9 F.4th 129 (2d Cir. 2021) ............................................................. 25, 26

**Statutes**

1 W. & M., ch. 2, § 7, in 3 Eng. Stat. at Large 441 ....................................................................... 9

15 The Public Records of the Colony of Connecticut (1890)....................................................... 19

3 *Laws of the Commonwealth of Pennsylvania, from the Fourteenth Day of October, One Thousand Seven Hundred* (1810) ................................................................... 19

6 *Statutes at Large of Pennsylvania from 1682 to 1801* (1899) .................................................... 18

*Colonial Laws of Massachusetts Reprinted from the Edition of 1672* (1890)............................. 19

*Laws and Ordinances of New Netherland, 1638-1674* (1868) .................................................... 18

Laws of Va., Feb., 1676-77, Va. Stat. at Large, 2 William Waller Hening, *The Statutes at Large: Being a Collection of All the Laws of Virginia, from the First Session of the Legislature, in the Year 1619* (1823) ..................................................................................... 17

*The Charter and Ordinances of the City of Providence, with the General Assembly Relating to the City* (1835) ........................................................................................................... 19

**Other Authorities**

1 Trumbull, *Public Records of the Colony of Connecticut* .......................................................... 17

Bureau of Alcohol, Tobacco, Firearms and Explosives, *Don't Lie for the Other Guy*, http://www.dontlie.org/faq.cfm (accessed Feb. 22, 2023)......................................................... 2

Bureau of Alcohol, Tobacco, Firearms and Explosives, *State Federal Firearms Listings*, https://www.atf.gov/firearms/listing-federal-firearms-licensees/state?field_ffl_date_ value%5Bvalue%5D%5Byear%5D=2022&ffl_date_month%5Bvalue%5D%5Bmonth%5D=6 &field_state_value=NY (accessed Feb.17, 2023) ................................................................... 11

David M. Kennedy et. al., *Youth Violence in Boston: Gun Markets, Serious Youth Offenders, and a Use-Reduction Strategy*, 59 Law & Contemp. Probs. 147 (1996)........................................ 15

James Whisker, *The Gunsmith's Trade* (1992)............................................................................ 19

Lois Schoewer, *Gun Culture in Early Modern England* (2016)................................................. 20

S. Rep. No. 89-1866 (1966)........................................................................................................ 21

S. Rep. No. 90-1097 (1968)........................................................................................................ 15

U.S. Const. amend. II.................................................................................................................... 8

Webster's 1828 American Dictionary of the English Language .................................................. 10

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum in opposition to defendant Steven Perez's, a/k/a "Lucha" (hereinafter, "Lucha"), pretrial motions to dismiss and to suppress. *See* Dkt. No. 22 ("Def. Mot."). On November 30, 2022, Lucha was charged in Count Three of a three-count indictment (the "Indictment"), with receiving or transporting into his state of residence at least one firearm that was obtained outside his state of residence, in violation of 18 U.S.C. § 922(a)(3). *See* Dkt. No. 2. The charges arose from Lucha's importation into his state of residence (New York) firearms that had been straw-purchased in a state other than his state of residence (South Carolina).

Lucha now moves (1) to dismiss Count Three of the Indictment, arguing that Section 922(a)(3) unconstitutionally restricts his Second Amendment rights; and (2) to suppress physical and testimonial evidence from his June 23, 2021 arrest, arguing that the police lacked reasonable suspicion to stop and search him. For the reasons discussed below, the Court should deny Lucha's motions.

The Court should reject Lucha's argument that Section 922(a)(3) is unconstitutional under the Second Amendment. The prohibition on importation of firearms from other states without a federal firearms license is the sort of commercial restriction on sale that the Supreme Court has repeatedly endorsed, and one that does not work any impairment on an individual's right to lawfully bear arms in self-defense. To the extent that Section 922(a)(3) does implicate the Second Amendment, it fits within this country's historical tradition of firearms regulation—including historical restrictions on the sale of firearms and gunpowder.

The Court should also deny Lucha's motion to suppress the gun without a hearing because, based on undisputed facts, law enforcement had reasonable suspicion to stop Lucha based on a reliable 911 call reporting that he had a gun in his bag, as well as a corresponding radio run and body camera footage capturing the encounter. If the Court does not find that these facts alone give

rise to reasonable suspicion, it should hold a hearing in which an officer is expected to testify that he saw a heavy bulge consistent with a firearm in Lucha's bag.

## FACTUAL BACKGROUND

As charged in Counts One and Two of the Indictment, between in or about May 2020 and in or about November 2020, Keith Vereen ("Vereen") purchased at least 25 firearms from federal firearm licensees ("FFLs") in South Carolina on behalf of others. In other words, Vereen made "straw purchases" by representing to the FFLs that he was the true purchaser of the firearms when, in fact, he was making the purchases on behalf of others. "Straw purchasing" is a common way for those who would be otherwise prohibited from purchasing firearms to circumvent firearms regulations by obtaining guns through an individual—like Vereen—who appears to be a legitimate purchaser and is willing to make false representations about the nature of the purchase, often in exchange for a fee. *See* Bureau of Alcohol, Tobacco, Firearms and Explosives, *Don't Lie for the Other Guy*, http://www.dontlie.org/faq.cfm (accessed Feb. 22, 2023).

After buying the firearms in South Carolina, Vereen made at least four trips from South Carolina to New York in order to deliver the firearms to their true purchasers. On at least three occasions, at or about the time of his trips to New York, Vereen received wire payments from check cashing facilities in the Bronx, New York. These payments were sent by New York state residents who were the true purchasers of the firearms. Before and after the purchases, Vereen consistently communicated with those for whom he was buying the guns. For example, on or about September 22, 2020, "Steven Perez"—that is, Lucha—sent $350 from a check cashing facility in the Bronx to Vereen in South Carolina. Days later, on or about October 1, 2020, Vereen bought five firearms in South Carolina, including a Canik TP9 9mm handgun (the "Canik"). The next day, on or about October 2, 2020, Vereen traveled to New York to deliver guns. During the thirteen-day period between on or about September 21, 2020 and on or about October 3, 2020, Vereen and

Lucha communicated by cellphone at least sixteen times.

As evidence of Lucha's importation of straw-purchased firearms into New York, the Government intends to introduce at trial, among other things, records of phone communications and a wire payment from Lucha to Vereen. In addition, the Government intends to introduce evidence of at least two occasions on which Lucha possessed guns bought by Vereen in South Carolina. Specifically, the Government would show that (1) on or about June 23, 2021, Lucha was in possession of the Canik in the Bronx, and (2) on or about July 3, 2021, during a traffic stop in Massachusetts, Lucha and others were in possession of eight firearms, including a Glock Model 44, .22 caliber pistol, which had been purchased by Vereen on or about July 23, 2020, in South Carolina.

On February 4, 2023, Lucha filed motions seeking (1) to dismiss Count Three of the Indictment, arguing that Section 922(a)(3) unconstitutionally restricts his Second Amendment rights; and (2) to suppress physical and testimonial evidence from his June 23, 2021 arrest, arguing that the police lacked reasonable suspicion to stop and search him.

**ARGUMENT**

## I.  Section 922(a)(3) Is Constitutional

Lucha argues, based upon the Supreme Court's recent decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), that Count Three of the Indictment must be dismissed because Section 922(a)(3) is unconstitutional. He is incorrect.

As an initial matter, Lucha does not specify whether his claim is that Section 922(a)(3) is unconstitutional on its face or as applied to him. To the extent Lucha brings a facial challenge, such a challenge can succeed only if "no set of circumstances exists under which the Act would be valid," *United States v. Salerno*, 481 U.S. 739, 745 (1987)—*i.e.*, only if the law is unconstitutional in all its applications, *Bucklew v. Precythe*, 139 S. Ct. 1112, 1127 (2019). Lucha

cannot make such a showing. Section 922(a)(3) generally makes it unlawful "for any [unlicensed] person . . . to transport into or receive in the State where he resides . . . any firearm purchased or otherwise obtained by such person outside that State," subject to certain exceptions not applicable here. Section 922(a)(3) would unquestionably be constitutional as applied, for example, to a person who imported "dangerous and unusual weapons" from out of the state, *Bruen*, 142 S. Ct. at 2128 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 627 (2008)), or who imported weapons as part of a criminal enterprise, *Heller*, 554 U.S. at 608, 612 (explaining that the Second Amendment does not protect the right to keep and bear arms for an "unlawful" or "unjustifiable purpose"); *United States v. Bryant*, 711 F.3d 364, 370 (2d Cir. 2013) ("[T]he Second Amendment does not protect the *unlawful* purpose of possessing a firearm [in violation of 18 U.S.C. § 924(c)].").

The Court need not take up any potential facial challenge because the law is constitutional as applied to Lucha. *See United States v. Decastro*, 682 F.3d 160, 163 (2d Cir. 2012) (finding Section 922(a)(3) constitutional as applied to defendant and holding that "a defendant who fails to demonstrate that a challenged law is unconstitutional as applied to him has necessarily failed to state a facial challenge, which requires him to establish that no set of circumstances exists under which the statute would be valid" (internal quotation marks and brackets omitted)). Here, Lucha's Second Amendment challenge fails on two fronts. First, as a minor restriction on the commercial sale and interstate transport of firearms aimed at unlawful purposes, Section 922(a)(3) does not burden the individual right to bear arms in self-defense. Second, even if the Second Amendment does apply, Section 922(a)(3) falls comfortably within this nation's historical tradition of firearm regulation.

### A.   Legal Standard—*Heller*, *McDonald*, and *Bruen*

In *Heller*, the Supreme Court held that the Second Amendment protects "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." 554 U.S. at 635. At the

same time, the Court emphasized that "nothing in our opinion should be taken to cast doubt on," *inter alia*, "laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626-27. As the Court noted, it "identif[ied] these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive." *Id.* at 627 n.26. Two years later, the Court "repeat[ed] th[e] assurances" that it had "made . . . clear in *Heller*." *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (plurality).

As courts applied *Heller* and *McDonald*, different methodological approaches emerged. In some cases, courts rejected Second Amendment claims based on the Supreme Court's reassurances in *Heller* and *McDonald* regarding the lawfulness of certain regulations. *See, e.g.*, *United States v. Bogle*, 717 F.3d 281, 281-82 (2d Cir. 2013) (rejecting challenge to 18 U.S.C. § 922(g)(1)); *Heller v. Bedford Cent. Sch. Dist.*, 665 F. App'x 49, 54 (2d Cir. 2016) (rejecting challenge to 18 U.S.C. § 922(g)(4)). In other cases, courts "coalesced around a 'two-step' framework for analyzing Second Amendment challenges that combines history with means-end scrutiny," *i.e.*, whether "the regulation promotes an important [governmental] interest." *Bruen*, 142 S. Ct. at 2125-26. Notably, the Second Circuit used this approach in *Decastro*, finding that Section 922(a)(3) imposed only a minimal burden, if any, on the right to keep and bear arms, and thus did not trigger any form of heightened scrutiny. 682 F.3d at 168-69.

In *Bruen*, the Supreme Court considered a New York State law that provided for a discretionary "proper cause" licensing regime to carry a firearm outside the home, which the Second Circuit upheld using the means-end framework. 142 S. Ct. at 2122-23, 2125. The Supreme Court reversed, rejecting the means-end test, *id.* at 2126-27, and reaffirming "*Heller*'s methodology centered on constitutional text and history," *id.* at 2128-29. Thus, "the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers

an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2129-30.

In assessing whether the Second Amendment's text covers an individual's conduct, a court must consider the "textual elements" of the Second Amendment's "operative clause," *i.e.*, "the right of the people to keep and bear Arms, shall not be infringed." *Id.* at 2134. In referring to "the right," the Second Amendment "codif[ied] a *pre-existing* right," *id.* at 2130, one that "is not unlimited" and is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose," *Heller*, 554 U.S. at 626. The individual must be "part of 'the people' whom the Second Amendment protects." *Bruen*, 142 S. Ct. at 2134. And the weapons at issue must be "[a]rms" within the meaning of the Second Amendment—"weapons 'in common use' today for self-defense." *Id.* (quoting *Heller*, 554 U.S. at 627). The individual's "proposed course of conduct" must be something "the plain text of the Second Amendment protects," *i.e.*, the conduct must constitute "keep[ing]" or "bear[ing]" arms. *Id.* at 2134-35.

If the Second Amendment's text covers an individual's conduct, "[t]he government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2126. This historical inquiry "will often involve reasoning by analogy." *Id.* at 2132. In determining whether a modern regulation and a historical regulation are "relevantly similar," courts should consider "at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense," *i.e.*, "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* at 2132-33. Such "analogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check." *Id.* at 2133. The inquiry

"requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.* (emphasis in original). Thus, "even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.*

### B.    The Second Amendment's Text Does Not Cover Lucha's Conduct

Under *Bruen*, the first question when considering the constitutionality of a firearms regulation is whether "the Second Amendment's plain text covers an individual's conduct." 142 S. Ct. at 2126. The Second Amendment states that "[a] well regulated Militia, being necessary to the security of a free state, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. As the Supreme Court "explained in *Heller*, the 'textual elements' of the Second Amendment's operative clause—'the right of the people to keep and bear Arms, shall not be infringed'—'guarantee the individual right to possess and carry weapons in case of confrontation.'" *Bruen*, 142 S. Ct. at 2134 (quoting *Heller*, 554 U.S. at 592). Because nothing in Section 922(a)(3) infringes upon Lucha's ability to lawfully possess and carry weapons in self-defense, the Second Amendment's text does not cover his conduct.

"[T]he Second Amendment . . . codified a *pre-existing* right." *Heller*, 554 U.S. at 592. *Heller* explained that "the Second Amendment was not intended to lay down a 'novel principl[e]' but rather codified a right 'inherited from our English ancestors.'" *Heller*, 554 U.S. at 599 (alteration in original) (quoting *Robertson v. Baldwin*, 165 U.S. 275, 281 (1897)). The English Bill of Rights, which "has long been understood to be the predecessor to our Second Amendment," did not protect an unlimited right. *Id.* at 593. Instead, it provided that Protestants "may have Arms for their Defence suitable to their Conditions, and as allowed by Law." *Id.* (quoting 1 W. & M., ch. 2, § 7, in 3 Eng. Stat. at Large 441). Thus, *Heller* explained, "[l]ike most rights, the right secured by

the Second Amendment is not unlimited" and is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 626.

*Heller* outlined several of the limitations inherent in the Second Amendment's text. It indicated that "prohibitions on carrying concealed weapons" were lawful under the Amendment. *Id*. It said the Court was not calling into question "longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or"—as relevant here—"laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626-27. And, as "another important limitation on the right to keep and carry arms," the Court said that the Amendment applies only to "the sorts of weapons" that were "in common use at the time." *Id.* at 627. Thus, *Heller* said, "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes." *Id*. at 625.

Interpreting the text of the Second Amendment as the Supreme Court has instructed, Section 922(a)(3) does not implicate Lucha's Second Amendment rights for two reasons. First and foremost, Section 922(a)(3) does not "infringe" on the central right protected by the Second Amendment: the right to armed self-defense. *See* Webster's 1828 American Dictionary of the English Language (defining "infringe" as "[t]o break; to violate; to transgress" and "[t]o destroy or hinder"). *Heller* "held that individual self-defense is 'the *central component*' of the Second Amendment right." *McDonald*, 561 U.S. at 767 (quoting *Heller*, 554 U.S. at 599). But Section 922(a)(3) says nothing about a person's ability to possess a firearm for self-defense. As the Second Circuit has explained, Section 922(a)(3) "does nothing to keep someone from purchasing a firearm in her home state, which is presumptively the most convenient place to buy anything." *Decastro*, 682 F.3d at 168. Section 922(a)(3) likewise "does not bar purchases from an out-of-state supplier

if the gun is first transferred to a licensed gun dealer in the purchaser's home state." *Id.*; *cf. United States v. Focia*, 869 F.3d 1269, 1286 (11th Cir. 2017) (denying Second Amendment challenge to Section 922(a)(5), which "prohibits only the transfer of a firearm by an unlicensed person to any other unlicensed person who resides in a different state than the state in which the transferor resides" and thus "does not operate to completely prohibit [the defendant] or anyone else, for that matter, from selling or buying firearms"). Indeed, at the time of Lucha's arrest in June 2022 there were 2,250 FFLs in New York—none of which he has alleged would not or could not sell him a firearm. *See* Bureau of Alcohol, Tobacco, Firearms and Explosives, *State Federal Firearms Listings*, https://www.atf.gov/firearms/listing-federal-firearms-licensees/state?field_ffl_date_value%5Bvalue%5D%5Byear%5D=2022&ffl_date_month%5Bvalue%5D%5Bmonth%5D=6&field_state_value=NY (accessed Feb.17, 2023).

The Supreme Court has repeatedly recognized that certain "conditions and qualifications on the commercial sale of arms" do not fall within the protections of the Second Amendment's text. *Heller*, 554 U.S. at 626-27. Section 922(a)(3) is one such condition. Although Section 922(a)(3) regulates the transport of firearms across state lines, it "only minimally affects the ability to acquire a firearm." *Decastro*, 682 F.3d at 164; *see also Mance v. Sessions*, 896 F.3d 699, 709 (5th Cir. 2018) (denying Second Amendment challenge to Section 922(a)(3) and noting that "[t]he delay incurred if a handgun is purchased out of state and transferred to an in-state FFL is de minimis"). Such a de minimis condition on the manner in which a firearm may be acquired does not infringe upon the right of armed self-defense. *See Focia*, 869 F.3d at 1286 (upholding Section 922(a)(5), which "only minimally affects the ability to acquire a firearm"); *United States v. Flores*, No. H-20-427, 2023 WL 361868, at *5 (S.D. Tex. Jan. 23, 2023) (holding that "a *de minimis* burden on downstream possession rights" fails to "trigger *Bruen* scrutiny" in a Section

922(a)(1)(A) case); *see also, e.g.*, *United States v. Tita*, No. RDB-21-0334, 2022 WL 17850250, at *7 (D. Md. Dec. 22, 2022) (rejecting an argument that export controls on firearms implicated the Second Amendment in a Section 922(k) case); *United States v. King*, No. 22 Cr. 215, 2022 WL 17668454, at *3 (E.D. Pa. Dec. 14, 2022) (rejecting an argument that commercially "buying and selling firearms . . . is protected by the Second Amendment'" in a Section 922(a)(1)(A) case).

This de minimis burden is far less than that imposed by other regulations that *Bruen* indicated do not infringe upon an individual's Second Amendment right. *Bruen* made clear that "nothing in [its] analysis should be interpreted to suggest the unconstitutionality" of the "shall-issue" firearm-carry licensing schemes that existed in 43 states. 142 S. Ct. at 2138 n.9. The Court explained that "these shall-issue regimes, which often require applicants to undergo a background check or pass a firearms safety course, are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" *Id.* (quoting *Heller*, 554 U.S. at 635). And Justice Kavanaugh emphasized in his concurrence (joined by Chief Justice Roberts) that states can constitutionally require license applicants to "undergo fingerprinting, a background check, a mental health records check, and training in firearms handling and in laws regarding the use of force, among other possible requirements." *Id.* at 2162 (Kavanaugh, J., concurring). If such administrative burdens on the carrying of firearms are permissible—not to mention dependent to a significant extent on Section 922(a)(3)'s requirement that the interstate traffic in firearms be channeled through legitimate commerce—then Section 922(a)(3)'s prohibition on unlicensed importation of out-of-state firearms similarly falls outside of the Second Amendment's text because it does not "deny ordinary citizens their right to public carry." *Id.* at 2138 n.9 (majority opinion).

Post-*Bruen*, many courts that have analyzed whether conditions on the sale, transport, and receipt of firearms fall within the Second Amendment's text have held that they do not. *See, e.g.*, *Flores*, 2023 WL 361868, at *3–5 (holding that Section 922(a)(1)(A)'s prohibition on selling firearms without a license does not fall within the Second Amendment's text or protections); *King*, 2022 WL 17668454, at *3 (same); *United States v. Gonzales*, No. 22 Cr. 54, 2022 WL 17583769, at *2 (D. Utah Dec. 12, 2022) (same for Section 922(a)(1)(A)'s regulation of the sale of firearms and Section 924(n)'s prohibition on traveling to other states to acquire firearms in order to violate Section 922(a)(1)(A)); *Tita*, 2022 WL 17850250, at *7 (same for Section 922(k)'s prohibition on transporting, shipping, receiving, or possessing firearms with removed, altered, or obliterated serial numbers); *United States v. Reyna*, No. 21 Cr. 41, 2022 WL 17714376, at *3-5 (N.D. Ind. Dec. 15, 2022) (same); *United States v. Holton*, No. 21 Cr. 482-B, 2022 WL 16701935, at *3-4 (N.D. Tex. Nov. 3, 2022) (same). This Court should hold the same as to Section 922(a)(3).

Second, firearms purchased from out of state through illegitimate channels are "not typically possessed by law-abiding citizens for lawful purposes" and therefore fall outside the Second Amendment's text. *Heller*, 554 U.S. at 625. As Congress found in enacting Section 922(a)(3), the traffic of guns through mail order common carriers and non-resident sources "is a means which affords circumvention and contravention of State and local laws governing the acquisition of [firearms]." S. Rep. No. 90-1097, at 49 (1968), *reprinted in* 1968 U.S.C.C.A.N. 2112, 2166. And studies suggest that guns purchased from out-of-state are more likely to quickly be involved in criminal activity. *See* David M. Kennedy et al., *Youth Violence in Boston: Gun Markets, Serious Youth Offenders, and a Use-Reduction Strategy*, 59 Law & Contemp. Probs. 147, 174 (1996). There is little reason why a law-abiding citizen, seeking a gun for law-abiding purposes, would not purchase a firearm through a licensed dealer in his home state, "which is

presumptively the most convenient place to buy anything." *Decastro*, 682 F.3d at 168. Regulations such as this, which are aimed at ensuring that firearms do not fall into the hands of criminals, do not generally violate the Second Amendment. *Cf. Reyna*, 2022 WL 17714376, at *5 (holding that although Section 922(k)'s prohibition on possessing firearms with obliterated serial numbers "reduces the pool of guns available" to law-abiding citizens, it does not fall within the Second Amendment's text because such guns are "useful for criminal activity" and "not typically possessed by law-abiding citizens for lawful purposes" (internal quotation marks omitted)).

The Second Amendment protects the right to keep and bear arms; it does not protect a right to import them or to acquire them without restriction. Section 922(a)(3)'s prohibition on unlicensed importation of firearms does not meaningfully affect, let alone infringe upon, the right to armed self-defense. And because illegally imported firearms are not typically possessed by law-abiding citizens for lawful purposes, the Second Amendment does not protect such weapons or their possession. Accordingly, Section 922(a)(3) does not implicate Lucha's Second Amendment rights, and his as-applied and facial challenges should be denied without further historical inquiry.

## C.  Section 922(a)(3) Fits Within This Nation's Historical Tradition of Firearms Regulation

If the Second Amendment does apply, Section 922(a)(3) remains constitutional because it "is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130. Since the time of the founding, states have regulated how firearms and gunpowder can be traded and transported, particularly across state lines; Section 922(a)(3) is simply another example of this type of permissible regulation.

First and most notably, "colonial governments substantially controlled the firearms trade." *Teixeira v. County of Alameda*, 873 F.3d 670, 685 (9th Cir. 2017) (en banc); *see generally Bruen*, 142 S. Ct. at 2127 (noting significance of "American colonial views leading up to the founding").

At least two American colonies prohibited the sale of firearms outside jurisdictional bounds. "Connecticut banned the sale of firearms by its residents outside the colony." *Teixeira*, 873 F.3d at 685 (citing 1 Trumbull, *Public Records of the Colony of Connecticut*, 138-39, 145-46). And while Virginia law provided that all persons were at "'liberty to sell armes and ammunition to any of his majesties loyall subjects inhabiting *this colony*,'" this liberty "did not, however, extend to sales to others." *Id.* at 685 n.18 (quoting Laws of Va., Feb., 1676-77, Va. Stat. at Large, 2 William Waller Hening, *The Statutes at Large: Being a Collection of All the Laws of Virginia, from the First Session of the Legislature, in the Year 1619*, at 403 (1823)). In particular, "under Virginia law, any person found within an Indian town or more than three miles from an English plantation with arms or ammunition above and beyond what he would need for personal use would be guilty of the crime of selling arms to Indians, even if he was not actually bartering, selling, or otherwise engaging with the Indians." *Id.* at 685 (citing Acts of Assembly, Mar. 1676-77, 2 Hening, *supra* at 336-37). And at least six colonies made it a crime (with severe penalties) to sell or provide firearms or ammunition to Native Americans. *Id.* at 685 (citing 17th-century laws from Massachusetts, Connecticut, Maryland, and Virginia); *see also* 6 *Statutes at Large of Pennsylvania from 1682 to 1801*, at 319-320 (1899) (1763 law); *Laws and Ordinances of New Netherland, 1638-1674*, at 18-19 (1868) (1639 ordinance), 47 (1645 ordinance), 278 (1656 ordinance). Although not an exact analogy to Section 922(a)(3), these laws show that colonial legislatures were concerned about the movement of firearms between private parties and the dangers of firearms falling into the wrong hands.

Additionally, several states had laws restricting the import and sale of gunpowder, which "was essential to the operation of firearms at that time," meaning that gunpowder regulations "necessarily affected the ability of gun owners to use firearms for self-defense." *Miller v. Bonta*,

No. 3:19 Civ. 1537 (S.D. Cal. 2022) (Dkt. 137-3, at 22) (Declaration of Prof. Saul Cornell); *cf.*
*Bruen*, 142 S. Ct. at 2149 (citing article by Cornell). In 1795, Pennsylvania enacted a law requiring
gunpowder stored in the public magazine to be proved and marked and prohibiting importation,
transfer, or sale of any gunpowder that was not appropriately marked. 3 *Laws of the*
*Commonwealth of Pennsylvania, from the Fourteenth Day of October, One Thousand Seven*
*Hundred* 240-44 (1810). Similarly, Massachusetts and Connecticut prohibited the export of
gunpowder without a license. *See Colonial Laws of Massachusetts Reprinted from the Edition of*
*1672*, at 126 (1890) (1651 statute) ("no person . . . shall transport any Gun-powder out of this
Jurisdiction, without license first obtained from some two of the Magistrates"); 15 The Public
Records of the Colony of Connecticut 191 (1890) (1775 statute) (no "gun-powder made and
manufactured . . . shall be exported out of the [Colony] without . . . license"). The city of
Providence, meanwhile, prohibited the sale *within* Providence of gunpowder without a license—a
direct historical precedent for Section 922(a)(3)'s requirement that firearms from out-of-state be
sold through FFLs. *See The Charter and Ordinances of the City of Providence, with the General*
*Assembly Relating to the City* 37 (1835) (1821 law) (prohibiting selling gunpowder within the
town of Providence "without having a license therefor"). Providence's law was similar to
England's 1638 Gunmaker's Law and subsequent legislation, which required all firearms
manufactured domestically or imported to be inspected and approved by licensed entities of the
state. *See* James Whisker, *The Gunsmith's Trade* 68-69 (1992); *accord* Lois Schoewer, *Gun*
*Culture in Early Modern England* 4-25 (2016).

Although these statutes are not identical to Section 922(a)(3), they are "relevantly similar."
*Bruen*, 142 S. Ct. at 2132. *Bruen* made clear that the government need only identify a "historical
*analogue*, not a historical *twin*." *Id.* at 2133. The ultimate question is "whether modern and

14

historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* In this case, the answer is yes.

As explained above, Section 922(a)(3) imposes a minimal "burden on the right of armed self-defense" because firearms are readily available within New York through licensed dealerships and such firearms are just as effective for self-defense as illegally imported firearms. That burden is no greater than the burdens imposed by historical laws relating to the sale of firearms and gunpowder. And neither the historical laws nor Section 922(a)(3) deprived citizens of the use of firearms for self-defense. *See Decastro*, 682 F.3d at 168 (Section 922(a)(3) "does nothing to keep someone from purchasing a firearm in her home state, which is presumptively the most convenient place to buy anything.").

Section 922(a)(3) is also "comparably justified." *Bruen*, 142 S. Ct. at 2133. The historical regulations on commerce in firearms were designed to keep firearms out of the hands of those who might be dangerous, such as (in the view of legislators at the time) Native Americans. And the laws restricting sale of gunpowder without licenses were designed to protect citizens from explosions and render effective states' regulation of gunpowder manufacturers. Section 922(a)(3) serves similar purposes by preventing criminals from circumventing federal and state regulations on firearms purchases and firearms dealers. *See Mance*, 896 F.3d at 706 (noting Congress's conclusion that there was a "serious problem of individuals going across State lines to procure firearms which they could not lawfully obtain or possess in their own State," and these interstate purchases were accomplished "without the knowledge of . . . local authorities" (alteration in original) (quoting S. Rep. No. 89-1866, at 19 (1966))); *accord Decastro*, 682 F.3d at 168. Although Section 922(a)(3) does not reflect precisely the same legislative priorities as these historical

regulations, it nevertheless imposes a "comparable burden" that is "comparably justified." *Bruen*, 142 S. Ct. at 2133.

The Court should reject any suggestion that a closer historical analogue is required than those the Government has offered. Such an argument reflects the precise analytical error that the Supreme Court rejected in *Bruen*: "[A]nalogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.* That argument also effectively asks this Court not to "apply[ ] constitutional principles to novel modern conditions." *Id.* at 2134. But *Bruen* teaches that "the Second Amendment's historically fixed meaning applies to new circumstances," and thus the Second Amendment "can, and must, apply to circumstances beyond those the Founders specifically anticipated." *Id.* at 2132.

Section 922(a)(3) only minimally burdens the right to lawful armed self-defense, if at all, and thus does not implicate the Second Amendment. And even if it does, this minimal restriction compares favorably in both burden and justification to historical analogues regarding the sale and transport of firearms and gunpowder. Accordingly, Section 922(a)(3) is constitutional both as applied to Lucha and on its face.

## II.  The Court Should Deny Lucha's Motion to Suppress

On the evening of June 23, 2021, a 911 caller (the "Caller") reported that there was a man named Lucha carrying a gun in a blue bag, in the vicinity of Perry Avenue and 207th Street in the Bronx, New York. Within minutes, members of the NYPD (the "Officers") located Lucha and recovered the Canik from his blue bag, as well as a cellphone.

Lucha now seeks to suppress the Canik, the cellphone, and his post-arrest statements on the ground that the 911 call did not give rise to reasonable suspicion to support a *Terry* stop.

Because the undisputed facts captured by the recording of the 911 call, as well as a radio run and body-worn camera, show that the Officers had reasonable suspicion to believe that Lucha was unlawfully carrying a concealed firearm, the motion should be denied without a hearing. And in the event that the Court held a hearing, the anticipated testimony that an Officer observed a bulge consistent with a gun in Lucha's bag provides further reason that Lucha's motion should be denied.

### A.   Relevant Facts

On June 23, 2021, at approximately 9:52 p.m., the Caller called 911 to report "a man with a gun." Ex. A (911 Call) at 00:03. In response to questioning from the 911 dispatcher, the Caller—who identified herself as a former friend of the man—reported that the man's name was "Lucha," and that she "saw the gun." *Id.* at 00:45, 01:32. She said that Lucha hangs out outside her building, and that he has his gun with him "every day." She described Lucha as a 31-year-old, 5'2", Hispanic male with a medium-build and a mustache, wearing "a white shirt with black stripes on it, black pants, and a blue bag on his back and a black and white turban on his head." *Id.* at 00:02. The Caller narrated Lucha's movements, explaining to the dispatcher that Lucha was walking "down Gun Hill Road" with a gun in his blue purse-like bag, heading toward Perry Avenue. *Id.* at 00:22. She predicted that he would ultimately turn on 207th Street. *Id.* at 01:26. At the conclusion of the call, the dispatcher asked the Caller to provide her name. She declined. *Id.* at 03:12. The dispatcher then asked the Caller for her phone number. The Caller responded, "don't you already have it," and then proceeded to give her full phone number. *Id.* at 03:15.

As she was talking to the Caller, the dispatcher reported on a radio run to the Officers that there was a "male with a firearm" at "East Gun Hill Road and Perry." Ex. B (Radio Run) at 00:12. As she learned more from the Caller, the dispatcher relayed additional information, including that the man goes by the name "Lucha," *id.* 00:34, that he was "Hispanic wearing a . . . white shirt with black stripes, black and white turban, has a mustache, wearing black and white sneakers, medium

build, 5'2", light skin," and that he was "turning on Perry towards . . . 207th Street." *Id.* at 02:08-02:22.

About four minutes after the 911 call, two of the Officers ("Officer-1" and "Officer-2") encountered a man dressed exactly as described by the Caller, wearing a blue crossbody bag, standing exactly where the Caller had predicted—at the southwest corner of Perry Avenue and East Gun Hill Road. Ex. C (Officer-1 Body-Worn Camera) at 01:01.

The Government expects that at a hearing, Officer-1 would testify that, as he approached the individual, he observed that the bag appeared heavy and had a bulge in it. As captured on his body-worn camera, Officer-1 performed a pat-down of the bag, while Officer-2 grabbed and held Lucha's arm for approximately five seconds. *Id.* at 1:06. The Government expects that Officer-1 would testify that, during the pat-down, he felt a hard L-shaped object which he believed to be a gun. Officer-1 signaled his suspicion to Officer-2 by saying "92," indicating that he felt a firearm. *Id.* at 01:11. Officer-2 then placed Lucha in handcuffs while Officer-1 removed the bag from Lucha's person. While Officer-1 was removing the bag, Lucha stated, "That's my arm . . . it's my constitutional right to carry." *Id.* at 01:25-01:33. Officer-1 looked inside using a flashlight and saw the Canik. *Id.* at 02:12. Officer-2 asked Lucha if he had a permit for the gun, to which he responded that he did not "need a permit" to carry a gun. *Id.* at 02:16. Lucha then confirmed to the Officers that his name was "Lucha El." *Id.* at 02:23.

While Officer-1 and -2 were interacting with Lucha, other Officers brought the Caller to the scene where, at approximately 10:06 p.m., she confirmed that Lucha was the man whom she had seen with a gun. *Id.* at 10:17. Officer-2 then placed Lucha under arrest.

### B.    Legal Standard

Lucha's motion to suppress is governed by the familiar standard of *Terry v. Ohio*, 392 U.S. 1 (1968). "To conduct a *Terry* stop—that is, a temporary detention of an individual—a police

officer must have reasonable suspicion that the individual has engaged in or is about to engage in criminal activity." *United States v. Hawkins*, 37 F.4th 854, 857 (2d Cir. 2022). "To support an accompanying frisk for weapons, the officer must also have reasonable suspicion that the person subjected to the frisk is armed and dangerous." *Dancy v. McGinley*, 843 F.3d 93, 107 (2d Cir. 2016).

"The reasonable suspicion standard is not high." *United States v. Weaver*, 9 F.4th 129, 140 (2d Cir. 2021) (en banc). It is a standard that requires "only facts sufficient to give rise to a reasonable suspicion that criminal activity *may* be afoot and that the person stopped *may* be armed and presently dangerous." *United States v. Bailey*, 743 F.3d 322, 332 (2d Cir. 2014) (first emphasis added). Although reasonable suspicion must be supported by more than a "hunch," the standard is "considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *Navarette v. California*, 572 U.S. 393, 397 (2014). While officers may rely on information provided by others—including informants—in finding reasonable suspicion to effect a stop, that information must bear indicia of reliability. *See id.* at 396-97 (evaluating reliability of 911 calls); *Alabama v. White*, 496 U.S. 325, 330-31 (1990) (evaluating information provided by anonymous tipster).

"In determining whether an officer has an objective basis for his conduct, the Court must view the totality of the circumstances through the eyes of a reasonable and cautious officer on the scene," with a recognition that "officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." *Weaver*, 9 F.4th at 140–41; *see also United States v. Cortez*, 449 U.S. 411, 418 (1981) ("[T]he assessment must be based [not] upon . . . library analysis by scholars, but as understood by those versed in the field of law enforcement."). "When an officer is justified in believing that the individual whose suspicious

behavior he is investigating at close range is armed and presently dangerous to the officer or to others," the officer is authorized "to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm." *Terry*, 392 U.S. at 24.

### C.     There Was Reasonable Suspicion to Support the *Terry* Stop

Because the Officers had reasonable suspicion to stop Lucha based upon the content and reliability of the 911 call, a hearing is unnecessary. If the Court holds a hearing, the Officers' personal observations, including seeing a bulge in Lucha's bag, further show that there was reasonable suspicion to justify the stop.

### 1.     The 911 Call Was Reliable and Justified the Stop

Although "an anonymous tip *alone* seldom demonstrates the informant's basis of knowledge or veracity," it is possible for a tip to demonstrate "sufficient indicia of reliability to provide reasonable suspicion to make an investigatory stop." *White*, 496 U.S. at 327, 329. A tip received through a 911 call may bear such sufficient indicia of reliability where (i) the caller demonstrates a personal basis of knowledge, (ii) the caller's report is contemporaneous with the caller's observations, and (iii) the caller's uses a formal 911 system with tracing and recording capabilities that will act as a deterrent to false tipsters. *See Navarette,* 572 U.S. at 398-401; *accord United States v. Twiss*, 758 F. App'x 127, 129 (2d Cir. 2018). The Caller's tip, which had all of these characteristics, was reliable and provided reasonable suspicion that Lucha was engaged in criminal activity.

*First*, the Caller was an eyewitness. *See Navarette*, 572 U.S. at 399 (finding anonymous tip reliable where "the caller necessarily claimed eyewitness knowledge"). She not only reported that a man "had a gun," but she also explained *how* she knew this: she "saw the gun." She used to be friends with the 31-year-old named Lucha, and as a result, she knew that he carried the gun "every day." This is not a case—such as *United States v. Freeman*, 735 F.3d 92 (2d Cir. 2013), on

which Lucha relies—"where the tip provided no basis for concluding that the tipster had actually seen the gun." *Navarette*, 572 U.S. at 399 (distinguishing *Florida v. J.L.*, 429 U.S. 266, 271 (2000), in which a "bare-bones tip" reported that a young black male in a plaid shirt standing at a bus stop had a gun); *see also Freeman*, 735 F.3d at 94 (explaining that 911 dispatcher was unable to confirm whether caller "actually saw a firearm").

*Second*, the Caller called 911 at the time she saw Lucha with the gun. *See Navarette*, 572 U.S. at 399 (finding anonymous tip reliable where "the caller reported the incident soon after" it occurred). She explained that the gun was inside his blue, "purse-like" bag and that she was "watching" him. She described what he was wearing and provided updates on where she saw him walking (down East Gun Hill Road to Perry Avenue) and where she expected him to go (to 207th Street). *See White*, 496 U.S. at 332 (finding anonymous tip reliable where caller predicted defendant's "*future behavior*, because it demonstrated inside information—a special familiarity with [the defendant's] affairs"). The Officers encountered Lucha shortly thereafter dressed exactly as had been reported and in the expected location.

*Third*, the 911 call was recorded and could be traced—a fact the Caller acknowledged. As the Supreme Court explained in *Navarette*, "use of the 911 emergency system" is an "indicator of veracity" because "[a] 911 call has some features that allow for identifying and tracing callers, and thus provide some safeguards against making false reports with immunity." 572 U.S. at 400. Further, the Caller appeared to *know* that her call could be traced. While she declined to provide her name to the dispatcher, she reacted with incredulity at the dispatcher's request for her phone number, stating, "don't you have it already," before providing her phone number in full.

This case is different from *Freeman*, a case on which Lucha relies extensively and which the Second Circuit decided before *Navarette*. In *Freeman*, "'nothing [was] known about the

informant,'" and there was "no way of knowing whether the consequences for false reporting at all influenced [the] caller to tell the truth." 35 F.3d at 98 (quoting *J.L.*, 529 U.S. at 268). On top of that, the Second Circuit was concerned that, throughout the case, the caller's identity was "still unknown, leaving no way for the police (or the reviewing court) to determine her credibility or reputation for honesty." *Id.* None of those potentially concerning circumstances are present here. The Caller stated that she was Lucha's friend and provided her phone number. And, although it occurred minutes after the stop, the Officers brought the Caller to the scene to identify Lucha.

Assessing the totality of the circumstances, the 911 call is reliable and provides reasonable suspicion that Lucha was involved in criminal activity that required prompt police action. *See Terry*, 392 U.S. at 24, *United States v. Bold*, 19 F.3d 99, 104 (2d Cir. 1994) ("Where the tip concerns an individual with a gun, the totality-of-the-circumstances test . . . should include consideration of the possibility of the possession of a gun, and the government's need for a prompt investigation.").

Lucha argues that his conduct—carrying a concealed firearm on a public street—is "not necessarily unlawful." Def. Mot. at 20. But that is not the relevant question. The low bar of reasonable suspicion "need not rule out the possibility of innocent conduct." *United States v. Arvizu*, 534 U.S. 266, 277 (2002). That is, just because it was possible that Lucha may have been —but was not—one of the few residents of New York City with a permit to carry a concealed firearm outside his home or business, the Officers were not required to ignore the likelihood that Lucha's possession was unlawful. Nor were the officers required to eliminate any possibility of "innocent conduct" before responding to the exigency created by a 911 call reporting a man with a gun wandering a public street at 10 p.m. As a result, Lucha's motion should be denied without a hearing.

22

## 2.     The Officer's Personal Observations Justified the Stop

Even if the Caller's tip alone was insufficient to support the stop, the Officers' observations provided sufficient grounds for a *Terry* stop. The Government anticipates that, at a hearing, Officer-1 would testify that shortly after the 911 call was made, he approached Lucha—a man matching the Caller's reported description and location—and observed that the bag he was wearing was heavily weighted and bore a bulge. Based on his training and experience, Officer-1 believed that the bag may have contained a firearm. Courts have repeatedly held that "an anonymous tip about a gun that has been corroborated by police observation of a bulge" gives rise to reasonable suspicion sufficient to justify a *Terry* stop. *United States v. Gonzalez*, 111 F. Supp. 3d 416, 429 (S.D.N.Y. 2015); *see also id.* at 429-30 (collecting cases). Therefore, if the Court does not find that the 911 call alone justified the stop, it should hold a hearing.

**CONCLUSION**

For the foregoing reasons, Lucha's motion to dismiss the indictment against him and his

motion to suppress should be denied.


Dated: New York, New York
       February 28, 2023

                              Respectfully submitted,

                              DAMIAN WILLIAMS
                              United States Attorney for the
                              Southern District of New York


                   By:     /s/
                              Ashley C. Nicolas
                              Madison Reddick Smyser
                              Lucas Issacharoff
                              Assistant United States Attorneys
                              (212) 637-2467 / 2381 / 2737

24