UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------- x
:
:
:
**UNITED STATES OF AMERICA**       :
:         22 Cr. 644    (JSR)
- v -                              :
:
**LUCHA EL POR LIBERTAD**,         :
:
              Defendant.   :
:
------------------------------------------------------- :
x

## REPLY TO THE GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT LUCHA EL'S PRETRIAL MOTIONS

      **DAVID E. PATTON, ESQ.**
      Federal Defenders of New York, Inc.
      Attorney for Defendant
      **LUCHA EL POR LIBERTAD**
      52 Duane Street - 10th Floor
      New York, New York 10007
      Tel.: (212) 417-8735

      **ZAWADI BAHARANYI**
      **AMANDA MAYO**
      <u>Of Counsel</u>

TO:  **DAMIAN WILLIAMS, ESQ**.
      United States Attorney Southern
      District of New York One. St.
      Andrew's Plaza
      New York, New York 10007
      Attn:  **ASHLEY NICOLAS, ESQ.**
           **MADISON REDDICK SMYSER ESQ.**
           **LUCAS ISSACHAROFF ESQ.**
      Assistant United States Attorneys

# TABLE OF AUTHORITIES

**Cases**

District of Columbia v. Heller, 554 U.S. 570 (2008) ........................................................................ 3

Florida v. J.L., 529 U.S. 266 (2000) ........................................................................... 10, 11, 12

New York State Rifle & Pistol Ass'n, Inc. v. Bruen, 142 S. Ct. 2111 (2022) ....................... *passim*

Pinner v. State, 74 N.E. 3d 226 (Ind. 2016) .................................................................... 11

United States v. Decastro, 682 F.3d 160 (2d Cir. 2012) ................................................... 2

United States v. Flores, 2023 WL 361868 (S.D. Tex. Jan. 23, 2023) .............................. 4

United States v. Freeman, 735 F. 3d 92 (2d Cir. 2013) ................................................. 10

United States v. Gonzalez, 2022 WL 17583769 (D. Utah Dec. 12, 2022) ....................... 4

United States v. King, 2022 WL 17668454 (E.D. Pa. Dec. 14, 2022) ............................. 4

United States v. Price, 2022 WL 6968457 (S.D.W. Va. Oct. 12, 2022) .......................... 5

United States v. Twiss, 758 F. App'x 127 (2d Cir. 2018) ........................................ 11, 12

**Statutes**

18 U.S.C. § 922 .............................................................................................................. *passim*

**Other Authorities**

Shawn E. Fields, Stop and Frisk in a Concealed Carry World,
   93 Wash. L. Rev. 1675 (2018) .................................................................................. 11

Lucha El respectfully submits this reply memorandum of law in response to the government's opposition to his motion to dismiss and motion to suppress. For the reasons stated herein and in Mr. Lucha's moving papers, this Court should dismiss the indictment, as it violates Mr. Lucha's Second Amendment right to bear arms. Separately, this Court must suppress the firearm and cellphone taken from Mr. Lucha's person at the time of his June 2021 arrest, as well as any statements following his arrest, as they were obtained in violation of Mr. Lucha's Fourth Amendment rights.

### Reply to the Motion to Dismiss the Indictment

In New York State Rifle & Pistol Ass'n, Inc. v. Bruen, 142 S. Ct. 2111 (2022), the Supreme Court announced a new framework for resolving Second Amendment challenges. Rejecting the approach lower courts had used for years, which involved balancing an individual's right to bear arms against the government's interest in gun regulation, the Supreme Court's new test required the government to prove that a challenged gun regulation is "consistent with this Nation's historical tradition of firearm regulation." Id. at 2126–29. Under this new test, the constitutional text and history became the *only* relevant considerations. As a result, the Court's decision in Bruen called into question the validity of all prior Second Amendment decisions that did not include a detailed historical analysis.

Mr. Lucha moved to dismiss the indictment in this case, arguing that 18 U.S.C. § 922(a)(3)—which prohibits an individual from possessing a firearm obtained from out of state—is unconstitutional. In its response, the government—which bears the burden of proving a national historical tradition of this form of regulation—does not cite a single founding-era law barring people from possessing guns based on the origin of the guns. Nor does it identify even one instance when a person in the founding era was specifically denied the right to possess a gun

1

based on where the gun was obtained. Instead, the government obfuscates the requirements of the Bruen test, relies almost entirely on pre-Bruen, abrogated Second Circuit law, and cites a series of laws that not only fail to be "distinctly similar" but are racist in their origin and application and cannot be the standard on which the Court upholds § 922(a)(3).

The government falls far short of establishing a historical tradition of laws preventing law-abiding citizens from possessing handguns obtained in other states. Accordingly, the Court should dismiss the indictment.

## I. The Second Amendment clearly covers Mr. Lucha's alleged conduct.

The government repeatedly characterizes the burden imposed on Mr. Lucha's Second Amendment rights by § 922(a)(3)'s application to his alleged conduct as "minimal" or merely a "de minimis" one. (Opp. 5, 9, 10, 15, 16.) In doing so, the government draws extensively on the Second Circuit's analysis in United States v. Decastro which, applying means-end scrutiny, rejected a constitutional challenge to § 922(a)(3). 682 F.3d 160, 168 (2d Cir. 2012). (See, e.g., Opp. 9 (arguing that § 922(a)(3) "'only minimally affects the ability to acquire a firearm'" (quoting Decastro, 682 F.3d at 164)).) But the government's reliance on Decastro is wrong because in Bruen, the Supreme Court abrogated Decastro along with every other circuit court decision engaging in means-end scrutiny rather than textual and historical analysis.

Decastro took three primary steps in its reasoning: (1) Heightened scrutiny is only appropriate for laws that substantially burden Second Amendment rights, and otherwise, means-end scrutiny is required; (2) because § 922(a)(3) does not substantially burden Second Amendment rights, means-end scrutiny is appropriate to evaluate the law; and (3) under means-end scrutiny, § 922(a)(3) survives because there is a reasonable basis for the law. 682 F.3d at 164, 168–69. But the Supreme Court has made clear that the fundamental basis for Decastro—reserving heightened

scrutiny for laws that substantially burden Second Amendment rights and employing "means-end analysis" for evaluating all other firearm laws—has been abrogated. Under Bruen, all laws that fall under the umbrella of the Second Amendment's plain text are subject to equivalent historical inspection, regardless of how substantially they impinge on Second Amendment rights. The Court's *only* inquiries are (1) whether the text of the Second Amendment covers the conduct in question, and (2) whether there is historical precedent for the regulation at issue. 142 S. Ct. at 2129–30. Decastro undertakes neither of these questions, neglecting to discuss in serious detail the text of the Second Amendment, and ignores entirely the lack of historical precedent for § 922(a)(3). It has therefore lost its entire legal foundation and accordingly, like the other pre-Bruen cases cited by the government, is no longer instructive.

Under the test that the Supreme Court laid out in Bruen, the relevant question is not whether there is a "minimal" or "de minimis burden" on Mr. Lucha but whether "the Second Amendment's plain text covers" his conduct. Bruen, 142 S. Ct. at 2129–30. The answer here is unequivocally yes.

The government does not dispute that (1) Mr. Lucha is among "the people" protected by the Second Amendment, District of Columbia v. Heller, 554 U.S. 570, 580 (2008), or (2) the firearms at issue are handguns, the type of "arm" to which the Second Amendment straightforwardly applies, id. at 628. And the conduct for which Mr. Lucha was arrested is his *possession* of handguns that had allegedly been purchased outside of New York when he "receive[d]" them in the state. 18 U.S.C. § 922(a)(3). The government's brief makes clear that Mr. Lucha's possession of these handguns is the exact conduct it seeks to criminalize, noting that it intends to introduce at trial "evidence of at least two occasions on which [Mr.] Lucha possessed guns bought by Vereen in South Carolina." (Opp. at 3.) The Supreme Court had "little difficulty

3

concluding" that "carrying handguns publicly for self-defense" is protected by the Second Amendment, Bruen, 142 S. Ct. at 2134, and that conclusion squarely applies here as well. Thus, Mr. Lucha's alleged conduct is "presumptively protect[ed]" by the Constitution. Id. at 2130.

The government provides two arguments for why Mr. Lucha's Second Amendment rights are not implicated by § 922(a)(3), both of which are easily dispatched. First, the government argues that § 922(a)(3) is a "condition" on the "commercial sale of arms," which does not fall within the protections of the Second Amendment. (Opp. at 9.) But Mr. Lucha is not being prosecuted for commercially selling firearms or firearms trafficking, regulated by different sections of § 922. As such, the government's reliance on post-Bruen case law (Opp. 11) upholding regulations of firearm licensing regimes is misplaced. In United States v. Flores, for example, the defendant was charged with dealing firearms without a license in violation of § 922(a)(1)(A); he moved to dismiss the indictment, arguing that he had "a Second Amendment right to commercially sell firearms." 2023 WL 361868, at *1 (S.D. Tex. Jan. 23, 2023). The court rejected this argument, holding that "commercial firearm dealing is not covered by the Second Amendment's plain text" while affirming that "[p]ossessing a firearm is protected conduct." Id. at *5; see also United States v. King, 2022 WL 17668454, at *3 (E.D. Pa. Dec. 14, 2022) (rejecting argument that "buying and selling firearms" is protected by the Second Amendment's plain text); United States v. Gonzalez, 2022 WL 17583769, at *2 (D. Utah Dec. 12, 2022) (rejecting motion to dismiss indictment for transfer of firearms without a license; defendant "put forth no arguments to demonstrate how the charged counts regulate or restrict . . . [his] ability to possess firearms for self-defense"). Mr. Lucha is charged with violating § 922(a)(3) for allegedly *possessing* firearms that were purchased in another state, placing his conduct squarely within the well-recognized ambit of the Second Amendment's plain text.

4

The government also cites to caselaw upholding § 922(k)'s prohibition on transporting firearms with removed, obliterated, or altered serial numbers. (Opp. at 11 (citing United States v. Tita, 2022 WL 17850250 (D. Md. Dec. 22, 2022); United States v. Reyna, 2022 WL 17714376 (N.D. Ind. Dec. 15, 2022); United States v. Holton, 2022 WL 16701935 (N.D. Tex. Nov. 3, 2022)).) Yet a split in authority on this provision has emerged and, as another district court has recently held, § 922(k) "is not a commercial regulation" but "criminalizes the mere *possession* of a firearm after a serial number is removed, obliterated, or altered." United States v. Price, 2022 WL 6968457, at *3 (S.D.W. Va. Oct. 12, 2022). As the court in Price noted in holding that § 922(k) prohibits conduct "fall[ing] squarely within the Second Amendment's plain text," when a "law-abiding citizen" can be "prosecuted federally for his possession" of a firearm, that is "the definition of an infringement on one's right to possess a firearm." Id. The same is true here: Mr. Lucha's federal prosecution for the mere possession of a firearm allegedly purchased in another state falls directly within the realm of what the Second Amendment protects.

Second, the government's argument that "firearms purchased from out of state through illegitimate channels are 'not typically possessed by law-abiding citizens for lawful purposes'" (Opp. at 11 (citation omitted)), is beside the point. Section 922(a)(3) criminalizes the receipt, and therefore the possession, of any firearm obtained from another state, for any purpose (even self-defense). While it might be socially desirable to limit the receipt of out-of-state firearms because of their potential use in criminal activity, "the Supreme Court no longer permits such an analysis." Price, 2022 WL 6968457, at *3–4 (noting that § 922(k) criminalizes possession of firearms with obliterated serial numbers even if the possessor "has no ill intent and never takes any otherwise unlawful action with the firearm").

Thus, Mr. Lucha's alleged conduct of possession of a handgun received from out of state

is plainly covered by the Second Amendment's text, and it is "presumptively protect[ed]" by the Constitution unless the government can justify its regulation as consistent with the "historical tradition of firearm regulation." Bruen, 142 S. Ct. at 2129–30. The government has failed to do so.

## II. The government fails to understand the *Bruen* historical analysis test.

In its opposition, the government insists that it is not required to identify a "historical twin" for § 922(a)(3), but merely a "historical analogue." (Opp. 14.) Indeed, the government goes so far as to instruct the Court to "reject any suggestion that a closer historical analogue is required than those the Government has offered." (Id. at 16.) The government mischaracterizes—or simply misunderstands—the Bruen test and now asks the Court to do the same.

In Bruen, the Supreme Court established two different analytical frameworks for courts to use when evaluating Second Amendment challenges. The determination of which framework applies depends on the nature of the problem the challenged gun regulation was designed to address:

1. When analyzing a gun regulation directed at "a general societal problem that has persisted since the 18th century," courts must engage in a "straightforward historical inquiry," and the government must identify a tradition of "distinctly similar" founding-era regulations. Bruen, 142 S. Ct. at 2131–32.

2. By contrast, when analyzing gun regulations directed at "unprecedented societal concerns or dramatic technological changes"—that is, laws directed at problems that the Founders could not have anticipated—courts may engage in a "more nuanced" form of "analogical reasoning," and the government need only "identify a well-established and representative historical *analogue*, not a historical twin." Id. at 2132–33.

Put differently, Bruen endorsed "analogical reasoning," but only for "modern regulations that were unimaginable at the founding." Id. at 2132. When instead a regulation is one "that the Founders themselves could have adopted to confront [a] problem," the government must prove that founding-era legislatures actually did so. See id. at 2131.

Here, the Government makes no claim that the issue of people receiving and possessing firearms from outside of their jurisdictions was unimaginable at the founding. Instead, the government chooses to ignore Bruen's two-part framework and crafts its own test under which analogical reasoning *always* applies.

Notably, the Government's response, while heavily quoting Bruen's language about analogical reasoning, makes no mention of Bruen's test for "general societal problems that [have] persisted since the 18th century." Id. at 2131–32. The Government does not acknowledge that the Court must conduct a "straightforward historical inquiry," id. at 2131, and fails to address any of the three factors Bruen specifically identified as relevant to determining the constitutionality of a modern regulation directed at a longstanding societal problem: (1) "the lack of a distinctly similar historical regulation," (2) earlier generations' attempts to regulate the conduct at issue "by materially different means," or (3) the *rejection* (not passage) of "analogous regulations" at the time of the founding. Id. Indeed, reading the Government's response, one would be led to believe that that core portion of Bruen's holding did not even exist.

Unfortunately for the Government, merely ignoring half of the Bruen test—the relevant half in this case, no less—does not make it inapplicable. In sum, a straightforward reading of Bruen demonstrates that, when confronted with a modern gun regulation addressing a longstanding societal concern, the government cannot sustain its burden merely by identifying relevant historical analogues. Rather, the government must identify a tradition of distinctly similar founding-era

7

laws. Applying the test actually enunciated in <u>Bruen</u> here, the Government fails to meet its burden with regard to § 922(a)(3).

### III. The government has failed to meet its burden of establishing that § 922(a)(3) is consistent with the nation's historical tradition of firearm regulation.

In attempting to meet its burden of establishing that § 922(a)(3) is consistent with a national historical tradition of firearm regulation, the government does not cite a single founding-era statute specifically barring people from possessing a firearm merely because the firearm was obtained out of state. The limited examples proffered by the government focus on the commercial sales of firearms and fail to establish a historical tradition of individuals being prohibited from possessing or using a firearm for self-defense (or other noncommercial purposes) because of the origin of the firearm.

The colonial-era examples provided by the government focus solely on regulations governing the commercial sale of firearms. (Opp. 12–13.) However, that "at least two American colonies prohibited the sale of firearms outside of jurisdictional bounds," and that the sale of firearms to Native Americans was criminalized by several colonies, fails to justify the government's attempt to regulate Mr. Lucha's possession of a firearm. The limited examples are inapposite here because, as discussed above, Mr. Lucha is not charged with the commercial sale of firearms or firearm trafficking. Rather § 922(a)(3) prohibits Mr. Lucha from possessing firearms—even for the purpose of personal self-defense—obtained from out of state. And no colony prohibited an individual from possessing a firearm for self-defense or any other non-commercial purpose merely because that firearm was obtained from another colony or jurisdiction.

Finally, the government writes that laws prohibiting the sale of firearms to Native Americans demonstrate that colonial legislatures were "concerned about the movement of

firearms between private parties and the dangers of firearms falling into the wrong hands." (Opp. 13.) It is shocking that the government chooses to cite to a narrow set of colonial era laws that not only fail to be "distinctly similar" to the regulation in question but are unquestionably racist. Bruen does not call on courts to rely on *any* historical tradition of firearm regulation. Otherwise African Americans, Native Americans, and other disfavored groups being routinely deprived of all rights under the Second Amendment because of racist beliefs about their dangerousness and worthiness would provide a basis for Courts to entirely gut Second Amendment protections for all.

      The government has failed to identify a pattern of "distinctly similar" founding-era regulations making it illegal for an individual to possess a firearm because it was obtained from out of state, and therefore it has failed to meet its burden of establishing the constitutionality of § 922(a)(3) as applied to Mr. Lucha and on its face. The Court must therefore dismiss the indictment against Mr. Lucha.

**Reply to the Motion to Suppress**

I. **The anonymous tip was not reliable in its assertion of illegality.**

The government argues that the NYPD had reasonable suspicion to stop Mr. Lucha based on a single tip from an anonymous caller alleging that Mr. Lucha was in possession of a firearm. However, while the tip in question was reliable in its "tendency to identify a determinate person"—here Mr. Lucha—the tip failed to reliably assert illegality, and therefore did not provide grounds for police to stop Mr. Lucha. See United States v. Freeman, 735 F. 3d 92 (2d Cir. 2013).

While the government is correct that the anonymous tipster called 911 while observing Mr. Lucha and accurately reported his physical appearance and public location to the 911 dispatcher, this means little in terms of the reliability of the tip. The caller failed to provide accurate predictive information for Mr. Lucha. When the dispatcher asked the anonymous caller if she knew where Mr. Lucha was headed, the caller responded unequivocally, "I don't know where he's headed." Def. Ex. B at 2:20–2:27.

In Florida v. J.L., 529 U.S. 266, 272 (2000), the Supreme Court made clear that anonymous tips like this one—reporting on a suspect's "readily observable location and appearance"—fail to cross the reliability threshold. Id. Such details bear only on the reliability of the caller's identification of a particular person but fail to show that the tipster "has knowledge of concealed criminal activity." Id. These tips are unreliable in their assertion of illegality. Id. To the extent that the caller attempted to predict Mr. Lucha's movements by stating that he would "turn on 207 street"— she was wrong. Def. Ex. B at 2:07. Mr. Lucha was stopped while standing on Perry Avenue in front of his home. The anonymous caller's failure to accurately predict Mr. Lucha's movement is further proof that her tip was not sufficiently reliable to justify a Terry stop.

Furthermore, while the anonymous caller *claimed* to have seen the firearm in Mr. Lucha's

possession, she failed to provide any information that would establish that she had actually seen a gun. For example, the caller did not offer any details about the appearance of the gun, where she had seen the gun, or the circumstances of seeing the gun. Nor did police seek this information prior to stopping Mr. Lucha. Upholding this Terry stop based on the bare-boned tip by the anonymous caller would encourage the type of harassment that the Court in J.L. specifically warned against. See id. at 272 ("[A]n automatic firearm exception to our established reliability analysis would…enable any person seeking to harass another to set in motion an intrusive, embarrassing police search of the targeted person simply by placing an anonymous call falsely reporting the target's unlawful carriage of a gun.").

Finally, the caller's tip that Mr. Lucha "had a gun" failed to actually allege any illegal conduct justifying a Terry stop. New York, like every other state in the Union, provides grounds for individuals to lawfully carry concealed weapons.[1] In New York City, there are at least seven different licenses and permits that allow an individual to legally possess a firearm.[2] Moreover, in the world post-Heller, states have grown increasingly permissive in their gun possession laws. The allegation of mere possession of a firearm, in a state where concealed carry is permissible, is therefore not by itself sufficient to justify a Terry stop. See Pinner v. State, 74 N.E. 3d 226, 232 (Ind. 2016) (Indiana Supreme Court held that tip that defendant was in possession of a firearm did not justify a Terry stop as officers had no reason to believe the possession of the firearm was in violation of state law).

United States v. Twiss, 758 F. App'x 127 (2d Cir. 2018), a post-Heller case cited by the

---

[1] Shawn E. Fields, Stop and Frisk in a Concealed Carry World, 93 Wash. L. Rev. 1675 (2018). Available at: https://scholarship.law.campbell.edu/fac_sw/154 ("[A]s of 2015, every state and the District of Columbia allows the public concealed carry of firearms.")
[2] New York Handgun Application, available at: https://licensing.nypdonline.org/new-app-instruction/ (listing seven different license and permit types in New York City).

government, provides an example of the type of circumstances involving a firearm that would give rise to reasonable suspicion to conduct a Terry stop. In Twiss, the Second Circuit held that a stop was reasonable based on an anonymous tip that that the defendant and three others had confronted the callers in a hospital parking lot and displayed a firearm. Id. at 128. The callers drove away in fear following this confrontation. Id. at 129. The Court found that the confrontation and brandishing of a firearm, not merely the possession of a firearm, were sufficient to give rise to reasonable suspicion that criminal activity was afoot. "The tip gave rise to reasonable suspicion of ongoing criminal activity: menacing in the second degree… police thus had reason to believe that the suspects had 'intentionally place[d] or attempt[ed] to place' the callers 'in reasonable fear of physical injury ... by displaying a deadly weapon. N.Y. Penal Law § 120.14(1).'" Id. at 129.

Here, unlike in Twiss, the anonymous caller did not report that Mr. Lucha was involved in any assaultive or threatening conduct. She did not allege that Lucha had brandished or displayed a gun in public. She made no claim that Mr. Lucha was prohibited from possessing a firearm. The tip was merely the assertion that Mr. Lucha "had a gun" which is not sufficient to establish that he was or was about to be engaged in criminal activity justifying a stop. While the police need not rule out innocent conduct before performing a Terry stop, when acting on a tip there must at least be the assertion of some criminal conduct to justify the police intrusion, even where a firearm may be involved. There is no firearm exception to the requirement that there be reasonable articulable suspicion that *crime* is afoot. See J.L., 529 U.S. at 272 (rejecting a firearm exception to the Court's "reliability analysis" in anonymous tip cases.)

The anonymous caller's tip did not provide a sufficient basis for police to stop Mr. Lucha and the government's proffer that Officer-1 would testify to observing a bulge in Mr. Lucha's bag does not tip the scales towards justifying the seizure. NYPD officers had no reason to believe

that Mr. Lucha was unlawfully in possession of a firearm or otherwise engaged in criminal activity at the moment that they physically restrained him. However, to the extent that the Court wishes to consider Officer-1's proffered observations, the defense requests an evidentiary hearing.

## Conclusion

The Court should grant Mr. Lucha's motion to dismiss because Mr. Lucha's prosecution violates the Second Amendment. Additionally, the Court should grant Mr. Lucha's motion to suppress the physical and testimonial evidence obtained through a violation of Mr. Lucha's Fourth Amendment rights.

Dated: March 6, 2023         Respectfully submitted,
       New York, New York

                                     /s/
                             _____

                             Zawadi Baharanyi, Esq.
                             Amanda Mayo, Esq.
                             Federal Defenders of New York
                             52 Duane Street, 10th Floor
                             New York, NY 10038
                             (917) 612-2753