```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

            v.                            22 CR 644(JSR)

STEVEN PEREZ, a/k/a LUCHA EL,

            Defendant.

------------------------------x
                                          New York, N.Y.
                                          February 15, 2023
                                          2:35 p.m.
Before:

                    HON. JED S. RAKOFF,

                                          District Judge

                         APPEARANCES


DAMIAN WILLIAMS,
     United States Attorney for the
     Southern District of New York
BY:  ASHLEY CAROLYN NICOLAS
     MADISON SMYSER
     Assistant United States Attorneys

DAVID PATTON
FEDERAL DEFENDERS OF NEW YORK, INC.
     Attorney for Defendant
BY:  ZAWADI S. BAHARANYI


Also Present:  COURTNEY DEFEO, Pretrial Services
```

1           (Case called)
2           MS. NICOLAS:  Good afternoon, your Honor.  Assistant
3   United States Attorneys Ashley Nicolas and Madison Smyser.
4   We're also joined by pretrial services officer, Courtney Defeo.
5           THE COURT:  Good afternoon.
6           MS. BAHARANYI:  Good afternoon, your Honor.
7   Zawadi Baharanyi with the Federal Defenders Office on behalf of
8   Lucha El, who's seated to my right.
9           THE COURT:  Good afternoon.
10          All right.  So my understanding is that defense
11  counsel seeks a further modification of bail.
12          MS. BAHARANYI:  I do, your Honor.  Currently -- may I,
13  your Honor?
14          THE COURT:  Yes, please.
15          MS. BAHARANYI:  Currently, Mr. Lucha El is on home
16  confinement.  He has been now since December 7th when he was
17  first arrested.  Those conditions, your Honor, were imposed by
18  Magistrate Judge Figueredo.  I think since over the past two
19  months, two and a half months of his compliance with no issues,
20  I think we've shown that those are no longer the least
21  restrictive conditions — for him to continue to be subject to
22  home confinement, placement in his home for 24 hours a day,
23  except for whatever permission may be given for him to leave
24  his home for pretrial.
25          That, your Honor, is too far, too excessive especially

given the Bail Reform Acts limiting principle that the Court should only impose or maintain the least restrictive conditions for someone to ensure that they don't impose a danger to the community and to reasonably assure that they show up in court again.

Your Honor, I put some of this information in my letter to the Court, but I'd like to highlight some of the background factors here about Lucha that I think are pertinent. He's someone who has a single misdemeanor conviction in his entire history. And that's for a misdemeanor drug possession from 2014. There's no other criminal history, there's no other criminal convictions, no violence, no assaults. And even in this case he's charged in, your Honor, there's no allegation of assaultive conduct, a violent conduct. There are no victims, no children involved. Not the sort of circumstances where you might expect someone to be placed, if they were to be released from jail, to be placed on such strict conditions and all-encompassing conditions. Mr. Lucha is here facing his first -- one moment, your Honor.

(Defendant and counsel confer)

MS. BAHARANYI: Mr. El, which is his preferred name, Your Honor, Mr. El is here and as he's reminded me, there's been no allegation of witness intimidation, any contact with the codefendants in this case. He's been fully compliant. His history shows he's not a danger, and there's certainly no

indication he's a flight risk.  I think the Court has seen that he's quite eager to participate in his case, participate in his defense and be heard here, nothing to suggest that such stringent, strict conditions are necessary to reasonably assure his appearance in court.

And beyond that, he has no history of failing to appear in court.  He does have a pending Massachusetts case, as the Court is aware of.  He's made those court appearances even though that's a four-and-a-half hour-plus drive.  He will make every court appearance in this case without the condition of -- without home confinement.

Your Honor, in my letter, I put in a request for a curfew with location monitoring.  I would like to make an amendment to that request.  I believe given his continued compliance, even since that letter was submitted, the most appropriate, the least restrictive condition that should be imposed here would be strict condition -- strict supervision on pretrial, which means more frequent check-ins but not with the ankle monitor and not with such home confinement conditions that curfew would still encompass.

I understand that pretrial opposes that request, but I do think that given what the Bail Reform Act requires us to do in cases like this, that is more than sufficient to ensure both the safety and his appearance in court.

THE COURT:  We'll hear from the pretrial services

officer in a minute. But especially since you've now changed your proposal, let me hear from the government.

MS. NICOLAS: Thank you, your Honor. By way of background the government did seek Mr. El's incarceration at the time of presentment, both arguing on flight and dangerousness. This proposal was first brought to us as an amendment to a downgrade to curfew, we did support that based on the compliance and the information available to us at that time.

Certainly, we would not consent to a complete change where we'd remove all monitoring, but I think in light of the letter that's been put forth by Mr. El and received by the government on Friday evening, the government continues to have some reservations based on dangerousness at this point.

The alleged conduct in Count Three of the indictment involves the defendant receiving firearms brought to him from out of state, specifically from South Carolina. The course of the conduct, he was once arrested in the Bronx in possession of one of those firearms after a 9-1-1 call was received by the 9-1-1 dispatch in New York City saying there was a man, that the caller knew was Lucha, who had a firearm. He did, in fact, have a firearm and it was, in fact, one of these firearms brought to him from South Carolina.

The second incident took place in Massachusetts and is referenced by Mr. El in his letter to the Court.

1           THE COURT:  Yes, I'm sorry, I cannot bring up to the
2    courtroom that letter -- let me see if my -- or maybe you have
3    a copy of it.
4           MS. NICOLAS:  I do have a copy of it.  I can bring it
5    forward.
6           DEPUTY CLERK:  Thank you.
7           THE COURT:  Yes, I remember this letter well.
8           So this is a letter that was sent from the defendant
9    to the Court, and it's a lengthy letter of some three and a
10   half single spaced pages.
11          The -- it says, it's all about the defendant's
12   disagreement with the government having any ability to forbid
13   gun ownership.  It also says to me, "Sir, you have not honored
14   your oath or obligation to support the supreme law of the land.
15   You put police policy codes, municipal rules and regulations
16   before the true law of the land.  Judges are obligated to
17   uphold the supreme law of the land and authorized to see that
18   the Constitution is enforced in all controversies of law.
19          "Mr. Rakoff, when I was arraigned two things you said
20   struck me more than anything.  You said you would decide
21   whether I can enter any motions on the record and you would
22   protect my 4th and 5th Amendment rights.  First, I would like
23   to say there are 10 original Bills of Rights, which I am not
24   limited to.  Mr. Rakoff, it is your duty to protect all my
25   rights, not just the ones you feel like preserving.

1            "Second, I am aware of the abuse of authority you

2    displayed in telling me I can't turn in any motions unless you

3    decide to accept them.  As if my 1st Amendment right did not

4    exist.

5            "Mr. Rakoff, if a judge could decide when and which

6    motions to accept, then the judicial system wouldn't be

7    necessary as you would then be taking the position of

8    prosecutor from the bench.

9            Since you can't decide which motions to read, I ask

10   that the GPS monitoring system be removed since you've had

11   ample time to read it, and the prosecutor did not show any

12   factual basis that it doesn't violate my 4th Amendment right.

13   Something else that alarmed me was your attempt to belittle me

14   and talk as if it was necessary for me to pass the bar in order

15   to comprehend law.  There is no secret to what the law is as

16   aforementioned the Constitution is the Supreme Law and nothing

17   is above it on this land."

18           And then he goes on at some length about the second

19   amendment, and what it does in terms of his right to bear arms.

20           He then goes onto say that what's happened to him

21   was not coincidence -- "not by coincidence but because of the

22   events that unfolded in the prejudice state of Massachusetts."

23   And he says that, "You, Mr. Rakoff, by dishonoring your oath

24   are setting me up for the same tragedy."

25           He goes on to say that "Mr. Rakoff, is it a

coincidence that for years my people have been denied licenses for arms to preserve their lives as well as the fruit of their loins, meanwhile living in worse neighborhoods and being consistently targeted by the police mercenaries."

So an interesting look. It does suggest -- well, let me hear from the government what you make of this letter.

MS. NICOLAS: I raise it only, your Honor, because I think it does bear on the government's evaluation of the defendant's continued dangerousness as to the community. In that he continues to assert that these laws are illegitimate and in no way makes clear that he understands that the gun laws of the United States do, in fact, apply to him with full force. And insofar as we evaluate bail determinations, we're looking to both dangerousness and to flight.

On the flight grounds, grave concerns that the defendant has made clear that he has an issue with the Court, and I think that it's relevant insofar as pretrial services, as an arm of the Court, is able to enforce the mandates the Court as it applies to the compliance with pretrial supervision.

So I think at this point, it does not make sense, it's not prudent to remove the conditions as they currently are stated as they apply to this defendant.

THE COURT: And what curfew, assuming we go back to that proposal, what curfew timing would you agree to?

MS. NICOLAS: I think typically the government's

1  position was to defer to pretrial in that they can best
2  evaluate how to accommodate the defendant's needs and the
3  curfew. And I think Ms. Defeo can address that. I would
4  suggest that it should be fairly early in the morning evening.
5  The defendant's first gun arrest was in the evening in the
6  Bronx at a time when he was spending time on the sidewalk,
7  hanging out, as many people do, and there's certainly nothing
8  wrong with that, but I do have concerns that that is where this
9  type of behavior stems from.
10              THE COURT: All right. Let me -- I'm sorry, did you
11  want to respond before we turn to pretrial services?
12              MS. BAHARANYI: I do, your Honor.
13              I think to the extent we've turned to the letter,
14  there are a number of things I want to address with respect to
15  that letter. I do not think it's any evidence of dangerousness
16  or risk of flight. What is in that letter are Mr. El's views
17  on the law, on the government. Sometimes views on the Court as
18  well. But purely his views and his opinions solidly, squarely
19  governed and covered by the 1st Amendment. I do not see --
20              THE COURT: So let me ask you, just on a going forward
21  basis. So he's represented by counsel, he's very fortunate to
22  have extraordinarily abled counsel, and therefore by what --
23  maybe I should just return to him any letters he sends because
24  I'm not sure he has -- he says in his letter he has a right to
25  bring motions. No, he has a right to have his counsel bring

1    motions.

2         MS. BAHARANYI:  Your Honor, that point I think is
3    actually moot after a conversation that we've had in my office
4    on Monday.  He will be directing future correspondence to me
5    and then we will decide which motions to bring to the Court.

6         THE COURT:  All right.

7         MS. BAHARANYI:  I do want to point out that going back
8    to what this letter means, again, there's --

9         THE COURT:  Among other things, it shows he doesn't
10   remotely understand the Constitution of the United States
11   despite his claims that he does.  But that's neither here nor
12   there.

13        MS. BAHARANYI:  I think in the letter he talks about
14   rights.  And I think there are a number of rights that are
15   important to him that he wants to make sure both the Court and
16   the government, all parties are aware of.  And I think that's
17   fair to do.

18        THE COURT:  His -- he, as I read the letter, the
19   thrust of it is he would love to arm himself with a gun.  Now,
20   he says for protection, but under the circumstances that he now
21   finds himself in, why isn't that evidence that he would seek to
22   arm himself with a gun and therefore might pose, under these
23   circumstances, a danger to the community?

24        MS. BAHARANYI:  Your Honor, reading through these
25   three and a half pages, there's not a single place in there

where he says he intends to or will violate the law.  He gives his opinion on what he believes the law should be.

However, what he does not do, what he does not say is that I, Lucha, will be going out and arming myself.

THE COURT:  He doesn't say that.  And that's not the point.

MS. BAHARANYI:  Your Honor, I do --

THE COURT:  The point is what inferences should I draw from the fact that he felt so strongly about his desire to have a gun.  That, I think, comes across pretty plainly that he put it in a three-and-a-half page letter to the Court.

MS. BAHARANYI:  He is very, very opinionated.  He has strong opinions on what the law should be and those opinions are protected opinions.  He's allowed to believe that, he's allowed to state that.

THE COURT:  Of course.

MS. BAHARANYI:  What's not in those opinions, or what is missing, though, is any sort of suggestion that he cannot, then, follow the law or comply with the Court's orders or comply with pretrial's orders.  And that is what's pivotal, critical to this hearing today, is whether he is someone who can follow the rules set by the Court.  He's shown that he can.  He's not armed himself with firearms, he has no firearms in his possession, he will not be in possession of any firearms.

He's shown himself capable of abiding by the strictest

conditions by pretrial. Remaining in his home 24 hours a day except to go see counsel or the social worker in my office for assistance. That is the conduct that is relevant to this inquiry today or what are the types of conditions, restrictions that should be imposed on this person sitting next to me.

This, his opinions, his views, as strong as vehement meant, no matter how much you may disagree or agree with them, those opinions do not suggest in any way that he cannot comply with the rules set by this Court and he cannot comply with the laws of this country. He just also has opinions on these laws and that's what he shared with the Court.

THE COURT: Yeah, but he significantly distorts what I said to him.

Distorts, suggesting, for example, that I told him, which is not true, that I would only support two amendments of the Constitution and not the others in this case. And the -- and I must be a very poor communicator, so I humbly beg your and his apologies for not being able to speak English in a way that he understood, but, by gosh, he didn't understand it at all.

And the fact that he so distorted it, makes me concerned about his mental state of mind and how he will conduct himself.

MS. BAHARANYI: Your Honor, on that, part of the reason why we've had the conversation that we've had about

ensuring that future correspondence comes to me, to his counsel, is so that there aren't any misunderstandings like what may have happened here.  He certainly has no intention of offending the Court, he has no intention of taking any personal digs at the Court.

THE COURT:  Well, he certainly did, though.

MS. BAHARANYI:  But that was not his intention, your Honor, and I think to ensure --

THE COURT:  It's a funny way of expressing his non-intention.

MS. BAHARANYI:  To ensure that we're as far away from that as possible, again, we have come to an agreement that any future communications will come through me so that we can avoid any moments like this again, any misunderstandings again.

But all of this, this letter, these views that he's expressed, his temperament even, does not have anything to do with whether these conditions are the least restrictive conditions.  The Bail Reform Act is very clear on what's required when someone is being released on pretrial supervision.

THE COURT:  Well, I'm not sure that I agree.  First of all, the fact that he so misunderstood what I said to him and so distorted it, could arguably be taken as evidence that he would not follow other requirements set by the Court in the future, but would distort them through his own lens.

1          Moreover, the rambling nature of the letter, at least
2     there's some evidence one might argue of less than meaningful
3     self-control.  However, having said that, I will not consider
4     the letter upon this application on the assumption that if he
5     had had better sense and consulted with his lawyer before
6     sending it, he might have reconsidered.
7          So let me hear from pretrial services.
8          MS. DEFEO:  Yes, your Honor.  So at this time, our
9     office would not consent to a downgrade to a curfew.  He has
10    only been under supervision for about two months, which is not
11    a long enough period of time to demonstrate long-term
12    compliance with the conditions of his release.
13         Also, our office does not believe that at this time,
14    there's a substantial change in circumstances that would
15    warrant a departure down to a curfew.  Our office policy
16    regarding location monitoring is to gradually decrease the
17    level of home confinement, so we would be open to revisiting
18    this in the future.
19         But at this time, home detention would be appropriate
20    because it will allow him to continue to meet with his
21    attorney, go to court, go to treatment and work.
22         THE COURT:  Okay.  Go ahead.
23         MS. BAHARANYI:  Your Honor, if I may briefly.
24         THE COURT:  Yes.
25         MS. BAHARANYI:  The Bail Reform Act is quite clear,

there's no provision in 18 U.S.C. 3142 that says that there should be any gradual reduction in conditions. The only conditions that should be imposed are the least restrictive ones.

And I appreciate pretrial's position, but I do think there's a difference between the policy that pretrial follows and what the law requires in a case like this. And what the law requires, the least restrictive conditions here, based off of his compliance which no one is disputing, his continued compliance since December 7, the law requires conditions that match that and match his background and match whatever risk he actually poses to the community, which, based on his history, is, in fact, quite minimal.

Your Honor, there -- the Court has had the opportunity to now see him in court. I believe this is the Court's second time seeing him in court. He was with me in my office on Monday, also prepared to go to court at that time. He's not a flight risk in any sense of the word. I think with respect to dangerousness, I appreciate the Court disregarding the letter on that piece because do I think that what Mr. El -- what Mr. El has shown and from his background, he's not a danger. He has no violence, no assaults, none of this concerning community behavior that we sometimes see in cases where we are considering such harsh and stringent conditions.

So my request today to the Court is to modify his

conditions in light of his compliance that the Court has been able to see, even under very, very strict and difficult circumstances. To modify these conditions in light of that so that he is able to have a bit more freedom of movement in the community, he's not at home 24/7 with just his thoughts and instead is able to engage in productive community engagement.

He used to be the person in his neighborhood who would pick up groceries for his elderly neighbors. He was the one cooking for people in his community, going out and giving that food to folks on the street. That's Lucha El. Right now he's in his home sometimes with his computer for hours on end with no healthy productive outlet.

I believe that if we modify the conditions to perhaps increase the number of check-ins he has with pretrial, but remove some of the home confinement, the ankle monitoring conditions that I think have truly a deteriorating effect on individuals, that is going to more reasonably assure the safety of the community and reasonably assure his appearance in court more than anything else.

With respect to the ankle monitor as well, I've had a chance to speak with Lucha El a bit more about its effects on his health, actually. When he's charging this ankle monitor, he actually feels heat warming from it being connected to the power outlet while he's charging it. He wakes up with his ankle, I guess the sensation is of pins and needles in his

ankle because of the ankle monitor itself.

And finally it's had an impact on his relationship with his child.  He has a five-year-old son and he and the child's mother are in an ongoing custody battle that's fairly contentious.  The fact that he has shown up and is wearing an ankle monitor has been used against him and made it so the family court judge has now used this fact to his detriment in that other setting, that other court.

And prior to this because of the, I guess, his child's mother's lawyer was contacted by federal agents as well, is our understanding, and so made aware this case, made aware of this ankle monitor and all of that has made it so he has not seen his son in months.

So we believe that some modification of conditions here is appropriate in light of the Bail Reform Act, would also ensure that his health is not further affected.  It would also ensure that his relationship with his son is not negatively impacted as well.

Thank you, your Honor.

THE COURT:  Well, it was Oliver Wendell Holmes who famously said that the life of the law is not logic, but experience.  And I have to give substantial weight to the experience of the pretrial services officer who deals with these kinds of situations every day.

Nonetheless, I think defense counsel has made an

argument that is sufficient for a modification in the bail conditions, but not as far as she now seeks.  But the -- I think the proposal, given though opposed by the pretrial services officer, that was originally made by defense counsel and was agreed to by the government or consented to by the government is also agreeable to the Court and a curfew.

So I will ask the government with the consultation of defense counsel to draw a new bail order, just the bottom line of the conditions, we don't need anything further.  And I agree with the government, it should be left to the pretrial services officer to determine exactly what the curfew should be.  But I also agree that it makes sense to have it in the early evening, not the late evening.

So that's the ruling of the Court.

Thank you, very much.

THE DEFENDANT:  May I, your Honor.

MS. BAHARANYI:  I apologize.

THE DEFENDANT:  May I reserve my right to speak to you, Mr. Rakoff?

MS. BAHARANYI:  Hold on.

Your Honor, before we conclude these proceedings.

THE COURT:  No.  Your client quite contrary to, I think, the implication of what you said to me about his letters, would be thrilled to address the Court.  So let me hear from him.

1           MS. BAHARANYI:  Before --

2           THE COURT:  No, he asked right now to hear from -- let
3   me hear from him.

4           MS. BAHARANYI:  May I speak to my client first?

5           THE COURT:  Yes, of course.

6           (Defendant and counsel confer)

7           MS. BAHARANYI:  Thank you, your Honor.

8           Mr. El wanted to inform the Court that he does believe
9   that the two of you, I suppose, got off on the wrong foot and
10  that he does intend to be on a better foot in going forward.
11  So he's giving me permission to communicate that to the Court.

12          THE COURT:  Well, I'm very pleased to hear that.  As
13  defense counsel has so eloquently said, my job is simply to
14  apply the law.  I don't care if the person in front of me loves
15  me or hates me.  It's irrelevant to me.  But if, in honor of
16  the day after Valentine's Day we're now off to a better
17  situation, so be it.

18          MS. BAHARANYI:  I think the mood is affecting
19  everyone.

20          Your Honor, with respect to the modification, I know
21  that curfew can be imposed with location monitoring that can
22  take different forms.  We'd ask that the Court endorse a form
23  that does not require the use of an ankle monitor.  My
24  understanding is that pretrial is able to monitor curfew using,
25  I guess, what they call voice verification through someone's

phone device.  I think that would be an appropriate alternative here, given the issues the ankle monitor has specifically created.

        THE COURT:  What's the government's view?

        MS. NICOLAS:  I actually don't believe that's possible, your Honor, but I defer to pretrial services.

        THE COURT:  Okay.  So it's not a possibility.

        MS. BAHARANYI:  So, your Honor --

        THE COURT:  And in addition, I'm not convinced that it's really such a good idea.  And I'm sorry that he finds some irritation from using the monitor, but life has its irritations.

        MS. BAHARANYI:  Understood, your Honor.

        THE COURT:  Very good.

        (Adjourned)