

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

March 22, 2023

**BY ECF**

The Honorable Jed S. Rakoff
United States District Judge
Southern District of New York
Daniel Patrick Moynihan
United States Courthouse
500 Pearl St.
New York, NY 10007-1312

> Re:   *United States v. Steven Perez, a/k/a "Lucha,"* **22 Cr. 644 (JSR)**

Dear Judge Rakoff:

      The Government writes in response to the Court's request for supplemental letter briefing on issues relating to Defendant's motion to dismiss the indictment at the March 15, 2022 conference and raised in Defendant's reply brief.  In particular, the Governments writes to (1) clarify its position on the Second Amendment implications of 18 U.S.C. § 922(a)(3)'s prohibition on "receipt" versus possession; (2) distinguish Section 922(a)(3) from Section 922(n) and cases evaluating that latter provision; (3) explain the relevance of *United States v. DeCastro*, 682 F.3d 160 (2d Cir. 2012); and (4) address certain arguments made by Defendant relating to the method of historical analysis under *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022).

      First, as the Government stated at the conference, the United States does not take the possession that "receipt," as distinct from possession, is *categorically* unprotected by the Second Amendment.  *Cf. United States v. Rowson*, No. 22 CR. 310 (PAE), 2023 WL 431037, at *15 (S.D.N.Y. Jan. 26, 2023) (holding receipt covered by Second Amendment in context of 18 U.S.C. § 922(n)); *United States v. Quiroz*, No. PE:22-CR-00104-DC, 2022 WL 4352482, at *3-4 (W.D. Tex. Sept. 19, 2022) (same). Defendant takes this point and argues that, like Section 922(n), Section 922(a)(3) must therefore implicate the Second Amendment because it prohibits the "receipt" of arms.  Transcript of Mar. 15, 2023 Conference ("Tr.") at 5:8-6:14.  That conclusion, however, does not follow.  Under Section 922(n), a person under felony indictment is prohibited from receiving *any* arms; accordingly, unless they already possess a firearm prior to indictment, they have no legal ability to bear arms in self-defense.

      By contrast, Section 922(a)(3) works no meaningful impediment, and thus does not "infringe," on any person's right to bear arms in self-defense.  As the Government noted in its brief in opposition to the motion to dismiss, Defendant had available to him over 2,000 federally licensed firearms dealers within his state of residence, which the Second Circuit has noted "is presumptively the most convenient place to buy anything." *Decastro*, 682 F.3d at 168.  Section

922(a)(3) does not work to restrict anyone's ability to lawfully acquire arms; it merely funnels that commerce through designated, regulated channels. Accordingly, unlike Section 922(n), Section 922(a)(3) is among the "laws imposing conditions and qualifications on the commercial sale of arms" that were not called into question by *Heller* or its progeny. *District of Columbia v. Heller*, 554 U.S. 570, 626-27 (2008). The fact that, as Defendant noted, other provisions of 18 U.S.C. § 922 more explicitly regulate commercial firearms traffic is irrelevant to that conclusion; the statutory scheme works as a whole to ensure that firearms purchases are made through legitimate commercial channels and impose "conditions and qualifications" upon those channels.

Defendant separately argues that *DeCastro* has foreclosed any argument that Section 922(a)(3) does not implicate the text of the Second Amendment because it assumed the existence of a Second Amendment burden in conducting its means-end analysis. Tr. at 3:6-23. As an initial matter, Defendant cannot have it both ways: arguing that *DeCastro*'s holding does not bind this Court because *Bruen* has repudiated all decisions made under the prior two-step framework, while also arguing that the *DeCastro* Court implicitly made an analytical step under that same framework that *does* bind this Court. And further, Defendant is simply not correct as to *DeCastro*'s reasoning. *DeCastro* did not accept—explicitly or implicitly—that Section 922(a)(3) imposed *any* burden on Second Amendment rights. Rather, the Second Circuit applied the usual test at the time to determine whether heightened scrutiny was appropriate in its analysis of Section 922(a)(3)—it asked whether the statutory provision at issue "substantially burden[ed] the Second Amendment." *DeCastro*, 682 F.3d at 164. In concluding that it did not, the Court—far from implying that any burden existed at all—stressed that Section 922(a)(3) "only minimally affects the ability to acquire a firearm." *Id.* The Court went on to uphold Section 922(a)(3) over the defendant's as-applied and facial challenges without conducting any means-end analysis. *See id.* at 1698-69. Accordingly, the Second Circuit has never implied—much less held—that the Second Amendment covers the conduct regulated by Section 922(a)(3), as required at the first step of the *Bruen* analysis.

Turning to the second step of the *Bruen* analysis, the Government addresses certain points raised by Defendant. First, Defendant interprets *Bruen* to impose a rigid, bifurcated historical analysis: when a modern regulation is directed at a societal problem that has existed since the 18th century, courts must eschew analogical reasoning and apply only a straightforward historical analysis; by contrast, when a modern regulation was unimaginable at the founding, then and only then can the court employ analogical reasoning. *See* Def. Reply at 6-7.

This dichotomy is unsupported by *Bruen*. It may be that analogical reasoning is the primary or only tool available when a regulation (say, of AI-operated killer drones) was unimaginable at the founding, but that does not mean that this same tool is unavailable to courts considering less novel regulations. Indeed, the *Bruen* Court considered analogous regulations in its description of the "straightforward" historical inquiry: "In some cases, that inquiry will be fairly straightforward. For instance, . . . if some jurisdictions actually attempted to enact *analogous regulations* during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality." *Bruen*, 142 S. Ct. at 2131 (emphasis added).

The *Bruen* Court's acceptance of analogical reasoning as applied to longstanding problems is further demonstrated by its discussion of *Heller*. Per *Bruen*, "*Heller* itself exemplifies this kind

of straightforward historical inquiry." *Bruen*, 142 S. Ct. at 2131.  And the *Heller* Court did not eschew analogy; rather, "after considering 'founding-era historical precedent,' including 'various restrictive laws in the colonial period,' and finding that none was *analogous* to the District's ban, *Heller* concluded that the handgun ban was unconstitutional." *Id.* (quoting *Heller*, 554 U.S. at 631) (emphasis added).  Indeed, the very paragraph of *Bruen* that Defendant relies upon to reject analogical reasoning in this context stated that "*the historical analogies* here and in *Heller* are relatively simple to draw . . . ." *Id.* at 2132 (emphasis added).  The *Bruen* Court further endorsed *Heller*'s use of analogies to historical regulations of "sensitive places," without anywhere suggesting that regulations of such places were unimaginable at the founding. *Id.* at 2133.  *Bruen* should therefore be read to endorse the use of analogical reasoning—"a commonplace task for any lawyer or judge," *Bruen*, 142 S. Ct. at 2132—in any historical context, even if the necessary closeness of the analogical fit is dependent in part on the novelty of the regulation at issue.

Applying a correct understanding of *Bruen*'s historical methodology, the Court should reject Defendant's remaining arguments that the Government's proffered historical regulations are insufficiently similar.  Defendant argued at the conference that the Government's historical examples are distinguishable from Section 922(a)(3) because they involved commercial restrictions, not simple restrictions on receipt or transfer.  Tr. at 8:4-9:3.  That mischaracterizes the colonial-era laws relating to transactions with Native Americans cited by the Government, which sweep more broadly than commercial sale, *see* Gov. Br. at 12-13, and ignores entirely the gunpowder-transportation and gunpowder and firearm licensing laws cited by the Government, *see id.* at 13-14.

Finally, Defendant suggests that the Court should not look to historical precedents that were "unquestionably racist." Def. Reply at 9.  The Government does not dispute Defendant's characterization of those laws, but, as numerous courts have held, "the Second Amendment's inquiry into historical analogues is not a normative one." *Rowson*, 2023 WL 431037, at *22 (upholding constitutionality of 18 U.S.C. § 922(n)).  Indeed, the Supreme Court in *Heller* cited to similarly repugnant historical precedents in determining what constituted an "arm" and the meaning of the phrase "keep and bear arms."  554 U.S. at 581, 582 (citing An Act for the trial of Negroes, 1797 Del. Laws ch. XLIII, § 6, in 1 First Laws of the State of Delaware 102, 104 (J. Cushing ed.1981 (pt. 1)); 1 W. & M., ch. 15, § 4, in 3 Eng. Stat. at Large 422 (1689) ("[N]o Papist ... shall or may have or keep in his House . . . any Arms . . .")); *see also Bruen* 142 S. Ct. at 2142 n.12 (citing same English law disarming Catholics); *United States v. Perez*, 6 F.4th 448, 462 (2d Cir. 2021) (Menashi, J., concurring) (citing colonial laws disarming aliens, Native Americans, and Catholics); *United States v. Balde*, 20 Cr. 281 (S.D.N.Y. Dec. 19, 2022) (transcript of oral opinion) at 24:14-23 (citing *Perez* concurrence and "recognizing the abhorrence of certain of these prior statutes" while drawing "lessons from the historical record" to uphold constitutionality of 18 U.S.C. § 922(g)(5)).  While these laws "would be anathema, and clearly unconstitutional" today, *Rowson*, 2023 WL 431037, at *22, the examples cited by the Government speak to a common practice in regulating the transfer in firearms in and out of jurisdictional bounds at the time of the Founding, and provide ample historical support for the constitutionality of Section 922(a)(3).

The Government separately writes to address a hypothetical posed by the Court at oral argument: whether Section 922(a)(3) would prohibit a person who lawfully purchased a firearm while a resident of one state from retaining that firearm while moving to another state.  Tr. at

10:21-25.  The answer is no.  18 U.S.C. § 926A states that, "Notwithstanding any other provision of any law or any rule or regulation of a State or any political subdivision thereof, any person who is not otherwise prohibited by this chapter from transporting, shipping, or receiving a firearm shall be entitled to transport a firearm for any lawful purpose from any place where he may lawfully possess and carry such firearm to any other place where he may lawfully possess and carry such firearm" subject to certain conditions on the transportation of said firearm.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney


by:    /s/
Lucas Issacharoff
Ashley C. Nicolas
Madison Reddick Smyser
Assistant United States Attorneys
(212) 637-2737 / 2467 / 2381