N3F5lucA

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,              New York, N.Y.

 4              v.                          22 Cr. 644 (JSR)

 5   STEVEN PEREZ, a/k/a "Lucha El",

 6              Defendant.

 7   ------------------------------x

 8                                          March 15, 2023
                                            2:10 p.m.
 9

10   Before:

11                      HON. JED S. RAKOFF,

12                                          U.S. District Judge

13

14                        APPEARANCES

15   DAMIAN WILLIAMS
          United States Attorney for the
16        Southern District of New York
     BY:  LUCAS ISSACHAROFF
17        ASHLEY C. NICOLAS
          MADISON SMYSER
18        Assistant United States Attorneys

19   FEDERAL DEFENDERS OF NEW YORK
          Attorneys for Defendant
20   BY:  ZAWADI BAHARANYI
          AMANDA J. MAYO

21

22

23

24

25
```

N3F5lucA

```
 1              (Case called)

 2              THE DEPUTY CLERK:  Will everyone please be seated, and

 3     will the parties please identify themselves for the record.

 4              MR. ISSACHAROFF:  Thank you, your Honor.  Lucas

 5     Issacharoff for the government, joined by my colleagues,

 6     Madison Smyser and Ashley Nicholas.

 7              MS. BAHARANYI:  Good afternoon, your Honor.  Zawadi

 8     Baharanyi for the Federal Defenders.  I am joined by my

 9     colleague Amanda Mayo, also at the Federal Defenders.  We

10     represent Lucha El, who is seated to my right.

11              THE COURT:  So, we are here to, with respect to this

12     defendant, to hear argument on the motions that have been

13     filed.  There is both a motion to dismiss and a motion to

14     suppress.  Because I have somewhat limited time, I am going to

15     ask counsel not to repeat what is in their briefs, which I have

16     read, but just if there are new arguments they want to make or

17     responses to the other side's arguments that they didn't have

18     the opportunity to yet make, now is the opportunity, starting

19     with, let's take the motion to dismiss first.

20              So, let me hear from moving counsel.

21              MS. BAHARANYI:  Yes, your Honor.

22              So, without repeating what the Court is already aware

23     of, I think there are a couple of new and additional points

24     that further weigh in support of our motion to dismiss.  I will

25     then take, in turn, the motion to suppress, whenever the Court
```

N3F5lucA

1  wishes to hear that.

2          One of the points that had been raised by the

3  government in its argument is that the conduct in this case was

4  not conduct that was protected by the Second Amendment and one

5  of the cases that the government relies on heavily is *Decastro*,

6  which was discussed in the papers.  What I did not include in

7  our response, our reply last week but what I would like to

8  address now, is *Decastro* does implicitly concede and recognize

9  that 922(a)(3), the statute here, does put some burden, does

10  implicate someone's Second Amendment rights.  In *Decastro*, the

11  analysis was whether there was a heavy or significant or

12  substantial burden, but the Second Circuit at least made this

13  implicit understanding that there was some implication on

14  someone's right to bear and possess arms based on 922(a)(3).

15          Now, because of *Bruen*, which obviously has now upended

16  *Decastro* and its reasoning, we know that the analysis, the

17  determination of whether there is a heavy burden or significant

18  impact on someone's right to bear arms versus a governmental

19  interest is no longer the correct inquiry.  The correct inquiry

20  is, one, whether this conduct does in fact implicate the Second

21  Amendment, is his conduct in this case, which is receiving and

22  possessing a firearm, covered by the Second Amendment, and even

23  *Decastro* recognizes that this Court must say yes.

24          THE COURT:  Let me ask you this.  Your client is not

25  charged with unlawful possession, he is charged with unlawful

N3F5lucA

```
 1    transportation.

 2              MS. BAHARANYI:  Your Honor, he --

 3              THE COURT:  Go ahead.

 4              MS. BAHARANYI:  He is charged with receiving, and

 5    receiving --

 6              THE COURT:  Well --

 7              MS. BAHARANYI:  Receiving into his state residence and

 8    that by its --

 9              THE COURT:  The statute is, yes, he willfully and

10    knowingly transported or received in New York firearms

11    purchased or otherwise obtained out-of-state.  Right?

12              MS. BAHARANYI:  And that is what the government is

13    saying --

14              THE COURT:  So why is that a regulation of gun

15    possession, as you claim, as opposed to a regulation about

16    out-of-state acquisition and transfer?

17              MS. BAHARANYI:  Your Honor, in order for them to apply

18    the statute here the government will have to prove that he

19    received and possessed these firearms.  That is a necessary --

20    that's what the government also concedes in their own motion,

21    that they are going to prove.

22              THE COURT:  But it doesn't stop him if he was

23    otherwise lawfully entitled to go out and buy a gun but that's

24    not what he is being charged with here.

25              MS. BAHARANYI:  He is not charged with going -- that's
```

1    correct.  He is not charged with going out and buying a gun

2    unlawfully, but the charge here does rest on his receipt of a

3    firearm.  And I think to the give the court a few more cases

4    that weren't cited in our briefs, there have been a number of

5    District Court opinions on similar 922 statutes that say the

6    receipt, the process of receiving a firearm, necessarily

7    entails possessing it.

8         So, for example, in 18 U.S.C. 922(n) it makes it

9    unlawful for an individual, who is under some form of

10   indictment, to receive a firearm.  I have a couple of cases

11   that I will cite to the Court now.  *United States v. Quiroz*,

12   2022 WL 4354282, that's a Western District of Texas case from

13   September of last year.  It explains that that statute, 922(n),

14   which again governs or is concerned with the receipt of a

15   firearm is unconstitutional because, one, it does entail

16   someone possessing a firearm; and two, there is no historical

17   tradition of that sort of regulation.

18        Similarly, I will give the Court a couple more

19   statutes, case citations if the Court will allow it, *United*

20   *States v. Hicks*, which is a 2023 Western District of Texas case

21   and that case, the citation is another Westlaw case, 2023 WL

22   164170, the Court explicitly opines on whether receiving a

23   firearm under 922(n) necessarily entails someone possessing a

24   firearm and whether that then comes under the gambit of

25   someone's right to bear and possess guns.  That Court, as I

N3F5lucA

1    believe your Honor should do as well, found that the act of

2    receiving requires someone to possess.  And we are talking

3    about the same language here so we are talking about receipt

4    and receiving in the context of someone being under federal

5    document, or receipt and receiving in the context of someone

6    receiving or obtaining a gun from out of state but both have to

7    do with someone's ability to possess a firearm and one -- the

8    receipt -- requires the other -- possession.  And in this

9    particular case as well the government has made clear that they

10   intend to prove his guilt in this case by arguing that on two

11   separate occasions he possessed these firearms in June and July

12   of 2021.  So, very much so, receipt here has everything to do

13   with Mr. Lucha's ability to possess and his actual possession

14   of these firearms.

15          So that takes us then to the next question, your

16   Honor.  If there is any --

17          THE COURT:  Let me ask you this.  I will look at those

18   cases and thank you for bringing them to my attention.  Did you

19   tell your adversary that you were going to cite those cases

20   before today's argument?

21          MS. BAHARANYI:  I did not, your Honor, but I can

22   provide them with copies of the cases as well.

23          THE COURT:  Well, if they want it I will give them an

24   opportunity to put in a written response, because otherwise

25   they didn't know that you were going to be citing that, but go

N3F5lucA

1    ahead.

2          MS. BAHARANYI:  Yes.  Your Honor, obviously we are

3    happy to --

4          THE COURT:  No, I think it is the better practice, if

5    you are going to cite a case that isn't in your briefs, which

6    is not uncommon in these kinds of situations, to give your

7    adversary advance warning, at least a few hours, so the person

8    can take a quick look at it, maybe he has independently, I

9    don't know, he or she, but, if not, I will certainly give them

10   the opportunity to put in a written response since they

11   otherwise would be surprised.

12         Go ahead.

13         MS. BAHARANYI:  Understood, your Honor.  Those cases

14   are just two examples of cases where the district courts have

15   taken and assessed what "receipt" means and have found it to be

16   conduct that requires possession and falls under the Second

17   Amendment.

18         So then that brings us to the next point, the only

19   other kind of prong in this inquiry since *Bruen*, which is is

20   there any sort of historical tradition of this form of

21   regulation.  Now, it is only the government's burden to prove

22   this historical tradition and not history broadly, as I think

23   is made clear in our papers, but did the founding fathers, when

24   they were ratifying the Second Amendment, envision this sort of

25   regulation, this sort of constraint on someone's Second

N3F5lucA

1    Amendment rights.  And what is missing from the government's

2    brief is any example of a law that is distinctly similar to the

3    law that is being applied against Mr. Lucha here.

4         What is in the government's brief are numerous --

5    well, not quite numerous but a couple of examples of colonial

6    era laws of commercial regulations so of the regulations of the

7    sale or trafficking of firearms.  What Mr. Lucha has been

8    charged with is not commercial sale of firearms.  He is not

9    charged with gun trafficking either, I think that's a charge

10   that applies solely to his co-defendant.  He is charged under

11   922(a)(3) which does prohibit his individual possession of a

12   firearm based off of how it was obtained but he is not someone

13   who has been charged as being engaged in the commercial sale

14   provision of these firearms.  And I want to point this out

15   because we did not raise this in our motion, there is a second

16   of 922 that governs the commercial sale of firearms or licensed

17   importers providing firearms to individuals in similar context.

18        So 922(b)(3) says that it is a crime, it is unlawful

19   for someone who is a licensed importer of firearms, to sell or

20   deliver any firearm to any person who the licensee knew, knows,

21   or has reason to believe, does not reside in the state in which

22   the licenses operate.  So that is the commercial regulation and

23   if that is what Mr. Lucha had been charged under, your Honor,

24   then the examples provided to the government would be somewhat

25   on point.  But that's not at all what he has been charged with

1    here.  So, he is not charged with engaging in the sales, he is

2    charged with his actual -- his possession for receiving and

3    possessing firearms.

4                   THE COURT:  All right.

5                   MS. BAHARANYI:  If the government is unable to provide

6    a single distinctly similar statute, which they have been

7    unable to provide, then *Bruen* makes clear the only next step is

8    dismissal because the Second Amendment does cover what his

9    conduct was in this case, because the government has been

10   unable to provide that statute, just one example, your Honor,

11   then that's the only result that is now required under *Bruen*.

12                  THE COURT:  All right.  Thank you very much.  Let me

13   hear from the government.

14                  MR. ISSACHAROFF:  Thank you, your Honor.

15                  I want to start with the conduct question that defense

16   counsel began with.  So first I just want to clarify that the

17   government is not taking the position that receipt is

18   categorically unprotected under the Second Amendment as

19   distinct from possession.  The government acknowledges that

20   receipt is a necessary precursor to possession for ability to

21   keep and bear arms in certain instances.  That being said, what

22   distinguishes 922(a)(3), for example, from 922(n) discussed in

23   the *Quiroz* case and I am familiar with that case and don't need

24   the opportunity to provide supplemental briefing but appreciate

25   the Court's consideration.

1          So, 922(n) states that a person who is under felony

2    indictment cannot transport or receive.  That means that it

3    functions as a complete extinguishment of that person's ability

4    to acquire arms for self-defense.  That is why 922(n)

5    implicates the Second Amendment, because although it doesn't

6    affect the pre-indictment -- any arms that were already

7    possessed pre-indictment, it does state that a person cannot

8    acquire any arms from any source.  922(a)(3), on the other

9    hand, simply channels the acquisition of arms for lawful

10   self-defense through legitimate channels.  As we cited in our

11   brief, there are over 2,000 federal firearms licensees in the

12   State of New York.  Presumably these were not only available to

13   the defendant, they were in fact, by far, the most convenient

14   way for him to obtain a firearm rather than have somebody

15   acquire them for him from out of state.

16          So, that is why 922(a)(3) falls within the category

17   recognized by *Heller*, conditions and qualifications on the

18   commercial sale of arms which is a recognized, long-standing

19   regulation that *Heller* and *Bruen*, and the Supreme Court's

20   Second Amendment juris prudence casts no doubt on --

21          THE COURT:  So, just looking at the text of the

22   statute, might it not be read to prohibit a gun owner who is

23   moving regularly between various states but who lawfully

24   required his gun in the initial state of residence from

25   bringing it with him to the new state of residence?  If that's

N3F5lucA

1    the case would that pre-Second Amendment --

2              MR. ISSACHAROFF:  Your Honor, I believe that

3    Section 922(a)(3) includes, it states that:  Shall not preclude

4    any person -- I'm sorry.  So subsection A of 922(a)(3) talks

5    about inheritance through bequest or intestate succession.  So

6    I don't -- I apologize, but I believe the text of 922(a)(3), it

7    states that it discusses transport into or receipt in the state

8    where he resides.  So I think that if one lawfully acquired an

9    arm, received that arm while residing within a state and then

10   moved to another state, I'm not certain that 922(a)(3) would

11   prohibit that conduct.  Nevertheless, that is not the

12   circumstance that we face here and so considering an as-applied

13   challenge, which we noted in our brief, is the appropriate

14   order.

15             THE COURT:  All right.

16             MR. ISSACHAROFF:  So then I want to turn briefly to

17   the *Decastro* case.  I disagree with defense counsel that

18   *Decastro* does acknowledge that there is a Second Amendment

19   burden imposed by 922(a)(3).  *Decastro* rejects heightened

20   scrutiny by noting repeatedly that there is no substantial

21   limitation on the right to acquire arms, noting the ready

22   availability and the greater convenience of arms required

23   through legitimate channels within one state.  Now, it may be

24   that an individual is prohibited by, say, New York State's laws

25   from using those channels, but that is not -- this is not the

N3F5lucA

1   context in which they made that challenge.  They should

2   separately challenge the New York State laws rather than seek

3   to acquire them from out-of-state.  The *Decastro* Court does not

4   actually apply any means-end scrutiny.  They reject heightened

5   scrutiny and say therefore the challenge must fail.  And they

6   do analogize to time place restrictions under the amendment but

7   it is not clear that they do accept the proposition that there

8   is any actual limitation on the right to keep and bear arms in

9   self-defense which is the right as defined by the Supreme Court

10  in *Heller*.  There were literally thousands of legitimate

11  channels through which defendant could have acquired arms for

12  self-defense and it simply doesn't restrict those.

13          THE COURT:  I'm going to take the liberty of cutting

14  you off because, as I hear the arguments from both sides, I

15  think it would be useful to have some additional brief

16  briefing.  So I will allow the government to put in a further

17  brief not to exceed five single-spaced pages addressing both

18  the cases that were first raised here today but also any other

19  issue that was raised here in the argument today, and then I

20  will allow defense counsel to put in a five-page surrebuttal or

21  whatever you want to call it.

22          So, how soon can the government get in its paper?  You

23  are talking to the real party in interest I can see.

24          MR. ISSACHAROFF:  I was asking how long before we get

25  the transcript but I think that 10 days.

N3F5lucA

```
 1            THE COURT:  You need 10 days?

 2            MR. ISSACHAROFF:  A few days to get the transcript so

 3   that we can --

 4            THE COURT:  I am sure your colleague was taking notes

 5   of what was said today.

 6            MR. ISSACHAROFF:  We did, your Honor, but I do want to

 7   make sure.

 8            THE COURT:  You don't think her notes, you are

 9   skeptical that her notes are less than complete and accurate?

10            MR. ISSACHAROFF:  Of course not, your Honor.

11            THE COURT:  All right, 10 days, but I really want to

12   move it along.  Then so that would be, let's see, today is the

13   15th, so that would be.

14            MR. ISSACHAROFF:  We can do the 20th, your Honor.

15            THE COURT:  I'm sorry?

16            MR. ISSACHAROFF:  We can do the 20th, next Wednesday.

17   That's fine.

18            THE COURT:  The 22nd?

19            MR. ISSACHAROFF:  The 22nd, yes.

20            THE COURT:  So one week, that sounds better, and one

21   week for the defense so that's the 29th, and I will give you at

22   least a bottom line ruling by no later than the week after that

23   May 5th.  I may or may not have a full opinion ready for you by

24   that time but at least you will know where you stand one way or

25   the other.
```

 1              So, let's turn to the motion to suppress and let me go

 2      back to moving counsel.

 3              MS. BAHARANYI:  Thank you, your Honor.

 4              Your Honor, there actually aren't additional points

 5      that I need to make beyond what has been provided in both our

 6      moving papers and our reply.  I would reiterate, though, if the

 7      Court does want to consider any part of that Officer 1's

 8      observations we would ask for a hearing on that matter.

 9              THE COURT:  OK.  Let me hear what the government says.

10      I won't speak until your colleague is ready to take complete

11      notes.

12              MS. SMYSER:  Great.  We are ready, your Honor.

13              So I just want to respond briefly to a few points that

14      came up in defense counsel's briefing.  One thing that they

15      focus significantly on, I think there are two main issues here,

16      one is whether the 911 call is a reliable indicator that gives

17      the officers reasonable suspicion for the stop.

18              THE COURT:  Didn't the person say that she knew Lucha?

19      Did she provide her phone number?  Didn't she identify him by

20      name and location?  And isn't there every indication that she

21      had actually seen the gun?

22              MS. SMYSER:  Yes, your Honor.  All of that is true and

23      that is what we believe distinguishes this case from many cases

24      cited by the defense and including the *Freeman* case.  I think

25      that those indications that your Honor just cited show her

N3F5lucA

1    basis for believing that Lucha had a gun and also show a

2    familiarity with him.  They had been friends, she had seen the

3    gun before, and that shows where this information comes from

4    and that it is reliable.  So I won't talk too much more about

5    the reliability of the 911 call unless your Honor has --

6            THE COURT:  No.  I think -- frankly, I am not yet

7    persuaded by the defense argument on that point.  I think a

8    more interesting argument is the question of whether there is

9    reasonable suspicion when someone may be carrying the gun

10   lawfully but that is colored, very much, by *Bruen*, and this all

11   occurred before *Bruen*, as I understand it.

12           MS. SMYSER:  That's correct, your Honor.

13           THE COURT:  So it has to be looked at from the context

14   of what the law reasonably was held to be or appeared to be at

15   that time.

16           MS. SMYSER:  That's correct, and that was something I

17   wanted to just touch briefly on, this question of whether the

18   gun possession in this instance is sufficient to show

19   reasonable suspicion that Lucha was engaging in ongoing

20   criminal activity, and obviously this --

21           THE COURT:  Even though pre-*Bruen*, what is the basis

22   for saying that one has a reasonable suspicion that someone is

23   engaged in unlawful activity just based on knowing they are

24   carrying a gun?

25           MS. SMYSER:  So, your Honor a few points on that.

1          One, this 911 call was made around 10:00 p.m.

2     reporting gun possession on a sidewalk in the Bronx and the

3     standard here is reasonable suspicion to indicate that they are

4     engaging in some sort of crime, it is not probable cause, not

5     beyond a reasonable doubt, it is just to engage in that initial

6     investigatory stop.  We see from case law that this falls well

7     within what rises to the level of reasonable suspicion.  For

8     example, this is discussed in the *Gonzalez* case that we cite,

9     by Judge Engelmayer, in our briefing and he, in addition, cited

10    a few Second Circuit cases *Wiggan* and *Manuel* that I am happy to

11    provide the specific citations for in which 911 calls were made

12    reporting gun possession and then a subsequent stop was made.

13    Now, in those cases they also saw a bulge, which we have in our

14    case if an officer were to testify, but the point I am making

15    here is that the 911 call about gun possession was sufficient

16    in those cases to show that someone was engaging in some sort

17    of criminal activity based on the gun possession alone without

18    additional facts from how they were using the gun or anything

19    of that nature.

20          THE COURT:  All right.  Unless you had anything else

21    you wanted to cover, again unfortunately we are under a fairly

22    tight time frame today.  I wanted to hear from your adversary

23    in response to the arguments you have just made.

24          MS. SMYSER:  Of course.

25          MS. BAHARANYI:  Thank you, your Honor.

1            Briefly, question 1 or part 1 regarding the

2     reliability of this call, I think the issue is the exact

3     concern that was raised in *Florida v. J.L.*, which is what is to

4     stop someone from calling in some tip about someone they can

5     readily observe on the street in the community, claim that they

6     have a firearm, and setting off a chain of events to harass

7     that person.  And I think if you keep that kind of concern in

8     the back of your mind, it highlights what our problem is here

9     in this type of case.  The tip that was called in was by

10    someone who refused to provide her name and prior to police

11    actually stopping Lucha, refused to cooperate with them,

12    meaning they tried multiple times to reach back out to her, get

13    in contact with her, and she refused, which I think is one

14    signal that there is a concern that she might have done

15    something or been engaged in reporting someone that she knew

16    she should not have done.  So there is that, that piece on the

17    reliability.

18            I think the second piece is in Alabama v. White, one

19    of the reasons why the Supreme Court found the tip there

20    reliable is because it provided some predictive information

21    that only someone familiar with the wrongful conduct or

22    intimately familiar with the wrongful conduct going on could

23    have known so that person gave the police a play-by-play of

24    where this individual -- White in this case -- was going to

25    pick up cocaine.  Here there is no predictive information that

N3F5lucA

```
1    is being provided and in fact, as we say in our motion, the 911
2    dispatcher explicitly asked the caller, do you know where he is
3    going? and she says no.  So what we have here is someone who is
4    able to provide a very detailed description of someone that
5    they can see, maybe someone they have seen around the
6    community, but who in no way has provided information that
7    would suggest their tip is reliable in its assertion of
8    illegality, not just identifying him.

9             THE COURT:  All right.

10            MS. BAHARANYI:  And I also find that second issue
11   quite concerning, that someone could call and say, this person
12   has a firearm, in a state where individuals can legally carry
13   concealed weapons, and set off this motion of events allowing
14   police to stop and seize them.  This caller, at no point, said
15   this person had a firearm and I am concerned, or he is
16   threatening people, or he is waiving it around.  She didn't
17   even say that it has come out of his bag, it is simply a report
18   that he is in possession of a firearm which is not unlawful.
19   And, this case came after the *Heller* case, your Honor.  So it
20   came after there has already been this shift from the Supreme
21   Court in what someone's rights to carry are.  And I think the
22   fact that this is not a pre-*Heller* case but this is *Heller* on
23   our way to *Bruen* but understandably not there yet, I think
24   shows that the police had no reason at that point to suspect
25   that he was engaged in unlawful activity, unlawfully carrying a
```

N3F5lucA

| | |
|---|---|
| 1 | firearm.  And if there had been some suggestion as there are in |
| 2 | the cases that there was threatening or assaultive or |
| 3 | concerning conduct in addition to it, then I think we would be |
| 4 | in a very different position but none of that was present here. |
| 5 | THE COURT:  So, I will reserve on this as well and get |
| 6 | you a bottom line ruling but remind me, do we have a trial |
| 7 | date? |
| 8 | MS. BAHARANYI:  We do not, your Honor. |
| 9 | THE COURT:  Let's set a trial date.  So I'm going to |
| 10 | get you bottom line rulings on both of these motions by what |
| 11 | did we say, early May?  What was the date I just gave you?  May |
| 12 | 5th.  And it is conceivable on the second motion that there |
| 13 | might be a need for an evidentiary hearing, but even if that is |
| 14 | true we would have it in a matter of a couple days.  So, the |
| 15 | motions will all be done with by the middle of May.  How long a |
| 16 | trial are we talking about? |
| 17 | MS. SMYSER:  A week, your Honor. |
| 18 | THE COURT:  So I don't have my trial schedule in front |
| 19 | of me, so my ever-ready courtroom deputy has just handed it to |
| 20 | me, and so we could do the last week of May.  We could do the |
| 21 | middle of June.  Let's stop there.  How about either of those? |
| 22 | MS. BAHARANYI:  Your Honor, if you are hearing |
| 23 | suggestions about trial date, I would ask for a date in |
| 24 | mid-June or early to mid-June if the Court is available June |
| 25 | 5th through the week of June 12th.  I will be out June 19th |

N3F5lucA

 1    through the 30th but again available following that time.

 2            THE COURT:  So I think if we are going into June I

 3    have a trial starting June 7th that will be over early the

 4    following week, so let's look at Tuesday, June 13th.

 5            THE DEPUTY CLERK:  You are sitting in Portland.

 6            THE COURT:  Oh.  I am sitting on the Ninth Circuit in

 7    Portland.  So how about June 20th?

 8            MS. BAHARANYI:  Your Honor, I am going to be out of

 9    the country that week and the week of the 26th.  I know the

10    Court mentioned end of May dates.  I would be available that

11    time as well.

12            THE COURT:  So how about -- I'm sorry, so in May?  I

13    have a three-week trial starting May 1st so how about May 22nd?

14    Does that work?

15            MS. BAHARANYI:  That time works for the defense.

16            MS. NICOLAS:  It is fine for the government.  I want

17    to clarify the timeline you set forth earlier.  The defense

18    response for March 29th, I think your Honor originally said a

19    bottom line decision a week after that, which would be April

20    5th?

21            THE COURT:  That's right.  May 5th sounded wrong, that

22    is not my style.  So I will decide these motions by April 5th,

23    giving everyone plenty of time to prepare for the trial, so

24    let's set it down for May 22nd.

25            All right?  Very good.

N3F5lucA

1          MS. BAHARANYI:  Your Honor, before we adjourn, may I

2     have one moment?

3          THE COURT:  Yes.

4          MS. BAHARANYI:  I think there is something we may want

5     to address with the Court, if I could have one moment.

6          (Defendant and counsel conferring)

7          MS. BAHARANYI:  Thank you, your Honor.  Actually,

8     nothing further.

9          THE COURT:  So you folks are excused except for

10    whoever with the government is remaining for the other matter,

11    and let's have the counsel and defendant of the co-defendant

12    set up right now.

13                                o0o

14

15

16

17

18

19

20

21

22

23

24

25