**Federal Defenders**
OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

David E. Patton
*Executive Director*

Southern District of New York
Jennifer L. Brown
*Attorney-in-Charge*

March 29, 2023

*Via ECF*
The Honorable Jed S. Rakoff
United States District Judge
Southern District of New York
United States Courthouse
500 Pearl Street
New York, NY 10007

    Re:    *United States v. Lucha El,*
               22-CR-644 (JSR)

Honorable Judge Rakoff:

       Defendant Lucha El Por Libertad respectfully submits this supplemental letter-brief in accordance with the Court's March 15, 2023 order and in response to the government's submission ("Gov't Ltr."; ECF No. 38). The government continues to misconstrue *Bruen*'s required analysis and fails to sustain its burden to show that 18 U.S.C. § 922(a)(3) "is consistent with the Nation's historical tradition of firearm regulation." *N.Y. State Rifle & Pistol Assoc., Inc.* v. *Bruen*, 142 S. Ct. 2111, 2130 (2022). Accordingly, the indictment against Mr. Lucha must be dismissed.

       The government wrongly insists that § 922(a)(3) is a purely "commercial" regulation of the sale of firearms. (Gov't Ltr. at 2.) But § 922(a)(3)'s prohibition sweeps much more broadly than commercial firearm sales. Take, for example, a law-abiding citizen of New York, fully able to own a gun in his home state, who visits a brother in New Jersey. The brother, concerned for the citizen's safety in New York City, offers him a handgun for use in self-defense. The citizen accepts and takes the handgun home with him. No commercial sale has occurred: yet the law-abiding citizen has now "transport[ed]" into "the State where he resides" a firearm "obtained by [him] outside that State," in violation of 18 U.S.C. § 922(a)(3)—even if he is lawfully able to own a gun in New York.[1] Far from acting solely as a "funnel[]" for the sale of guns "through designated, regulated channels" (Gov't Ltr. at 2), § 922(a)(3) criminalizes law-abiding citizens' *possession* of firearms based solely on the origin of those firearms.

---

[1] Notably, § 926A (cited by the government (Gov't Ltr. at 4)), would not protect the law-abiding citizen in this scenario from this independent Chapter 44 violation. *See* 18 U.S.C. § 926A (applying only where a person is "not otherwise prohibited by this chapter from transporting, shipping, or receiving a firearm").

Other provisions of § 922 do in fact regulate the sale, rather than the possession, of firearms obtained from out of state. *See, e.g.*, 18 U.S.C. § 922(b)(3) ("It shall be unlawful for any licensed importer, licensed manufacturer, licensed dealer, or licensed collector to sell or deliver any firearm to any person who the licensee knows or has reasonable cause to believe does not reside in . . . the State in which the licensee's place of business is located."). If Mr. Lucha had been charged with a violation of this provision, the conduct at issue would more closely resemble the types of "conditions and qualifications on the commercial sale of arms" recognized by the Supreme Court as potentially lawful. *District of Columbia v. Heller*, 554 U.S. 570, 626–27 (2008).

But Mr. Lucha's possession of handguns is what the government is prosecuting here—the indictment charges that Mr. Lucha, "not being a licensed importer, licensed manufacturer, licensed dealer, [or] licensed collector of firearms," did "willfully and knowingly transport into or receive in the State where he resides firearms purchased or otherwise obtained by [him] outside that State." (ECF No. 2 at 4.) As the government now concedes, "receipt is a necessary precursor to possession." (Mar. 15, 2023 Tr. ("Tr.") 9:19–21); *see United States v. Rowson*, 2023 WL 431037, at *15 (S.D.N.Y. Jan. 26, 2023) ("shipping, receiving, or transporting a firearm" is "presumptively protected by the [Second] Amendment"); *United States v. Hicks*, 2023 WL 164170, at *2 (W.D. Tex. Jan. 9, 2023) ("Receipt is the condition precedent to possession—the latter is impossible without the former."); *United States v. Stambaugh*, 2022 WL 16936043, at *3 (W.D. Okla. Nov. 14, 2022) ("[R]eceipt is the condition precedent to keeping and bearing arms."); *United States v. Quiroz*, 2022 WL 4352482, at *4 (W.D. Tex. Sept. 19, 2022) ("The Second Amendment's plain text does cover 'receipt' and the Constitution presumptively protects such conduct."). Far from being charged in connection with a role in a commercial transaction involving the sale of a firearm, Mr. Lucha faces prosecution for mere possession of a firearm outside of any stream of commerce. *See United States v. Price*, 2022 WL 6968457, at *3 (S.D.W. Va. Oct. 12, 2022) (holding § 922(k) unconstitutional; "Other commercial regulations may well require that any firearm sale only involve firearms bearing a manufacturer's serial number. Section 922(k) goes farther. It criminalizes the mere *possession* of a firearm after a serial number is removed, obliterated, or altered in any way, whether or not the firearm is then placed into commerce.").

With this proper framing, there can be no serious dispute that Mr. Lucha's conduct is protected by the "plain text" of the Second Amendment. The government continues to insist that § 922(a)(3) "works no meaningful impediment" on Mr. Lucha's right to bear arms (Gov't Ltr. at 1) because it does not "complete[ly] extinguish[]" the right the way other statutes do (Tr. 10:1–10). That argument finds no purchase in *Bruen*; while § 922(a)(3) does not completely ban individuals such as Mr. Lucha from possessing certain weapons, "neither [did] the law found to be unconstitutional in *Bruen*." *United States v. Kelly*, 2022 WL 17336578, at *3 (M.D. Tenn. Nov. 16, 2022). In fact, the Supreme Court rejected a similar argument in *Heller*: "It is no answer to say, as petitioners do, that it is permissible to ban the possession of handguns so long as the possession of other firearms (*i.e.*, long guns) is allowed." 554 U.S. at 629; *see also Kelly*, 2022 WL 17336578, at *3 ("[T]he infringement on a constitutional right in one way is not typically

negated by the fact that the government did not violate the same right even further in another way.").

Nor, indeed, is this argument supported by the text of the Second Amendment, which provides that "the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. As the government acknowledged in its opposition, the definition of "infringe" includes "[t]o destroy or hinder." (Gov't Opp. at 8 (citing Webster's 1828 Dictionary of the English Language).) "Hinder," in turn, is defined as "[t]o stop," "[t]o obstruct," "[t]o impede," or "[t]o prevent." Webster's 1828 Dictionary of the English Language. Section 922(a)(3) "prevents" Mr. Lucha from exercising his Second Amendment rights by making it unlawful for him to carry a weapon in self-defense based solely on the weapon's state of origin. After *Bruen*, there can be no further inquiry into how much Mr. Lucha's Second Amendment rights are "hindered" by the challenged law: "Instead, any intrusion into a right protected by the Second Amendment thrusts us into the territory of justifying the regulation as one historically placed on similar weapons." *Ocean State Tactical, LLC* v. *Rhode Island*, 2022 WL 17721175, at *14 n.28 (D.R.I. Dec. 14, 2022).

Even the Second Circuit recognized in *United States v. Decastro* that § 922(a)(3) "affects the ability to acquire a firearm," even if only "minimally." 682 F.3d 160, 164 (2d Cir. 2012). Contrary to the government's argument, Mr. Lucha is not arguing that "the *DeCastro* Court implicitly made an analytical step" that "bind[s] this Court." (Gov't Ltr. at 2.) As explained at length in reply (at 2–3), *Decastro*'s reasoning has been abrogated by *Bruen*, and whether the burden imposed on an individual's ability to acquire a firearm by § 922(a)(3) is "minimal" or "meaningful" is beside the point. But this Court can and should reach the same conclusion the *Decastro* court did that § 922(a)(3)'s prohibition implicates the Second Amendment. *See Decastro*, 682 F.3d at 168 (§ 922(a)(3) "does not burden" Second Amendment rights "in a way so substantial as to justify heightened scrutiny"). This triggers the second step of the *Bruen* analysis. *See Bruen*, 142 S. Ct. at 2134 (having "little difficulty [in] concluding that" "carrying handguns publicly for self-defense" is protected conduct and proceeding to analyze whether the challenged law comports with the historical tradition of firearm regulation).

Turning to the historical analysis at the core of *Bruen*'s second step, the government argues that the analytical distinction between "modern regulation[s] [] directed at a societal problem that has existed since the 18th century" and "modern regulation[s] [] unimaginable at the founding" is "unsupported by *Bruen*." (Gov't Ltr. at 2.) Not so. *Bruen* explicitly states that for a regulation that "addresses a general societal problem that has persisted since the 18th century," "the lack of a *distinctly similar* historical regulation addressing that problem" is evidence that the regulation is inconsistent with the Second Amendment. 142 S. Ct. at 2131 (emphasis added). Only "cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach," which asks whether the modern regulation and a proffered historical analogue are "*relevantly similar.*" *Id.* at 2132 (emphasis added). Both cases certainly permit analogical reasoning, but the "distinctly similar" standard for longstanding societal problems requires a much closer fit. *See United States v. Harrison*,

Case 1:22-cr-00644-JSR    Document 43    Filed 03/29/23    Page 4 of 5

2023 WL 1771138, at *5–6 (W.D. Okla. Feb. 3, 2023) (explaining that the historical inquiry is "'fairly straightforward' when the challenged regulation addresses a 'general societal problem that has persisted since the 18th century,'" and holding that "the United States has not identified a single historical law that is 'distinctly similar' to § 922(g)(3)—which *Bruen* suggests is dispositive").

Courts consistently recognize the difference between these two types of analyses. *See United States v. Lewis*, 2023 WL 187582, at *3 (W.D. Okla. Jan. 13, 2023) ("[T]he court concludes, upon careful reading of [*Bruen*], that it does articulate two standards for assessment of the government's proffered historical analogues . . . This is so even though . . . the Court [in *Bruen*] talked about 'analogues' in discussing both standards."); *Price*, 2022 WL 6968457, at *4–5 (recognizing two approaches and concluding that the "societal problem[s] addressed by Section 922(k) appear to be crime, including crime involving stolen firearms"; "According to *Bruen*, that the societal problem addressed by Section 922(k) was likely in existence at the founding but not addressed by similar means is relevant evidence" that the law is "inconsistent with the Second Amendment"); *United States v. Melendrez-Machado*, 2022 WL 17684319, at *3 (W.D. Tex. Oct. 18, 2022) (distinguishing the application of the "distinctly similar" and "relevantly similar" standards); *United States v. Holden*, 2022 WL 17103509, at *2–3 (N.D. Ind. Oct. 31, 2022) (same); *United States v. Power*, 2023 WL 131050, at *2 (D. Md. Jan. 9, 2023) (same); *United States v. Perez-Gallan*, 2022 WL 16858516, at *3 (W.D. Tex. Nov. 10, 2022) (same).

Ultimately, the government cannot prevail here under either standard because it has not provided *any* historical analogue that is "distinctly similar," or even "relevantly similar," to § 922(a)(3). Nothing in the government's opposition or supplemental submission requires a different result. In its opposition, the government references several examples of how firearms and gunpowder were "traded and transported" at the time of the founding. (Gov't Opp. at 12.) But as described in Mr. Lucha's reply and at oral argument, Mr. Lucha is not charged with commercial sale of firearms or gun trafficking, and § 922(a)(3)'s scope sweeps much more broadly than just "commercial" firearm sales. (Reply at 8; *see* Tr. 8:4–17.) These "trade and transport" laws may have addressed the "sale" of firearms or gunpowder in certain circumstances, but they do not criminalize the mere possession of a firearm based on its state of origin. Further, the laws restricting the sale of gunpowder referenced in the government's opposition (at 15) were targeted at "protect[ing] citizens from explosions" (*id.*) and did not serve the purpose of regulating individuals' possession of a firearm. *See Harrison*, 2023 WL 1771138, at *15 ("[T]he justification of modern restrictions still must be analogous to the justifications of Founding-era restrictions."). These examples therefore cannot support a historical tradition of regulation that is "distinctly similar" or "relevantly similar" to § 922(a)(3)'s ban on possession of out-of-state firearms.

In its supplemental letter, the government also refers to the "colonial-era laws relating to transactions with Native Americans" that it cited in its opposition, arguing that they "speak to a common practice in regulating the transfer in firearms in and out of jurisdictional bounds at the time of the Founding." (Gov't Ltr. at 3.) Yet in addition to

being unquestionably racist (Reply at 9), these historical examples certainly cannot be held up as evidence that at the time of the founding, there was a common practice of regulating possession of firearms based on the jurisdiction in which they were obtained.

Instead, courts have considered the colonial-era prohibitions on transactions with Native Americans as evidence that early firearm legislation was concerned with firearms ending up in the hands of those perceived as "dangerous." *See Rowson*, 2023 WL 431037, at *20 ("[F]irearm legislation in colonial America prohibited various categories of persons viewed at the time as dangerous, having violent propensities, and/or unfaithful to the sovereign and its laws from owning firearms," including 'Native Americans, Black persons, and indentured servants'"); *United States v. Bartucci*, 2023 WL 2189530, at *7 (E.D. Cal. Feb. 23, 2023) (citing laws disarming "those unwilling to take an oath of allegiance . . ., slaves, and Native Americans" as evidence that "these laws permitted certain categories of persons from being disarmed based on their perceived dangerousness or lack of status"); *see also Kanter v. Barr*, 919 F.3d 437, 458 (7th Cir. 2019) (Barrett, J., dissenting) (citing laws that disarmed "slaves and Native Americans" as support for proposition that "founding-era legislatures categorically disarmed groups whom they judged to be a threat to the public safety"). Section 922(a)(3) criminalizes the possession of *any* weapon obtained out of state, even by law-abiding citizens that pose no threat to public safety and are not otherwise prohibited from owning a firearm for any reason. This law therefore cannot serve the purpose of keeping firearms out of the hands of those perceived as "dangerous," meaning the government's proffered analogues do not have sufficiently "analogous" justifications. *Harrison*, 2023 WL 1771138, at *15.[2]

For these reasons, and the reasons set out in Mr. Lucha's opening and reply papers, the indictment against Mr. Lucha must be dismissed.

Respectfully submitted,

/s/
Zawadi Baharanyi
Amanda J. Mayo
Assistant Federal Defenders
Tel.: (212) 417-8735

cc:   Lucas Issacharoff, Ashley C. Nicolas, & Madison Reddick Smyser,
      AUSAs (by ECF)

---

[2]   The government's citation to these laws prohibiting Native Americans from receiving firearms is also inapt because at the time of the founding, Native Americans "were generally not considered to be a part of the political community protected by the Second Amendment." *Harrison*, 2023 WL 1771138, at *20.