# EXHIBIT B

Case 1:22-cr-00644-JSR   Document 56-2   Filed 08/14/23   Page 1 of 7

### PROBABLE CAUSE NARRATIVE

1. Trooper Michael R. Sullivan, Massachusetts State Police, submits this probable cause narrative in support of the attached criminal complaint charging the following defendants as described below:

   a. Jamal Tavon Sanders LATIMER ▮▮▮▮▮ a/k/a Jamal Talib Abdulleh Bey
   b. Alban el CURRAUGH ▮▮▮▮▮
   c. Quinn KHABIR ▮▮▮▮▮
   d. Robert RODRIGUEZ ▮▮▮▮▮
   e. Wilfredo HERNANDEZ ▮▮▮▮▮ a/k/a Will Musa
   f. Aaron Lamont JOHNSON a/k/a Tarrif Sharif Bey ▮▮▮▮▮
   g. Brandon BRITTON ▮▮▮▮▮ a/k/a Messiah Bey
   h. John Doe #1 (DOB unknown, refused to be photographed)
   i. John Doe #2 (DOB unknown)
   j. Lamar DOW ▮▮▮▮▮ a/k/a Jamil
   k. Conald PIERRE ▮▮▮▮▮

2. This narrative is based upon review of video surveillance, body-worn camera footage, police reports, database queries, and conversations with State Police and other law enforcement officers, among other things. Because this narrative is for the limited purpose of establishing probable cause, it does not recite all facts known to investigators, but only those necessary to accomplish this purpose. Where this narrative refers to conversations, recordings, or documents, it does so in substance and in relevant part.

3. On July 3, 2021, Trooper Ryan Casey of the Massachusetts State Police was working the midnight shift (2300-0700 hours) out of the State Police Danvers Barracks in a fully marked cruiser. At approximately 1:10 am, while traveling on Route 95 NB in the town of Wakefield prior to the North Avenue Exit, Trooper Casey observed a black 2018 Ford Transit van bearing Maine Reg. #834023 pulled over in the break down lane with its hazard lights on. The van was a large conversion-type vehicle that had over 12 seats. Trooper Casey pulled over behind the van and activated his rear emergency lights.

4. Trooper Casey then approached the vehicle on the passenger side and was met by suspect 1, later identified as Jamal Tavon Sanders LATIMER ▮▮▮▮▮ a/k/a Jamal Talib Abdulleh Bey who was outside the vehicle. Trooper Casey was wearing a body camera during the entirety of his interaction, which was recorded. LATIMER had a rifle harnessed around his torso, was wearing camouflage army fatigues, and had body armor on. The rifle was loaded and Trooper Casey observed rounds of ammunition through a window in the magazine. Besides LATIMER, two other individuals approached Trooper Casey. Suspect 2, later identified as Aaron Lamont JOHNSON a/k/a Tarrif Sharif Bey was wearing army fatigues, a face covering, and carrying a loaded rifle with visible rounds of ammunition in the magazine. Suspect 3, later identified Alban el CURRAUGH was wearing camouflage army fatigues with body armor.

5. Trooper Casey asked LATIMER what was going on and he responded they were "militia" on their way to Maine from Rhode Island, and that they were trying to limit unnecessary stops by refueling their vehicles on the side of the roadway. It was then

traveling with them. That vehicle was a 2006 Gray Honda Ridgeline bearing Maine Reg. 935711.

6. Trooper Casey then asked if anyone in the two vehicles had any license to operate a motor vehicle and LATIMER indicated that they did not. LATIMER specified that none of them had licenses or any forms of identification on their person and reiterated that they were traveling to Maine from Rhode Island for "training." LATIMER stated they are all from Pawtucket, Rhode Island. Trooper Casey asked for his name and date of birth and LATIMER wrote down "Jamhal Talib Abdullah Bey, a telephone number, ▮▮▮ At this time, suspect 2 covered his face with a garment and turned his body away from Trooper Casey. When Trooper Casey presented his notebook for CURRAUGH to write down his information, LATIMER extended his hand and told CURRAUGH that he didn't have to give him anything. CURRAUGH did not provide any information.

7. Trooper Casey then approached the driver's side of the 2018 Ford Transit van and spoke with the operator, Suspect 4, later identified as Wilfredo HERNANDEZ (DOB ▮▮▮ a/k/a Will Musa. HERNANDEZ identified himself to Tpr. Casey with an "International Road Travel" I.D. under the name MUSA, Will El (Life Date ▮▮▮ and stated he was "traveling," and not driving the vehicle. Around this time, Sgt. Burnham of the Wakefield Police Department arrived on scene.

8. Trooper Casey and Sgt. Burnham then had further conversation with LATIMER, who stated it was legal for them to travel through the state with the firearms as long as they didn't make any unnecessary stops. When asked if anyone had any sort of FID card or license to carry a firearm, LATIMER replied "No." He went on to state that he previously advised everyone "not to bring anything that can identify us due to the nature of what we're trying to do." LATIMER also told Sergeant Burnham that they were exempt from firearm laws because they were militia. During this conversation, Trooper Casey observed a new suspect (suspect 5, later identified as Quinn KHABIR (DOB ▮▮▮ approach wearing a black ski mask, similar camouflage army fatigues, body armor, with a loaded rifle harnessed on his torso. Additionally, suspect 6 appeared and provided a name of Robert RODRIGUEZ and DOB ▮▮▮ RODRIGUEZ was wearing camouflage army fatigues along with body armor and was standing outside of the 2006 Honda Ridgeline. Suspect 7 was also observed as wearing camouflage army fatigues with body armor and a red hood. At this time, other members of the Massachusetts State Police arrived on scene and Trooper Casey temporarily returned the area of his cruiser.

9. A CJIS inquiry of the Maine plate number and VIN number associated with the 2018 Ford Transit van indicated that it was unregistered in Maine, and its registration in Massachusetts was revoked as of 2020. A CJIS inquiry of the Maine plate number and VIN number associated with the 2006 Honda Ridgeline pick-up truck indicated it was unregistered in Maine, and its registration in Massachusetts was cancelled as of 10/19/2020.

10. Sergeant McDevitt, Trooper Orlando, and Trooper Casey then re-approached the group of suspects. LATIMER identified himself as the leader of the "militia." He reiterated that he was traveling from RI to ME and stated he was going to private land up there to train. When asked why they were armed, LATIMER began citing a series of federal laws. He indicated that the vehicles were his. When asked to stow the firearms in the vehicle,

LATIMER refused and stated "we can't do that." LATIMER claimed that asking him to put down his firearms was a violation of his second amendment rights and stated "I'm going to stay armed for my safety just like you are going to stay armed for yours." At this time, no suspect had provided any evidence of a FID card or license to carry a firearm from Massachusetts or any other state despite requests.

11. Trooper Casey knows, based on training and experience, that in order to properly transport firearms across state lines from one state to another state, the owner must be duly licensed or in lawful possession of their firearm in their home state, as well as their destination state, and the weapons must be unloaded and in a secure container and/or completely out of reach of the owner. He also knows Massachusetts law requires that non-residents in possession of rifles and shotguns must keep those firearms unloaded and properly stored.

12. In speaking further with LATIMER, Sgt. McDevitt asked if he had any license to possess the rifle he had on his person. LATIMER responded "you don't need a license in Rhode Island to own a rifle." When advised that they are not allowed to brandish the firearms in Massachusetts while transporting them between Rhode Island to Maine, LATIMER stated they were holding the firearms because they were no longer in the car. LATIMER also claimed they wouldn't have brandished the firearms if Trooper Casey did not put his police lights on. However, Trooper Casey indicated that the suspects were already armed when he responded to the scene, consistent with video footage.

13. At this point, the Troopers returned to their cruisers to further assess the situation. During this time, Troopers Orlando and Casey noticed that a few of the armed men were moving towards the wood line on the side of the roadway. Given their refusal to disarm and the escalating situation, it was determined to move all officers back to a position of cover and create distance and a perimeter. Sgt. McDevitt then attempted to speak to LATIMER again. During that attempted conversation, Sgt. McDevitt heard the sound of a rifle chambering a round in the wood line area. When LATIMER asked if he was free to go, Sgt. McDevitt stated no. When he asked if he was being detained, Sgt. McDevitt informed him yes. When LATIMER was asked to lay down his firearm and surrender, he refused. LATIMER was advised he was being arrested for unlawfully carrying a firearm on at least 4 occasions. At least 5 armed suspects were identified at that time and 8 total suspects were observed from the perimeter.

14. At this point, the Massachusetts State Police shut down both lanes of Route 95, and a standoff ensued between the armed suspects and the Troopers for several hours. During the standoff, RODRIGUEZ and HERNANDEZ who were originally in the wood line area were located by Officer Holliday of the Wakefield Police on North Avenue about a half mile from the location of the standoff. HERNANDEZ was wearing body armor, blue shorts, a T-shirt, had a pistol (later identified as a Taurus G3 9mm semi-automatic pistol) on his person, and had a firearm magazine in his pocket. The other suspect was wearing body armor and camouflage army fatigues. While the suspects initially claimed they were simply jogging in the area, subsequent interviews conducted by the Massachusetts State Police confirmed that they were originally on scene at the standoff and had fled the area through the woods. The two individuals were taken into custody and transported to the State Police Barracks in Andover.

USAO_0012429

15. After several hours of negotiation, the armed suspects at the scene surrendered. At the instruction of the Massachusetts State Police, the suspects disarmed themselves of weapons and ammunition and told to place those items in the van. Nine of the defendants (all except the "joggers") and two dogs were taken into custody between the two vehicles.

16. Police recovered approximately 10 ballistic vests (body armor) during the arrests of the defendants, as well as camouflage uniforms, and ballistic helmets, and a pair of night-vision goggles, among other things.

17. While on scene, a brief inventory was conducted of both vehicles before they were towed to the Danvers State Police Barracks. The vehicles were first inventoried then later searched pursuant to warrants.

18. Pursuant to the search warrant, officers recovered the following things, among others, from the Ford Transit van:

    a. A CZ P-10C pistol with loaded magazine recovered from the passenger side rear seat

    b. A Glock 44 .22 caliber semi-automatic pistol and loaded magazine

    c. A Ruger 556 5.56 caliber semi-automatic rifle with a loaded 28-round magazine

    d. A Palmetto State Armory PA-15 rifle

    e. A DPMS Panther Arms A15 5.56 caliber rifle

    f. Approximately 630 live 223 caliber rounds of ammunition in a green bag

    g. Approximately 13 magazines loaded with an unknown quantity of ammunition

    h. A sandwich bag filled with .22 caliber ammunition

    i. A box of approximately 150 rounds of 9mm Luger caliber ammunition

    j. 26 12-guage shotgun shells

    k. A box of approximately 140 5.56 caliber rounds of ammunition

    l. A loaded 9mm Luger magazine

    m. A box of approximately 100 12-guage shotgun shells

    n. Seven magazines loaded with an unknown amount of ammunition recovered from a white trash bag under the van's second-row bench seat

    o. Approximately 50 .308 caliber rounds of ammunition

    p. Approximately 20 7.62x51 caliber rounds of ammunition

n. Seven magazines loaded with an unknown amount of ammunition recovered from a white trash bag under the van's second-row bench seat

o. Approximately 50 .308 caliber rounds of ammunition

p. Approximately 20 7.62x51 caliber rounds of ammunition

19. Pursuant to the search warrant, officers recovered the following things, among others, from the Honda Ridgeline:

   a. A Remington model 700 .308 Winchester caliber rifle with a Nikon scope recovered in the back seat.

   b. A loaded Mossberg model 930 12-guage semi-automatic shotgun (loaded with a 12-guage shell in the chamber) recovered between the front passenger seat and center console;

   c. A Glock semi-automatic pistol recovered from the back seat

   d. Three loaded 5.56 magazines

   e. One loaded .22 caliber magazine

   f. One loaded .308 caliber magazine

   g. A clear bag containing ammunition

   h. A loaded .40 caliber drum magazine

   i. A box of 20 .308 caliber rounds of ammunition

   j. A box of 40 9mm Luger rounds of ammunition

   k. 96 rounds of 5.56 caliber ammunition

20. In the vehicles, police also recovered gas cans, a pair of binoculars, an empty holster, rubber gloves, sleeping bags, and other items.

21. None of the firearms located in the van were properly stored and/or out of reach of the occupants in a secure location, including the juvenile described above. None of the armed suspects ever provided a FID card or license to carry firearms from Massachusetts or any other state.

22. Therefore, there is probable cause to believe that the defendants committed the following crimes as a joint venture, arising out of the weapons and items seized from the van:

   a. Possession of a Firearm (G.L. c. 269, § 10(a))

   b. Possession of a Large Capacity Firearm (G.L. c. 269, § 10(m))

    f. Conspiracy to Possess and Improperly Store Firearms (G.L. c. 274, § 7)

23. Further, there is probable cause to believe that defendants Wilfredo Hernandez a/k/a Will Musa committed the crime of Possession Of A Firearm (G.L. c. 269, § 10(a)), arising out of his carrying the above-described pistol at the time of his arrest.

24. Further, there is probable cause to believe the following defendants committed the crime of Providing False Information to a Police Officer (G.L. c. 268, § 34A), by provided the aliases listed below during their arrest processing:

    a. Jamal Tavon Sanders LATIMER a/k/a Jamal Talib Abdulleh Bey
    b. Wilfredo HERNANDEZ a/k/a Will Musa
    c. Aaron Lamont JOHNSON a/k/a Tarrif Sharif Bey
    d. Brandon BRITTON a/k/a Messiah Bey
    e. Lamar DOW a/k/a Jamil

25. Finally, there is probable cause that each of the defendants committed the crimes of Wearing Body Armor during the Commission of a Felony (G.L. c. 269, § 10D) and conspiracy (c. 274, § 7)