# EXHIBIT E

**Trial Court of Massachusetts**
**District Court Department**

| Date Filed 8 |12|21 | SEARCH WARRANT | Docket Number 21- 118 |
| --- | --- | --- |

| Applicant/Affiant | Location: (Person, Place or Thing) |
| --- | --- |
| Trp- Michael Sullivan | Black Samsung SGT |

| Items Searched For | ( ) Warrant and Affidavit Impounded by Order of |
| --- | --- |
| Evid. of firearms/~~Conspiracy~~ Conspiracy | _____ Justice |

### SEARCH WARRANT

| NO. | DATE | DOCKET ENTRIES |
| --- | --- | --- |
| | 8|13|21 | Affidavit In Support of Search Warrant Issued.  Returnable on: _____ |
| | 8-19-21 | Warrant Returned (with) (without) Service |
| | | |
| | | |
| | | |
| | | A TRUE COPY ATTEST: CLERK-MAGISTRATE |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

| APPLICATION FOR SEARCH WARRANT | TRIAL COURT OF MASSACHUSETTS | |
|---|---|---|
| G.L. c. 276 §§ 1-7 | District | COURT DEPARTMENT |
| | Malden | DIVISION |

| NAME OF APPLICANT | Michael R. Sullivan |
|---|---|

| POSITION OF APPLICANT | Trooper, Massachusetts State Police | SEARCH WARRANT DOCKET NUMBER  21SDSW118 |
|---|---|---|

I, the undersigned **APPLICANT**, being duly sworn, depose and say that:

1. I have the following information based upon the attached affidavit(s), consisting of a total of __13__ Pages, Which is (are) incorporated herein by reference.

2. Based upon this information, there is **PROBABLE CAUSE** to believe that the property described below:

   ☐ Has been stolen, embezzled, or obtained by false pretenses.
   ☐ Is intended for use or has been used as the means of committing a crime.
   ☐ Has been concealed to prevent a crime from being discovered.
   ☐ Is unlawfully possessed or concealed for an unlawful purpose.
   ☒ Is evidence of a crime or is evidence of criminal activity.
   ☐ Other ( *specify* )

3. I am seeking the issuance of a warrant to search for the following property ( *describe the property to be searched for as particular as possible* ):

   See Addendum A Attached Herein.

4. Based upon this information, there is also probable cause to believe that the property may be found ( *check as many as apply* ):

   ☒ At ( *identify the exact location or description of the place(s) to be searched* ):
   See Addendum B Attached Herein.

   *A TRUE COPY ATTEST.*
   *[signature]*
   *CLERK-MAGISTRATE*

   Which is occupied by and/or in the possession of:

   ☐ On the person or in the possession of ( *identify any specific person(s) to be searched* ):

   ☐ On any person present who may be found to have such property in his or her possession or under his or her control or to whom such Property may have been delivered.

   **THEREFORE,** I respectfully request that the court issue a Warrant and order of seizure, authorizing the search of the above described place(s) and Person(s), if any, to be searched, and directing that such property or evidence or any part thereof, if found, be seized and brought before the court, Together with such other and further relief that the court may deem proper.

   I ☐ have previously submitted the same application.
   I ☒ have **not** previously submitted the same application.

| PRINTED NAME OF APPLICANT | SIGNED UNDER THE PENALTIES OF PERJURY |
|---|---|
| Michael R. Sullivan | X _[signature]_ #3885 |
| | Signature of Applicant |

| SWORN AND SUBSCRIBED TO BEFORE | |
|---|---|
| X _[signature]_ Eren Colombo, FACM | 8/13/21 |
| Signature of Justice, Clerk-Magistrate or Assistant Clerk | DATE |

USAO_0014547

# SEARCH WARRANT

G.L. c. 276 §§ 1-7

**TRIAL COURT OF MASSACHUSETTS**

| District | COURT DEPARTMENT |
|---|---|
| Malden | DIVISION |

SEARCH WARRANT DOCKET NUMBER
21 SD SW 118

**TO THE SHERIFFS OF OUR SEVERAL COUNTIES OR THEIR DEPUTIES, ANY STATE POLICE OFFICER, OR ANY CONSTABLE OR POLICE OFFICER OF ANY CITY OR TOWN, WITHIN OUR COMMONWEALTH:**

Proof by affidavit, which is hereby incorporated by reference, has been made this day and I find that there is **PROBABLE CAUSE** to believe that the property described below:

- [ ] Has been stolen, embezzled, or obtained by false pretenses.
- [ ] Is intended for use or has been used as the means of committing a crime.
- [ ] Has been concealed to prevent a crime from being discovered.
- [ ] Is unlawfully possessed or concealed for an unlawful purpose.
- [X] Is evidence of a crime or is evidence of criminal activity.
- [ ] Other ( specify )

**YOU ARE THERFORE COMMANDED** within a reasonable time and in no event later than seven days from the issuance of this search warrant to search for the following property:

See Addendum A Attached Herein.

[X] At :

See Addendum B Attached Herein.

*A TRUE COPY ATTEST:*
*CLERK MAGISTRATE*

Which is occupied by and/or in the possession of:

- [ ] On the person or in the possession of :

You [ ] are [✓] are not    also authorized to conduct the search at any time during the night.

You [ ] are [✓] are not    also authorized to enter the premises without announcement.

You [ ] are [✓] are not    also commanded to search any person present who may be found to have such property in his or her possession or under his or her control or to whom such property may have been delivered.

**YOU ARE FURTHER COMMANDED** if you find such property or any part thereof, to bring it, and when appropriate, the persons in whose possession it is found before the

Malden    Division of the    District    Court Department.

| Date Issued | Signature of Justice, Clerk-Magistrate or Assistant Clerk |
|---|---|
| 8/13/21 | X  *Erica Colombo, fAcm* |
| First or Administrative Justice, **WITNESS:** *Emily A. Karstetter* | Printed name of Justice, Clerk-Magistrate or Assistant Clerk  *Erica Colombo, fAcm* |

USAO_0014548

## RETURN OF OFFICER SERVING SEARCH WARRANT

*A search warrant must be executed as soon as reasonably possible after its issuance, and in any case may not be validly executed more than 7 days after its issuance. The executing officer must file his or her return with the court named in the warrant within 7 days after the warrant is issued G.L. c.276 §3A.*

This search warrant was issued on _____August 13_____ , 20 __21__ , and I have executed it as follows:
                                                          DATE

The following is an inventory of the property taken pursuant to this search warrant:

1. On Friday, August 13, 2021, the search warrant was executed for warrant #2150SW118. Due to the volume and process
2. of forensic searches, the search will not be completed within seven days. Complete results of the information obtained
3. through execution of the warrant will be provided to defense counsel in the pre-trial discovery process.
4. 
5. 
6. 
7. 
8. 
9. 
10. 
11. 
12. 
13. 
14. 
15. 
16. 
17. 
18. 
19. 
20. 
21. 
22. 

( attach additional pages as necessary )

This inventory was made in the presence of:  Trooper Michael R. Sullivan

I swear that this is a true and detailed account of all property taken by me on this search warrant

| SIGNATURE OF PERSON MAKING SEARCH | DATE AND TIME OF SEARCH | SWORN AND SUBSCRIBED TO BEFORE |
|---|---|---|
| X  *[signature]* #3885 | August 13, 2021 | X *[signature]* |
| | | Signature of Justice, Clerk-Magistrate or Assistant Clerk |
| PRINTED NAME OF PERSON MAKING SEARCH | TITLE OF PERSON MAKING SEARCH | DATE SWORN AND SUBSCRIBED TO |
| Michael R. Sullivan | Trooper | 8-19-21 |

Page ____ of ____ Pages

A TRUE COPY ATTEST: CLERK-MAGISTRATE

## ADDENDUM A
### (Evidence to be Searched For and Seized)

This search warrant authorizes the Massachusetts State Police to search the ~~three~~ cell phones
described in Addendum B and to seize the following data believed to constitute evidence of the
crimes of Unlawful Possession of a Firearm, Carrying a Firearm Without a License, Unlawful
Possession of Ammunition, Improper Storage of a Firearm, Use of Body Armor in the
Commission of a Felony, and Conspiracy to Commit a Crime:

A.      From the timeframe of **June 3, 2021 to July 3, 2021**, all data on the device which
        provides direct and/or circumstantial evidence as to the identity of the user or users of
        said device and provides evidence towards continuous possession, custody, and control of
        the device, including subscriber information, contact lists, phone logs, voicemails, text
        messages, videos, photographs, application usage and history, and internet history and
        usage, and any other files or data that identify the regular user of the phone such as
        account names or IDs for the user's email(s), data storage (cloud), and social media
        accounts;

B.      From the timeframe of **June 3, 2021 to July 3, 2021**, any substantive data that refers or
        relates to the motive(s), planning, assistance, or roles of other participants in the crimes
        of Unlawful Possession of a Firearm, Carrying a Firearm Without a License, Unlawful
        Possession of Ammunition, Improper Storage of a Firearm, Use of Body Armor in the
        Commission of a Felony, and Conspiracy to Commit a Crime.  Specifically, the relevant
        data that this warrant seeks permission to search includes:

        i.      The content of any text messages or other electronic communications, created,
                sent, and received (including attachments), as well as phone logs detailing any
                phone calls missed, received, or made, and saved contacts;

        ii.     All photographs and videos related to or depicting the crimes above, as well as
                screenshots of any relevant text conversations or other electronic
                communications;

        iii.    Any evidence showing social media postings related to or depicting the crimes
                above, by web browser or phone application, such as video uploads to YouTube
                or Instagram.

C.      From the timeframe of **June 3, 2021 to July 3, 2021**, any information tending to show
        affiliation and/or participation in the militia group self-identified by members as "Rise of
        the Moors," as well as any information regarding the creation and usage of illegitimate
        identification documents for members of said militia group.

D.      For (A), (B), and (C) above, all Data files, Records, Logs, and Metadata which may
        identify, trace, or record the date and/or time of the files' creation, modification,
        alteration, transmission or receipt via the internet or other networks; and

USAO_0014550

E.    Any passcodes necessary to access the above-referenced data.

This warrant also permits executing officers to:

- have the cell phone identified above searched, photographed and/or otherwise recorded, examined, and analyzed by an expert using specialized forensic extraction tools, either civilian or law enforcement, if such assistance is determined by investigators executing this Search Warrant to be necessary;

- search for deleted files and unallocated space. To the extent that the date a file was created or stored on a device cannot be automatically determined by a date search, the executing officers are permitted to examine the file to determine whether it falls into one of the above categories of evidence to be seized within the above time frame;

- power up and recharge the cell phones as needed to execute this Search Warrant; and

- conduct and continue the search of the cell phone beyond the seven (7) day return period.



A TRUE COPY
ATTEST
CLERK-MAGISTRATE

USAO_0014551

**ADDENDUM B**
**(Location to be Searched)**

This search warrant authorizes the Massachusetts State Police, with assistance from other law enforcement officers and civilians acting under their supervision to search the following devices, which are presently in the custody of the Massachusetts State Police at 15 Commonwealth Avenue, Woburn, Massachusetts, for evidence described in **Addendum A**:

- A black Samsung Galaxy SGT in a black Otterbox case recovered during the arrest of Quinn Cumberlander a/k/a "Quinn Khabir" (item # 2021-110-329:37).



Page 1 of 1

A TRUE COPY
ATTEST:

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## AFFIDAVIT OF MASSACHUSETTS STATE POLICE TROOPER
## MICHAEL R. SULLIVAN

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

I, Trooper Michael R. Sullivan, being duly sworn, hereby depose and state as follows:

1.  I am a Trooper with the Massachusetts State Police (MSP), where I have been employed since 2013. I am assigned to the Middlesex District Attorney's State Police Detective Unit (SPDU) within the MSP Division of Investigative Services; I began work with the SPDU in January 2019. My duties in include investigation into unattended or suspicious deaths, suicides and homicides. Since this assignment, I have investigated more than 50 unattended deaths and/or suicides and have been involved in the investigation of a homicide. Prior to this assignment, I was assigned to the MSP Division of Field Services on patrol. In that capacity, my duties included issuing motor vehicle citations for violations, investigating traffic crashes, investigating various crimes, including drug related offenses, and warrant apprehension. I have made over 200 arrests in my career for weapons crimes, drug crimes, motor vehicle violations, and domestic crimes. Prior to becoming a Trooper, I was a police officer for the Town of Bedford for 12 years, where I was assigned to a regional drug task force. In addition to training to become a police officer and a trooper, I have attended over 250 hours of specialized trainings in narcotics investigations, namely a Methamphetamine Investigation Workshop, Drug Recognition Expert (DRE) School, Standardized Field Sobriety Testing/DRE Instructor, Firearms Investigations, Pharmaceutical Investigation Training, Undercover Operations, and Interview and Interrogations and Drug Trafficking Investigations. I have testified as a DRE in Concord District Court. Over the course of my career, I have been the affiant in support of approximately 10 search warrants and have participated in the execution of over 100 warrants.

2.  I believe that there is probable cause that the crimes of (1) Unlawful Possession of a Firearm, in violation of G.L. c. 269, §10(h)(1), (2) Carrying a Firearm Without a License, in violation of G.L. c. 269, §10(a), (3) Unlawful Possession of Ammunition, in violation of G.L. c. 269, §10(h), (4) Improper Storage of a Firearm, in violation of G.L. c. 140, §131L, (5) Use of Body Armor in the Commission of a Felony, in violation of G.L. c. 269, §10D, and (6) Conspiracy to Commit a Crime, in violation of G.L. c. 274, §7, have occurred and that evidence of these crimes will be found in or stored on the following device currently in the custody of the Massachusetts State Police at 15 Commonwealth Avenue, Woburn, Massachusetts.

Page 1 of 13

USAO_0014553



- A black Samsung Galaxy SGT in a black Otterbox case recovered during the arrest of Quinn Cumberlander a/k/a "Quinn Khabir" (item # 2021-110-329:37).

[See **ADDENDUM B**, attached and incorporated herein]

3. My conclusion is based on the following information below, which I obtained from my participation in the investigation, as well as other information and reports from members of the Wakefield and Massachusetts State Police.

### Basis of Probable Cause

4. On July 3, 2021, Trooper Ryan Casey of the Massachusetts State Police was working the Midnight shift (2300-0700 hours) out of the State Police Danvers Barracks in a fully marked cruiser. At approximately 1:10 am, while traveling on Route 95 NB in the town of Wakefield prior to the North Avenue Exit, Trooper Casey observed a black 2018 Ford Transit van bearing Maine Reg. #834023 pulled over in the break down lane with its hazard lights on. The van was a large conversion-type vehicle that had over 12 seats. Trooper Casey pulled over behind the van and activated his rear emergency lights.

5. Trooper Casey then approached the vehicle on the passenger side and was met by suspect 1 who was outside the vehicle. Trooper Casey was wearing a body camera during the entirety of his interaction, which was recorded. Suspect 1 had a rifle harnessed around his torso, was wearing camouflage army fatigues, and had body armor on. The rifle was loaded and Trooper Casey visibly observed rounds of ammunition in the magazine. Besides suspect 1, two other individuals approached Trooper Casey. Suspect 2 was wearing army fatigues, a face covering, and carrying a loaded rifle with visible rounds of ammunition in the magazine. Suspect 3 was wearing camouflage army fatigues with body armor.

6. Trooper Casey asked suspect 1 what was going on and suspect 1 responded they were "militia" on their way to Maine from Rhode Island, and that they were trying to limit unnecessary stops by refueling their vehicles on the side of the roadway. It was then brought to Trooper Casey's attention that a second vehicle was ahead of the van and was traveling with them. That vehicle was a 2006 Gray Honda Ridgeline bearing Maine Reg. 935711.

7. Trooper Casey then asked if anyone in the two vehicles had any license to operate a motor vehicle and suspect 1 indicated that they did not. Suspect 1 specified that none of them had licenses or any forms of identification on their person and reiterated that they were traveling to Maine from Rhode Island for "training." Suspect 1 stated they are all from Pawtucket, Rhode Island. Trooper Casey asked for suspect 1's name and DOB and he wrote down "Jamhal Talib Abdullah Bey, ▮▮▮▮▮▮▮▮▮" (this suspect was later identified as

USAO_0014554

A TRUE COPY
ATTEST:

Jamhal Tayvon Latimer). At this time, suspect 2 covered his face with a garment and turned his body away from Trooper Casey. When Trooper Casey handed suspect 3 a notebook to write down his name and DOB, suspect 1 interjected and stated he did not need to provide any information, so suspect 3 did not do so.

8. Trooper Casey then approached the driver's side of the 2018 Ford Transit van and spoke with the operator (suspect 4). Suspect 4 provided an "International Road Travel" I.D. under the name MUSA, Will El (Life Date ▓▓▓▓▓▓) and stated he was "traveling," and not driving the vehicle. Around this time, Sgt. Burnham of the Wakefield Police Department arrived on scene.

9. Trooper Casey and Sgt. Burnham then had further conversation with suspect 1, who stated it was legal for them to travel through the state with the firearms as long as they didn't make any unnecessary stops. When asked if anyone had any sort of FID card or license to carry a firearm, suspect 1 replied "No." Suspect 1 went on to state that he previously advised everyone "not to bring anything that can identify us due to the nature of what we're trying to do." Suspect 1 also told Sergeant Burnham that they were exempt from firearm laws because they were militia. During this conversation, Trooper Casey observed a new suspect (suspect 5) approach wearing a black ski mask, similar camouflage army fatigues, body armor, and had a loaded rifle harnessed on his torso. Additionally, suspect 6 appeared and provided a name of Robert Rodriguez and DOB ▓▓▓▓▓; suspect 6 was wearing camouflage army fatigues along with body armor and was standing outside of the 2006 Honda Ridgeline. Suspect 7 was also observed as wearing camouflage army fatigues with body armor and a red hood. At this time, other members of the Massachusetts State Police arrived on scene and Trooper Casey temporarily returned the area of his cruiser.

10. A CJIS inquiry of the Maine plate number and VIN number associated with the 2018 Ford Transit van indicated that it was unregistered in Maine, and its registration in Massachusetts was revoked as of 2020. A CJIS inquiry of the Maine plate number and VIN number associated with the 2006 Honda Ridgeline pick-up truck indicated it was unregistered in Maine, and its registration in Massachusetts was cancelled as of 10/19/2020.

11. Sergeant McDevitt, Trooper Orlando, and Trooper Casey then re-approached the group of suspects. Suspect 1 identified himself as the leader of the "militia." Suspect 1 reiterated that he was traveling from RI to ME and stated he was going to private land up there to train. When asked why they were armed, suspect 1 began citing a series of federal laws. Suspect 1 indicated that the vehicles were his. When asked to stow the firearms in the vehicle, suspect 1 refused and stated "we can't do that." Suspect 1 claimed that asking him to put down his firearms was a violation of his second amendment rights and stated "I'm going to stay armed for my safety just like you are going to stay armed for yours." At this time, no suspect had

USAO_0014555

provided any evidence of a FID card or license to carry a firearm from Massachusetts or any other state despite requests.

12. I know, based on my training and experience, that in order to properly transport firearms across state lines from one state to another state, the owner must be duly licensed or in lawful possession of their firearm in their home state, as well as their destination state, and the weapons must be unloaded and in a secure container and/or completely out of reach of the owner. I also know Massachusetts law requires that non-residents in possession of rifles and shotguns must keep those firearms unloaded and properly stored.

13. In speaking further with suspect 1, Sgt. McDevitt asked if he had any license to possess the rifle he had on his person. Suspect 1 responded "you don't need a license in Rhode Island to own a rifle." When advised that they are not allowed to brandish the firearms in Massachusetts while transporting them between Rhode Island to Maine, suspect 1 stated they were holding the firearms because they were no longer in the car. Suspect 1 also claimed they wouldn't have brandished the firearms if Trooper Casey did not put his police lights on. However, Trooper Casey indicated that the suspects were already armed when he responded to the scene.

14. At this point, the Troopers returned to their cruisers to further assess the situation. During this time, Troopers Orlando and Casey noticed that a few of the armed men were moving towards the wood line on the side of the roadway. Given their refusal to disarm and the escalating situation, it was determined to move all officers back to a position of cover and create distance and a perimeter. Sgt. McDevitt then attempted to speak to suspect 1 again. During that attempted conversation, Sgt. McDevitt heard the sound of a rifle chambering a round in the wood line area. When suspect 1 asked if he was free to go, Sgt. McDevitt stated no. When he asked if he was being detained, Sgt. McDevitt informed him yes. When suspect 1 was asked to lay down his firearm and surrender, he refused. Suspect 1 was advised he was being arrested for unlawfully carrying a firearm on at least 4 occasions. At least 5 armed suspects were identified at that time and 8 total suspects were observed from the perimeter.

15. At this point, the Massachusetts State Police shut down both lanes of Route 95, and a standoff ensued between the armed suspects and the Troopers for several hours. During the standoff, two suspects who were originally in the wood line area were located by Officer Holliday of the Wakefield Police on North Avenue about a half mile from the location of the standoff. One of the suspects was wearing body armor, blue shorts, a T-shirt, and was carrying a sidearm on his person. The other suspect was wearing body armor, camouflage army fatigues, and had a firearm magazine in his pocket. While the suspects initially claimed they were simply jogging in the area, subsequent interviews conducted by the Massachusetts

USAO_0014556

State Police confirmed that they were originally on scene at the standoff and had fled the area through the woods. One of those suspects was the individual who identified himself as Robert Rodriguez to Trooper Casey. The two individuals were taken into custody and transported to the State Police Barracks in Andover.

16. After several hours of negotiation, the armed suspects at the scene eventually surrendered. At the instruction of the Massachusetts State Police, the suspects disarmed themselves of weapons and ammunition and told to place those items in the van. A total of 9 individuals and 2 dogs were taken into custody between the two vehicles.

17. While on scene, a brief inventory was conducted of both vehicles before they were towed to the Danvers State Police Barracks. The Troopers involved looked into the main compartment area of the 2018 Ford Transit van and observed the following:

- 1 bolt-action rifle
- 3 AR-15 rifles -- one of the rifles had a magazine attached to it and one of the rifles had a scope attached to the top
- 1 shotgun
- 1 shorter-barreled rifle
- 2 handguns
- Multiple rifle magazines containing ammunition
- Approximately 12 camouflage backpacks
- Several sleeping bags
- 1 box of rubber gloves
- 1 pair of binoculars
- 1 empty gun holster
- Several pieces of body armor and/or tactical vests



None of the firearms located in the van were properly stored and/or out of reach of the occupants in a secure location.

18. When Troopers looked into the bed of the 2006 Honda pick-up truck, they observed 3 large red gas cans. Nothing in the brief visual inspection was seen in the passenger compartment of the truck. Both vehicles were then towed to the State Police Barracks to be seized pending a search warrant. Subsequently, a search warrant was approved and executed on the two vehicles; the items described above in paragraph 17 were located and seized, as well as a Uniden 1080p dash camera in the Ford Transit van and a black iPhone in the Honda pick-up truck.

19. None of the armed suspects ever provided a FID card or LTC from Massachusetts or any other state. All of the suspects were arrested and charged with (1) Unlawful Possession of a Firearm, in violation of G.L. c. 269, §10(h)(1), (2) Carrying a Firearm Without a License, in

USAO_0014557

violation of G.L. c. 269, §10(a), (3) Unlawful Possession of Ammunition, in violation of G.L. c. 269, §10(h), (4) Improper Storage of a Firearm, in violation of G.L. c. 140, §131L, (5) Use of Body Armor in the Commission of a Felony, in violation of G.L. c. 269, §10D, and (6) Conspiracy to Commit a Crime, in violation of G.L. c. 274, §7. The suspects were identified when arrested (some of which after providing initial false information or initially refusing to identify themselves) as:



- Brandon Britton (DOB█████)
- Quinn Cumberlander (DOB█████)
- Alban El Curraugh (DOB█████)
- Lamar Dow (DOB█████)
- Wilfredo Hernandez (DOB█████)
- Jamhal Tayvon Latimer (DOB█████)
- Conald Pierre (DOB█████)
- Robert Rodriguez (DOB█████)
- Aaron Lamont Johnson (DOB█████)

A TRUE COPY
ATTEST
*Crylach Morry*
CLERK-MAGISTRATE

Two individuals were also initially brought to court unidentified (after continuing to refuse to identify themselves) and were labeled John Doe 1 and 2.

20. During the hours-long standoff, Jamhal Tayvon Latimer self-identified as the leader of the "militia" and other members of the group also identified him as the leader in subsequent conversations with police. Latimer during the standoff wore a ballistic vest and had a body camera. He often reminded police during the hours-long incident that he was actively recording using the body camera. Latimer also uploaded recorded videos during the standoff to a YouTube page associated with the militia group. Police were told the name of the militia group was "Rise of the Moors" by members and a Moorish flag was displayed throughout the standoff by members of the self-described militia group. When arrested, a black Motorola cell phone was located in Latimer's ballistic vest, as well as a body camera. A black iPhone was also recovered from the property of Alban El Curraugh by Lt. O'Rourke when he was in custody at the Andover State Police Barracks. Additionally, a phone believed to be the property of Quinn Cumberlander was seized during his arrest by police.

21. Once arrested, the Massachusetts State Police interviewed several members of the Moors militia group after providing them their Miranda warnings. Each member who chose to speak to police did so after choosing to waive their rights under Miranda. All of the interviews were audio and video recorded. The following is a brief summary of some of the most relevant information obtained during those interviews related to this warrant request:

- Robert Rodriguez told police that he had been associated with the militia group for approximately 2-3 years. He indicated that they all met at Latimer's

*Q^l*
*M^s*

USAO_0014558

house in Pawtucket, Rhode Island and several of them put on body armor at
that time while others arrived there already wearing it.

- Alban El Curraugh also told police that he had been a member of the militia
  group for 2-3 years. When asked by police, Curraugh volunteered that the trip
  from Rhode Island to Maine took months of planning. He stated that Latimer
  purchased all of the guns transported in Rhode Island. Curraugh indicated that
  the various members of the militia planned and communicated about the trip
  to Maine via text messages and/or phone calls using their cell phones.
  Curraough also stated that during the trip and standoff, the various members
  continued to coordinate and communicate using their cell phones.

- Aaron Lamont Johnson told police that he had been aware of planning for the
  trip to Maine by the militia group for about a month prior to the standoff. The
  planning, according to Johnson, was conducted on their cell phones, including
  through the usage of social media but Johnson did not specify in the interview
  which particular phone applications or websites were utilized. Johnson also
  indicated that the plan was to the transport the firearms from Rhode Island to
  Maine to conduct military type training with the guns.

22. During the in-court detention hearings for some of the defendants, videos were offered by the
defense which showed defendant Latimer making "selfie" videos of himself and the co-
defendants during the standoff. The videos appeared to be recorded via cell phones and were
presented as having been recorded and posted to the Internet on YouTube. I know that
YouTube is a site where users can upload videos to be viewed for free by other persons on
the Internet.

## Training and Experience

23. I know from police conversations with Jamhal Latimer, Aaron Lamont Johnson, and other
members that the "militia" communicated via text messages and/or phone calls to/from their
various cell phones to coordinate, plan, and execute their attempted transportation of the
firearms from Rhode Island to Maine for at least a month leading up to the date of the
incident described above.

24. I also know, based on conversations with the militia members as well as conversations with
other law enforcement officers, that the "Rise of the Moors" is a New England based militia
movement. The militia movement members claim they are "Moorish American" and allege
they are not subject to local, state, and federal laws as a result of their identity. As part of the
group, many members chose a new name and create illegitimate identification documents in
said name. The group also actively utilizes social media and maintains an Instagram and

USAO_0014559

A TRUE COPY
ATTEST

YouTube account, uploading videos and other postings promoting their actions.

25. I know that cell phones are ubiquitous in our society. As the Supreme Judicial Court has recognized, "the cellular telephone has become an indispensable part of modern [American] life," "[m]any households now forgo traditional 'landline' telephone service, opting instead for cellular phones carried by each family member," and "cellular telephones physically accompany their users everywhere — almost permanent attachments to their bodies." Commonwealth v. Augustine, 467 Mass. 230, 245-246 (2014) (quotations omitted).

26. I know from my training and experience that cellular telephones (cell phones) are a primary mode of communication for telephone calls and text messages, and that the photographic capability of a cell phone is often used to record events either by taking a still photograph or by making a short digital/audio recording. I know that cell phones can store voicemails and text messages and can have customized voice settings and speed dial entries, and that by reviewing this stored information and how the cell phone is set up for its user, it is possible to determine to whom, from whom, and when calls, emails, voice messages and text or similar electronic messages were made from that cell phone as well as actual voicemail, text or electronic messages stored in the phone. I have also learned that various functions on the cell phone are password protected.

27. I know from my law enforcement experience, as well as from my personal experience, that text messaging, instant messages, and e-mails are available on cell phones. Because a cell phone is essentially a micro-computer, email works essentially as it does on a regular computer. Text messaging allows users to send brief typed messages to others who have cell phones with this feature. To enter text a person types his message using the key pad on the phone and presses the send button, just as they would to make a cell phone call. The signal travels through cell sites similar to cellular telephone calls. I know that text messages can remain on the phone until they are deleted, and often continue to remain on the device in unallocated space even after they are deleted.

28. I know that cellular telephones also routinely contain account names or IDs for the regular user's email, data storage (cloud), and social media accounts. On occasion, data from social media applications like Instagram and Facebook, as well as other applications downloaded onto a phone like YouTube, will be accessible to a forensic examiner through the use of proper tools.

29. I know, based on my training and experience that deleted data is sometimes recoverable by a forensic examiner. This is because a computer/electronic storage device does not erase data from its hard drive when a user "deletes" a file; rather, it simply marks the area of its storage as available to be overwritten with new data if necessary. Typically, space that is consumed by "deleted" data is not overwritten until all other unconsumed space is first written to or consumed. This fact is important in law enforcement because it means that so-called

USAO_0014560

A TRUE COPY
ATTEST:
CLERK MAGISTRATE

"deleted" files or data are, in fact, often still present on the storage medium which can be (and have been) recovered months, years, and even decades after their deletion if the integrity of the cellular phone is maintained. Given this, it is not at all uncommon to be able to "undelete" files or data years after their deletion date.

30. Deleted files located in unallocated space on a device are typically stripped of metadata that would establish, among other things, the date/time of their creation and/or use, as well as contextual information on the device necessary to understand other evidence that falls within the scope of the warrant. Therefore, it is difficult to limit the search of deleted files by date range.

31. I also know based on my training and experience that it is important in this type of investigation to attempt to develop a timeline of events as well as to learn where suspects were at certain times. A variety of location information can be directly extracted from a mobile device. For example, an Advanced Logical extraction utilizing Cellebrite Physical Analyzer Software can yield location data from a variety of sources, including Global Positioning System ("GPS") data stored on the phone, WiFi connections and probe requests, applications downloaded to the mobile device (such as Snapchat), and GPS data stored on photos and videos residing on the device. This data can be used to corroborate or refute witness/suspect statements where they are available.

32. Based on my training and experience, I also know that cell phones contain numerous pieces of evidence that can establish whether a user has possession, custody, or control of the device in question before, during, and after the commission of a crime. Besides the personal information imputed by a user, there is often a plethora of circumstantial evidence that can assist me as a law enforcement officer in identifying the potential user of a cell phone. These can include a review of a user's personal contacts list for known associates, a review of text messages sent and received by the user, photographs taken and sent from the device, social media sites and/or applications, as well as internet and application usage and history. These sources of information often provide invaluable information, including personal identifying information of the user of the phone during the relevant time period, as well as circumstantial identifying information including potential addresses, known associates, and geographical information.

33. Also, I know from my training and experience that when investigating an individual who may be a user of the cell phone, it is often crucial to establish that the individual had continuous and dominant control over the device for the period leading up to, during, and after the commission of the crime. Such "continuous control" evidence is essential to ascertaining the actual user or users of a device for the purposes of a criminal investigation, and to establish what users might have had possession, custody, and control during the planning, commission, and subsequent events involving a crime. Additionally, "continuous

USAO_0014561

control" evidence is essential to narrowing the potential author or authors of relevant communications uncovered, as well as photographs taken and other evidence that implicates the user or users of the device in criminal activity.

34. I know, based on my training and experience, that in order to prove an ongoing conspiracy to commit a crime, there must be evidence of an agreement among individuals and/or members to engage in said crime. I also know, that when attempting to prove that members of a group acted in a "joint venture" to commit a crime, evidence that establishes each member's direct knowledge of the criminal enterprise is crucial and essential to establishing an individual's culpability in the crime and to negate any potential defenses claiming ignorance or lack of knowledge. In this case, based on conversations with various members of the militia, it is clear that the members conducted extensive planning, coordination, and communication through the usage of their cell phones. Such communications are highly probative in establishing not only the author's knowledge and involvement in the conspiracy, but other members that can be identified later through the cell phone number associated with the other end of the communications. I also know, based on my training and experience, that any communications discussing participation in, allegiance to, and working on behalf of the militia group will also be highly probative in establishing a member's involvement in the criminal conspiracy and their knowledge as a joint venturer to the illegal transportation and use of firearms.

## Request to Search

35. Based on information contained herein I believe probable cause exists that evidence related to the crimes of (1) Unlawful Possession of a Firearm, in violation of G.L. c. 269, §10(h)(1), (2) Carrying a Firearm Without a License, in violation of G.L. c. 269, §10(a), (3) Unlawful Possession of Ammunition, in violation of G.L. c. 269, §10(h), (4) Improper Storage of a Firearm, in violation of G.L. c. 140, §131L, (5) Use of Body Armor in the Commission of a Felony, in violation of G.L. c. 269, §10D, and (6) Conspiracy to Commit a Crime, in violation of G.L. c. 274, §7, will be found in or stored on the following devices:

- A black Motorola cell phone in a red case, recovered in the property of Jamhal Latimer following his arrest (item # 2021-110-0329:27);

- A black iPhone, recovered from the property of Alban Curraugh by Lt. O'Rourke once in custody at the Andover State Police Barracks (item # 2021-110-0329:28);

USAO_0014562

- A black iPhone with cracked screen in black otter box case, recovered from the grey Honda Ridgeline pick-up truck by Trooper Delaney (item # 2021-110-0329:29); and

- A black Samsung Galaxy SGT in a black Otterbox case recovered during the arrest of Quinn Cumberlander a/k/a "Quinn Khabir" (item # 2021-110-329:37).

36. Therefore, I seek permission to search the above cell phones for certain data described below which is believed to constitute evidence of the above crimes:

A.    From the timeframe of **June 3, 2021 to July 3, 2021**, all data on the device which provides direct and/or circumstantial evidence as to the identity of the user or users of said device and provides evidence towards continuous possession, custody, and control of the device, including subscriber information, contact lists, phone logs, voicemails, text messages, videos, photographs, application usage and history, and internet history and usage, and any other files or data that identify the regular user of the phone such as account names or IDs for the user's email(s), data storage (cloud), and social media accounts;

B.    From the timeframe of **June 3, 2021 to July 3, 2021**, any substantive data that refers or relates to the motive(s), planning, assistance, or roles of other participants in the crimes of Unlawful Possession of a Firearm, Carrying a Firearm Without a License, Unlawful Possession of Ammunition, Improper Storage of a Firearm, Use of Body Armor in the Commission of a Felony, and Conspiracy to Commit a Crime. Specifically, the relevant data that this warrant seeks permission to search includes:

i.    The content of any text messages or other electronic communications, created, sent, and received (including attachments), as well as phone logs detailing any phone calls missed, received, or made, and saved contacts;

ii.    All photographs and videos related to or depicting the crimes above, as well as screenshots of any relevant text conversations or other electronic communications;

iii.    Any evidence showing social media postings related to or depicting the crimes above, by web browser or phone application, such as video uploads to YouTube or Instagram.

USAO_0014563

C.    From the timeframe of **June 3, 2021 to July 3, 2021**, any information tending to show affiliation and/or participation in the militia group self-identified by members as "Rise of the Moors," as well as any information regarding the creation and usage of illegitimate identification documents for members of said militia group.

D.    For (A), (B), and (C) above, all Data files, Records, Logs, and Metadata which may identify, trace, or record the date and/or time of the files' creation, modification, alteration, transmission or receipt via the internet or other networks; and

E.    Any passcodes necessary to access the above-referenced data.

[See **ADDENDUM A**, attached and incorporated herein]

37. Consistent with my training and experience, as outlined above, I know that retrieval of the data or information outlined above may require the examination of deleted files located in unallocated space on the digital devices, which are stripped of metadata that would establish, among other things, the date/time of their creation and/or use, as well as contextual information on the device necessary to understand other evidence that falls within the scope of the warrant. Therefore, I also request permission to search such data, as well as files lacking metadata indicating the date of creation, for responsive data consistent with the above search request.

38. Based on my experience and training, I have learned that it is only with careful laboratory examination of Internet capable devices and electronic storage media that it is possible to discern their contents. Forensic examination of electronic devices is time- and labor-intensive because of the vast amount of information that can be stored. I know that it is necessary to search the files on the devices and/or media at a secure law enforcement location where the contents may be forensically examined in a manner best suited to retrieve and preserve evidence. I know that individuals who commit crimes, and who keep information in their computers and electronic storage media about that crime, often attempt to encrypt or delete that information. As mentioned above, I know that even if a file has been "deleted," it is often still present on such devices and media, particularly computers, and can be retrieved in a forensic setting. Because of the technical expertise involved in such a search, I seek permission to have an experienced computer forensic analyst who is also a law enforcement officer or a civilian working under the supervision of the Massachusetts State Police and/or the Middlesex District Attorney's Office assist, as necessary, with the entire search that is the subject of this warrant application.

39. I am aware that forensic examination of electronic media often requires additional time beyond the seven-day period provided by statute for the filing of a search warrant return. This is because of the time-intensive nature of such searches and the high volume of electronic devices delivered to the forensic experts for examination.   It therefore may not be

USAO_0014564

possible to execute the warrant or to file a complete return within the normal seven-day window.  The results of any search that is ultimately conducted will be provided to the defendant in the normal course of discovery.


Sworn under the pains and penalties of perjury this 13 day of August, 2021.


Trooper Michael R. Sullivan
Massachusetts State Police


Then personally appeared before me this 13th day of August 2021 the above-named Michael R. Sullivan and made oath that the foregoing subscribed by him is true.

Justice / Clerk / Assistant Clerk of the
Malden District Court


Page 13 of 13