N8SAAPER1                        Jury Trial

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4               v.                         S1 22 CR 644 (JSR)

5    STEVEN PEREZ, A/K/A "LUCHA,",

6               Defendant.

7    ------------------------------x

8                                          New York, N.Y.
                                           August 28, 2023
9                                          9:30 a.m.

10
     Before:
11
                      HON. JED S. RAKOFF,
12
                                           District Judge
13

14                        APPEARANCES

15   DAMIAN WILLIAMS
          United States Attorney for the
16        Southern District of New York
     ASHLEY NICHOLAS
17   MADISON SMYSER
     SARAH MORTAZAVI
18        Assistant United States Attorneys

19   FEDERAL DEFENDERS OF NEW YORK
          Attorneys for Defendant Perez
20   ZAWADI BAHARANYI
     AMANDA MAYO
21
22   ALSO PRESENT:  ANANYA SANKAR, Paralegal, U.S. Attorney's Office
          ARJUN AHUJA, Paralegal, U.S. Attorney's Office
          SARAH KWON, Paralegal, Federal Defenders of New York
23

24

25

N8SAAPER1                          Jury Trial

1              (Case called)

2              MS. NICHOLAS:  Ashley Nicholas, Madison Smyser and

3     Sarah Mortazavi for the government, joined at counsel table by

4     paralegal specialist Arjun Ahuja.

5              THE COURT:  So, the FBI has nothing but special agents

6     and I'm glad to know that U.S. Attorney's Office has nothing

7     but paralegal specialists.  Some day I'll be a paralegal

8     generalist but probably not in my life time.

9              MS. BAHARANYI:  Good morning, your Honor.

10             Zawadi Baharanyi, on behalf of Lucha El Por Libertad.

11    I am also joined by our paralegal specialist Sarah Kwon.

12             THE COURT:  Let me have my law clerk hand to each side

13    a copy of my preliminary instructions.  Thank you to both sides

14    for submitting your proposed instructions.  Take a look at this

15    because we will want to read it to the jury before opening

16    statements.

17             Second, my law clerk tells me we've not yet received

18    from the parties the list of persons, witnesses and others who

19    we need for the voir dire.

20             MS. NICHOLAS:  We're handing up that hard copy now,

21    your Honor.

22             THE COURT:  Very good.  And from the defense?

23             MS. BAHARANYI:  Your Honor, I am checking in our

24    proposed voir dire, I think we included our names in those

25    questions but what we can do is coordinate with the government

N8SAAPER1                         Jury Trial

1    to make sure you have a complete list.

2              THE COURT:  Let me take a look at your voir dire.

3              (Pause)

4              THE COURT:  I don't see it in the defense voir dire.

5    Do you have a copy of your voir dire?

6              MS. BAHARANYI:  Your Honor, I do.  And it lists our

7    names.  So, names of the parties.  There's only one additional

8    name.  So if I may, your Honor, I might write that name on this

9    voir dire copy and pass it up to the Court.

10              THE COURT:  Well, just give me the name.

11              MS. BAHARANYI:  The first name is Maria --

12              THE COURT:  Okay.  Hold on.

13              MS. BAHARANYI:  Last name is O-t-e-r-o.

14              THE COURT:  Otero.

15              MS. BAHARANYI:  The other names are just our names,

16    your Honor.

17              THE COURT:  So, I'm not talking about lawyers' names.

18    I'm talking about -- and I'm not talking about the parties

19    names.  I am talking about the names of persons who either will

20    be witnesses or whose names are likely to come up in the course

21    of the testimony.

22              MS. BAHARANYI:  Understood.  That's all, your Honor.

23              THE COURT:  All right.  Very good.

24              All right.  Anything else we need to take up right

25    now?

1        MS. BAHARANYI:  Your Honor, while we have you, your

2   Honor, I think there are a couple of issues that we want to

3   raise right now.  One with respect to, I think it's, before we

4   get to the point of openings, I can raise that now or after.

5        THE COURT:  Go ahead.

6        MS. BAHARANYI:  We understand the Court's ruling

7   regarding the Massachusetts case and the preference to proceed

8   sort of case-by-case or evidence-by-evidence.  One of our

9   concerns is there is a tremendous amount of potentially

10  prejudice evidence that we don't want mentioned in opening

11  selection before the jury.  This includes any reference to

12  armed standoff, any reference to hours long, eight, nine, ten

13  hours-long standoff.

14       THE COURT:  I thought I indicated on Friday that while

15  I was going to allow in much of this evidence subject to

16  specific objections when it was offered that the standoff was

17  likely not to be admitted.  I am pretty sure that's what I

18  said.

19       MS. BAHARANYI:  I heard the "likely not", your Honor.

20  I did want to be clear before we got into openings and the bell

21  was rung --

22       THE COURT:  Is the government planning to say anything

23  about the eight-hour standoff in their opening?

24       MS. NICHOLAS:  We are going to address the fact of the

25  traffic stop.  We don't call it a standoff.  We don't mention

1    the temporal element of it but the facts of the stop are

2    mentioned.

3              THE COURT:  Well, that seems to be consistent with

4    what I ruled on Friday.  So --

5              MS. BAHARANYI:  There was one area that wasn't, I

6    think, addressed explicitly on Friday by the parties, and

7    that's what respect to the other firearms that were found

8    during the Massachusetts stop.  I think, as the Court knows,

9    there was only one firearm at that Massachusetts stop that was

10   in any way connected to Vereen, or purchased by the

11   co-defendant Vereen, but there are other eight other firearms

12   that we want to make sure the government doesn't reference in

13   opening because again, it's unrelated to the charge here and it

14   would be highly prejudice for them to open up saying, you are

15   going to hear about all of those other firearms, or things that

16   aren't relevant to the case.

17             THE COURT:  Of course the conspiracy does involve

18   other firearms.

19             MS. BAHARANYI:  The government's provided us with a

20   fairly clear list of firearms that they believe are related and

21   connected to this conspiracy from the point of the indictment

22   where they listed every firearm, its make, its model and serial

23   number, and only one of those firearms shows up during the

24   Massachusetts stop.  The others don't.

25             THE COURT:  So I guess the other question is my

N8SAAPER1                        Jury Trial

1    understanding of the defense here -- I'll listen carefully to

2    your opening -- is that it's basically a knowledge and intent

3    defense state of mind.

4              MS. BAHARANYI:  That is certainly one element, your

5    Honor.

6              THE COURT:  What other element?  Other than the

7    government has to prove every element beyond a reasonable

8    doubt.

9              MS. BAHARANYI:  Of course they've added the conspiracy

10   charge.  So, the agreement and existence of an agreement for

11   this conduct.  But I think it would be highly prejudicial for

12   the jury to hear about guns that have not been traced to the

13   co-defendant in this case that seem to have no connection to

14   this case, not purchased by Vereen and the guns that, frankly,

15   your Honor, look highly prejudicial as well.  There's a great

16   risk that they'll hear this information, hear about these other

17   guns, hear about this stop, hopefully, not a standoff and they

18   convict on that basis instead of relevance to a question of

19   whether the guns were received --

20             THE COURT:  Let me hear from the government.

21             MS. SMYSER:  Your Honor, Ms. Baharanyi is correct.

22   Those in our view are still evidence of the conspiracy.  There

23   are a set of guns that Ms. Baharanyi is referencing that Vereen

24   purchased and that we believe are part of the conspiracy but in

25   addition these other guns he recovered at the Massachusetts

1    stop.  This conspiracy is about receiving and transporting

2    firearms interstate without proper licenses and there's

3    evidence and body worn camera footage that, for example, the

4    defendant and this co-conspirator addressed whether the guns

5    are stolen and whether they're clean.  And that indicates that

6    they know the source of the guns, not just the one gun that was

7    recovered from Massachusetts that came from Vereen.  We think

8    it's helpful evidence -- show that these men are transporting

9    guns interstate without the proper licenses to do so.

10          THE COURT:  Well, just so I'm clear, first of all,

11   what, if anything, is said by the defendant.

12          MS. SMYSER:  So, your Honor, in this body cam footage

13   the leader of the group, Jamal Latimer, asks the defendant and

14   one of his co-conspirators named Jamil Bey who also paid -- for

15   the firearms, Are any of those stolen?  And the defendant

16   shakes his head and Bey says no.  The defendant later comes

17   back and says, These are clean.  They're clean.

18          THE COURT:  Why does that show anything about the

19   agreement to do something unlawful?

20          MS. SMYSER:  Your Honor, this shows that both Mr. Bey

21   and the defendant were involved in getting the firearms that

22   were with them at this stop and we know that they traveled from

23   New York to Rhode Island to Massachusetts.  They received

24   firearms in New York, traveled with those to Rhode Island

25   including to meet people who are residents of Rhode Island.

N8SAAPER1                    Jury Trial

1    Jamal Latimer -- Cumberlander which in itself is an agreement

2    and violation of 922 (A) (3).

3            THE COURT:  Well, that may support your introducing

4    stuff about this situation but I'm still not clear what the

5    specific conversation you just mentioned shows.

6            MS. SMYSER:  I think it goes directly to the

7    defendant's knowledge.

8            THE COURT:  In what way?  He says he's been told that

9    these are not stolen guns.

10           MS. SMYSER:  It is a question.  Are those stolen?  And

11   he shakes his head which indicates his knowledge of where those

12   firearms came from, which is key to put him and Mr. Bey in a

13   conspiracy and to give them knowledge of where those firearms

14   came from.  And they're the ones transporting those firearms

15   from their state of residency, New York to Rhode Island, to

16   Massachusetts.

17           THE COURT:  And what, if anything, is being said about

18   that conversation on opening statement?

19           MS. SMYSER:  One moment, your Honor?

20           THE COURT:  Yes.

21       (Pause)

22           MS. SMYSER:  Your Honor, we plan to say that there is

23   video capturing the defendant and his coconspirator discussing

24   the guns and where those guns came from.

25           MS. BAHARANYI:  Your Honor, that's not a correct

1    assessment of the evidence or it's quite misleading actually.

2    There is no discussion about where the guns came from.  And in

3    fact, what the government's just told you like the inferential

4    steps its asking the Court and the jury to make is exactly what

5    we objected to in our motions in limine.  There is so much

6    speculation that is going to be required for them to say that

7    this comment in the middle of this very intense --

8            THE COURT:  I think there are two different points

9    here.  And not it's not clear to me that the wording in the

10   opening is appropriate and I'll get to that in a minute.  But

11   on the more general question of whether circumstantial evidence

12   of your client's knowledge of the location of these guns can be

13   produced, it's a reasonable inference.  It's not only possible

14   inference -- and you are free to of course cross-examine, argue

15   to the contrary -- but it's certainly a reasonable inference

16   that if he says none of the guns are stolen, he knows where

17   those guns came from.  So I don't think that that should be

18   excluded and I don't see the prejudice at all in making that

19   argument.

20           Now, what is different about the statement in the

21   opening is they say he discussed where the guns come from.  I

22   think that is an overstatement from what I just heard.  So they

23   would have to change that to something like, they had

24   discussions which you may well find shows that they knew where

25   the guns came from or something along those lines.

N8SAAPER1                    Jury Trial

1              But in terms of admissibility, the federal law is

2    clear that under Rules 401, 402 and 403, anything that has any

3    reasonable tendency to advance a circumstantial inference is

4    permissible.  403, of course, deals with prejudice.  The

5    prejudice has to be very substantial before otherwise

6    admissible evidence can be excluded.  I don't see -- at least

7    not from anything I just heard.  So, it will be permitted but

8    with the modification I've just indicated.

9              MS. BAHARANYI:  Your Honor, I don't think that --

10   well, we certainly agree that there is actually substantial

11   potential prejudice by allowing the government to make these

12   connections and these speculative leaps.

13             THE COURT:  It's all speculation.  Unlike state law

14   federal law says circumstantial evidence is just as good as

15   direct evidence and the only question then is whether the

16   inference that is being asked to be drawn is one that is

17   reasonable.  And it's certainly reasonable to say that one who

18   says flatout those guns are not stolen could only say that if

19   he knew where the guns were coming from.

20             MS. BAHARANYI:  The context of when the statement is

21   given, your Honor, I don't think that's a fair assessment.

22             THE COURT:  Well, you can argue that to the jury.

23             MS. BAHARANYI:  Returning to the number of guns

24   however, which is when we started this conversation, again, the

25   eight other guns that the government plans to reference are

N8SAAPER1                    Jury Trial

1   guns that never, I don't think they're even alleging were

2   bought by co-defendants were in New York City.

3           THE COURT:  This is all part of the conspiracy.

4           MS. BAHARANYI:  The conspiracy has boundaries, your

5   Honor.  This has limits.

6           THE COURT:  The conspiracy as I understand it is that

7   your client entered into an arrangement or agreement to traffic

8   guns on an interstate basis without a license and that includes

9   everything I've just heard about this particular situation.

10          MS. BAHARANYI:  A conspiracy is about receiving guns

11  into your state of residence.  We're talking about guns that

12  are stopped and in Massachusetts and that have no connection to

13  the buyer in this case, Keith Vereen.

14          THE COURT:  Well, let's look at the indictment.  So

15  Paragraph One of Count One states as follows:

16          "From at least in or about May 2020 through at least

17  in or about July 2021 in the Southern District of New York and

18  elsewhere, Steven Perez, a/k/a "Lucha", the defendant, and

19  others, known and unknown, willfully and knowingly combined,

20  conspired confederate and agreed together and with each other

21  to commit an offense against the United States, to wit,

22  transporting and receiving firearms interstate without the

23  requisite licenses in violation of Title 18 U.S.C. Section 922

24  (A) (3).

25          Why doesn't that cover what we just discussed?

N8SAAPER1                    Jury Trial

1          MS. BAHARANYI:  While that's perhaps a summary or a

2     title of what they believe that statute is about, in effect --

3          THE COURT:  As I checked it was the determination of

4     the grand jury of the United States.

5          MS. BAHARANYI:  Well, your Honor, it has to actually

6     fit with the particular law that's being violated and the law

7     is 18 United States 922 (A) (3).  And that specific provision

8     that he has been charged with and he has been charged with

9     conspiring to violate isn't about the general interstate

10    transportation of firearms.  It's whether someone who was other

11    than a licensed importer, manufacturer, distributor received

12    into or received in a state where he resides firearms that were

13    attained outside of that state.  That's what he's been charged

14    with.

15         THE COURT:  Let me look at 922 (a)(3).  922 is an

16    interesting statute.  It goes on the standard edition of the

17    Criminal Code for six single-spaced pages, showing nothing else

18    Congress believes in a -- approach to drafting.  But in any

19    event, let's take a look at it.

20         (Pause)

21         THE COURT:  It shall be unlawful for any person other

22    than a licensed importer or licensed manufacturer, a licensed

23    dealer or licensed collector to transport into or receive in

24    the state where he resides or if the person is a corporation or

25    other business, entity of the state where he maintains a place

1    of business any firearm purchased or otherwise obtained by such

2    person outside that state and under some exceptions.

3            So, why do you think that it says "transport into or

4    receive" that it's limited to received?

5            MS. BAHARANYI:  Your Honor, I'm not saying that's it's

6    limited to receiving.  It is for the transportation into a

7    person's state of residence or receiving into a person's state

8    of residence.  What I'm saying is the conduct in Massachusetts

9    is far removed from what needs to be proven for 922 (a)(3)

10   violation.

11           THE COURT:  No, no.  The conspiracy as I understand it

12   is there are a group of people who agreed that they without a

13   license would transport on an interstate basis, guns that would

14   ultimately wind up in states other than where they were from

15   originally where they were purchased or whatever.  And that was

16   the overall conspiracy and in furtherance of the conspiracy in

17   the second count, brought a gun into New York.  I don't think

18   the conspiracy is limited to guns that just come into New York.

19           MS. BAHARANYI:  The conspiracy is, certainly, should

20   be limited to guns that are received or transported into state

21   of residence -- gunman is able to prove.  Nobody's state of

22   residence is Massachusetts and also only applies if a gun was

23   obtained outside of that state of residence and brought in.

24   So, my first point --

25           THE COURT:  Yeah, but the point is what they agreed

N8SAAPER1                    Jury Trial

1    to, not what actually happened.

2            MS. BAHARANYI:  Agreeing to permit that particular

3    offense with some sort of overt act towards that offense,

4    right?

5            THE COURT:  Yeah.  The overt act could be purchasing

6    anything, as you know.

7            MS. BAHARANYI:  I think that's problematic here, your

8    Honor, is that we have that conduct in Massachusetts that

9    involves one firearm that they, can that they are intending to

10   prove was purchased by someone out of state and received into a

11   state of residence and none of the other --

12           THE COURT:  I think we're talking -- forgive me,

13   because I have great admiration for your eloquent advocacy, but

14   I think what they're talking about is the nature of the

15   conspiracy.  You can have a conspiracy where zero guns ever

16   actually meet the agreement.  That's still a conspiracy if they

17   can show the elements of a conspiracy.  So the objection is

18   overruled.  And with the one loss that I mentioned, the opening

19   is received, is permitted on this ground.  Of course the other

20   side can respond.

21           Okay.  My understanding is the jury will be ready in

22   about five minutes or so.  So, take a look now again at the

23   proposed preliminary instruction and tell me and I'll hear any

24   objection to it.  It is largely consistent with what I received

25   from both sides but I'm obviously happy to hear any edits you

1    suggest.

2              (Pause)

3         MS. BAHARANYI:  Your Honor, we don't have any

4    objections to the preliminary instructions.

5         THE COURT:  Okay.  Anything from the government?

6         MS. SMYSER:  Your Honor, the government doesn't have

7    any changes.  I did want to flag, we have one issue as to our

8    first witness which while we're waiting on the jury happy to

9    address now or happy to address at a later time.

10        THE COURT:  Go ahead.

11        MS. SMYSER:  So, your Honor, the first government

12   witness is Officer Jarren Smalls who testified in the

13   suppression hearing a few months ago about the defendant's

14   arrest in the Bronx.  And the government is planning to offer a

15   portion of the radio transmission which Officer Smalls heard

16   before he stopped the defendant.  In that transmission there's

17   description of the person with a gun.  And it explains why he

18   arrives at the scene.  My understanding is that the defense has

19   a relevance objection to --

20        THE COURT:  I just heard the jury is ready.  So we

21   will take this up after opening statements but before the first

22   witness.  So if you want to use the facilities, now is the time

23   to do so.  We'll resume in five minutes.

24        MS. SMYSER:  Thank you.

25        MS. BAHARANYI:  Your Honor, I'm so sorry.

N8SAAPER1                    Jury Trial

1          THE COURT:  Yes.

2          MS. BAHARANYI:  I don't think we got the intended voir

3    dire questions for the jury.

4          THE COURT:  The questions I am going to put?

5          MS. BAHARANYI:  Yes.

6          THE COURT:  You'll hear them when I put them.

7          MS. BAHARANYI:  Okay.  With respect to the ones that

8    we proposed, I don't know if the Court already made a decision

9    on those and what your Honor plans to include or not include --

10          THE COURT:  You'll hear what I have to say.  Then at

11    the end of every voir dire I ask the parties to come to the

12    sidebar if they want me to ask some other questions.

13          MS. BAHARANYI:  Understood.

14          (Recess)

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

N8SAAPER3

 1              (Jury not present)

 2              THE COURT:  All right.  So to the remaining members of

 3      the pool who dodged a bullet, you are not off the hook yet

 4      because you may be called for duty on another jury.  You need

 5      to go down to the jury room that you must first came up from.

 6      We will send your cards with you.

 7              Mr. Limphongpand, come on forward and we'll give you

 8      all the cards.  Just give them to the jury clerk when you get

 9      back.

10              I want to express my thanks to you for your jury

11      service.  You are now excused.  You can go back down.

12              (Prospective jurors excused)

13              THE COURT:  Okay.  So when we come back I'll read to

14      the jury and give them a kind of the preliminary instruction

15      then we'll have opening statements from both counsel.  Then I

16      think we'll probably be able to start before lunch with the

17      first witness.  So there was an issue that someone wanted to

18      raise about the first witness.

19              MS. SMYSER:  Yes, your Honor.  The first witness is

20      Officer Jarren Smalls who responded to the 911 call that the

21      defendant having a gun.  The government intends to introduce a

22      portion of the radio transmission that Officer Smalls received

23      before he responded or explain why he was there.  And my

24      understanding that the defense has a relevance objection to

25      that.

N8SAAPER3

1          THE COURT:  Let me hear from defense counsel.

2          MS. MAYO:  Yes, your Honor.

3          We object to the relevance of introducing the actual

4    radio run into evidence that was obviously relevant during the

5    suppression hearing but now that we're not -- Officer Smalls

6    can testify about what you heard and why he was stopping our

7    client in the first place.  So, we don't think it's necessary

8    to produce the actual radio run.

9          THE COURT:  Did you -- to the preliminary question of

10   the sort and were you there pursuant to a professional as part

11   of your job or something like that -- I'm not wording it

12   exactly right -- but he has to explain why he was there.  But I

13   agree with you, subject to hearing from the government, that

14   the why he's there is not particularly relevant.

15         MS. MAYO:  Yes, your Honor.  We think Officer Smalls

16   can testify as to why he was there and why he was stopping the

17   defendant.

18         THE COURT:  Let me ask the government, what's wrong

19   with that?

20         MS. SMYSER:  Your Honor, we do think that's relevant

21   and the reason is we don't want the jury to make assumptions

22   about why Officer Smalls was there.  To be quite frank, the

23   defendant was standing on the sidewalk in a turban and I don't

24   want the jury to assume for other reasons Officer Smalls got

25   out of his car and approached the defendant.  When you hear it

1    on the radio run it gives context to Officer Smalls hearing

2    that there is a man with a specific description with a firearm

3    and he immediately responds and gets out of the car.

4              MS. MAYO:  Your Honor, I think we would say that's

5    cumulative if Officer smalls can testify to that fact that he

6    received a radio run describing a man with a firearm.

7              THE COURT:  Okay.  Given that representation, I think

8    that's sufficient.  We don't need the actual call if he is

9    going to be able with both sides consent to testify to that.

10             MS. SMYSER:  Your Honor, I hear that point.  I do

11   think the radio run is necessary to corroborate what Officer

12   Smalls is saying.  It is the first thing he is going to

13   corroborate while he is on the stand.

14             THE COURT:  I'm not convinced.  We'll go the way

15   defense counsel suggested.  We'll take another ten-minute break

16   and then we'll resume.

17             (Recess)

18             THE COURT:  Please be seated.

19             (Jury present)

20             THE COURT:  The jurors can be seated immediately.

21   Everyone else stands for the jury.  Except, I don't stand up

22   because I'm an old guy, but you can be seated immediately.

23             So, ladies and gentlemen, before we hear opening

24   statements I'm going to read a short preliminary instruction

25   and you can take it with you also back in the jury room for

N8SAAPER3

1    your guidance.

2                To the jury, before you begin to hear the evidence I

3    want to give you a brief overview of the two charges in this

4    case.  After you've heard all the evidence and the parties have

5    made their closing arguments I will give you detailed

6    instructions of law that will displace this preliminary

7    instruction and will give to your deliberations.

8                This is a criminal case that concerns receiving or

9    transporting firearms in interstate commerce when you don't

10   have a license to do so.  The government alleges in one of its

11   two charges that the defendant, Steven Perez, who goes by the

12   name of "Lucha El Por Libertad" or "Lucha El" under lawfully

13   intentionally and knowingly -- I'm sorry.  The word "he"

14   shouldn't be there -- lacked a license.

15               (Pause)

16               THE COURT:  I'm sorry.  I was looking at an earlier

17   version.  Let me pick up in the second paragraph.

18               This is a criminal case that concerns receiving or

19   transporting firearms in interstate commerce when you don't

20   have a license do so.

21               The government alleges in one of its two charges that

22   the defendant, Steven Perez, who goes by the name "Lucha El Por

23   Libertad" or "Lucha El" unlawfully, intentionally and knowing,

24   he lacked a license, received a firearm specifically Century

25   Arms Canik .9 millimeter handgun into his state of residence,

N8SAAPER3

New York that was purchased or otherwise obtained outside of
New York.

          The government alleges in its other charge that
between May 2020 and July 2021 Lucha El conspired, that is,
agreed with one or more other persons to unlawfully,
intentionally without a license transport and receive firearms
that were purchased or otherwise obtained out of state into the
state of residency of person receiving or transporting the
firearm.

          Lucha El has pleaded not guilty to each of those
charges.  This means is presumed innocent on each charge until
and unless you were satisfied the government's proved each
essential element of that charge beyond a reasonable doubt, a
standard that I will explain to you later in this case.

          Please remember that this preliminary instruction is
simply a very brief overview of the charges in this case.  I
will give you more detailed final instructions that will
replace this overview and will govern your deliberations.

          Okay.  So now we're going to hear opening statements
of counsel.  I want to caution you that nothing that counsel
says is evidence.  The evidence, as I mentioned before, is
going to come from the testimony of the witnesses, the exhibits
that are received in evidence and there may be what we call
stipulations where the parties agree to some facts.  And those
three things are the only sources of evidence.

1          So why do we even have the statements?  Well, it's

2     because the evidence is going to come in a little bit at a

3     time.  So it may be useful to you to have a brief overview from

4     each side and what they think the evidence will show or fail to

5     show as the case may be.  Because the government has the burden

6     of proof, we hear first from the government.  So we'll hear now

7     from the government.

8          MS. NICHOLAS:  Your Honor, may I proceed?

9          THE COURT:  Yes.

10         MS. NICHOLAS:  This is a case about guns, a case about

11    guns and a man who ignored the laws designed to keep

12    communities safe so that he could accomplish a simple goal, get

13    guns.  This man, Steven Perez, the defendant.  Get guns.  And

14    he succeeded.  Over and over again he got guns.  He did it with

15    the help of a straw buyer, a man over 600 miles away who lied

16    to South Carolina gun dealers to help the defendant accomplish

17    this goal, getting guns no matter what the law says.

18         Members of the jury, that is why we're here.  Because

19    the defendant committed a federal crime by getting guns from

20    outside the state he lives in without a license.  And he knew

21    exactly what he was doing.

22         Laws like the ones the defendant broke exist for a

23    reason.  Guns are dangerous and so there are state and federal

24    laws that govern how guns are sold and transported, laws that

25    require gun stores to follow certain procedures and require gun

N8SAAPER3                        Opening statement – Ms. Nicholas

1    buyers to follow certain requirements, laws that were violated

2    here.

3            You see the defendant, Steven Perez, who you'll hear

4    referred to as "Lucha El" lives in the Bronx.  He is a resident

5    of New York state, a state that requires handgun buyers to have

6    a license before they buy guns.  The defendant did not have a

7    license.  He never even tried to get one.  So he had a problem.

8    The defendant was fixated on getting guns, but without a New

9    York license he could not legally buy guns for himself in New

10   York.  He found another way, an illegal way to get guns.  How

11   did he do it?  A straw buyer, a man living hours away who was

12   willing to lie on government forms to get guns for the

13   defendant, forms that the defendant straw buyer filled out

14   under the penalty of perjury at South Carolina gun stores so

15   that he could buy guns for defendant in South Carolina and then

16   secretly and illegally transport those guns into defendant's

17   hands here in New York.

18           It was a simple plan.  The defendant wanted guns but

19   he couldn't get them in New York.  So the straw buyer walked

20   into gun stores in South Carolina.  He presented an

21   identification card.  He lied on an official form and he bought

22   guns.  What did he do after he bought those guns?  He

23   communicated with the defendant.  He traveled to the Bronx and

24   he delivered those guns to the defendant, bought the guns in

25   South Carolina, talked to the defendant, delivered those guns

1    to the defendant in the Bronx.  The defendant and his

2    associates paid the straw buyer for those trips on at least

3    three occasions sending money from a check cash store in the

4    Bronx to the straw buyer in South Carolina.

5              On two occasions the defendant was actually arrested

6    with guns that the straw buyer had purchased for him in South

7    Carolina.  First, he was arrested in the Bronx with a handgun

8    in his bag.  Second, just two weeks later he was arrested

9    again, this time in Massachusetts where he was traveling with

10   his associates, members of an armed group that claimed to be a

11   militia, a militia that was heading from Rhode Island to a

12   training exercise in Maine.  Law enforcement searched the

13   vehicles that the defendants and his associates drove in, and

14   that day law enforcement seized a total of nine guns from the

15   group.  One of those guns was a particular handgun, another

16   handgun the straw buyer purchased for the defendant in South

17   Carolina and delivered to him right here in New York City.

18   Just like the handgun seized from the defendant in the Bronx,

19   both bought by that South Carolina straw buyer and delivered to

20   the defendant in New York.

21             So that's what the evidence will show, that the

22   defendant worked with others to illegally receive firearms in

23   New York that had been purchased by a straw buyers in South

24   Carolina.

25             Now, how will the government prove its case beyond a

1    reasonable doubt?  You're going to see and hear different types

2    of evidence in this trial.  You will see the guns, the two guns

3    that the straw buyer bought for the defendant, the gun pulled

4    out of the defendant's bag in the Bronx and the gun seized

5    during the defendant's arrest in Massachusetts.

6           You're also going to hear from law enforcement

7    officers who arrested the defendant and seized his guns.

8    You'll see videos from these arrests including video capturing

9    the defendant and his friends armed and dressed in military

10   gear discussing their guns, suggesting that they knew where the

11   guns came from.  You'll see and hear the defendant and you'll

12   see another man, a man standing right next to the defendant,

13   one of the defendant's friends who also sent money to that

14   straw buyer in South Carolina.

15          You're also going to see the forms that the straw

16   buyer bought these two seized guns as well as many others.

17   You'll also see the Western Union report showing payments to

18   the defendant and his friends right around the time the straw

19   buyer was buying guns.  You are going to see evidence from

20   cellphones including cellphones seized from the defendant, as

21   well as that group in Massachusetts.  That evidence includes

22   text messages from the group references their plans for a

23   military style training event.  You'll see that in those text

24   messages the groups discussed the need to prepare to buy guns

25   and obtain other supplies.  You'll see how members of that

1  group reacted when they learned just two weeks before their

2  planned exercise that the defendant, a trusted member of their

3  inner circle, had been arrested in the Bronx with a gun

4  purchased by the straw buyer.

5        You will also see location information for cellphones

6  used by the defendant and the straw buyer in South Carolina.

7  You'll see that they were located close together in the Bronx

8  each time the straw buyer traveled to New York.  You'll also

9  see phone record that show the defendant communicated with the

10  straw buyer and facilitated communications between the straw

11  buyer and at least two other New York residents.  At the end of

12  this trial you are going to know exactly what happened here.

13  The defendant illegally received guns in New York, hand

14  delivered to the Bronx from a straw buyer in South Carolina.

15        Now, members of the jury, this will not be a long

16  trial but it is an important one.  The evidence is going to

17  come in piece-by-piece and at end of the trial we'll have

18  another chance to come back and speak with you again to explain

19  how all of this evidence gets together.  But between now and

20  then I'm going to ask you to do three things.  First, pay close

21  attention to the evidence.  Second, listen to Judge Rakoff's

22  instructions on the law, and third use your common sense, the

23  same common sense you used to make important decisions in your

24  lives everyday.

25        If you do those three things you'll reach the only

1   verdict consistent with the evidence, the defendant is guilty.

2                THE COURT:  Thank you very much.  We'll hear now from

3   defense counsel.

4                MS. MAYO:  Thank you, your Honor.

5                Lucha El Por Libertad, Lucha El is not here for

6   possessing a gun.  He is not charged with carrying a gun.  He's

7   certainly not here because he was using or waiving around a gun

8   or threatening anyone with a gun.  So why exactly is Lucha El

9   sitting here today?  In June of 2021 Lucha El was in his

10  neighborhood in the Bronx, a neighborhood that was still

11  emerging from the COVID pandemic still reeling with the crime

12  wave that swept the city during that time.  It was at this time

13  in this atmosphere that Lucha El was stopped by the police,

14  stopped while he was standing in front of his apartment

15  building chatting with his elderly neighbors, minding his own

16  business, all because he had a gun in his bag.

17               That gun, Lucha El had gotten it from someone in his

18  family, someone he knew and trusted, someone he had grown up

19  with in the Bronx who had since moved to South Carolina but

20  still came to visit him sometimes when he was in town, a man

21  named Keith Vereen.  The only reason that Lucha El is sitting

22  here today is because that gun was purchased in another state

23  and Lucha El accepted it in New York.  But the federal

24  government doesn't go around prosecuting people just because

25  they received guns from different states.  To be a crime the

1    government has to prove that Lucha El intended to do something

2    unlawful by accepting that gun in New York City.  To be a crime

3    the government must prove that he acted with a bad purpose in

4    his mind.  But Lucha El did not know there was anything

5    unlawful about accepting that gun.  To Lucha El, what could be

6    wrong about accepting a gun from someone he's known his entire

7    life?  Lucha El by receiving that gun, that gun purchased by

8    someone else in South Carolina did not intend to disobey the

9    law.

10           This matter is because this entire case turns on you

11   deciding what was in Lucha El's mind.  Did Lucha El intend to

12   do something unlawful?  Did he have a bad purpose to disobey

13   the law when he received this handgun from someone that he

14   knew?  Did Lucha El agree with other people to transport guns

15   to do something unlawful?  The answer to both questions is no.

16           But how will you know that Lucha El did not act with

17   this bad purpose?  How will you know that he did not agree with

18   other people to do something unlawful?  You will see the moment

19   that officers surrounded Lucha El standing in front of his

20   apartment building talking with his neighbors on that June

21   night.  It was captured on the body worn camera footage of one

22   of the officers who stopped him.  You'll hear that Lucha El was

23   stopped by the police just because he had a gun, not because

24   there had been a shooting or because anyone had been injured,

25   but just because he had a gun.  And when Lucha El is stopped

1    you'll see that he doesn't run.  He doesn't hide.  He don't try

2    to fight off the police.  In fact, he is bewildered as to why

3    they're even stopping him in the first place.  He says, yeah,

4    that's my arm.  He doesn't know that he did anything wrong and

5    what you won't see is any evidence to the contrary.  You won't

6    see text messages between Lucha El and Keith Vereen.  You won't

7    hear recordings of phone calls between them talking about guns,

8    where to get guns, what states to get guns from.  You'll see a

9    Western Union payment made from Lucha El to Keith Vereen, but

10   that one time payment was for $350.  That's not even enough to

11   cover the cost of a single gun.

12           As to other people, the associates that the government

13   claims are Lucha El's co-conspirators, you will see text

14   messages but most of them won't even involve Lucha.  He didn't

15   send them and he didn't receive them.  None of these messages

16   include Lucha talking about guns.

17           What you won't see is Lucha El intending to disobey

18   the law.  This question of what Lucha El knew and believed and

19   intended is the critical question that you have to anticipate

20   here.  Did Lucha El act with a bad purpose?  It's a simple

21   question.  But the government wants to make a case about

22   everything but that question, everything but that issue of what

23   was in Lucha El's mind.  The government doesn't want you to

24   focus on that.  You just heard the government stand up here and

25   tell you about other guns that Keith Vereen purchased about

1    other people's text messages that don't involve Lucha El, about

2    other agreements and other plans that other people made without

3    involving Lucha.

4          But this is all a distraction.  Because weaving in

5    these other gun references, other statements by other people,

6    statements that have no connection to Lucha El, the government

7    will only complicate what is simple and distract you from the

8    truth.  Don't fall for it.  This case is about Lucha El and his

9    state of mind.  Did Lucha El receive a gun purchased out of

10   state knowing it was unlawful?  He did not.  Did Lucha El agree

11   with other people to transport guns purchased out of state?  he

12   did not.  This case is about a man who was trying to protect

13   himself by obtaining a handgun who simply did not know he could

14   not accept it.

15         Pay close attention to the relevant evidence.  And

16   like the government said, use your common sense.  When you

17   ignore the distractions and focus on what Lucha says, what

18   Lucha does and what Lucha believes, then you'll know that Lucha

19   El is not guilty.  And after you have heard all of this

20   evidence we will ask you to return a verdict of not guilty.

21         THE COURT:  Thank you very much.

22         All right.  The government will call their first

23   witness.

24         MS. SMYSER:  Your Honor, the government calls Police

25   Officer Jarren Smalls.

1    JARREN SMALLS,

2         called as a witness by the Government,

3         having been duly sworn, testified as follows:

4              COURTROOM DEPUTY:  Please state you name and spell it

5    for the record.

6              THE WITNESS:  Officer Jarren Smalls, J-a-r-r-e-n,

7    Smalls, S-m-a-l-l-s.

8    DIRECT EXAMINATION

9    BY SMYSER:

10   Q.  Morning, Officer Smalls.

11   A.  Good morning.

12   Q.  Where do you presently work?

13   A.  New York Police Department.

14   Q.  What is your title there?

15   A.  Police officer.

16   Q.  How long have you worked for the NYPD?

17   A.  Almost five and a half years.

18   Q.  Do you work in a particular unit or team for NYPD?

19   A.  Yes.  I work for Bronx Public Safety.

20   Q.  What are some of your responsibilities as an officer for

21   Bronx Public Safety?

22   A.  We patrol high crime locations, areas with an increase of

23   shootings, gang activities, gang violence, robberies.

24   Q.  Could you pull the microphone a little bit closer to you.

25   In that role, Officer Smalls, do you work in a particular

1    precinct or throughout the Bronx?

2    A.   Throughout the Bronx.

3    Q.   Prior to joining Bronx Public Safety did you work in a

4    precinct?

5    A.   Yes.

6    Q.   Which precinct was that?

7    A.   The 52nd Precinct.

8    Q.   Where is the 52 Precinct?

9    A.   It covers the Norwood section of the Bronx, University

10   Heights, Fordham, Gun Hill.

11   Q.   How long did you worked for the 52nd Precinct?

12   A.   Approximately, five years.

13   Q.   Were you working there in June of 2021?

14   A.   Yes.

15   Q.   Were you assigned to a particular unit in the precinct at

16   that time?

17   A.   Yes.

18   Q.   What was that?

19   A.   Public Safety Team.

20   Q.   Were your responsibilities as with the Public Safety Team

21   similar to your current responsibilities with Bronx Public

22   Safety?

23   A.   Yes.

24   Q.   As part of your responsibilities did you patrol the 52nd

25   Precinct?

```
 1   A.  Yes.
 2   Q.  When you were on patrol, what was some of the kinds of
 3   things that you did?
 4   A.  Responded to radio runs which is 911 calls, emergencies,
 5   accidents, made arrests.
 6   Q.  You mentioned the term "radio run".  What does that mean?
 7   A.  When somebody calls 911 to report a crime or an emergency.
 8   Q.  Officer Smalls, I want to direct your attention to June
 9   23rd of 2021.  Were you on duty that day?
10   A.  Yes.
11   Q.  Did you make any arrests that day?
12   A.  Yes.
13   Q.  Who did you arrest?
14   A.  A Mr. Steven Perez.
15   Q.  Do you know Mr. Perez by any other names?
16   A.  Yes.
17   Q.  What names?
18   A.  "Lucha".
19   Q.  Do you see Mr. Perez or Lucha in the courtroom today?
20   A.  Yes, I do.
21   Q.  Can you identify him based on where he is sitting and an
22   article of clothing that he is wearing?
23   A.  Yes.  He is sitting between those two ladies back there
24   wearing a white shirt.
25          MS. SMYSER:  Your Honor, let the record reflect the
```

1   witness has identified the defendant?

2          THE COURT:  Yes.

3   Q.  Officer Smalls, we'll talk about the specifics of that

4   arrest in a moment but I want to talk about the evening of June

5   23rd.

6          Were you patrolling on that night?

7   A.  Yes.

8   Q.  On foot or by car?

9   A.  By car.

10  Q.  Were you alone or with other officers?

11  A.  I was with my partner, Officer Carter.

12  Q.  Who was driving?

13  A.  My partner.

14  Q.  Where were you sitting?

15  A.  In the front passenger seat.

16  Q.  I want to direct your attention to approximately 9:50 p.m.

17  on that evening were you monitoring the radio around that time?

18  A.  Yes.

19  Q.  Did you receive any radio transmissions?

20  A.  Yes.

21  Q.  What did you learn from the radio transmission?

22  A.  That there was a male in the vicinity of East Gun Hill Road

23  and Perry Avenue armed with a firearm.

24  Q.  On that radio transmission did they describe what that man

25  looked like?

1    A.  Yes.  They gave a description of a male Hispanic,

2    approximately five/six wearing a white T-shirt, black pants

3    wearing a blue purse with a black and white turban.

4    Q.  Did they say what the man's name was?

5    A.  Yes.  Said his name was "Lucha".

6    Q.  Could you just remind us what initiates that radio

7    transmission?

8    A.  That is when someone calls 911 to report a crime or an

9    emergency or something happening.

10   Q.  When you received that radio transmission, where were you?

11   A.  I was in Sector David of the 52nd Precinct.

12   Q.  What's a sector?

13   A.  A sector is a smaller portion of a precinct broken down.

14   Q.  Where is Sector David, just generally?

15   A.  It covers the Gun Hill area of the 52nd Precinct.

16   Q.  How close were you to East Gun Hill Road and Perry Avenue

17   where that was mentioned on the radio run?

18   A.  It was very close.  It was blocks, within blocks.

19         MS. SMYSER:  Could we please pull up for the witness

20   only what has been marked for identification as Government

21   Exhibit 204.

22   Q.  Officer Smalls, can you see that?

23   A.  Yes.

24   Q.  Do you recognize it?

25   A.  Yes.

1    Q.  What is this?

2    A.  This is a portion of Sector David.

3    Q.  How do you know?

4    A.  I paroled this location for almost five years.

5    Q.  Is it a fair and accurate depiction of the area you were

6    patrolling on the night of June 23rd?

7    A.  Yes.

8            MS. SMYSER:  Government offers Government Exhibit 204.

9            MS. MAYO:  No objection.

10           THE COURT:  Received.

11           (Government's Exhibit 204 received in evidence)

12           MS. SMYSER:  May we publish, your Honor?

13           THE COURT:  Please.

14           (Pause)

15   Q.  Officer Smalls, using Government Exhibit 204 --

16           MS. SMYSER:  Has that been published for the jury?

17   Q.  Using Government Exhibit 204, could you please show the

18   jury where you were when you received a radio run, and I think

19   you can write on the screen.

20   A.  Sure.  I was in the vicinity of Hull Avenue between -- it

21   is not allowing me to write.

22   Q.  Just walk us through where you were.

23   A.  Between East Gun Hill Road and East 209 Street and Hull

24   Avenue.

25   Q.  After you received the radio run where did you go?

1    A.  I went southbound on Hull Avenue, then I made a right onto

2    East 209 Street going westbound and made another right onto

3    Perry Avenue going northbound.

4    Q.  When with you made a right, were you near that supermarket

5    that's indicated on the map?

6    A.  Yes.

7    Q.  Could you please describe where you eventually saw the man?

8    A.  In that location where that red flag is on Perry Avenue.

9    Q.  Officer Smalls, were you wearing a body worn camera that

10   day?

11   A.  Yes.

12   Q.  Does your body worn camera need to be turned on in order to

13   record?

14   A.  Yes, it does.

15              (Continued on next page)

16

17

18

19

20

21

22

23

24

25

N8SBPER2                    Smalls - Direct

 1  BY MS. SMYSER:

 2  Q.  Could you just explain how that works?

 3  A.  So our body worn camera is always running.  It only

 4  memorializes footage once we press the activation button.  It

 5  will go back a minute prior and record what was going on

 6  without the audio, and then you'll get the audio up at the

 7  minute that you pressed it.

 8  Q.  We can take down Government Exhibit 204.

 9          Officer Smalls, do you see in front of you a disk

10  that's been marked for identification as Government Exhibit

11  202A?

12  A.  Yes.

13  Q.  Do you recognize that?

14  A.  Yes.

15  Q.  What is it?

16  A.  This is a copy of my body worn camera.

17  Q.  How do you know that?

18  A.  I watched it and then I signed and initialed and dated it.

19  Q.  Did you review its contents before testifying today?

20  A.  Yes, I did.

21  Q.  Is it a fair and accurate representation of events on the

22  night of June 23, as captured by your body worn camera?

23  A.  Yes.

24          MS. SMYSER:  Your Honor, the government offers

25  Government Exhibit 202A.

N8SBPER2                        Smalls - Direct

1            THE COURT:  Any objection?

2            MS. MAYO:  No objection, your Honor.

3            THE COURT:  Received.

4            (Government's Exhibit 202 received in evidence)

5            MS. SMYSER:  Your Honor, at this time I would also

6    offer a stipulation between the parties.  It's Government

7    Exhibit 1008.  I'd like to read a portion of that to the jury.

8            THE COURT:  Okay.

9            MS. SMYSER:  The parties agree that Government Exhibit

10   202AT is a true and accurate transcript of Government Exhibit

11   202A.  And Government Exhibit 205T is a true and accurate

12   transcript of Government Exhibits 205A, 205B and 205C.

13           Your Honor, at this point I would like to publish

14   Government Exhibit 202AT which is a transcript as an aid to the

15   jury.

16           THE COURT:  Any objection?

17           MS. MAYO:  No objection.

18           THE COURT:  Received.

19           (Government's Exhibits 202AT, 205T received in

20   evidence)

21           MS. SMYSER:  Mr. Ahuja, could you please display

22   Government Exhibit 202A side by side with Government Exhibit

23   202AT.

24   Q.  Officer Smalls, can you see that?

25   A.  Yes.

N8SBPER2                          Smalls - Direct

1   Q.  Before we begin playing your body camera, could you just

2   describe what we're looking at on the right side of the screen?

3   A.  You're looking at footage captured from my body worn camera

4   from my vantage point that evening.

5   Q.  Does your body worn camera record the date and time?

6   A.  Yes, it does.

7   Q.  What is the date and time that this clip begins?

8   A.  It's June 23rd of 2021, at 21:56 hours.

9   Q.  Mr. Ahuja, could you please play the clip for the first ten

10  seconds.

11          (Media played)

12          (Media stopped)

13  Q.  Officer smalls, what happened in this clip?

14  A.  My partner rounded the corner of East 209th Street and

15  Perry Avenue.  As we're rounding the corner, I observed a male

16  subject matching the specific description that was put over the

17  radio, and I'm pointing him out to my partner.

18  Q.  Mr. Ahuja, could we continue to play from ten seconds to

19  one minute and 15 seconds, and we can start with the transcript

20  on page one, line two.

21          (Media played)

22          (Media stopped)

23  Q.  Officer Smalls, who was this man that you approached?

24  A.  Mr. Steven Perez.

25  Q.  As you approached the defendant, who, if anyone, was

N8SBPER2                          Smalls - Direct

1   approaching with you?

2   A.  My partner Officer Cotter.

3   Q.  When you got to the defendant, what did you do?

4   A.  I frisked his blue purse, and I felt a hard L-shape object

5   that was consistent to the shape and size of a firearm.

6   Q.  What happened after you frisked the bag and felt the

7   L-shape object?

8   A.  That led me to believe a firearm was in the bag, so I told

9   my partner 92, which means arrest, so my partner can begin to

10  handcuff Mr. Steven Perez.

11  Q.  What did Officer Cotter do after he heard you say 92?

12  A.  He immediately started handcuffing Mr. Steven Perez.

13  Q.  The defendant said a few times, "That's my arm."  What did

14  you understand the defendant to mean by that?

15  A.  That being his firearm.

16  Q.  At the end of the clip here you took the blue bag off of

17  the defendant, why did you do that?

18  A.  Cause the defendant I believe was potentially armed with an

19  illegal firearm, dangerous to have subjects on the street to be

20  armed with a weapon, especially when there's other officers in

21  the street and also other people in the street.

22          MS. MAYO:  Objection.

23          THE COURT:  Overruled.

24  A.  Also when there's other people in the street.  So for our

25  safety and the safety of others on the street, I want that

N8SBPER2                        Smalls - Direct

1    weapon off the subject.

2    Q.  Mr. Ahuja, we can continue now to play Government exhibit

3    202A, and we're going to play through the end of the clip and

4    the transcript here will start on page two, line five.

5            (Media played)

6            (Media stopped)

7    Q.  Officer Smalls, what were you doing in this clip?

8    A.  Once I removed the bag off of him, I looked inside the bag

9    to make sure there was actually a firearm in the bag.  I then

10   asked him if he had a permit for it and he said no.

11   Q.  The defendant said, I don't need a permit in response to

12   your question whether he had one.  Why did you ask him whether

13   he had a permit?

14   A.  Because it's New York State and New York City law to have a

15   permit for a handgun.

16   Q.  At any point after this approach did you look up whether

17   the defendant had a permit for a handgun?

18   A.  Yes, I did.

19   Q.  How did you do that?

20   A.  We ran an individual in our DAS system.  Our DAS system is

21   a database we use in the New York City Police Department to

22   basically run people's pedigree information, get their pedigree

23   information, see if they have any licenses, permits, if they

24   made any reports, if they been a victim of anything or have any

25   domestic incident reports or any arrest they may have had in

```
N8SBPER2                      Smalls - Direct
```

1    the city.

2    Q.  Did the defendant have a permit?

3    A.  No.

4    Q.  Officer Smalls, was your partner Officer Cotter wearing

5    body worn camera that day?

6    A.  Yes, he was.

7    Q.  Could you look in front of you for the disk that contains

8    exhibits marked for identification as Government's Exhibits

9    205A, 205B and 205C.

10           Do you recognize it?

11   A.  Yes.

12   Q.  What is this?

13   A.  This is a copy of my partner's body worn camera footage.

14   Q.  How do you know?

15   A.  I watched it and then I signed and dated it.

16   Q.  Were you present when Officer Cotter's body cam footage was

17   running?

18   A.  Yes.

19           MS. SMYSER:  Your Honor, the government offers

20   Government's Exhibits 205A, 205B and 205C.

21           MS. MAYO:  No objection.

22           THE COURT:  Received.

23           (Government's Exhibits 205A, 205B and 205C received in

24   evidence)

25           MS. SMYSER:  Your Honor, we'd also like to publish

N8SBPER2                        Smalls - Direct

Government Exhibit 205T which is a transcript as an aid to the

jury.  Mr. Ahuja, could you please display 205A side by side

with 205T.

Q.  And Officer Smalls, could you explain what we are looking

at here on the right-hand side of the screen?

A.  You're looking at a still from my partner's body cam.  You

see me in it.  You see Mr. Steven Perez in it.  You see my

partner's arm and another police officer in it as well.

Q.  Does this capture some of what we just watched from a

different vantage point?

A.  Yes.

Q.  Mr. Ahuja, could you please play the clip and scroll along

in Government Exhibit 205T.

          (Media played)

          (Media stopped)

Q.  Now, could we please display Government Exhibit 205B next

to 205T.

          Officer Smalls, where does this body camera footage

come from?

A.  This is also from my partner's body camera.

Q.  Where is the defendant standing in relation to your

partner?

A.  To his right.

Q.  Mr. Ahuja, could you please play the clip which corresponds

to page one, lines 13 through 15 of the transcript.

N8SBPER2                         Smalls - Direct

1              (Media played)

2    Q.   The defendant said a permit is a permission, what did you

3    understand him to mean?

4    A.   That --

5              MS. MAYO:  Objection.

6              THE COURT:  Overruled.

7    A.   That a permit is basically him asking for permission to

8    have a firearm.  And I ask him if he had one and he said no.

9    Q.   Mr. Ahuja, could you please display Government Exhibit 205C

10   side by side with 205T.

11             Officer Smalls, what are we looking at here?

12   A.   This is a clip from my partner's body worn camera.

13   Q.   Where is the defendant in relation to this clip?

14   A.   Should be to his right.

15   Q.   Mr. Ahuja, could we please play this clip and it's going to

16   start on page one, line 17 on the transcript to the left.

17             (Media played)

18             (Media stopped)

19   Q.   Officer Smalls, here the defendant stated that you should

20   not uphold legalities and regulations and mandates.

21             By that time had you already placed the defendant

22   under arrest?

23   A.   Yes.

24   Q.   Did those statements change your view on arresting him?

25   A.   No.

N8SBPER2                        Smalls – Direct

1           MS. SMYSER:  Your Honor, I'd just like to clarify

2     whether the jury was able to see that video?

3           THE COURT:  Were you?

4           JUROR:  No.

5           MS. SMYSER:  Could we replay the video.  We'll start

6     at the beginning of Government Exhibit 205C, and again this is

7     going to start on line 17 of the transcript there.

8           (Media played)

9           (Media stopped)

10    Q.  Now we can take down Government Exhibit 205C and 205T.

11          Officer Smalls, during your interaction with the

12    defendant, did he tell you his name?

13    A.  Yes.

14    Q.  What did he say that his name was?

15    A.  Lucha.

16    Q.  Did he provide any identification?

17    A.  Yes, he did.

18    Q.  Mr. Ahuja, could you display for the witness only what's

19    been marked for identification as Government Exhibit 203.

20          Officer Smalls, do you recognize this?

21    A.  Yes, I do.

22    Q.  What is it?

23    A.  This is the ID that was provided by Mr. Perez.

24    Q.  How do you know?

25    A.  It's the name that he provided to us on scene.  It also has

N8SBPER2                         Smalls – Direct

1    a picture of him.

2    Q.  Is this a fair and accurate representation of the ID he

3    provided on that night?

4    A.  Yes.

5             MS. SMYSER:  Your Honor, the government offers

6    Government Exhibit 203.

7             MS. MAYO:  No objection.

8             THE COURT:  Received.

9             (Government's Exhibit 203 received in evidence)

10            MS. SMYSER:  May we publish it?

11            THE COURT:  Please.

12            MS. SMYSER:  Please publish Government Exhibit 203,

13   and we can take that down.

14   BY MS. SMYSER:

15   Q.  Officer Smalls, after the defendant was placed under

16   arrest, did you take him anywhere?

17   A.  Yes.

18   Q.  Where?

19   A.  Took him to the 52nd precinct.

20   Q.  Once you got to the precinct, what did you do with that

21   firearm that you had seized from the defendant?

22   A.  I gave it to my partner Officer Cotter.

23   Q.  What happened after you gave that gun to Officer Cotter?

24   A.  We called ECT.

25   Q.  What's ECT?

N8SBPER2                        Smalls - Direct

1   A.  The New York City police department evidence collection

2   team.

3   Q.  Did the evidence collection team respond?

4   A.  Yes.

5   Q.  Were you present when they responded?

6   A.  Yes, I was.

7   Q.  What does the evidence collection team do with respect to

8   firearms?

9   A.  They'll swab it.  They'll fume and dust it for prints.

10  They'll unload it, make it safe, and take photographs of it as

11  well.

12  Q.  Did the evidence collection team examine this particular

13  firearm?

14  A.  Yes, they did.

15  Q.  Was this gun loaded?

16  A.  Yes, it was.

17  Q.  While the evidence collection team was unloading the gun

18  and making it safe, did they take photographs?

19  A.  Yes.

20  Q.  Mr. Ahuja, could you please pull up for the witness only a

21  few exhibits marked for identification first as Government's

22  Exhibits 520A through C, and could you also show for

23  identification Government Exhibit 521A and 522A and B.

24          Officer Smalls, do you recognize these?

25  A.  Yes, I do.

N8SBPER2                          Smalls - Direct

1   Q.  What are they?

2   A.  These are photographs of the firearm that was recovered off

3   of Mr. Perez.

4   Q.  How do you know that?

5   A.  It has the distinctive red trigger that I remember that

6   evening.  It has a mounted flashlight on it and also a little

7   pinky extender on the magazine.

8   Q.  Is this a fair and accurate depiction of the firearm and

9   the magazine as it was seized from the defendant that day?

10  A.  No.

11  Q.  Why not?

12  A.  This is a photograph with the firearm unloaded.  When it

13  was seized from Mr. Perez, the firearm was loaded.

14  Q.  Is it a fair and accurate representation of the gun after

15  the evidence collection team disassembled it?

16  A.  Yes.

17          MS. SMYSER:  Your Honor, the government offers

18  Government's Exhibit 520A through C, 521A and 522A and B.

19          MS. MAYO:  No objection.

20          THE COURT:  Received.

21          (Government's Exhibits 520A, 520B, 520C, 521A, 522A,

22  522B received in evidence)

23          MS. SMYSER:  May we publish?

24          THE COURT:  Yes.

25  BY MS. SMYSER:

N8SBPER2                        Smalls – Direct

1    Q.  Mr. Ahuja, may we please publish 520A.

2            Officer Smalls, what is this?

3    A.  This is a photograph of the firearm.

4    Q.  Is this the same gun that was seized from the defendant?

5    A.  Yes, it was.

6    Q.  What brand of firearm is this?

7    A.  This is a Canik.

8    Q.  Mr. Ahuja, could you now please display Government Exhibit

9    520C.

10           Officer Smalls, is this the same gun?

11   A.  Yes, it is.

12   Q.  I'm going to read the serial number depicted on the firearm

13   in Government Exhibit 520C which is 20 CB 25810.

14           Do you see that Officer Smalls?

15   A.  Yes, I do.

16   Q.  Is that correct?

17   A.  Yes, it is.

18   Q.  Mr. Ahuja, could you please publish now Government Exhibit

19   522A.  Officer Smalls, what is the item on the right here?

20   A.  That is the magazine.

21   Q.  Could you explain what a magazine is?

22   A.  A magazine is what holds the rounds or the bullets and that

23   goes inside the firearm.

24   Q.  Is this what the magazine looked like when it was pulled

25   out of that firearm?

N8SBPER2                        Smalls - Direct

1   A.  Yes.

2   Q.  Mr. Ahuja, could you now display Government Exhibit 522B,

3   please.

4           Officer Smalls, do you see the bullets on the screen?

5   A.  Yes, I do.

6   Q.  Where did those come from?

7   A.  Those came from inside the magazine.

8   Q.  So they were inside the firearm?

9   A.  Correct.

10  Q.  How many bullets were in the gun?

11  A.  Twelve.

12  Q.  Officer Smalls, could you please now look to your right for

13  two items marked for identification as Government Exhibits 521

14  and 522.

15  A.  Yes.

16  Q.  Do you see those?

17  A.  Yes, I do.

18  Q.  Do you recognize them?

19  A.  Yes.

20  Q.  What are they?

21  A.  They are the rounds that were in the magazine which were in

22  the firearm and the magazine itself as well that was inside the

23  firearm.

24  Q.  How do you know?

25  A.  They're labeled.  They were in the same magazine that I

N8SBPER2                        Smalls – Direct

1    recognize from the firearm.

2              MS. SMYSER:  Your Honor, the government offers

3    Government's Exhibits 521 and 522.

4              MS. MAYO:  Your Honor, may we briefly just examine the

5    evidence ourselves?

6              THE COURT:  Yes.

7              MS. MAYO:  May we approach?

8              THE COURT:  Yes.

9              MS. MAYO:  Thank you, your Honor.  No objection.

10             THE COURT:  Received.

11             (Government's Exhibits 521, 522 received in evidence)

12   BY MS. SMYSER:

13   Q.  Officer Smalls, can you please take Government Exhibit 522

14   and hold it up for the jury.

15             And what is that?

16   A.  This is the magazine that was inside the firearm.

17   Q.  You can set that down.

18             And next could you please display Government Exhibit

19   521.  What is this?

20   A.  These are the rounds or bullets that were seated inside the

21   magazine that was ultimately seated inside the firearm.

22   Q.  Officer Smalls, could you next look to your right for the

23   item marked for identification as Government Exhibit 520.

24             Do you recognize that?

25   A.  Yes, I do.

N8SBPER2                    Smalls – Direct

1    Q.  What is it?

2    A.  This is the firearm that was recovered off of Mr. Steven

3    Perez.

4    Q.  How do you know?

5    A.  It's labeled.  It matches the exact firearm with the red

6    trigger guard, the mounted flashlight from that evening.

7            MS. SMYSER:  Your Honor, the government offers

8    Government Exhibit 520.

9            MS. MAYO:  No objection.

10            THE COURT:  Received.

11            (Government's Exhibit 520 received in evidence)

12    BY MS. SMYSER:

13    Q.  Officer Smalls, could this gun be loaded right now?

14    A.  No.

15    Q.  Why not?

16    A.  There are zip ties through the barrel and the magazine

17    well, so it doesn't allow for a magazine to be inserted in it

18    or a round to be inserted in the chamber.

19    Q.  Was it loaded on the night of June 23, 2021?

20    A.  Yes, it was.

21            MS. SMYSER:  Could the witness please walk Government

22    Exhibit 520 safely in front of the jury.

23            THE COURT:  Yes.

24            MS. SMYSER:  Your Honor, may I have just a moment.  No

25    further questions.

N8SBPER2                         Smalls – Direct

1          THE COURT:  All right.  So we have five minutes before

2     lunch, but we could break early or we could start the cross,

3     whichever defense counsel prefers.

4          MS. MAYO:  Your Honor, we can take a break now.

5          THE COURT:  Ladies and gentlemen, we'll take our lunch

6     break at this time and we'll resume a couple of minutes before

7     2:00.  We're only going as I mentioned today at 3:30 because of

8     other matters, so we won't take any further break after lunch

9     so be prepared to sit 2:00 to 3:30.  Have a very good lunch and

10    we'll see you at 2:00.

11              (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

N8SBPER2                          Smalls - Cross

1                    (Jury not present)

2            THE COURT:  Please be seated.  Let me ask defense

3    counsel how do you propose to put before the jury the evidence

4    of the things you mentioned in your opening statement unless

5    you're planning to call the defendant as a witness?

6            MS. BAHARANYI:  Your Honor, if the evidence doesn't

7    come out through any of the government's witnesses, then we

8    have the option of obviously putting on Lucha El as a witness

9    or putting on another witness who can help support that.

10           THE COURT:  Who would that be?

11           MS. BAHARANYI:  Possibly -- obviously at this point we

12   haven't decided given the government's case is still open, but

13   possibly Maria Otero.

14           THE COURT:  Because, the reason I mention this, the

15   defendant doesn't have to decide whether to take the stand or

16   not until the close of the government's case, although he has

17   to decide right then and there.  But if there are other

18   witnesses who the defense is going to call, I think they need

19   to give the government at least 24 hours' notice before the

20   close of government's case.

21           MS. BAHARANYI:  I understand, your Honor.

22           THE COURT:  Very good.  We'll see you at 2:00.

23           (Recess)

24

25

N8SBPER2                          Smalls - Cross

 1                       AFTERNOON SESSION

 2                          2:00 p.m.

 3          (Jury not present)

 4          THE COURT:  You recall at 3:30 we'll have the *Daubert*

 5   hearing on the one witness that I thought we needed it.

 6          MS. NICHOLAS:  Yes, your Honor.  We're ready for that.

 7          THE DEPUTY CLERK:  Jury entering the courtroom.

 8          (Jury present)

 9          THE COURT:  Please be seated.  All right.

10   Cross-examination.

11   CROSS-EXAMINATION

12          MS. MAYO:  Thank you, your Honor.

13   BY MS. MAYO:

14   Q.  Good afternoon, Officer Smalls.

15   A.  Good afternoon.

16   Q.  You referred in your direct testimony several times to the

17   name Steven Perez?

18   A.  Yes.

19   Q.  Multiple times?

20   A.  Yes.

21   Q.  You're aware that the name he goes by is Lucha El?

22   A.  Yes.

23   Q.  His ID had the name Lucha El on it that he gave to you?

24   A.  Yes.

25   Q.  You testified that you and your partner were on patrol on

1  the night of June 23, 2021?

2  A.  Yes.

3  Q.  When you received this information about a man with a

4  firearm?

5  A.  Correct.

6  Q.  When you heard this information, you drove to Perry Avenue?

7  A.  Correct.

8  Q.  And while you were driving on Perry Avenue you saw Lucha El

9  on the sidewalk?

10  A.  Correct.

11  Q.  Standing to the right of you?

12  A.  Correct.

13  Q.  Your partner stopped your patrol car?

14  A.  Yes.

15  Q.  And you both approached Lucha El?

16  A.  Correct.

17  Q.  He was still standing on the sidewalk?

18  A.  Yes.

19  Q.  He was talking to two women?

20  A.  Yes.

21  Q.  The two women were sitting in front of the building that

22  Lucha El was standing in front of?

23  A.  Correct.

24  Q.  And Lucha El saw you approach him?

25  A.  Yes.

N8SBPER2                          Smalls - Cross

1    Q.  And as you walked toward him, he did not run away?

2    A.  No.

3    Q.  He didn't start backing away?

4    A.  No.

5    Q.  He didn't try to hide the bag that he was wearing from you?

6    A.  No.

7    Q.  Or try to prevent you from looking in the bag?

8    A.  No.

9    Q.  Let's talk a little bit more about the information that you

10   were responding to.  You received this information about a 911

11   call?

12   A.  I received a 911 call.

13   Q.  You received a radio run describing a 911 call?

14   A.  Correct.

15   Q.  And the radio run was relaying the information the 911

16   caller described?

17   A.  Correct.

18   Q.  The dispatcher described a call about a man with a firearm?

19   A.  Yes.

20   Q.  And gave his location?

21   A.  Yes.

22   Q.  A description of what he looked like and what he was

23   wearing?

24   A.  Yes.

25   Q.  There was no mention of an assault?

N8SBPER2                          Smalls - Cross

1   A.  No.

2   Q.  No mention of a shooting?

3   A.  No.

4   Q.  Nothing about any injuries?

5   A.  No.

6   Q.  Or any victims?

7   A.  No.

8   Q.  And you testified that when you were patrolling, you were

9   in the 52nd precinct?

10  A.  Yes.

11  Q.  And specifically patrolling as part of the public safety

12  team?

13  A.  Correct.

14  Q.  And as in your role on the public safety team, you were

15  patrolling high crime areas?

16  A.  Correct.

17  Q.  Areas with gang violence?

18  A.  Correct.

19  Q.  Assaults?

20  A.  Correct.

21  Q.  Robberies.  And you were specifically patrolling in a high

22  crime area that night?

23  A.  We patrol the whole precinct, but we were in that area

24  because of an increase of crime around that time period.

25  Q.  So the area was a high crime area that you were patrolling

1   in?

2   A.   That specific area had a lot of gang violence at that

3   particular time.

4   Q.   And that's why you were patrolling there?

5   A.   We patrol the whole precinct, but we just happen to be in

6   that area because of the increase of crime.

7   Q.   In that specific area where you were patrolling?

8   A.   Yes.

9   Q.   And that's the area where you arrested Lucha El?

10  A.   Yes.

11  Q.   You arrested Lucha El in front of a building?

12  A.   Yes.

13  Q.   On Perry Avenue.  It was specifically 3318 Perry Avenue?

14  A.   Yes.

15  Q.   Which was Lucha El's home address?

16  A.   I don't recall his home address.

17  Q.   It was the address on the identification card that he gave

18  you?

19  A.   I don't recall the address that was on the identification

20  card.

21  Q.   Sarah, can you please pull up Government Exhibit 203.

22          Officer Smalls, was this the exhibit we were looking

23  at on your direct testimony?

24  A.   Yes.

25  Q.   Does that list 3318 Perry Avenue on this ID card?

1   A.  Yes, it says corner of 3318 Perry Avenue.

2   Q.  It says c/o 3318 Perry Avenue?

3   A.  Yes, which means corner of.

4   Q.  Now I want to turn to talk a little bit about what happened

5   after you handcuffed Lucha El.

6           Sarah, can you pull up Government Exhibit 202A and

7   then play from 1:39 seconds and 1:49 seconds and pause there.

8           (Media played)

9           (Media stopped)

10  Q.  This is a clip from your body worn camera footage from that

11  night?

12  A.  Yes.

13  Q.  It shows you at the beginning of the clip that we just

14  played shining a flashlight?

15  A.  Yes, it does.

16  Q.  And you're shining the flashlight into Lucha El's bag?

17  A.  Yes, I am.

18  Q.  And that's to look at the firearm in the bag?

19  A.  Correct.

20  Q.  You asked Lucha El if he has a permit for it?

21  A.  Yes, I did.

22  Q.  By "it," you're referring to the gun?

23  A.  Yes.

24  Q.  And by permit you're asking him if he has a concealed carry

25  permit?

N8SBPER2                        Smalls - Cross

1   A.  Yes, a permit to carry a handgun.

2   Q.  You weren't asking him where he got the gun from?

3   A.  No.

4   Q.  Or what state the gun was purchased in?

5   A.  No.

6   Q.  You never asked him where did you get this gun from?

7   A.  No, I didn't.  It doesn't matter where you got it from.  If

8   you don't have a permit from New York State or New York City,

9   you're not allowed to be in possession of it.

10  Q.  But you did not ask him that question?

11  A.  I asked him if he had a permit.  He said no.

12  Q.  Thank you.  To talk a little bit more about the government

13  you recovered from Lucha El.  You recovered the gun from the

14  bag that Lucha El was wearing?

15  A.  Correct.

16  Q.  It wasn't tucked in his waistband?

17  A.  No.

18  Q.  Or hidden under his shirt in any way?

19  A.  No.

20  Q.  And you looked at the gun that night when you looked in his

21  bag?

22  A.  Yes.

23  Q.  The gun had a serial number on it?

24  A.  Correct.

25  Q.  The serial number hadn't been filed off?

N8SBPER2                        Smalls – Redirect

1    A.  No.

2    Q.  Or removed in any other way?

3    A.  No.

4    Q.  And you testified you've been a police officer for several

5    years now?

6    A.  Yes.

7    Q.  And you've made several gun related arrests in this time?

8    A.  Yes, I have.

9    Q.  In these gun arrest, you've encountered guns that have no

10   serial numbers?

11   A.  Yes, I have.

12   Q.  Because they've been filed off?

13   A.  Correct.

14   Q.  Or they never had any serial numbers in the first place?

15   A.  Correct.

16          MS. MAYO:  One moment, your Honor.  Thank you.  No

17   further questions.

18          THE COURT:  Any redirect.

19          MS. SMYSER:  Just briefly, your Honor.

20   REDIRECT EXAMINATION

21   BY MS. SMYSER:

22   Q.  Officer Smalls, on cross-examination you were asked a

23   series of questions about the defendant's bag.  Do you recall

24   those?

25   A.  Yes.

1   Q.  Do you know whether he told you not to touch his bag?  Do
2   you recall that?
3   A.  During cross or during --
4   Q.  During cross-examination were you asked about whether Lucha
5   El tried to hide his bag?
6   A.  Yes, I was.
7   Q.  Could we just pull up Government Exhibit 201AT.  Scroll to
8   the second page, 202AT.
9         Officer Smalls, just looking here at lines five and
10  six, when you all first approached the defendant, what did he
11  say about his bag?
12  A.  He said, I'm a Moor.  Excuse me.  Don't touch me.  That's
13  my bag. Don't go in my bag.
14  Q.  Officer Smalls, you were asked a series of questions about
15  3318 Perry Avenue on direct examination.  Do you recall that?
16  A.  Yes.
17  Q.  And whether the defendant was standing in front of 3318
18  Perry Avenue?
19  A.  Yes.
20  Q.  Whether that was his address?
21  A.  Correct.
22  Q.  Looking at line 16 and 17, when the defendant was initially
23  asked about the building, what did he say?
24  A.  I have no idea.
25        MS. SMYSER:  Can I have just a moment, your Honor.

N8SBPER2                          Smalls - Redirect

1            THE COURT:  Yes.

2            MS. SMYSER:  Nothing further.

3            THE COURT:  Any recross?

4            MS. MAYO:  No, your Honor.

5            THE COURT:  Thank you very much.  You may step down.

6            (Witness excused)

7            THE COURT:  Please call your next witness.

8            MS. SMYSER:  Your Honor, before we call our next

9    witness, the government has a stipulation that we would like to

10   offer.

11           THE COURT:  Okay.

12           MS. SMYSER:  This is Government Exhibit 1006.  Can we

13   please publish it for the jury.  I'm going to start reading the

14   stipulation which is Government Exhibit 1006.  Under this

15   stipulation which is now on the screen here, the parties agree

16   that Steven Perez, AKA Lucha, the defendant, has never applied

17   for or been granted a license for a firearm or a firearms

18   dealers license.

19           Government Exhibit 607 is a true and accurate

20   certification produced by the New York City Police Department,

21   NYPD, certifying that a diligent search of the NYPD's License

22   Division Records was conducted, and there are no licensing

23   records in existence for a license for a firearm or a firearms

24   dealers license for Steven Perez, AKA, Lucha, the defendant.

25   The parties agree that this stipulation as well as Government

N8SBPER2                        Archuleta- Direct

1    Exhibit 607 are admissible, and your Honor the government would

2    offer 1006 and 607.

3              THE COURT:  Received.

4              (Government's Exhibits 1006, 607 received in evidence)

5              MS. SMYSER:  Mr. Ahuja, could you please publish

6    Government Exhibit 607 for the jury.  Would you just zoom in on

7    the text in the middle.  We can take down that exhibit and the

8    government's next witness it would call is Mark Archuleta.

9    MARK ARCHULETA,

10         called as a witness by the Government,

11         having been duly sworn, testified as follows:

12             THE DEPUTY CLERK:  Please state your name and spell it

13   for the record.

14             THE WITNESS:  My name is Mark Archuleta, M-A-R-K

15   A-R-C-H-U-L-E-T-A.

16   DIRECT EXAMINATION

17   BY MS. SMYSER:

18   Q.  Good afternoon, Mr. Archuleta.

19   A.  Good afternoon.

20   Q.  Where do you work?

21   A.  I work for Western Union Financial Services Incorporated.

22   Q.  How long have you worked for Western Union?

23   A.  Just about 20 years.

24   Q.  What is your current title there?

25   A.  My current title is senior specialist officer of consumer

1   monitoring and investigations.

2   Q.  What are some of your responsibilities as senior

3   specialist?

4   A.  My basic responsibility is transaction monitoring.

5   Q.  What do you mean by transaction monitoring?

6   A.  We monitor transaction, both money transfer and money order

7   for suspicious activity.

8   Q.  What are some of the other roles that you've held at

9   Western Union?

10  A.  I worked in regulatory exam management, law enforcement

11  outreach and investigations, corporate security, research and

12  reporting, and now I'm at my current role.

13  Q.  Are those all in kind of a particular group at the company?

14  A.  Yes, it all falls under the umbrella of anti-money

15  laundering.

16  Q.  What kind of company is Western Union?

17  A.  Western Union is a money service business is the

18  classification.  The main thing we do is move money around the

19  world.

20  Q.  Are you familiar with Western Union records that document

21  those money transfers?

22  A.  Yes.

23  Q.  What are some of the ways that you can transfer money with

24  Western Union?

25  A.  A few of the ways are you can go to like a Brick and

1    Mortar, certain grocery stores, liquor stores, convenient

2    stores, and do a location to location; or you can transfer it

3    from a bank to a bank or consumer to a bank, mobile wallets as

4    well.

5    Q.  I want to focus on going into a Brick and Mortar store and

6    sending money for a moment.

7         What kind of information is a sender of money required

8    to provide when they go into a Brick and Mortar store?

9    A.  Depending on the amount, you're asked to provide an ID

10   either way.  Sometimes the clerk can just take the information

11   for the sender such as name, address, phone number off of an

12   ID.

13   Q.  What is that money threshold that you just mentioned?

14   A.  A thousand dollars.

15   Q.  So if it is above a thousand dollars, what happens?

16   A.  They're required to input that information into our point

17   of sale system which actually facilitates the transfer.

18   Q.  If it's under thousand dollars, are they required to input

19   that information?

20   A.  Not required to input it, but they are asking to look at

21   the ID to verify the individual sending the money.

22   Q.  Under Western Union policy, they still have to request and

23   inspect the identification of the sender?

24   A.  Yes, ma'am.

25   Q.  What about the person who's picking up the money, what do

1    they have to show?

2    A.   They would have to provide a valid ID because we need to

3    know who we're paying the funds to.

4    Q.   Is that regardless of the amount that is sent?

5    A.   Yes.

6    Q.   What kind of identification do they have to show?

7    A.   Usually it's a driver license or state issued ID or you can

8    use a passport as well.

9    Q.   Mr. Ahuja, could you please display for the witness only

10   what's been marked for identification as Government Exhibit

11   803.

12             Mr. Archuleta, do you see this document?

13   A.   Yes.

14   Q.   Do you recognize it?

15   A.   Yes.

16   Q.   What is it?

17   A.   This is a money transfer transaction grid.

18   Q.   Was this grid created, kept and maintained by Western Union

19   as a record of its regularly conducted activities?

20   A.   Yes.

21   Q.   Was it created by persons with knowledge of or from

22   information transmitted by people with knowledge of the

23   information that's contained in this document?

24   A.   Yes.

25   Q.   And was it created at or near the time of the transaction

1    when that information became available?

2    A.  Yes.

3              MS. SMYSER:  Your Honor, the government offers

4    Government Exhibit 803.

5              MS. MAYO:  No objection.

6              THE COURT:  Received.

7              (Government's Exhibit 803 received in evidence)

8              MS. SMYSER:  May we publish it?

9              THE COURT:  Yes.

10   Q.  Mr. Ahuja, could you please publish Government Exhibit 803

11   and turn to the tab that's marked Keith Vereen.

12             Mr. Archuleta, have you reviewed this document?

13   A.  Yes.

14   Q.  Before we go through this log in detail, I just want to ask

15   you at a high level what's contained in that?

16   A.  This would be sender and payee information that was

17   captured during the transactions.  It also contains the

18   location where the transactions were conducted.

19   Q.  So it's about several money transfers?

20   A.  Yes.

21   Q.  And now I'd like to walk through some of this table.

22             First, I'd like to direct your attention to column D.

23   What information is contained in column D?

24   A.  Column D contains the sender's name.

25   Q.  And who sent money as reflected in this spreadsheet?

1   A.   Steven Perez, Ricardo Rodriguez Resto and Jamil Bey.

2   Q.   Can you tell how much money they sent?

3   A.   Yes.  In column B it has the sender amount in U.S. dollars.

4   Q.   How much money did Mr. Perez send?

5   A.   $350.

6   Q.   What about Mr. Rodriguez?

7   A.   $911.

8   Q.   And Mr. Bey?

9   A.   $600.

10  Q.   What does column A show?

11  A.   Column A is the Western Union money transfer fee that was

12  charged along with the principal amount.

13  Q.   Is that fee included in the amount that is transferred to

14  the recipient or not?

15  A.   No.

16  Q.   I want to direct your attention to columns G and H.

17         What information is contained in these columns?

18  A.   G and H contain the send date, the day the transaction was

19  initiated.

20  Q.   When did Perez send money?

21  A.   9/22 of 2020.

22  Q.   At what time?

23  A.   07:15 a.m. eastern standard time.

24  Q.   So this log is in eastern standard time?

25  A.   Yes.

1    BY MS. SMYSER:

2    Q.   What about Mr. Rodriguez?

3    A.   9/12 of 2020 at 1619 hours which would be 4:19 in the

4    afternoon, Eastern Standard Time.

5    Q.   Finally, Mr. Bey?

6    A.   9/12/2020, 1538 hours which would be 3:38 p.m. Eastern

7    Standard Time.

8    Q.   Looking at Column C, what does this column reference?

9    A.   Column E.

10   Q.   "C", sorry.

11   A.   "C" contains the money transfer control number which is a

12   transaction identifier assigned by Western Union.

13   Q.   What is that number used for in the transaction?

14   A.   It's to identify the transaction and it's also information

15   for the sender to pass along to the receiver or payee

16   identifying the transaction.

17   Q.   Would you please look at Column F.  What is contained in

18   this column?

19   A.   That would be the sender's phone number that was provided

20   at the time of the transaction.

21   Q.   What is the phone number for Mr. Perez?

22   A.   347-251-1561.

23   Q.   For Mr. Rodriguez?

24   A.   646-875-1041.

25   Q.   For Mr. Bey?

1   A.  914-800-4171.

2   Q.  I want to scroll on this table to Columns P through S.

3   What kinds of information are contained in these columns

4   Mr. Archuleta?

5   A.  This would be the -- you said "P" through "S"?

6   Q.  "P" through "S".

7   A.  Okay.  That is the sender's address, the send city and send

8   state and the send zip code.

9   Q.  What is the address for Mr. Perez in the first line?

10  A.  3318 Perry Avenue.

11  Q.  In what city?

12  A.  Bronx, New York.

13  Q.  What about for Mr. Rodriguez in the second line?

14  A.  3556 Webster Avenue again, Bronx, New York.

15  Q.  Finally, for Mr. Bey in the third line?

16  A.  2759 Webster Avenue again, Bronx, New York.

17  Q.  Now I want to turn to Columns AN through AR.

18          (Pause)

19  Q.  What is contained in these columns?

20  A.  This is the Western Union agent location where the money

21  transfer was initiated.

22  Q.  So where did Mr. Perez send the payment from?

23  A.  Pay-O-Matic location number 201 11 East Gun Hill Road in

24  Bronx, New York.

25  Q.  Mr. Rodriguez?

1    A.  Pay-O-Matic number 242339, East Gun Hill Road in the Bronx,
2    New York.
3    Q.  What about Mr. Bey?
4    A.  Pay-O-Matic number 242339, East Gun Hill Road, again,
5    Bronx, New York.
6    Q.  I want to scroll back in the log to Column W.  What kind of
7    information is contained in the Column W?
8    A.  Welcome.  "W" is the payee's name is the receiver of the
9    money transfer funds.
10   Q.  Did Mr. Perez, Mr. Rodriguez and Mr. Bey send money to the
11   same person here?
12   A.  Yes.
13   Q.  Who was that person?
14   A.  Keith Vereen.
15   Q.  I want to look now at Column Y.  What is contained in that
16   column?
17   A.  That is the payee's phone number.
18   Q.  What is Mr. Vereen's phone number?
19   A.  1-843-460-0166.
20   Q.  Now let's turn to Columns AG through AJ.  What information
21   is in these columns?
22   A.  This is the payee location address for the Western Union
23   location where the one transfer was picked.
24   Q.  Is it for the Western Union location or recipient address?
25   A.  Yes.  It's for the payee address which is the recipient.

1 Q. What is Mr. Vereen's address in line one?

2 A. Pridgen Road, Unit 16.

3 Q. In what city?

4 A. Myrtle Beach, South Carolina.

5 Q. What about the address in line two?

6 A. 1211 Pridgen Road, Unit 16.

7 Q. Line three?

8 A. 1211 Pridgen Road.

9 Q. Next let's turn to columns AU through AY.

10   (Pause)

11 Q. What is in these columns?

12 A. This is the Western Union agent location name.

13 Q. And its address?

14 A. Yes, address and city and state where it is located.

15 Q. Where did Mr. Vereen pick up the first two pavements?

16 A. At Food Lion number 1468, 1430 South Kings Highway in

17 Myrtle Beach, South Carolina.

18 Q. What about that last payment?

19 A. That would be Food Lion number 1202, Food Lion Myrtle

20 Beach, South Carolina.

21 Q. Finally, can we turn to Columns AD and AE.

22   (Pause)

23 Q. What is contained in these columns, Mr. Archuleta?

24 A. This is the payee's ID type and payee's ID number that

25 we're associated with the transaction pick up.

N8SAAPER5                        Archuleta – Cross

1   Q.  So what does that mean?

2   A.  This means that the identification numbers provided at the

3   time the funds were received.

4   Q.  What kind of identification did Mr. Vereen provide?

5   A.  Payee ID type number one is a state issued driver's

6   license.

7            MS. SMYSER:  Your Honor, may we just have a moment?

8            THE COURT:  Yes.

9            (Pause)

10            MS. SMYSER:  No further questions.

11            THE COURT:  Cross-examination?

12            MS. MAYO:  Thank you, your Honor.

13   CROSS-EXAMINATION

14   BY MS. MAYO:

15   Q.  Good afternoon, Mr. Archuleta.

16   A.  Good afternoon.

17   Q.  You were asked by the prosecutors to review specific

18   transactions in this case?

19   A.  Yes.

20   Q.  Review the three transactions that you went through on that

21   spreed sheet?

22   A.  Yes.

23   Q.  These were not, you were not personally familiar with these

24   records before you testified?

25   A.  Not personally, no.

1    Q.  They weren't flagged independently by Western Union as

2    "suspicious activity"?

3    A.   Initially.

4    Q.  Western Union did not raise an anti money laundering

5    concern or suspicious activity concern?

6    A.  Not to my knowledge.

7    Q.  You were asked to examine the record for purposes of this

8    trial?

9    A.  Yes.

10   Q.  To explain how the money transferred worked?

11   A.  Yes.

12           MS. MAYO:  One moment, your Honor?

13           THE COURT:  Yes.

14           (Pause)

15           MS. MAYO:  Thank you.  No further questions.

16           THE COURT:  Anything else?

17           MS. SMYSER:  Nothing further from the government.

18           THE COURT:  Thank you.  You may step down.

19           Please call your next witness.

20           MS. NICHOLAS:  Your Honor, before the government calls

21   its next witness we have two stipulations to offer.

22           First, your Honor, we'd be offering Government Exhibit

23   101 which is a stipulation between the parties that in

24   Paragraph One Steven Perez, a/k/a "Lucha", the defendant, was

25   at all relevant times a resident of New York State.  Defendant

N8SAAPER5                    Archuleta - Cross

1    is not, nor has he ever been a licensed importer, licensed

2    manufacturer or licensed dealer of firearms.

3           Paragraph Two, Government Exhibits 400 through 408 are

4    true and accurate Blue Ribbon certifications produced by the

5    Bureau of Alcohol Tobacco firearms and Explosives, the ATF,

6    certifying that a diligent search of ATF's records were

7    conducted and there are no license records in existence for

8    with for the license importation, manufacturer or dealing of

9    firearms by any of the following individuals.

10          Steven Perez, a/k/a "Lucha", Keith Vereen, Lamar Dow,

11   a/k/a "Jamil Bey, "Jamal Latimer, a/k/a "Jahmal Bey", Brandon

12   Britton, a/k/a "Messiah Bey", Quinn Cumberlander, a/k/a "Quinn

13   Khabir", Aaron Jiminez, a/k/a "Alban El Currah" and Ricardo

14   Rodriguez.

15          It is further stipulated and agreed that this

16   stipulation may be marked as Government Exhibit 1001 and that

17   Exhibits 400 through 408 are admissible and may be received in

18   evidence at trial.

19          At this time, the government offers Government

20   Exhibits 1001, as well as Government Exhibits 400 through 408.

21          THE COURT:  Received.

22          (Government's Exhibits 1001, 400 - 408 received in

23   evidence)

24          MS. NICHOLAS:  Next, your Honor, the government would

25   like to offer Government Exhibit 1004 which is an additional

N8SAAPER5                     Gordon - Direct

1   stipulation between the parties.

2              (Stipulation read)

3              THE COURT:  Received.

4              (Government's Exhibits 1004, 411 - 422 and 430

5   received in evidence)

6              MS. NICHOLAS:  With that, your Honor, the government

7   calls Special Agent Lennea Gordon.

8    LENNAE GORDON,

9         called as a witness by the Government,

10         having been duly sworn, testified as follows:

11             COURTROOM DEPUTY:  Please state and spell your name

12   for the record.

13             THE WITNESS:  Lennea Gordon, L-e-n-n-e-a, G-o-r-d-o-n.

14   DIRECT EXAMINATION

15   BY MS. NICHOLAS:

16   Q.  Good afternoon.

17   A.  Good afternoon.

18   Q.  Special Agent Gordon, where do you work?

19   A.  I work at the Bureau of Alcohol Tobacco, Firearms and

20   Explosives, New York Field Division.

21   Q.  Is that also known as the "ATF"?

22   A.  Yes, it is.

23   Q.  What is your title at the title ATF?

24   A.  Special agent.

25   Q.  Do you have any particular assignment as a special agent

1  with the ATF?

2  A.  Yes.  I am currently assigned to the New York Group Two

3  Office.

4  Q.  We are going to return to your current job in a moment.  Is

5  this your first job in law enforcement?

6  A.  No, it is not.

7  Q.  What other jobs in law enforcement have you held?

8  A.  I was previously a special agent with the U.S. Department

9  of States Bureau of Diplomatic Security.

10  Q.  What is the U.S. Department of States Bureau of Diplomatic

11  Security?

12  A.  It is the law enforcement wing of the U.S. Department of

13  State.

14  Q.  Was your title also a special agent?

15  A.  Yes, it was.

16  Q.  How long were you a special agent what the Department of

17  State?

18  A.  Approximately, five years.

19  Q.  Now to become a special agent at the Department of State do

20  you have to go through any particular training?

21  A.  Yes, you do.

22  Q.  Do you have to go to multiple schools?

23  A.  Yes, you do.

24  Q.  What's the first school in that pipeline?

25  A.  The first school is the criminal investigator training

1  program, also referred to as CITP.

2  Q.  So let's talk about CITP for a second.  Where is CITP

3  located?

4  A.  It is located in Brunswick, Georgia at the Federal Law

5  Enforcement Training Center, also referred to as a FLETC.

6  Q.  Approximately, how long is CITP?

7  A.  Approximately, three months.

8  Q.  In general terms can you describe what kind of training a

9  special agent in training experiences when they're at CITP?

10  A.  Yes.  They receive training in federal laws.  They receive

11  training in criminal investigations, in firearms, defensive

12  tactics and physical fitness training.

13  Q.  Now, as a DSS agent did you personally carry a firearm?

14  A.  Yes, I did.

15  Q.  Did you train and qualify with that firearm?

16  A.  Yes, I did.

17  Q.  Was there a time when you were assigned to DSS as A special

18  agent when you were responsible for training of others with

19  firearms?

20  A.  Yes, there was.

21  Q.  Can you briefly describe what that job was?

22  A.  I was posted to the United States Embassy in Kuwait City,

23  Kuwait.  As part of my duties there I was a firearms range

24  safety officer and I would oversee the firearms training and

25  certification programs for our locally employed staff and also

1    for the main security guards that were also present at the

2    embassy.

3    Q.  When you introduced yourself at the beginning of your

4    testimony you said you are an ATF special agent.

5    A.  That's correct.

6    Q.  When did you transition from the state department to the

7    ATF?

8    A.  I believe it was the summer of 2018.

9    Q.  Now, did you have to undergo any additional training when

10   you made that transition?

11   A.  Yes, I did.

12   Q.  Did you have to attend any particular schools?

13   A.  Yes, I did.

14   Q.  What schools did you attend?

15   A.  I attended the ATF special agent basic training course.

16   Q.  If I call that "SABT", will you know what I am taking

17   about?

18   A.  Yes.

19   Q.  Where is that held?

20   A.  The ATF National Academy which is also in Brunswick

21   Georgia.

22   Q.  About how long is SABT?

23   A.  Approximately, three months.

24   Q.  When one attends SABT, what types of things are you

25   learning ABOUT?

1    A.  Learning the details OF federal firearms laws AND also the

2    other ATF portfolios which would include arson AND explosives

3    and you're also learning advanced firearms instruction and also

4    defensive tactics.

5    Q.  Now did some of that training happen on gun ranges?

6    A.  Yes.

7    Q.  Is some of it also in a classroom?

8    A.  Yes.

9    Q.  Can you describe what some of the topics you may learn

10   about in this classroom setting?

11   A.  Yes.  Significant amount on firearms investigations,

12   firearms trafficking investigations, arson and the like.

13   Q.  Now, between your time training to become a DSS special

14   agent and your time training you become an ATF special agent,

15   how much time would you estimate you've spent training with

16   firearms?

17   A.  Hundreds of hours.

18   Q.  When did you graduate from SABT?

19   A.  Approximately, the fall of 2018.

20   Q.  Once you graduate from SABT are you an ATF special agent?

21   A.  Yes, you are.

22   Q.  Once you became an ATF special agent where did you report

23   for your first assignment?

24   A.  My first assignment with ATF was to the San Diego field

25   office in San Diego, California.

1    Q.   What did you do there?

2    A.   I investigated illegal possession of firearms and also

3    firearms trafficking.

4    Q.   Approximately, how long did you have that assignment?

5    A.   Approximately, three years.

6    Q.   After you completed your assignment in San Diego, where

7    were you next assigned?

8    A.   To the New York Field Division.

9    Q.   When you arrived at the New York Field division, what was

10   your first assignment?

11   A.   My first assignment was to the ATF New York Crime Gun

12   Intelligence Center.

13   Q.   How does the ATF refer to the crime gun --

14   A.   We refer to it as CGIC.

15   Q.   Once you are assigned to CGIC, what sorts of things were

16   you doing there?

17   A.   I was assisting in intel analysis and in providing agents

18   in the field with support.

19   Q.   Just at a high level, what is the mission of CGIC?

20   A.   The CGIC is, at a high level it identifies firearms that

21   have been recovered in and around New York City and analyzes

22   those firearms and looks for indicators that those firearms may

23   have been trafficked into the city and looks for investigative

24   opportunities, I would say.

25   Q.   After you finished your assignment with the CGIC did you

1    have another job with the New York Field Division?

2    A.  Yes, I did.

3    Q.  Is that the job you are currently in?

4    A.  Yes, it is.

5    Q.  Could you just briefly describe what your duties and

6    responsibilities are in your current job?

7    A.  Yes.  In the New York Group Two Office, also known as the

8    Joint Firearms Task Force, I primarily focused on firearms

9    trafficking into New York City.

10           MS. NICHOLAS:  Your Honor, at this time the government

11   offers Special Agent Gordon's testimony under Rule 702.

12           THE COURT:  You don't need to do that in front of the

13   jury but that is acceptable to the Court.

14           MS. BAHARANYI:  Your Honor, I would just note our

15   previous standing objection.

16           THE COURT:  Yes.

17   Q.  When you are doing investigations as an ATF special agent,

18   do you sometimes visit gun stores?

19   A.  Yes.

20   Q.  Let's talk again by talking a bit about gun stores.  Is

21   there a term that the ATF uses to refer to gun stores?

22   A.  Yes, there is.

23   Q.  What is that term?

24   A.  An FFL.

25   Q.  What does that stand for?

1   A.   A "federal firearms licensee".

2   Q.   Okay.  What is a federal firearm license?

3   A.   A federal firearm licensee is what the public would

4   generally know as a gun store.  It is a place of business that

5   is authorized by ATF to sell firearms as their course of

6   business.

7   Q.   Now are FFLs subject to any particular ATF requirements?

8   A.   Yes, they are.

9   Q.   Okay.  Can you describe some of those requirements?

10  A.   When selling firearms they are required to have the

11  purchaser fill out the ATF form 4473.  They're required to

12  report some of their information and maintained their records.

13  Q.   We are going to come back at 4473 in a second.  When an FFL

14  is selling a firearm do they have any obligations to check

15  identifications?

16  A.   Yes, they do.

17  Q.   Now, does the ATF maintain a record of who authorizes or

18  who's authorized to be an FFL?

19  A.   Yes, they do.

20  Q.   Does the ATF have a way to verify that a person or business

21  has received an FFL?

22  A.   Yes, they do.

23  Q.   In front of you just to your right there's a manila

24  envelope with a series of documents in it.  Do you see that?

25  A.   Yes.

1   Q.  Those are in evidence as Government Exhibits 400 to 408.

2   Can you flip through those for a moment.

3          (Pause)

4   A.  Yes.

5   Q.  Are you familiar with those documents?

6   A.  Yes, I am.

7   Q.  What are those?

8   A.  ATF Blue Ribbon certificates.

9          MS. NICHOLAS:  Can you please publish what's in

10  evidence as Government Exhibit 400.

11         (Pause)

12  Q.  You just described this as a Blue Ribbon certificate.  What

13  is this document in layman's terms?

14  A.  This is a document that verifies whether or not an

15  individual has registered with the ATF.

16         MS. NICHOLAS:  Could you go to page two, please.

17         (Pause)

18  Q.  Special Agent Gordon, I am going to have you read the

19  paragraph that begins with "I do hereby certify".

20  A.  Yes.  I do hereby certify that I made a diligent search of

21  said records and that no record or entry was found therein with

22  respect to the application for or issuance of a firearms

23  license to Steven Perez, a/k/a "Lucha", at any address in the

24  50 states of the United States and its territories for the time

25  period of January 1, 2020 through August 1, 2021.

1    Q.  Thank you.  Shifting gears just a little bit to talk more

2    particular about the mechanics of a gun sale.

3            You mentioned earlier that -- you testified earlier

4    that FFLs are required to check IDs and administer 4473s; is

5    that correct?

6    A.  Yes.

7    Q.  Why are FFL required to check IDs?

8    A.  To verify the individual is who they purport to be and that

9    they are also, and also to check residency.

10   Q.  There are also state requirements that FFLs are mandated to

11   follow?

12   A.  Yes, there are.

13   Q.  Generally speaking, do those requirements vary between

14   states?

15   A.  Yes, they do.

16   Q.  Are there some states that require license to purchase a

17   firearm?

18   A.  Yes.

19   Q.  I want to turn specifically to the ATF form 4473.  Is there

20   another name for that form?

21   A.  Yes, there is.

22   Q.  What name is that?

23   A.  The firearms transaction record.

24   Q.  What's the purpose of the 4473?

25   A.  The purpose of the 4473 is to determine that the purchaser

1   is lawfully permitted to possess the firearm.

2   Q.  Who fills out the 4473?

3   A.  The purchaser fills out certain sections and then the FFL

4   employee will fill out other sections.

5   Q.  And does the FFL have to make sure that 4473 is filled out

6   at the time of every gun sale at an FFL?

7   A.  Yes.

8   Q.  Now, after the 4473 is filled out where is it stored?

9   A.  The FFL is responsible for maintaining those records.

10  Q.  And are those records subject to inspection by the ATF?

11  A.  Yes, they are.

12  Q.  Now, if a gun dealer fails to comply with he requirements

13  that are set forth in the 4473, can there be consequences for

14  that FFL?

15  A.  Yes, there can.

16  Q.  What sorts of things?

17  A.  Those consequences can be up to and including the

18  revocation of their FFL license.

19          MS. NICHOLAS:  Ms. Sankar, can you please publish

20  what's in evidence as Government Exhibit 413.

21          (Pause)

22  Q.  Special Agent Gordon, what's on the screen?

23  A.  This is what ATF refers to as a form 4473, the firearms

24  transaction record.

25  Q.  Okay.  Without talking about any specific sections, can you

1   just broadly explain what the form is that we're looking at?

2   A.  Yep.  So this is the form that the gun store or that an

3   individual when making a firearms purchase will fill out at a

4   gun store.

5   Q.  Now, are you aware of any changes that have been made to

6   the form over time?

7   A.  Yes.

8   Q.  Okay.  Are you aware of what the effective date of the

9   particular form we're looking at in Government Exhibit 413 is?

10  A.  Yes.

11  Q.  What's the date on that form?

12  A.  2016.

13  Q.  This is the 2016 version of the 4473?

14  A.  Yes, it is.

15          MS. NICHOLAS:  Okay.  Ms. Sankar, can you please

16  publish what's in evidence as Government Exhibit 418.

17          (Pause)

18  Q.  Can you see Government Exhibit 418 in front of you, Special

19  Agent Gordon?

20  A.  Yes, I can.

21  Q.  What is the effective date on Government Exhibit 418?

22  A.  May 2020.

23          MS. NICHOLAS:  Ms. Sankar, can you please place 413

24  side-by-side with 418.

25          (Pause)

1   Q.  So these are two versions of the same form?

2   A.  Yes.

3   Q.  What are the major differences in the two versions?

4   A.  So if you look at form 413, you can see that the initial

5   biographical information, the name and information about the

6   purchaser is at the very top.  Whereas, if you look at 418, the

7   firearm date is moved.  So, basically, the placement and the

8   ordering of the information contained within the has been moved

9   around a little bit for ease of reference.

10          MS. NICHOLAS:  We're going to begin by talking about

11   the older investigation.  We are going to look at Government

12   Exhibit 413 a little more in depth.

13          Can you publish Government Exhibit 413.

14          (Pause)

15          MS. NICHOLAS:  Begin by focusing on Section A and

16   zoom-in.

17          (Pause)

18   Q.  We'll go back and talk about the specifics in a moment, but

19   in Section A can you just describe the type of information that

20   is required from the purchaser in this section?

21   A.  So, this is the information on the purchaser.  This would

22   be the name, their current address, their place of birth,

23   height, weight, sex, birthday, Social Security optional.

24   Q.  Who is providing that information?

25   A.  This is completed by the purchaser.

1              MS. NICHOLAS:  Ms. Sankar, if you could zoom back out.

2              (Pause)

3   Q.  Now we are going to look at Question 11, this middle

4   section of the form.

5              What's this middle section here?

6   A.  These are questions that are intended to determine whether

7   or not the individual purchasing the firearm is legally

8   permitted to possess a firearm.

9   Q.  We are going to come back to this in a second but when

10  someone is filling out a 4473, does the law require them to

11  provide information truthfully?

12  A.  Yes, it does.

13  Q.  I am going to draw your attention to the question in Box 11

14  A.  Can you read that question?

15  A.  Yes.  Are you the actual transferee/buyer of the firearms

16  listed on this form?  Warning:  You are not the actual

17  transferee/buyer, if you are requiring the firearms on behalf

18  of another person, if you are not the actual transferee/buyer,

19  the licensee cannot transfer the firearms to you.  Exception:

20  If you are picking up a repaired firearms for another person,

21  you are not required to answer AA and may proceed to question

22  11B.

23             MS. NICHOLAS:  We can zoom back out and go to page

24  two.

25             (Pause)

1  Q.  We're going to zoom in that top section all the way down to

2  just above box 16.

3       (Pause)

4  Q.  Special Agent Gordon, what is the purpose of this section?

5  A.  This is the certification box that the purchaser will

6  complete that certifies that everything that they have said on

7  the form in the previous section is true, correct and complete.

8  Q.  I'd like to have you read about halfway through the

9  paragraph after the sentence ending in 18C begins "I also

10 understand".

11 A.  Yes.

12 Q.  Read from there to the end?

13 A.  "I also understand that making any false oral or written

14 statement or exhibiting any false or misrepresented

15 identification with respect to this transaction is a crime

16 punishable as a felony under federal law and may also violate

17 state and/or local law.  I further understand that the

18 repetitive purchase of firearms for the purpose of resale for

19 livelihood and profit without a federal firearms license is a

20 violation of federal law."

21 Q.  Then there's a signature in box 14.  Who signs box 14?

22 A.  The purchaser.

23 Q.  Okay.  The person buying the gun?

24 A.  Yes.

25       MS. NICHOLAS:  Ms. Sankar, we can zoom back out.

1          (Pause)

2     Q.  Box 18A, what information is required there?

3     A.  A government issued identification.

4     Q.  Is this the information associated with the ID that was

5     presented?

6     A.  Yes.

7          MS. NICHOLAS:  Zooming back out, Ms. Sankar, go to the

8     next page.

9          (Pause)

10    Q.  I want to focus here on Section D.

11         Special Agent Gordon, if you could just walk us

12    through the type of information that goes into boxes 24, 25,

13    26, 27, and 28.

14    A.  Yes.  So 24 is manufacture and importer; 25 is model; 26 is

15    the serial number; 27 is the type of firearm; and 28 is the

16    caliber or gauge.

17    Q.  Where is this information coming from?

18    A.  This is coming from the firearms, the FFL employee.

19    Q.  Is this information for the gun at issue in that particular

20    transaction?

21    A.  Yes.

22         MS. NICHOLAS:  Ms. Sankar, zoom back out.  I want to

23    go down to box 33.

24         (Pause)

25    Q.  What information is contained in box 33?

1   A.   This is the information on the FFL.  So it would be their

2   business name, their address and then also their FFL number.

3   Q.   Is that FFL number a unique number to that particular gun

4   store?

5   A.   Yes, it is.

6            MS. NICHOLAS:  Okay.  Zoom back out.  Thank you.

7   Q.   Who signs in box 34 after the form is completed, signs in

8   box 35 after the form is completed?

9   A.   That is completed by the FFL employee conducting the sale

10  and/or transfer.

11           MS. NICHOLAS:  Okay.  Ms. Sankar, could you please

12  publish what's in evidence as Government Exhibit 418.

13           (Pause)

14  Q.   Now, I'm not going to walk back through every box on the

15  updated form but there are a few things I want to talk about.

16  On the updated form that's Government Exhibit 418, boxes one,

17  two, three, four and five.  What are those boxes?

18  A.   Those are the manufacture and importer in box one; box two,

19  the model; box three, the serial number; box four is the type

20  of firearm; and box five is the caliber or gauge.

21  Q.   Is that the same information that was in boxes 24 to 28 of

22  the old form?

23  A.   Yes, it was or yes, it is.

24           MS. NICHOLAS:  Ms. Sankar, zoom back out and go to

25  page two please.

1          (Pause)

2     Q.   Just below Question 21.1.2 is there in the new form the

3     same certification as the old form?

4     A.   Yes.

5     Q.   Which is to say the same obligation for truthfulness apply

6     to the new form as the old form?

7     A.   Yes.

8          MS. NICHOLAS:   Okay.  Focusing on a couple particular

9     things for this form, Government Exhibit 418, Ms. Sankar, if

10    you could go back to the first page.

11         (Pause)

12    Q.   Who is the purchaser in this particular transaction?

13    A.   The purchaser in this particular transaction is Keith

14    Anthony Vereen.

15    Q.   Can you just read the firearms that were purchased during

16    this transaction?

17    A.   Yes.  It appears to be a Janic TP9 pistol.  The Janic, I

18    should say is referred as a law enforcement personnel, a Canic

19    and then also a Taurus PT pistol.

20    Q.   The first firearm, the Janic or Canic, can you read the

21    serial number on that firearm?

22    A.   Yes.  It is 20CB25810.

23    Q.   Now, special agent Gordon, do you see in front of you an

24    item marked as Government Exhibit 520 which should be directly

25    in front of you?

N8SAAPER5                        Gordon - Direct

1   A.  Yes.

2   Q.  Grab that.  What is Government Exhibit 520?

3   A.  This is Janic pistol.

4   Q.  Do you see a serial number on that particular pistol?

5   A.  Yes, I do.

6   Q.  Okay.  Can you read the serial number from Government

7   Exhibit 520?

8   A.  20CB25810.

9   Q.  OK.  Does that match the serial number listed for weapon

10  number 1 on this firearms transaction, Government Exhibit 418?

11  A.  Yes, it does.

12  Q.  Let's talk about serial numbers just for a quick second.

13  Is the serial number a unique identifier for a particular

14  firearm?

15  A.  In combination with the make and model of the firearms,

16  yes.

17  Q.  What, if any, value does a serial number have to the ATF?

18  A.  That enables the ATF to determine the original purchaser of

19  firearm and also to query whether or not it was part of a

20  multiple sale purchase.

21  Q.  Before we move on, I want to take a closer look at one more

22  form, 4473, and that's Government Exhibit 413.  Government

23  Exhibit 413, who is the buyer?

24  A.  Keith Anthony Vereen.

25          MS. NICHOLAS:  Going to page two, Ms. Sankar.

1          (Pause)

2          MS. NICHOLAS:  One more page, page three, please.

3          (Pause)

4    Q.  Can you read the descriptors for that firearm?

5    A.  Yes.  It had this is Glock 44 pistol bearing serial

6    ACLY222.

7    Q.  What was the date of transfer for that firearm?

8    A.  The date of transfer is 72320.  I think that's zero 2020.

9          MS. NICHOLAS:  You can pull that down.

10         (Pause)

11   Q.  Special Agent Gordon, I want to shift gears just a little

12   bit for a second.

13         Are you familiar with the concept of straw purchasing?

14   A.  Yes, I am.

15         MS. BAHARANYI:  Objection, your Honor.

16         THE COURT:  For the reasons already described outside

17   the presence of the jury the objection is overruled.

18   Q.  What is straw purchasing?

19   A.  Straw purchasing is where one individual buys a firearm for

20   another person.

21   Q.  The 4473, the form we have been looking at requires that

22   the type of firearm be reported; is that correct?

23   A.  Yes, it does.

24   Q.  Are there any red flags as it relates to the types of

25   firearms the ATF looks for when trying to identify straw

1  purchasers?

2  A.  Yes.  Multiples of the same type of firearm.

3  Q.  Why is that a red flag?

4  A.  Individuals purchasing multiple firearms especially if it's

5  the same make, model and caliber of a firearm that typically

6  indicates that us that the firearm is not destined for a

7  collector or it's not for the individual.  People typically

8  don't buy duplicates of an item for themselves.

9  Q.  Special Agent Gordon, are you familiar with the E-trace

10  System?

11  A.  Yes, I am.

12  Q.  What's the E-trace system?

13  A.  The E-trace System is a database maintained by the ATF's

14  national tracing system.

15  Q.  A system you've personally used before?

16  A.  Yes.

17  Q.  What type of reports does the E-trace system generate?

18  A.  It generates price reports and also multiple sales

19  summaries.

20  Q.  What's multiple sales summary?

21  A.  It is a report that shows if an individual purchases two or

22  more of a specific type of firearm within a set period of time.

23  Q.  Now, who supplies the information that the ATF inputs into

24  the E-trace System to generate a multiple sales summary?

25  A.  That's the FFL.

N8SAAPER5                    Gordon – Direct

1    Q.  So the gun store?

2    A.  Yes.

3    Q.  Now, does the FFL have an obligation to report that

4    information to the ATF?

5    A.  Yes, they do.

6    Q.  In front of you there's a binder.  Do you see that?

7    A.  Yes.

8    Q.  There's a tab marked as Government Exhibit 426.  Can you

9    flip to that for me?

10   A.  Yes.

11   Q.  Just look at me when you are there.

12   A.  Yes.

13   Q.  Do you recognize this?

14   A.  I do.

15   Q.  What is that?

16   A.  This is a multiple sales.

17           MS. BAHARANYI:  Your Honor, at this point we have an

18   objection but we'd like to approach the bench.

19           THE COURT:  Okay.

20           (Continued on next page)

21

22

23

24

25

N8SAAPER5                          Gordon - Direct

1             (side bar)

2             MS. BAHARANYI:  Your Honor, we're about to embark on a

3      line of questioning that is based on the witness, not based on

4      witness's actual knowledge of the source of the underlying

5      documents, the R & R forms, purchase forms.  This witness is an

6      ATF agent.  Where I predict the government is going to be going

7      is starting to talk about the R & R., FFL in this particular

8      case which is R & R and how they kept their forms and how they

9      kept the information and what information they said when she is

10     not an employee of R & R.  She has not spoken to anyone in R &

11     R, has no basis in knowledge to admit any information from R &

12     R and put that before the jury.  Nor can she establish a

13     foundation for any R & R records, meaning -- business record or

14     I want to get in front of before --

15             MS. NICHOLAS:  This is the Government Exhibit 426.  It

16     is an ATF form that was pulled by this witness today from the

17     ATF E-trace system.  These forms are generated as a matter of

18     course by the ATF, not in preparation for any particular event

19     but as a matter of regular conducted business of the ATF.  The

20     information contained herein is provided by an FFL in the

21     regular course of business with an obligation to provide

22     truthful information to the FFL.  It adopts business records

23     of --

24             MS. BAHARANYI:  If I can point to a couple things on

25     this form, your Honor.  This is a form that was prepared in

N8SAAPER5                    Gordon - Direct

1    testimony for today and prepared in connection to an ongoing

2    law enforcement investigation.  I think this is a form that is

3    certainly testimonial in the nature and should not qualify as a

4    business record and moreover it's based on information from

5    another party R & R public safety.  This is a party that we've

6    learned from the government they've closed down.  They are no

7    longer in business.  So the ability of this witness to talk

8    about R & R keeping of records whether these records are

9    regularly conducted, whether they're trustworthy is limited

10   because she's never spoken to R & R.  Moreover --

11            THE COURT:  Wait a minute.  Let me see.

12            MS. NICHOLAS:  I also want to point something else

13   out.  The information was created in a database on December

14   16th of 2020.  The data business report was pulled today by

15   this witness.

16            MS. BAHARANYI:  For a date, your Honor, we are a

17   talking about also months after the activity would have taken

18   place.

19            THE COURT:  I am sort of sorry that this wasn't raised

20   earlier today but I don't fault counsel for that but I think

21   it's not going to be a good idea to have a lengthy side bar

22   which is what I think we need to have to resolve this while the

23   jury sits there twiddling their thumbs.

24            So let me ask the government, we can either excuse the

25   jury now and then resolve this since we're sitting till 3:30

N8SAAPER5                        Gordon - Direct

1    today anyway and it's now 3:20, or you can go into something

2    else and then we'll come back to this, whichever you prefer.

3               MS. NICHOLAS:  This is essentially the end of

4    government's direct.

5               THE COURT:  I see.  All right.

6               (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

N8SAAPER5                    Gordon - Direct

 1          (In open court)

 2          THE COURT:  Ladies and gentlemen, I have bad news for

 3   you.  We are going to stop early today.  I know you are

 4   heartbroken but a little issue just came up that I've got to

 5   resolve.  It is going to take a fair amount of time and it's

 6   silly for you to sit there while counsel and I work that out.

 7   So we are going to end for today.

 8          We're off to a good start now.  One thing I wanted to

 9   mention is really critical.  If we are going to stay on

10   schedule, we need to start each morning promptly at 9:30 and

11   so, if I can ask you to sort of plan to be in the jury room by

12   9:15/9:20 because you may have heard that occasionally in the

13   great metropolis of New York, there are traffic delays and I

14   know you have you never encountered that in your life, but just

15   in case, and that way if you're all there at 9:20 we can start

16   at 9:30 without any delays.

17          So, have a very good evening and we'll see you

18   tomorrow at 9:30.

19          (Jury not present)

20          THE COURT:  Please be seated.

21          All right.  So you said the Government Exhibit 426.

22          MS. NICHOLAS:  Your Honor, may I ask that the witness

23   step down?

24          THE COURT:  Well, I thought we might need to keep her

25   to comment on some of the issues that are raised here.  So, I

1    think she needs to stay.  I can't imagine that she would be

2    compromised in any way by remaining here.  She might be bored

3    but that's a different story.

4            Okay.  So, this is a document that was, regards a sale

5    number that was entered onto the system on December 16, 2020,

6    and its based on, appears to be on information furnished from R

7    & R to the AFT.  The underlying information appears to be

8    ordinary business information, but let me hear more from first

9    the government and then from defense counsel as to what they

10   think is the reason this is not admissible or in the case of

11   the government, is admissible.  So let me hear first from the

12   government.

13           MS. NICHOLAS:  Yes, your Honor.  So, essentially,

14   Government Exhibit 426 is a business record within a business

15   record, and I think the adoptive business record doctrine is

16   really the cornerstone here and the touchstone of that document

17   is reliability.  Without looking at any other documents we know

18   there is a very strong -- have regulatory and statutory

19   obligation to report to the ATF every instance in which they'd

20   sell more than one gun of particular types within a particular

21   timeframe.

22           THE COURT:  And they report that at or about the time

23   of the sale?

24           MS. NICHOLAS:  They do, your Honor.

25           THE COURT:  Okay.

N8SAAPER5                     Gordon - Direct

1            MS. NICHOLAS:  That information is transmitted from

2     the FFL, the gun store to the ATF tracing center in West

3     Virginia.  The ATF tracing center inputs that information every

4     time they receive it, not because they are planning for a

5     particular case.  They receive the information.  They create

6     the record.

7            That obligation and truthfulness from the FFL is how

8     we know this record is reliable.  In this case we have and have

9     produced to defense counsel the underlying documents.  We've

10    produced that 4473 filled out by the gun buyer at the time of

11    the purchase.  We've produced the receipt from that purchase.

12    And we've produced the piece of paper the FFL fills out and

13    sends to the ATF from which the ATF types the records into this

14    document.  This is a business record of the ATF from a database

15    accessed by this custodial witness.

16            THE COURT:  Okay.  So, let me hear from defense

17    counsel.

18            MS. BAHARANYI:  Your Honor, I think reliability is a

19    good place to start.  The touchstone is reliability and we're

20    talking about the reliability of records kept by a business

21    entity that is no longer in business.  We heard from the

22    witness on the stand today that if there are FFL dealers who

23    don't properly keep their records, they are at risk of losing

24    their FFL license, their ability to sell firearms, their

25    ability to stay in business and we know for R & R no longer

N8SAAPER5                        Gordon - Direct

1    are.

2              So, I think to suggest that we should assume that they

3    kept their records in regularly conducted course of business

4    that we should assume that these records were trustworthy is

5    not supported by the facts that we do know from the witness who

6    took the stand here today.

7              THE COURT:  I'm not sure I understand what you're

8    telling me about R & R.  I mean to take a different example, if

9    a company goes out of business, that doesn't mean that its

10   business records are not admissible as business records.  You

11   are saying there is reason to believe that R & R did not keep

12   accurate records and what's the basis for that?

13             MS. BAHARANYI:  Well, your Honor, one factor is

14   certainly them going out of business.

15             THE COURT:  No, no.  I don't think that's a factor at

16   all.  As I say, you know a company could go into bankruptcy.

17   It doesn't mean that its business records would be not qualify

18   for a business record exception to the hearsay rule.

19             MS. BAHARANYI:  I think another reason we believe that

20   these records weren't regularly or properly kept is that we

21   don't actually have the record, the originals of the record.

22             THE COURT:  What was it that defense counsel said she

23   just gave you?

24             MS. BAHARANYI:  Well, the government said they sent us

25   records.  In fact they sent us photos of certain records two

N8SAAPER5                         Gordon - Direct

1    days ago.  Not any, nothing that we can authenticate, nothing

2    that seemed to actual come from R & R but photographs of

3    certain documents and records.

4                THE COURT:  You think the government altered its

5    photographs of records in a devious attempt to confuse you as

6    to the accuracy?

7                MS. BAHARANYI:  Your Honor, I think that there are now

8    multiple levels of potential unreliability here.

9                THE COURT:  Let me ask the government, what was the

10   photographs that you so cleverly sent to defense counsel?  What

11   were they photographs of?

12               MS. NICHOLAS:  When an FFL goes out of business they

13   have statutory obligations to box up all the records and send

14   them to the National Tracing Center in West Virginia, which is

15   where those photographs came from yesterday afternoon.  So we

16   actually do know that R & R complied with that program

17   regulation because they did and we have those records.  Also,

18   if there is any speculation about why R & R publication went

19   out of business amidst the pandemic, it's speculation as to why

20   they are out of business.

21               (Continued on next page)

22

23

24

25

N8SBPER4

MS. BAHARANYI:  Your Honor, an additional point on that.  Turning back to Government Exhibit 426, which is these multiple sale summaries they're seeking to admit.  Of course to fall properly under a business record exception, the records need to be regularly conducted and recorded close in time to whatever activity they're purporting to represent.

Here we have a sale that took place on October 31st.  That's the underlying firearm sale -- of 2020.  These record was entered -- since that's all the information we have.  It says entered December 6, 2020.  That's a month and a half later.  This is far from a recording that's happening in time or close in time to the transaction or activity.

THE COURT:  Does someone have a copy of what was sent to you a couple of days ago, the underlying record?

MS. NICHOLAS:  We do, your Honor.

THE COURT:  May I take a look at those.

MS. BAHARANYI:  Your Honor, I'd just add for the other purchases that have been brought up or raised today in the government's case, we have the original 4473 forms.  This is interesting and frankly raises the questions of reliability because we don't have any sort of original form or copy, unlike in every other instance the government has sought to prove today.

THE COURT:  So the items that the government has just handed up which are marked as Government's Exhibits 423, 424

N8SBPER4

1  and 425 appear on their face to be business records of R&R that

2  were entered on October 31st of 2020, and I will forego any bad

3  jokes about buying a gun on Halloween Eve.  But in any event,

4  on their face they all appear to be classic ordinary business

5  records.  And so they were then sent -- or I should say the

6  information was sent later on.  The records were sent when R&R

7  went out of business as I understand it.

8            MS. NICHOLAS:  Close in time.

9            THE COURT:  But the information required to be sent to

10  the Bureau of Alcohol Tobacco and Firearms National Tracing

11  Center was sent on December 16, 2020.  I don't think that delay

12  in any way detracts from the ordinary business nature of the

13  underlying records that are accurately recorded then on what

14  was sent to ATF.

15            So I thank defense counsel for raising this

16  interesting issue, but the objections are overruled, and 426

17  will be received.

18            (Government's Exhibit 426 received in evidence)

19            THE COURT:  Anything else that we need to raise before

20  we start the *Daubert* hearing of the other witness?

21            MS. SMYSER:  I want to note for the Court that

22  Mr. Petersohn had a hard stop at 4:30, but his municipal

23  hearing while we've been in court today that was supposed to

24  take place this evening has been canceled.  In the event we

25  need to go a little bit longer, that's fine with the witness.

N8SBPER4

THE COURT:  Thank you.  However, I have another matter at 4:00, and I don't think it's going to take more than a half hour.  Thank you so much we'll see you tomorrow.

(Witness excused)

(Recess)

THE COURT:  Are you agreeable to starting without your client since this is just a question --

MS. BAHARANYI:  We can proceed.

THE COURT:  Okay.  Very good.  Thank you.  First just before I forget, it use to be the case that after an expert testified -- excuse me, after an expert gave his or her qualifications, the party calling the expert would then move to have the court certify them as an expert.  The Second Circuit a long time ago said don't do that in front of the jury.  Government counsel with the previous witness really didn't do it because you only referred to the rule so the jury had no idea what you were asking for, but still it's better to do that at the sidebar not in front of the jury.

However, as I understand, there's no challenge to this particular witness's qualifications.  The challenge is to the substance of what he has to say.  So let's swear him in.  Please rise.

(Witness sworn)

THE COURT:  State your name for the record.

THE WITNESS:  My name is Andrew Petersohn,

N8SBPER4

1    P-E-T-E-R-S-O-H-N.

2              THE COURT:  Let me see if I can cut this short subject

3    to hearing whatever either counsel wants to add, and I'll note

4    for the record that the defendant is now back.  From prior

5    proceedings involving cell tower matters, I have long since

6    concluded that they, if properly qualified through making the

7    jury aware of certain limitations qualify and pass the *Daubert*

8    standard.  So I have sometimes excluded witnesses who didn't

9    have the personal technical knowledge -- that's not true of

10   this witness -- but it was always fun to exclude a government

11   employee.

12             My concern -- and it goes to both his direct testimony

13   and to the charts that he intends to use is that the jury be

14   made aware immediately without waiting for cross-examination of

15   the limitations on cell tower evidence as indicating the

16   location of the underlying phone and person.  These include

17   that the signal doesn't always go to the closest tower and

18   often goes not even to the second closest tower.  And

19   furthermore, that that can be affected by things like whether,

20   if it's an urban neighborhood or rural neighborhood, and so

21   forth.

22             But when I went back over the weekend and looked at

23   the government's response to the motion to preclude the

24   testimony of Mr. Petersohn, it appeared that all that was going

25   to be brought out on his direct testimony.  Is that right?

N8SBPER4

1          MS. SMYSER:  Yes, your Honor.

2          THE COURT:  So that satisfies, to be frank, what was

3    the main reason why I thought we needed this hearing.  Now with

4    respect to the charts which are the attached to the

5    defendant's —— this was a belated motion on the part of the

6    defense.  I don't fault them for that, but they added this in

7    their opposition to the government's motions *in limine*, and

8    then there was a further response from the government.  But

9    there are, in addition to again stuff like photographs of cell

10   sites and the like, there are several charts indicating cell

11   site location utilized by Keith Vereen's device on September

12   14th, 2020.  There's first an indication that he traveled from

13   South Carolina to the New York area.  Then there's a chart

14   showing the cell site location utilized by Keith Vereen's

15   device and the Steve Perez device on September 14, 2020 from

16   8:10 p.m. to 8:25 p.m. And I'm not quite sure what the shaded

17   areas there are intended to show.  Maybe someone can put a copy

18   of the chart up before the witness.

19         MS. SMYSER:  Can you display Government Exhibit 801.

20   I can also give him a hard copy.

21         THE COURT:  It's not appearing yet on my screen.

22   What's the shaded area suppose to show?

23         THE WITNESS:  So the shaded area is only meant to show

24   the direction of the signals transmitted by the particular

25   sector of that particular cell site, and there's some

N8SBPER4

background as to what exactly the icon means.  In one of the

preceding slides that speaks more generally about how the

software tool displays the call records that we will have gone

through with the jury prior to looking at this.  So they should

have a good sense when this comes up as to what that icon means

as far as the direction of the energy emanating from that cell

site.

THE COURT:  Well, I hear what you say, but I don't

understand it.  Meaning, let's look at the one I was just

referring to which is -- well, go back to your general one.  I

think this is a chart that you labeled displaying cell site

sector and azimuth.  What's azimuth?

THE WITNESS:  Azimuth is the direction of the main

beam of the antenna where the maximum energy is focused.

THE COURT:  All right.  So what?  What's the

relevance?

THE WITNESS:  The icon displays the direction that the

sector of that cell site faces, which would give the viewer a

sense of the direction that the device was relative to the cell

site when the connection was made.  The shaded area is not

meant to represent the coverage area, and there'll be some

testimony on the slide that's on the display now to that

effect.

THE COURT:  That's very helpful, the last part you

said, but I'm not understanding what the relevance then is.  If

N8SBPER4

1    it's not designed to show the coverage, what's the relevance of

2    the direction?

3          THE WITNESS:  If we know that the energy from that

4    sector in the case of the slide that's being displayed is

5    pointed generally southeast, then the likelihood is that the

6    device used to make this connection is on the southeast side of

7    the facility when the connection was made.  Based on that

8    information as well as the general cell density in a given

9    area, we can have a sense of the distance that the user was

10   from the facility as well as the direction, of course not a

11   precise location, but I can give some likely ranges.

12         THE COURT:  I'm just looking at your chart entitled

13   cell site location utilized by Keith Vereen's device and Steven

14   Perez's device 9/14/2020 to 8:15 p.m. to 8:25 p.m.  Do you have

15   that in front of you?

16         THE WITNESS:  I do.

17         THE COURT:  What are the shaded areas intended to

18   show?

19         THE WITNESS:  So there are red and green concentric

20   shaded areas there.  The only reason they have different

21   sizes -- and we will go through this on direct -- is just for

22   display purposes.  That way they're not completely overlapping,

23   and we can't tell that they are distinct green and red shapes

24   indicating connections by the Vereen device and the Perez

25   device to the same sector of the same cell site. The icon also

N8SBPER4

1    shows --

2              THE COURT:  That's fine, but that's not an answer to

3    my question.  What is the relevance of any of these shaded

4    areas to any issue in this case?

5              THE WITNESS:  Well, the shaded areas indicate that a

6    cellular device connected to the cell site that is located at

7    the intersection of the edge defining boundaries of the

8    semi-circles; and that more specifically the sector or set of

9    antennas that serve that call pointed generally southeast down

10   the East Gun Hill Road corridor.

11             THE COURT:  So, once again I'm not following what

12   you're saying.  The direction as I take it shown by the arrows,

13   yes or no?

14             THE WITNESS:  The arrows only --

15             THE COURT:  Are just to connect the device to the

16   shaded area?

17             THE WITNESS:  Yeah, just to connect -- let's say if we

18   look at the first top left caption box that there was an 8:20

19   p.m. voice call that the Perez device was involved in and that

20   it utilized that red shaded sector that the arrow points to.

21             THE COURT:  Okay.  I don't have a color copy which is

22   the red and which is the green in your color copy?

23             THE WITNESS:  The red is smaller of the two concentric

24   semi-circles.

25             THE COURT:  So you're saying that from the data that

N8SBPER4

1  you used to prepare this chart that the device had to be within

2  at least the green area and maybe more likely the red area.  Is

3  that what you're saying?

4          THE WITNESS:  No.  The data only indicates that the

5  device utilized that sector that is located on the rooftop

6  there at the intersection of East Gun Hill Road and the north

7  south cross street there which is Bainbridge.

8          THE COURT:  Again, I'm just a dumb judge.  I don't

9  understand a word you're saying.  Maybe counsel wants to

10  intervene here.  What do you say is the relevance of any of

11  this?

12          MS. SMYSER:  Your Honor, I think it might be helpful

13  to take a step back.  At this point in Mr. Petersohn's

14  testimony, we will have him explain the basics of cell sites,

15  what cell sites are, and he will explain that there are

16  multiple sectors on a cell site, particularly generally three.

17  So when you connect to a cell site, you connect to one of those

18  sectors which has antennas and waves that generate in a

19  particular direction.

20          So Mr. Petersohn will have explained that this shading

21  at this point -- before we even get to his particular map,

22  simply indicates the sector and the direction that those waves

23  were facing and we will have questions.

24          THE COURT:  I thought the whole object of this --

25  maybe I misunderstand what you're getting at -- was to show

N8SBPER4

1    that Mr. X was located or at least his phone was located in a

2    certain area at a certain time.

3          MS. SMYSER:  Yes, that is part of what we are trying

4    to show.

5          THE COURT:  Isn't that all that you're trying to show?

6          MS. SMYSER:  I think it is also important in this case

7    that these particular phones connect to the same sector, rather

8    than the inference here is that they're meeting.  They are in

9    the same spot.

10         THE COURT:  They could be meeting even if they weren't

11   in the same sector if they're, for example -- that's why I

12   think it's one thing the earlier chart which shows the moving

13   from South Carolina to the New York area doesn't much matter

14   whether it was connecting to the first cell site or the second

15   cell site or the third cell site because it's such a huge

16   change from one location to another.

17         Here what you're trying to do, if I understand it, is

18   corroborate that they met for the exchange of guns or whatever.

19         MS. SMYSER:  Yes.

20         THE COURT:  So are you saying through these charts

21   anything more than they were in the general same vicinity?

22         MS. SMYSER:  That's what we're saying and that is what

23   Mr. Petersohn will testify is his conclusion based on his

24   review of the data, that they were in the same general vicinity

25   at the time and will explore the limitations of that as he's

N8SBPER4

1    testifying.

2              THE COURT:  So let me ask defense counsel.  What

3    questions do you want to put or what arguments you want to

4    make.

5              MS. BAHARANYI:  Quite a few, your Honor.  I think we

6    can start where we are now and work backwards.  I think part of

7    the confusion that the Court rightfully has in my opinion and

8    that I've had is these circles and the shading makes it look as

9    those these devices are overlapping in the same place at the

10    same time.  When in fact the shading does not have anything to

11    do with location, but that is certainly what it seems to

12    suggest.  And I don't think no amount of qualifications is

13    going to take away from the visual representation of these two

14    devices in the same place at the same time, despite the fact

15    that the data cannot tell us that.  One of the later objections

16    --

17              THE COURT:  I think there are two objections there.

18    One, I don't understand that the witness will be saying that

19    they're in the same place at the same time.  What he's going to

20    say is they're going to be in the same vicinity at the same

21    time, and so I think that's permissible.

22              Whether the chart suggest something more is a separate

23    point which I think has some force. If all he's saying is

24    they're in the same vicinity, we know going back to the very

25    first chart, you're not suggesting, are you, that Mr. Vereen

N8SBPER4

1   was still in South Carolina when his phone is connecting to a

2   cell tower in Newark?

3       MS. BAHARANYI:  I'm not making that suggestion, your

4   Honor.  I think on point number one since we're talking about

5   it, the witness's ability to say that certain devices are even

6   near -- certain devices are even in the vicinity of these cell

7   site towers, I think is in fact not supported by the data and

8   data itself that is not reliable.

9       So as we raised in our motion, the witness would be

10  relying on these call detail records that have certain cell

11  site location information.  Perhaps I could ask him, but I

12  think he would not disagree that he did not collect these call

13  detail records.  He has not reviewed them for any errors, nor

14  has he corroborated that there were in fact cell towers at that

15  particular time on that particular date.

16      I think he'd also have to recognize that for this cell

17  site location information there have been errors in the past,

18  so there's this deep sense of unreliability for the records

19  he's relying on and then analyzing.  He's adding his analysis

20  on top of these unreliable records, and his analysis is based

21  off of how he views cell site towers is usually working.  And I

22  understand his analysis is also based on drive test that he

23  sometimes made, but he has not made in this case.  He's not

24  conducted a drive test your Honor that could help you test

25  whether a particular phone is connecting to a particular tower.

N8SBPER4

1    He has not conducted that in this area that's going to be shown

2    to the jury or in any other area in the Bronx borough, so I

3    think his ability to take unreliable data then add his analysis

4    on top of it --

5        THE COURT:  I'm not sure why you say the data is

6    unreliable.

7        MS. BAHARANYI:  Because the data he's going to rely on

8    are these call details records created by cellular companies,

9    and there's no error rate whatsoever for these call detail

10   records.  Meaning, he does not know if -- he does not know, the

11   witness does not know if these are in fact accurate reliable

12   records.

13       THE COURT:  So this I've gone through in previous

14   *Daubert* hearings.  The fact that there is not a specific error

15   rate calculated is a factor the Court considers under *Daubert*,

16   but it's hardly definitive.  And the logic of how these operate

17   suggests -- if a call is connected, it's connected with some

18   tower somewhere, and it's not a tower in Timbuktu.  It's a

19   tower somewhere in the vicinity.  He needs to say on his

20   direct -- and I gather the government will have him say that

21   it's not always the closest tower.  It's not even necessarily

22   the second closest tower, but it's a tower in the general area.

23       MS. BAHARANYI:  What are the boundaries of that?  My

24   understanding from the 3500 the government recently produced

25   maybe as of this weekend that they may be seeking to elicit

N8SBPER4

testimony from this witness that Mr. Lucha's device being on

one location on Perry Avenue wouldn't allow him -- excuse me.

Let me make sure I'm saying this clearly.  His device located

at 3318 Perry Avenue where he lives would not allow him to use

a tower that is a few blocks away.  This is a new subject area

testimony, one that hasn't been previewed to us, and we don't

know the basis of those conclusions.  We don't know what he's

going to say in terms of what area can be covered by what

particular sectors, and that's why it's necessary to have.

What we do know is that he's basing his analysis on data that

we can't corroborate, on methodologies that we can't

corroborate, and he's giving us conclusions for which we don't

know the exact parameters.

THE COURT:  That's interesting, but I'm still not --

let me go back to the government.  Is the relevance of this

simply to show that, for example, two guys, one of whom use to

be located in South Carolina were in the same general vicinity

in the Bronx or whatever on a certain date at approximately the

same time.  That seems to me to fall within his expertise.  But

if you're saying something much more precise than that, then I

think defense counsel's points have some force.

MS. SMYSER:  We're not saying something more precise

than that, your Honor.

THE COURT:  So then my only question then is whether

these charts suggest something more precise than what you just

N8SBPER4

said is all you're trying to establish.  So tell me again
what's the difference between what at least on my screen is a
sort of insipid green and probably base described as magenta,
but what's the difference between them?

MS. SMYSER:  Your Honor, the shadings, both the
magenta and the green indicate that the Perez device, the
magenta, connected to this particular sector of this cell site
as did the Keith Vereen device, the green device, connected to
this particular sector of this cell site.  It is not purported
to say that those devices are within the shaded area, and we
will bring that out with Mr. Petersohn before he even testifies
about this particular map.  They show the direction that the
sector faces.

MS. BAHARANYI:  Your Honor, maintaining our first
objection, but I think I understand where the Court is going.
Shaded areas are certainly not necessary to show direction of
coverage.  I think what unfortunately it's going to lead the
jury to believe is that they are in this particular area.

THE COURT:  I think that's problem, while she has
fully preserved all the points made in her papers, and here in
argument that my focus is much more on whether the charts
themselves are misleading, not because of what the witness will
say about them, but just because on their face they suggest
more precision than even his testimony will support.  So let's
continue to focus there.  So why do you need these charts?

N8SBPER4

MS. SMYSER:  Your Honor, I think these charts are key
to understanding the data.  It would be extremely I think
difficult for the jury to follow were these charts not there as
an aid to walk through these call detail records and when each
device is connecting to a particular cell site.  I mean even if
we took away the shading, you still need to be able to say and
to show to the jury that these two devices connected to a
particular cell site at a particular time.  And Mr. Petersohn
is called out --

THE COURT:  Looking at the one that's in front of me.
Okay.  So what the jury is seeing is a box that says Steven
Perez device voice record 8:20 p.m. and that's pointing to the
magenta shaded area, yes.

MS. SMYSER:  Yes, your Honor.

THE COURT:  And then we have the Keith Vereen device
at 8:13 calling the Perez device and at 8:21 it is located
within the green shaded area, right.

MS. SMYSER:  Not that it is located within the green
shaded area, that the Keith Vereen device is connecting to that
sector of that particular cell site, the same one that the
Perez device is connecting to at 8:20 p.m.

THE COURT:  The relevance of all that is with all the
qualification the jury can infer that it's more likely than not
that they are in the same area?

MS. SMYSER:  Absolutely, yes.

N8SBPER4

1        THE COURT:  I think if the charts are to come in at

2   all they need to be reworded maybe by along the lines you were

3   just saying, this shows what tower or area of towers they were

4   connected to.

5        MS. SMYSER:  Your Honor, we do plan to have that

6   testimony, and I think it's key though to have a visual

7   representation of the particular sector because that indicates

8   what area you are in.  You're on the far western side.  You're

9   probably not going to connect to the sector on the eastern side

10  of that cell tower.  There's some overlaps.  Some things can

11  happen.  We'll bring that out, but the repeated connection to a

12  particular sector helps indicate the location, and so I think

13  that we have to have some visual indication of the various

14  sectors.  Here, they're not only connecting to the same cell

15  site, they're connecting to the same sector that serves that

16  general area.

17       MS. BAHARANYI:  Your Honor, the visual representation

18  here, I understand they want something to visually go along

19  with their witness's testimony, but that thing can't be

20  misleading.  I think as the conversation has revealed today

21  just over the past 20 minutes is just how confusing and

22  misleading the shading is.

23       The shading does not mean, and in fact cannot mean

24  that they were in this area at the same time.  He can't say

25  they were here, there, a block or two away from the shaded

N8SBPER4

1    area, and yet that's certainly what it suggest to a jury.

2         THE COURT:  I think I will dwell on this some more

3    tonight because there's no sense watching a Yankee's game

4    because they always lose, but the government may want to

5    consider redoing these charts.  I'm not requiring you to.  I

6    may accept them.  I may not.  At least it seems to me that

7    defense counsel has a good point that the nuances that attach

8    to these charts which will be made verbally maybe in the charts

9    themselves show that the jury does not reach an unfair

10   conclusion.

11        MS. SMYSER:  Your Honor, one idea.  I think part of

12   the problem is this is how it is represented with the software,

13   and we could ask Mr. Petersohn that we could include a textual

14   disclaimer on each side along the lines.

15        THE COURT:  That certainly would be a move in the

16   right direction.

17        MS. SMYSER:  We would be happy to do that.

18        THE COURT:  Very good.

19        MS. BAHARANYI:  On that note though, again it does not

20   take away what the jury is looking at and what they're seeing.

21        THE COURT:  Now you're assuming the jury can't read

22   simple English.  If there's a disclaimer that says, this is

23   what we're showing.  This is not, and we're not showing X.

24   We're 'showing Y.

25        MS. BAHARANYI:  One way for them to proceed in a less

N8SBPER4

misleading and prejudicial manner is to place the dot where the

sector is, use an arrow to show direction.  That's all that he

would be testifying to.

MS. SMYSER:  Your Honor, I think just using an arrow

could potentially be more prejudicial.

THE COURT:  I agree.  It's an interesting suggestion,

but I actually think that is potentially more prejudicial.  I

like the disclaimer idea.  I'm not making any final ruling.

I'll think about this all night and see what synonyms there are

for magenta.  And why don't I invite all of you to come in at

9:00 tomorrow and we'll continue this discussion then with the

new charts with the disclaimer.  Okay.  Very good.  I'll see

you tomorrow at 9:00.

(Adjourned to August 29, 2023 at 9:00 a.m.)

INDEX OF EXAMINATION

Examination of:                                Page

 JARREN SMALLS

Direct By Smyser . . . . . . . . . . . . . . .31

Cross Ms. Mayo . . . . . . . . . . . . . . . .56

Redirect By Ms. Smyser . . . . . . . . . . . .63

MARK ARCHULETA

Direct By Ms. Smyser . . . . . . . . . . . . .66

Cross By Ms. Mayo . . . . . . . . . . . . . .76

 LENNAE GORDON

Direct By Ms. Nicholas . . . . . . . . . . . .79

                   GOVERNMENT EXHIBITS

Exhibit No.                                 Received

 204    . . . . . . . . . . . . . . . . . . .36

 202    . . . . . . . . . . . . . . . . . . .38

 202AT, 205T   . . . . . . . . . . . . . . . .39

 205A, 205B and 205C   . . . . . . . . . . . .43

 203    . . . . . . . . . . . . . . . . . . .46

 520A, 520B, 520C, 521A, 522A, 522B  . . . . .49

 521, 522  . . . . . . . . . . . . . . . . . .52

 520    . . . . . . . . . . . . . . . . . . .53

 1006, 607   . . . . . . . . . . . . . . . . .66

 803    . . . . . . . . . . . . . . . . . . .70

 1001, 400 – 408  . . . . . . . . . . . . . .78

 1004, 411 – 422 and 430   . . . . . . . . . .79

426      . . . . . . . . . . . . . . . .73