N8TBPER1                        Jury Trial

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

                v.                      S1 22 CR 644 (JSR)

STEVEN PEREZ, A/K/A "LUCHA,",

                Defendant.

------------------------------x

                                        New York, N.Y.
                                        August 29, 2023
                                        9:30 a.m.

Before:

                    HON. JED S. RAKOFF,

                                        District Judge

                        APPEARANCES

DAMIAN WILLIAMS
     United States Attorney for the
     Southern District of New York
ASHLEY NICHOLAS
MADISON SMYSER
SARAH MORTAZAVI
     Assistant United States Attorneys

FEDERAL DEFENDERS OF NEW YORK
     Attorneys for Defendant Perez
ZAWADI BAHARANYI
AMANDA MAYO
KENDRA L. HUTCHINSON

ALSO PRESENT:  ANANYA SANKAR, Paralegal, U.S. Attorney's Office
     ARJUN AHUJA, Paralegal, U.S. Attorney's Office
     SARAH KWON, Paralegal, Federal Defenders of New York

N8TBPER1                    Jury Trial

<pre>
 1              (Case called; jury not present)
 2              THE COURT:  All right.  Some of you may have already
 3    heard on the news there was this big water main break at Times
 4    Square.  A water main that was installed in 1896 somehow broke.
 5    I don't know why something that young would break, but there it
 6    was.  So one of the jurors has already called and said that
 7    because subway service is completely disrupted on the west
 8    side, she's trying to get over to the east side, but she may be
 9    a little delayed, so there it is.
10              Now before we turn to the question of the charts, let
11    me find out from the government what's your schedule for today?
12              MS. SMYSER:  So, your Honor, we expect to have --
13    we'll finish up this current witness, and then we expect to
14    have three more witnesses.  I think it is likely that by the
15    end of the day we will rest.  Sorry, four more witnesses after
16    the current one.
17              THE COURT:  So we can go today till 4:25.  And if you
18    do rest today, then I need to hear immediately from defense
19    counsel whether defendant is taking the stand.  But in any
20    event, even if you don't rest today, I need to hear by the end
21    of the day whether Ms. Otero is going to be called as a witness
22    so we'll know what the story is for Wednesday.
23              So in terms of a charging conference, I will try to
24    get you sometime by lunch a first draft of the proposed charge
25    so you can look it over, and we'll probably have a charging
</pre>

N8TBPER1                        Jury Trial

1    conference at 5:00 today.  That will give you, since I have a

2    matter at 4:30, that will give you a half an hour to look at

3    the charge as well.  In terms of summations, how long does the

4    government want for its combined summations?

5              MS. SMYSER:  Your Honor, we think an hour and a half.

6              THE COURT:  And how long for the defense?

7              MS. BAHARANYI:  Your Honor, approximately one hour.

8              THE COURT:  So I will give government 90 minutes which

9    they can divide between their two summations, except that the

10   rebuttal cannot be more than 30 minutes.  If you go more than

11   60 minutes on your initial summation, then of course we'll

12   subtract that from the rebuttal.

13             Defense counsel if you wind up needing it can have 90

14   minutes, but I understand you probably think it will be less

15   than that.  So now what's the story on the charts.

16             MS. SMYSER:  Your Honor, the government has made some

17   changes to the charts in response to our discussion yesterday.

18   I'm going to pass up a hard copy of one of the slides that we

19   were discussing yesterday, and we'll also bring it up on the

20   screen Government Exhibit 901.

21             THE COURT:  Okay.  There's now in very large print the

22   disclaimer, which I assume appears on all the similar charts.

23   "These shaded areas represent direction of a sector's

24   transmitted signal, not the sector's specific coverage area."

25   I think that's clears up I think a lot of the problems that we

N8TBPER1                    Jury Trial

1    discussed yesterday.  Obviously defense counsel's more general

2    objections are preserved, but is there anything specific about

3    the charts now that you wanted to on defense side raise?

4            MS. BAHARANYI:  Your Honor, for the change in the

5    charts, this still does not do enough to clarify what the

6    shaded areas are or not suppose to represent it.

7            THE COURT:  Why not?

8            MS. BAHARANYI:  It says here that this does not cover

9    the sector's specific coverage area.  My understanding from

10   Mr. Petersohn's brief testimony yesterday is that he can speak

11   generally about the vicinity in which a location device might

12   be.  And I think this makes it seem still a little too narrow,

13   too specific.  I would say, understanding we maintain our

14   objection to this altogether, taking out this does -- amending

15   so it says, These shaded areas represent direction of a

16   sector's transmitted signal, not the coverage area.

17           THE COURT:  Well, the only difference between what you

18   just said and what they've written is they say "These shaded

19   areas represent direction of a sector's transmitted signal, not

20   the sector's specific coverage area." Is all that you want to

21   do is eliminate the word "specific?"

22           MS. BAHARANYI:  Your Honor, because I think it still

23   implies that we're still talking about maybe a general area

24   that is reflected and that's not supported by the expert's own

25   testimony.

N8TBPER1                Jury Trial

1           THE COURT:  So what does the government say to that?

2           MS. SMYSER:  Your Honor, this objection is very

3   attenuated from where we were yesterday.  And if defense

4   counsel wants to bring out the use of the term "specific" on

5   cross, I think that's totally fair game.  But the textual

6   disclaimer here is an accurate statement and will be on all the

7   slides, and we will also bring out those limitations in the

8   direct testimony.

9           THE COURT:  All right.  I think this is a great

10  improvement.  Defense counsel of course is more than free to

11  cross-examine about the word "specific" or anything else, but I

12  think to me at least it's not ambiguous.  So this will be

13  received.  Okay.  Is there anything else we need to take up

14  this morning?

15          MS. SMYSER:  Nothing from the government.

16          MS. BAHARANYI:  Your Honor, not at this time.

17          THE COURT:  Okay.  So I'll have my courtroom deputy in

18  five minutes go into the jury room and find out where things

19  stand.  I think there will probably be a short delay, but

20  obviously stick around.  Don't disappear, and we'll start as

21  soon as all the jurors are here.  Very good.

22          (Recess)

23          THE COURT:  Please be seated.

24          THE DEPUTY CLERK:  Still missing.

25          THE COURT:  So here's the situation.  The juror who

N8TBPER1                    Jury Trial

1    had called in to say that she was delayed because of the subway

2    problem resulting from the water main break is now here, but

3    there's another missing juror who we haven't heard from, but

4    who is also coming from the west side so probably is

5    encountering the same issues.  We've tried her cell phone

6    several times without being able to reach her, which maybe

7    means she's in transit I hope.

8           So my normal practice when jurors are delayed is if a

9    juror is delayed more than a half hour, we replace them with an

10   alternate juror.  I think in this situation where we know that

11   there's an unusual cause of the likely delay, we should extend

12   that a little.  But on the other hand, I think it's very

13   important that we keep the trial moving.  You may recall that

14   juror number 12, the dancer, will have a problem if we go into

15   next week.  So my suggestion is that if the missing juror is

16   not here by 10:15, which would give her 45 minutes from the

17   original time -- and actually I'd asked them to be a little

18   early so it will be almost an hour from the original time --

19   that we replace that juror with alternate juror number one.

20   Any objection to that?

21          MS. SMYSER:  No objection.

22          MS. BAHARANYI:  No objection, your Honor.

23          THE COURT:  Very good.  All right.  So stay tuned and

24   we'll see what develops.

25          (Recess)

1          THE COURT:  All right.  All the jurors are here.

2     Let's bring in the jury.

3          THE DEPUTY CLERK:  Jury entering the courtroom.

4          (Jury present)

5          THE COURT:  Please be seated.  Good morning, ladies

6     and gentlemen.  I can't understand why two jurors didn't

7     anticipate that there would be a major water main break at

8     Times Square disrupting service throughout the west side.  I

9     mean, this is New York.  But in any event, my sympathy goes out

10    to the two jurors who had to deal with that, and thank you for

11    being here now.  And my thanks also for the patience of all the

12    members of the jury, and we're going to sit till 4:30 today so

13    we will make up the little time we've lost, so we're ready to

14    continue.  Counsel.

15         MS. NICHOLAS:  Thank you, your Honor.

16    LENNEA GORDON, resumed.

17    DIRECT EXAMINATION CONTINUED

18    BY MS. NICHOLAS:

19    Q.  Welcome back, Special Agent Gordon.

20         When we concluded last night, we were talking about

21    the eTrace system.  Do you remember that?

22    A.  Yes, I do.

23    Q.  Can you tell the jury what the eTrace system is?

24    A.  The eTrace system is an ATF database administered by the

25    national tracing center.

N8TBPER1                          Gordon- Direct

1    Q.   What type of reports are produced from the eTrace system?

2    A.   The eTrace system provides trace reports and also multiple

3    sale summaries.

4    Q.   Ms. Sankar if you could just pull up for the witness what's

5    marked as Government 426.

6              Agent Gordon, do you recognize this document?

7    A.   Yes, I do.

8    Q.   What is it?

9    A.   This is an ATF multiple sale summary.

10             MS. NICHOLAS:  Your Honor, at this time the government

11   offers Government Exhibit 426.

12             MS. BAHARANYI:  Your Honor, we maintain our objection

13   to this exhibit.

14             THE COURT:  Yes. The objections are overruled for the

15   reasons stated outside the presence of the jury and the exhibit

16   is received.

17             (Government's Exhibit 426 received in evidence)

18             MS. NICHOLAS:  May we publish.

19             THE COURT:  Please.

20             MS. NICHOLAS:  Ms. Sankar, please publish Exhibit 426

21   for the jury.

22   BY MS. NICHOLAS:

23   Q.   Special Agent Gordon, in the section labeled purchaser

24   information.  Ms. Sankar, if you can zoom in on that section

25   which is the top right.

1          For this particular firearm, Agent Gordon, what's the

2     listed purchase date?

3     A.   The purchase date is 10/31/2020.

4     Q.   And the name of the purchaser?

5     A.   Keith Anthony Vereen.

6     Q.   Ms. Sankar, we can zoom out again.

7          If you could zoom in on the weapon summary section.

8     If you could read for us, Agent Gordon, the two firearms listed

9     in the weapon summary section of 426?

10    A.   Yes. It is a Glock 43 9mm caliber pistol bearing serial

11    number AEYB797, and a Taurus G2C 9mm caliber pistol bearing

12    serial number ABK021341.

13    Q.   Ms. Sankar, we can pull that down.

14         Agent Gordon, a couple of final questions for you.

15    Are you familiar with the term "case agent?"

16    A.   Yes, I am.

17    Q.   What is a case agent?

18    A.   A case agent is the agent who manages an investigation.

19    Q.   But specific to a particular investigation?

20    A.   Yes.

21    Q.   And when you say agent, do you mean ATF special agent?

22    A.   Yes.

23    Q.   Were you the case agent in this case?

24    A.   No, I was not.

25    Q.   Was your testimony today based on specifics of this case or

N8TBPER1                         Gordon - Cross

1    your general knowledge about the ATF?

2    A.  It is based upon my general knowledge.

3            MS. NICHOLAS:  Your Honor, may I have one moment.

4            THE COURT:  Yes.

5            MS. NICHOLAS:  Nothing further.

6            THE COURT:  Cross-examination.

7            MS. BAHARANYI:  Yes, your Honor.

8    CROSS-EXAMINATION

9    BY MS. BAHARANYI:

10   Q.  Good morning, Agent Gordon.

11   A.  Good morning.

12   Q.  I want to talk about your training and experience with

13   firearms regulations.

14           You've been a special agent since about 2018?

15   A.  That is correct.

16   Q.  And when you became an agent, you were required to undergo

17   basic training?

18   A.  Yes.

19   Q.  And I believe on direct you testified to the acronym SABT?

20   A.  Yes.

21   Q.  Special Agent Basic Training?

22   A.  Yes.

23   Q.  During this time you were required to learn about the

24   details of the firearms regulations?

25   A.  Yes.

N8TBPER1                         Gordon - Cross

1    Q.  And firearms laws?

2    A.  Yes.

3    Q.  As part of this training, you took a class on the Gun

4    Control Act?

5    A.  Yes.

6    Q.  And that's a federal act?

7    A.  Yes.

8    Q.  And that federal act is also about firearms regulations?

9    A.  Yes.

10   Q.  And is about the interstate transportation of firearms?

11   A.  Yes.

12   Q.  And governs how firearms are regulated in this country?

13   A.  Yes.

14   Q.  That law also establishes different categories of people

15   who can't possess firearms?

16   A.  Yes.

17   Q.  During your training you study the Gun Control Act for

18   multiple days?

19   A.  Yes.

20   Q.  You became very familiar with this act?

21   A.  Yes.

22   Q.  You were taught how it was structured?

23   A.  Yes.

24   Q.  You were taught the specific regulations contained in it?

25   A.  Yes.

N8TBPER1                          Gordon - Cross

1  Q.  And you were taught on this subject for several hours a
2  day?
3  A.  Yes.
4  Q.  And this isn't the only firearm regulation you studied
5  during this training?
6  A.  Yes.
7  Q.  You studied the, I believe it's called the National
8  Firearms Act?
9  A.  Yes.
10  Q.  Which also regulates firearms?
11  A.  Yes.
12  Q.  At the federal level?
13  A.  Yes.
14  Q.  And this act determines how firearm dealers conduct their
15  business?
16  A.  Yes.
17  Q.  Including how they're taxed for example?
18  A.  Yes.
19  Q.  And these acts together govern the transportation of
20  firearms?
21  A.  Yes.
22         THE COURT:  Counsel, I think we need to have a
23  sidebar.
24         (Continued on next page)
25         (At sidebar)

N8TBPER1                      Gordon - Cross

1          THE COURT:  So I infer that these questions are being

2     asked so that defense counsel can make the argument that the

3     everyday person wouldn't know the complexities of the act.  I

4     don't think that's a defense in this case.  We haven't had a

5     real chance to discuss that, but I take it that's what you're

6     driving at here.

7          MS. BAHARANYI:  Yes, your Honor.  I think it's

8     important for us to elicit from this witness just how extensive

9     her training was in this area.

10         THE COURT:  That's only relevant if you're going to

11    make the argument that I think you've suggested already you

12    want to make which is, he didn't know he was violating this

13    particular law.

14         MS. BAHARANYI:  Not so specifically, your Honor.  We

15    understand where the law is currently on this act and like the

16    mens rea for it.  He has to act with the knowledge he's doing

17    something the law forbids.

18         THE COURT:  It gets a little more complex than this --

19    and I have to admit that I'm still wrestling with this issue.

20    I was going to take it up at the charging conference, but I

21    don't think from what I've seen so far in the case law that

22    there is required the kind of knowledge that you might have to

23    have of a regulation, administrative regulation.

24          On the other hand, it's not clear to me whether you

25    could make the argument that the defendant had a good faith

N8TBPER1                          Gordon - Cross

1    belief that the law was different than it is, but that could

2    only be done if he takes the stand.  So I don't think I could

3    allow it here unless you're representing he will take the stand

4    so that's why I called the sidebar.

5              MS. BAHARANYI:  Your Honor, what I might propose, I

6    don't have actually many more questions on this subject.

7              THE COURT:  Why don't we leave it then and we'll see

8    later on what you can or cannot make.

9              MS. BAHARANYI:  I think we'd like to discuss that with

10   you.

11             THE COURT:  Very good.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

N8TBPER1                         Gordon - Cross

1              (In open court)

2      BY MS. BAHARANYI:

3      Q.  Agent Gordon, we were just discussing some of your training

4      on firearms regulations.  Just a couple of questions on that

5      point.

6              Your training on firearms regulations also included

7      what FFLs are responsible for doing or obligated to do?

8      A.  Yes.

9      Q.  And FFLs as you explained on direct is another way of

10     saying a gun shop owner?

11     A.  Yes.

12     Q.  Individuals can also be federal firearms licensees, right?

13     A.  Yes.

14     Q.  And during your training you also learned what sort of

15     forms are required before someone can -- someone must fill out

16     to buy a firearm, right?

17     A.  Yes.

18     Q.  From an FFL?

19     A.  Yes.

20     Q.  And what sort of forms that the FFL is required to

21     maintain?

22     A.  Yes.

23     Q.  And we'll talk a little more about those forms in a minute.

24             Now during your experience as an ATF agent, you have

25     investigated violations of firearms regulations?

N8TBPER1                        Gordon - Cross

1   A.  Yes.

2   Q.  And your work as an agent requires you to be familiar with

3   the legal ways that guns are sold?

4   A.  Yes.

5   Q.  And the way guns are transferred?

6   A.  Yes.

7   Q.  And transported?

8   A.  Yes.

9   Q.  Your work also requires you to be familiar with how guns

10  might be illegally sold?

11  A.  Yes.

12  Q.  Or transferred?

13  A.  Yes.

14  Q.  And transported?

15  A.  Yes.

16  Q.  I want to talk a little bit more about -- actually,

17  withdrawn.

18          You currently practice as an agent in New York?

19  A.  Yes.

20  Q.  But you're a federal agent as well?

21  A.  Can you restate the question "as well?"

22  Q.  You're a federal agent?

23  A.  Yes.

24  Q.  You investigate within the boundaries of New York City,

25  that's where your office is located?

1    A.  That is correct.

2    Q.  And you're familiar with federal firearm laws as we've

3    established?

4    A.  Yes.

5    Q.  You're also familiar with New York state laws around

6    firearms?

7    A.  I have some familiarity with state laws; however, my

8    training and expertise is in federal firearms laws.

9    Q.  Agent Gordon, you're aware, for example, that in New York a

10   business can hold a FFL license, right?

11              MS. NICHOLAS:  Objection.

12              THE COURT:  Sustained.

13   Q.  Agent Gordon, there are FFL holders in New York who don't

14   have New York state dealer licenses?

15              MS. NICHOLAS:  Objection.

16              THE COURT:  Sustained.

17              MS. BAHARANYI:  Your Honor, may we approach?

18              THE COURT:  Yes, but I think it will be a rather short

19   sidebar.

20              (Continued on next page)

21

22

23

24

25

1          (At sidebar)

2          THE COURT:  I sustained the objection on numerous

3     grounds.  First, what New York state law thinks, whether it is

4     relevant at all, which I have some doubts about, it is relevant

5     for the Court to determine what the law is, not for any

6     witness.  No witness may ever testify as to what the law is.

7          Second, what you're asking for is blatant hearsay.

8     You're asking did she learn from someone sometime that someone

9     in New York state might be able to hold -- might be able to

10    sell guns without a license or whatever you're suggesting.

11    Whatever it is, it's at a minimum hearsay, probably double or

12    triple hearsay.  And third, it's irrelevant.  Now, what would

13    you like to say.

14         MS. BAHARANYI:  Briefly on that, I think we have

15    another one to take up with you while we're here, but there's

16    already been testimony elicited about New York concealed

17    carrying licensing, or whether our client has the ability to --

18    like whether our has a license.

19         THE COURT:  What's been admitted was a certified copy

20    indicating that the defendant does not hold any license, and

21    specifically it references what the federal statute talks about

22    various people who are permitted to have licenses, so I don't

23    think that opens the door to this irrelevant hearsay.

24         MS. BAHARANYI:  She did testify yesterday that some

25    states require licenses to purchase firearms, and she wasn't

N8TBPER1                    Gordon - Cross

1    speaking specifically about whether Lucha did or didn't. She

2    was allowed to talk more generally about what some state

3    require or don't, which I do think has opened the door for her

4    to talk a little bit more on that area on cross-examination.

5              THE COURT:  I remember that question.  There was no

6    objection of course to that question.  You were saying you

7    didn't object because you wanted to open the door.

8              MS. BAHARANYI:  Now that she's testified about it, I

9    do think it's fair for the jury to hear.

10             THE COURT:  If you want me to strike that testimony,

11   I'll consider that.

12             MS. NICHOLAS:  I think there's something to be said

13   here, your Honor, about the extent of her qualifications.  The

14   fact that state laws have to be followed by FFLs and those vary

15   is plain in the face of 4473.  It says it.

16             THE COURT:  That's another thing.  The extent -- the

17   question wasn't phrased in this term, but extent as an expert

18   she can be cross-examined about certain hearsay, this is not

19   within the scope of her expertise.  In fact she, in response to

20   counsel's question, specifically explained any expertise.  All

21   she has is some general familiarity.

22             MS. BAHARANYI:  Your Honor, understood.  We do think

23   that the door has been opened and we wanted to step through

24   that door and explore this area with her.

25             THE COURT:  Well, I think to carry out the analogy if

N8TBPER1                          Gordon - Cross

1    the door was opened, it was only opened a tiny crack, not

2    sufficient for your purposes.

3            MS. BAHARANYI:  I think there's one more area they

4    wanted to --

5            MS. NICHOLAS:  I understand the defense will be

6    attempting to introduce a defense exhibit they gave us notice

7    of yesterday.  We do have an objection to that exhibit.  I

8    don't know if your Honor wants to take that up now.

9            THE COURT:  I don't want to keep the jury waiting.

10           (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1              (In open court)

 2              THE COURT:  So, ladies and gentlemen, just so you

 3    understand about side bars, sometimes I have to make rulings.

 4    And to make that ruling I have to hear what one side or another

 5    says they think future evidence will be that they want to

 6    present.  And if it turns out they're under the law not

 7    permitted to present that other evidence, it would be improper

 8    for you to hear it.  So, that's why we have side bars but we

 9    will try to keep them to a minimum.

10              Go ahead, counsel.

11              MS. BAHARANYI:  Thank you, your Honor.

12    BY MS. BAHARANYI:

13    Q.  Agent Gordon, on direct you testified about 4473 forms?

14    A.  Yes, ma'am.

15    Q.  Just to remind the jury, those are forms that must be

16    filled out and maintained by FFLs with information from a gun

17    purchaser?

18    A.  Yes.

19    Q.  Now these forms are filled out typically at the FFL, so at

20    the store?

21    A.  Yes.

22    Q.  At the time of purchase?

23    A.  Yes.

24    Q.  The person filling out the form is the person who

25    contributes information for the form is the purchaser of the

1    gun?

2    A.  There are two individuals who fill out the form but, yes,

3    the purchaser fills out their information.

4    Q.  The purchaser is one of the individuals who fills out the

5    form.  Excuse me.  The purchaser is one of the individuals who

6    helps provide information to fill out the form?

7    A.  They do not provide the information.  They fill out the

8    form.

9    Q.  So the purchaser has to physically write on the 4473?

10   A.  Yes.

11   Q.  And the FFL, whoever works at FFL, will fill out some other

12   portions of that form?

13   A.  Yes, ma'am.

14   Q.  Including the information about the particular gun

15   purchased?

16   A.  Yes.

17   Q.  Type and caliber of that gun?

18   A.  Yes.

19   Q.  So details that the FFL has?

20   A.  Yes.

21           MS. BAHARANYI:  One moment, your Honor.

22           (Pause)

23   Q.  I'd like to show the witness what's been marked as

24   Government Exhibit 411.

25           (Pause)

1    Q.  Now Agent Gordon, I believe you discussed this 4473 form on

2    direct, right?

3    A.  I believe so, yes.

4    Q.  This form, as we established, asked for certain demographic

5    information for the purchaser?

6              THE COURT:  Is this in evidence or no?

7              MS. BAHARANYI:  This one should --

8              MS. NICHOLAS:  I believe this is, your Honor.

9              THE COURT:  Then I think we can show it to the jury

10   not just --

11             (Pause)

12   Q.  So the form in front of you, Agent Gordon, that's the 4473

13   form you discussed on direct?

14   A.  Yes.

15   Q.  And this form includes certain demographic information for

16   the purchaser?

17   A.  Yes.

18   Q.  And this form was filled out at the point of purchase of

19   the firearm?

20   A.  Yes.

21   Q.  Meaning when the gun was transferred from the FFL to the

22   purchaser of the firearm?

23   A.  It is either filled out at the time of purchase or at the

24   time of transfer, yes.

25   Q.  At the point at which someone enters the FFL store and is

1    trying to obtain a gun, they have to fill out this form?

2    A.  Yes, ma'am.

3    Q.  And that's what happened with this particular form?

4    A.  Yes, ma'am.

5    Q.  You testified on direct about straw purchasing?

6    A.  Yes.

7    Q.  And you testified that this is where one individual buys a

8    firearm for another person?

9    A.  Yes.

10   Q.  Now, the person that you call a straw purchaser would be

11   the person maybe filling out the 4473?

12   A.  Yes.

13   Q.  And an individual -- excuse me.  Withdrawn.

14          And you discussed the different categories of

15   individuals who can't themselves purchase a firearm?

16   A.  Yes.

17   Q.  Some of these categories are listed on the 4473 form?

18   A.  Yes.

19   Q.  They include anyone who has a felony conviction?

20   A.  Yes.

21   Q.  Anyone who is under indictment for a felony?

22   A.  Yes.

23   Q.  Anyone who's mentally defective?

24   A.  Yes.

25   Q.  Or illegally present in the United States?

N8TAAPER2                          Gordon - Cross

1    A.  Yes.

2    Q.  The list goes on?

3    A.  Yes.

4    Q.  These are all prohibited people?

5    A.  Yes.

6    Q.  These were people who would need someone else to buy a

7    firearm for them?

8              MS. NICHOLAS:  Objection.

9              THE COURT:  Sustained.

10   Q.  Agent Gordon, not everyone who buys a gun to give to

11   another person is a straw purchaser?

12             MS. NICHOLAS:  Objection.

13             THE COURT:  Well, I think it's too broad and vague but

14   I think there may be questions in that area that can be put.

15   So why don't you rephrase the question.

16   Q.  Agent Gordon, to you, a straw purchaser is someone who is

17   illegally buying a gun for another person?

18   A.  Yes.

19   Q.  It is also possible to buy a gun for another person and it

20   not be illegal?

21   A.  Yes.

22   Q.  And not every person who receives a gun from someone else

23   is a prohibited person?

24   A.  Yes.

25   Q.  And as we established, whoever is purchasing the firearm is

1    the one who fills out the 4473?

2    A.  Yes.

3    Q.  And on -- at Government Exhibit 411 is the example of a

4    4473 form from May 2020.  Excuse me.  October 2016?

5    A.  Yes, October 2016.

6    Q.  Now, Agent Gordon, this is not the most recent version of

7    the 4473 form?

8              MS. NICHOLAS:  Objection.

9              THE COURT:  Sustained.

10   Q.  Agent Gordon, you also --

11             MS. BAHARANYI:  If you can show the witness and

12   publish to the jury Government Exhibit 413.

13             (Pause)

14             MS. BAHARANYI:  Actually, Sarah, Government Exhibit

15   418, and if you could publish that to the jury.

16             (Pause)

17   Q.  Agent Gordon, this is another 4473 form that you discussed

18   on direct?

19   A.  Yes.

20   Q.  And at the bottom right-hand corner of this form you can

21   see the date that this form was revised?

22   A.  Yes, ma'am.

23   Q.  I want to talk a little bit about the revisiting of these

24   4473 forms.  ATF periodically changes the 4473 forms?

25   A.  Yes.

N8TAAPER2                          Gordon - Cross

1  Q.  Adding questions?

2  A.  Yes.

3  Q.  Or sometimes, as you discussed on direct, rearranging the

4  sections of the form?

5  A.  Yes.

6  Q.  And this form from May 2020 is not the latest version of

7  this form?

8         MS. NICHOLAS:  Objection.

9         THE COURT:  Sustained.

10        MS. BAHARANYI:  Your Honor, we'd like to approach on

11  this.

12        THE COURT:  Okay.

13        (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

N8TAAPER2                    Gordon - Cross

1          (side bar)

2          THE COURT:  What's the relevance?

3          MS. BAHARANYI:  I think if we'd allow a few more

4    questions on this point, what I'm trying to elicit from the

5    question is, the form was revised specifically relating to

6    straw purchasers and to make clearer on those 4473 forms what

7    straw purchasing is to both the purchaser and the FFL.  And I

8    think she is able to lay the foundation if we can get through

9    some of these questions with her.  So, as it stands now --

10         THE COURT:  The government's position is that the

11   purchaser lied and whether it was, and lied for the purpose of

12   enable the defendant to get out-of-state guns, I don't

13   understand why that would make any difference in why any

14   changes in words would relate to that.

15         MS. BAHARANYI:  Because if their version is certainly

16   that the purchaser lied, there's another world in which the

17   purchaser was mistaken because of how these forms were written

18   and questions and now we know that the 4473 form has since been

19   changed, revised since May 2020 to make clearer who is straw

20   purchasing and brought to light purchaser and to the FFL.  So,

21   there's an argument that we or something we'd at least like to

22   pursue that maybe they have it wrong, it's not that he -- they

23   have lied is that the information on your forms wasn't clear

24   and here is the proof of it.  Then it's clearer now, which I

25   think and there's specific questions --

1          THE COURT:  I am trying to remember.  There's rule of

2     evidence that was mostly relating to tort cases that subsequent

3     or remedially were not admissible to show that something was

4     wrong at the time of the underlying events.  But I'm not sure

5     whether that applies here.

6          MS. NICHOLAS:  The spirit of it applies here.  This

7     form proposes that used from November 2020 which is well

8     outside the period of the crime in this case.  This witness is

9     not someone who works -- policy -- the ATF who can talk about

10    why forms have been revised that the ATF has gotten better --

11    reflect anything that has anything to do with this case.

12         THE COURT:  What is the change in wording?

13         MS. BAHARANYI:  So there are actually two points, your

14    Honor.  I can pull up my different exhibits.

15         (Pause)

16         MS. BAHARANYI:  The changes have to, specifically to

17    the subject matter that they've elicited from this witness

18    which is straw purchasing.  So this what we have up, what this

19    witness is looking at now.  This Government Exhibit 418 and I

20    want to just point the Court to question 21 which is where we

21    have the changes originally.  Question 21, subsection B was

22    about whether the person like you, the purchaser has any sort

23    of indictment.  It is been changed now.  21 B is now this

24    question.

25         Do you intend to purchase or acquire any form listed

1    on this and continuation -- and anythings for any -- question

2    21 C or to a person described in Question 21 N1.  That's the

3    change specifically going to straw purchasing which this

4    witness is an expert.  Their ATF expert should be able to

5    testify at least her knowledge of the change and her

6    understanding of the purpose of the change.  So that's one

7    addition.  21 B is now this question.

8            The other addition is 21 C.  Do you intend to sell or

9    otherwise dispose of any firearm listed on -- any continuation

10   sheets are ammunition in furtherance of any felony or other

11   offense again making clear to the purchaser and the FFL what it

12   is that would be legal in the straw purchasing realm.  That's

13   not the form that Keith Vereen was given.  That's not the

14   language that was in front of him.

15           THE COURT:  Hang on one second.

16           (Pause)

17           MS. BAHARANYI:  This is the new version, your Honor.

18           (Pause)

19           THE COURT:  I don't understand this.  The original

20   form has the following question beginning with number 20.

21           "If you are an alien or a -- sorry -- beginning 2

22   sorry."

23           Answer the following questions by checking or marking

24   either the yes or no box to the right of the questions.  First

25   question, 21 A is, are you the actual transferee/buyer of the

N8TAAPER2                    Gordon – Cross

1   firearms listed on this form and any continuation sheets?  And

2   then there is in solid caps the following language:

3          Warning:  You are not the actual transferee/buyer if

4   you are acquiring the firearms on behalf of another person.  If

5   you are not the actual transferee/buyer the licensee cannot

6   transfer the firearms to you.  In my recollection has already

7   been read to the jury and who ever was filling this out,

8   presumably, Mr. Vereen put in the answer to that being, yes, he

9   is the actual transferee/buyer.

10         I don't see how any of the changes are remotely

11  material to anything, any ambiguity.  There is no ambiguity.

12  Overruled.  The objection is sustained.

13         (Continued on next page)

1          (In Open Court)

2     Q.  Agent Gordon, let's turn to the firearms themselves?

3     A.  Yes, ma'am.

4     Q.  There are various markings on a firearm?

5     A.  Yes, ma'am.

6     Q.  And generally gun stores that sell firearms are selling

7     guns that have these markings on them?

8     A.  Yes, ma'am.

9          MS. BAHARANYI:  So for example, actually, I'll show

10    you an example, Agent Gordon.

11         Sarah, can you please pull up Government Exhibit 520A

12    and publish to the jury.

13         (Pause)

14    Q.  This is an example of a firearm, right, Agent Gordon?

15    A.  Yes, ma'am.

16    Q.  You discussed this firearm on direct?

17    A.  Yes.

18    Q.  Now, in this exhibit you can see the manufacturer of the

19    firearm?

20    A.  Yes.

21    Q.  That's the Century Arms Inc., right?  Excuse me.  Canic?

22    A.  Yes, ma'am.

23    Q.  You are able to see also Georgia, Vermont or Georgia VT

24    written on that firearm?

25    A.  Yes, ma'am.

1    Q.  Agent Gordon, it's intended to show where the firearm was

2    manufactured?

3    A.  No, ma'am.

4    Q.  That's intended to show where the, perhaps the distributor

5    of the firearm?

6    A.  Of the importer.

7          MS. BAHARANYI:  And actually, take this to Government

8    Exhibits 520B, Sarah, and publish to the jury.

9    Q.  On this side of firearm you can also see the serial number

10   on the firearm?

11   A.  Yes, ma'am.

12         MS. BAHARANYI:  Zoom-in.

13         (Pause)

14   Q.  The serial number is actually written on two different

15   places on this firearm?

16   A.  Yes, ma'am.

17         MS. BAHARANYI:  Zoom out a bit.

18         (Pause)

19   Q.  And now it might be hard to see, Agent Gordon, on your

20   screen but there is, it says "made in Turkey" on this firearm

21   as well?

22   A.  Yes, ma'am.

23   Q.  Which now that is where the firearm is made?

24   A.  Yes, ma'am.

25   Q.  These are the typical markings on a firearm, right?

N8TAAPER2                    Gordon - Cross

1   A.  Yes, ma'am.

2   Q.  And these markings are meant to help identify particular

3   firearms?

4   A.  Yes, ma'am.

5   Q.  These markings allow you as an agent to trace a firearm

6   that comes into your possession?

7   A.  Can you restate the question?

8   Q.  These markings allow agents to trace the origins of a

9   firearm?

10  A.  Yes, ma'am.

11  Q.  And you can use a serial number specifically to determine

12  who might have sold that particular gun?

13  A.  In conjunction with the make and model of firearm, yes,

14  ma'am.

15  Q.  So with the make and the model and the serial number you

16  can determine who sold a particular firearm?

17  A.  In many cases yes, ma'am.

18  Q.  But not in all cases?

19  A.  Yes, ma'am.

20  Q.  Let's talk a little bit about guns that don't have these

21  markings on them?

22          MS. NICHOLAS:  Objection.

23          THE COURT:  Well, I haven't heard a question.  I heard

24  a statement.  Let's hear the question and then we'll see.

25  Q.  Agent Gordon, not all guns have serial numbers?

1              MS. NICHOLAS:  Objection.

2              THE COURT:  I'll allow that question to be answered.

3    A.  Yes, ma'am.

4    Q.  And in that vain there is some guns that don't have a make

5    or model in them?

6    A.  Yes, ma'am.

7    Q.  You are familiar with guns that don't have any identifiers

8    on them at all?

9              THE COURT:  Now I see where this is going.  The

10   objection is sustained.

11   Q.  If an FFL business is selling a gun, that gun has a serial

12   number?

13   A.  Yes, ma'am.  There are some caveats I believe, yes, ma'am.

14   Q.  Certainly, the guns that you looked at today had serial

15   numbers on them?

16   A.  Yes, ma'am.

17   Q.  In your experience you've participated in investigations

18   with firearms that did not have any markings on them?

19             MS. NICHOLAS:  Objection.

20             THE COURT:  I think the question that's being asked --

21   Counsel, correct me if this is not your question -- is that

22   someone just looking at the gun itself as opposed to any of the

23   paperwork or any of the conversations or any other aspect of

24   the purchase, but just looking at the gun itself would not

25   notice anything unusual about it.

1              Is that the question?

2              MS. BAHARANYI:  Your Honor it wasn't but let me

3    rephrase my question perhaps.

4              THE COURT:  All right.

5    Q.  There are guns that you have come across in your

6    investigations that have no markings on them?

7              THE COURT:  Unless I'm missing where you are going, I

8    think that's an improper question.  Sustained.

9    Q.  Agent Gordon, well, let's talk about guns that do have

10   serial numbers like the ones in this case.

11             Agent Gordon, these serial numbers can be removed?

12   A.  Yes, ma'am.

13   Q.  And there are various ways to remove the serial number?

14             MS. NICHOLAS:  Objection.

15             THE COURT:  Sustained.

16             MS. BAHARANYI:  Your Honor, on this we'd like to

17   approach.

18             THE COURT:  All right.

19             (Continued on next page)

20

21

22

23

24

25

1              (side bar)

2              MS. BAHARANYI:  Your Honor, this is their expert on --

3              THE COURT:  I thought where you were going -- that's

4    why I tried to help you out -- was that someone looking at this

5    gun like your client would not from the face of the gun see

6    anything improper.  But instead you want to get into what some

7    hypothetical person in a case, not this case, would infer from

8    seeing a gun that was improper in some respect.  That's

9    irrelevant.

10             MS. BAHARANYI:  Your Honor, in this case mens rea will

11   willfully -- that issue.

12             THE COURT:  No question about it.

13             MS. BAHARANYI:  No question.  And what they are going

14   to say is that he knew he was doing something that the law

15   disallowed that was forbidden.

16             THE COURT:  Don't you want to say -- that's why I put

17   the question the way I did.  I thought based on your opening

18   that, your colleague's opening, that there was nothing to tip

19   off your client that anything was wrong here.  And for example,

20   the gun looked like a standard purchased gun with serial

21   numbers and all like that.  And that's the question I tried to

22   pose for you and that's a question I will allow.  But what

23   would tip off someone that it's improper and what their

24   reactions would be, aside from being grossly beyond this

25   witness's expertise, but assuming it's within her expertise is

N8TAAPER2                        Gordon - Cross

1   irrelevant.

2           MS. BAHARANYI:  She's extremely experienced in

3   firearms which they were --

4           THE COURT:  What is the relevance of asking her if in

5   some hypothetical case there is a gun that doesn't have serial

6   numbers or has the serial numbers removed, what can you infer

7   from that; is that what you want to ask her?

8           MS. BAHARANYI:  Well, if you are unlawfully

9   transporting and receiving firearms, if you are in the business

10  of doing that, you are not going to want to maintain or receive

11  a gun and keep the serial number on.  You are not going to

12  allow that to stay on there.

13          THE COURT:  No, no.  Now you want her to opine on what

14  you consider the primary methodology of crooks.  I don't see

15  any basis for that and I think one can even take judicial

16  notice of the fact that a crook is the aim of many

17  methodologies.  So what I now understand you want to be able to

18  say is that if Mr. Vereen and the defendant, were carrying out

19  this, they would have done other things.  They would have taken

20  out the serial number.  They would have done this, that or the

21  other.  That is all completely irrelevant.

22          MS. BAHARANYI:  I think the jury should be able to

23  know that there are serial numbers that can be removed.

24          THE COURT:  That's already been established.

25          MS. BAHARANYI:  But this is the expert --

N8TAAPER2                        Gordon – Cross

1              THE COURT:  No, no.

2              MS. BAHARANYI:  -- to view this with --

3              THE COURT:  All right.  The objection is sustained.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                (In Open Court)

2    BY MS. BAHARANYI:

3    Q.  Agent Gordon, returning to Government Exhibit, I think we

4    had 520A in front of you.

5    A.  Yes, ma'am.

6                MS. BAHARANYI:  And publish to the jury too.

7                (Pause)

8    Q.  This gun, this firearm has the typical markings you expect

9    on a firearm, right?

10   A.  In conjunction with the previous photograph that you

11   showed, yes, ma'am.

12   Q.  We'll show you that previous photograph as well which is

13   Government Exhibit, I believe 520B.

14               (Pause)

15   Q.  So with the make and model and serial numbers these are the

16   markings and firearms sold by FFLs?

17   A.  Yes, ma'am.

18   Q.  And this is what is required to be on firearms sold by

19   FFLs?

20               MS. NICHOLAS:  Objection.

21               THE COURT:  Sustained.

22   Q.  Agent Gordon, I'd like to turn to your testimony on tracing

23   of firearms.

24   A.  Yes, ma'am.

25   Q.  Now, the ATF relies heavily on firearm markings to be able

N8TAAPER2                        Gordon – Cross

1   to trace a firearm?

2   A.  Yes, ma'am.

3   Q.  This includes a serial number?

4   A.  Yes, ma'am.

5   Q.  The manufacturer?

6   A.  Yes, ma'am.

7   Q.  The model?

8   A.  Yes.

9   Q.  And it is incredibly difficult to trace a firearm without

10  these markings?

11          MS. NICHOLAS:  Objection.

12          THE COURT:  Sustained.

13  Q.  These are the types of markings, in your experience these

14  are the types of markings when a firearm has been illegally

15  purchased?

16          MS. NICHOLAS:  Objection.

17  Q.  These are the types of markings that are on firearms that

18  have been purchased from an FFL?

19  A.  Yes, ma'am.

20          MS. NICHOLAS:  Objection.

21          THE COURT:  Overruled.

22          MS. BAHARANYI:  One moment, your Honor?

23          (Pause)

24          MS. BAHARANYI:  Your Honor, no further questions.

25          THE COURT:  Redirect.

1          MS. NICHOLAS:  Very briefly, urge.

2     REDIRECT EXAMINATION

3     BY MS. NICHOLAS:

4     Q.  Special Agent Gordon, on cross-examination you were briefly

5     asked about lawful gun purchases; do you recall that?

6     A.  Yes, ma'am.

7          MS. NICHOLAS:  Can you publish what's in evidence as

8     Government Exhibit 413.

9          (Pause)

10    Q.  Special Agent Gordon, is there a way to fill out this form

11    legally?  Is there a proper way to fill out this form?

12    A.  Yes, ma'am.

13    Q.  Returning to a question on page two at the very top, can

14    you remind the jury what that bold-ed section is stating?

15    A.  Yes.  It is stating that the answers in Section A are true,

16    correct and complete.  I can also read verbatim if you'd like.

17    Q.  That's sufficient.

18         Special Agent Gordon, if someone is lawfully

19    purchasing a firearm for themselves which box would they check

20    in 11A?

21         MS. BAHARANYI:  Objection, your Honor.

22         THE COURT:  Ground?

23         MS. BAHARANYI:  This agent -- speculation on this.

24         THE COURT:  Well, I'm going to sustain it on the

25    grounds that it's cumulative.

N8TAAPER2                      Gordon - Redirect

1           Sustained.

2                MS. NICHOLAS:  Your Honor, may I have one moment?

3                THE COURT:  Yes.

4                (Pause)

5                MS. NICHOLAS:  Nothing further, your Honor.

6                THE COURT:  Anything else from defense?

7                MS. BAHARANYI:  No, your Honor.

8                THE COURT:  Thank you very much.  You may step down.

9           Please call your next witness.

10               MS. SMYSER:  Your Honor, our next witness is Andy

11     Petersohn, but before he takes the stand we have a stipulation.

12               THE COURT:  Of course.

13               MS. SMYSER:  Your Honor, may we publish Government

14     Exhibit 1002 which is a stipulation between the parties?

15               THE COURT:  Yes.

16               MS. SMYSER:  The parties agree as in Paragraph One of

17     this stipulation that Government Exhibit 801 is a true and

18     correct copy of the record of Block Inc., Block, that was

19     created, kept and maintained by Block as records of the

20     regularly conducted activities at Block.  It was created by

21     persons with knowledge of or created from information

22     transmitted by persons with knowledge of the information shown

23     and was created at or near the time the information became

24     available.

25               Paragraph two:  Government Exhibit 802 is a true and

N8TAAPER2                    Gordon - Redirect

1   correct copy of records of Google LLC that was created, kept

2   and maintained by Google as records of the regularly conducted

3   activities of Google, was created by persons with knowledge of

4   or created from information transmitted by persons with

5   knowledge of, the information shown and was created about the

6   or near the time the information became available.

7         Paragraph three:  Government Exhibit 701 through 721

8   are true and correct copies of records of T-Mobile U.S. Inc.

9   T-Mobile that were created, kept and maintained by T-Mobile as

10   records of the regularly conducted activities of T-Mobile,

11   created by persons with knowledge of or created from

12   information transmitted by persons with knowledge of the

13   information shown and were created at or near the time the

14   information became available.

15         If is further agreed that this stipulation marked as

16   Government Exhibit 1002 and Government Exhibits 801, 802 and

17   701 through 721 are admitted.

18         Your Honor, we would offer Government Exhibits 1002,

19   801, 802 and 701 through 721.

20         THE COURT:  Received.

21         (Government's Exhibits 1002, 801, 802 and 701 - 721

22   received in evidence)

23         MS. SMYSER:  The government calls Andy Petersohn.

24    ANDREW PETERSOHN,

25       called as a witness by the Government,

1            having been duly sworn, testified as follows:

2                 COURTROOM DEPUTY:  Please state your name and spell it

3     slowly for the record.

4                 THE WITNESS:  Andrew Petersohn, P-e-t-e-r-s-o-h-n.

5     BY MS. SMYSER:

6     Q.  Good morning, Mr. Petersohn.

7     A.  Good morning.

8     Q.  Where do you work?

9     A.  DBM Engineering.

10    Q.  What does DBM engineering do?

11    A.  It's a radio frequency design and electromagnetic

12    admissions compliance engineering firm.

13    Q.  What is your role at DBM Engineering?

14    A.  I am the company's founder and its president.

15    Q.  What are some of your duties or responsibilities as founder

16    and president of the company?

17    A.  I handle the day-to-day operations of the business, as well

18    as involvement in all of the design projects and

19    electromagnetic imaging compliance projects that the company

20    undertakes.

21    Q.  How long have you worked for DBM Engineering?

22    A.  Since 2006.

23    Q.  Mr. Petersohn, what is your profession?

24    A.  I'm a radio frequency engineer.

25    Q.  At a high level, what does a radio frequency engineer do?

1    A.  A radio frequency engineer works with the cellular

2    providers.  We identify issues with the cellular providers

3    networks, seek to address those issues either through the

4    construction of new facilities or augmentation of existing

5    wireless facilities.

6    Q.  Does DBM engineering work with the cellular providers that

7    you were mentioning?

8    A.  Yes.

9    Q.  What is some of the examples, kinds of companies that you

10   work with?

11   A.  Our clients include Verizon Wireless, AT&T Mobility,

12   T-Mobile, Dish Network, as well as they're ecosystem

13   subcontractors and tower owners.

14   Q.  I want to shift gears a little bit.  Could you just

15   describe your educational background?

16   A.  Sure.  I have undergraduate and graduate degrees both in

17   electrical engineering both from Lehigh University,

18   specifically, a bachelor of science in electrical engineering,

19   as well as a master of engineering and electrical engineering.

20   Q.  Before working at DBM what did you do?

21   A.  I worked for a handful of companies all in the realm of

22   wireless network design.  Those companies included Bell

23   Atlantic, NYNEX Mobile, which has now become Verizon Wireless.

24   I work directly for Nextell.  They were acquired by Sprint and

25   then subsequently by T-Mobile.  I was also a full-time

1    consultant through a company called Wireless Facilities
2    Incorporated where I worked nine to five in Singular Wireless
3    office in Pennsylvania, Singular Wireless became AT&T Mobile.
4    And I also worked at a few other engagements at smaller
5    companies all in the realm of wireless design.
6    Q.  What were some of the kinds things that you did for these
7    companies?
8    A.  Those companies I mainly worked in the design departments
9    of the cellular providers.  I also worked on the system
10   performance of the networks.
11   Q.  Are there professional registrations for engineers?
12   A.  Yes.
13   Q.  Do you currently hold a license as an engineer?
14   A.  Yes, I do.  I'm a registered professional engineer in New
15   York, as well as a handful of surrounding states.
16   Q.  During your career have you performed cell site analysis?
17   A.  Yes, I have.
18   Q.  I want to talk a little bit about cell site.  What is a
19   cell site?
20   A.  Cell site can take many forms.  What they all have in
21   common are radio equipment that is attached to cellular
22   antennas.  Those antennas are generally located in an elevated
23   position which ensures some live site at surrounding geography.
24   Q.  How do cellphones interact with cell sites?
25   A.  Over a radio frequency channel that is enabled by

N8TAAPER2                    Gordon - Redirect

1    electromagnetic wave.

2    Q.  When do cellphones typically connect to cell sites?

3    A.  Cellphones and cell sites are in constant communication so

4    long as the cellphone is on.  That way the network has a

5    general sense of where its subscribers are.  So if there's a

6    numbering call or text the network can page a limited geography

7    to try to find your device and then when there is a demand for

8    service whether incoming or outgoing there is a fixed wireless

9    channel that's established through communication that's

10   transparent to the user.

11   Q.  Do cellphone companies maintain a record of which cell

12   site's cellphones connect to during a typical interaction like

13   a call?

14   A.  Yes.

15   Q.  How is that data recorded?

16   A.  That data is recorded at or near the time of communication

17   then it is stored at a secure data business.

18   Q.  What are the record rooms cellphone calls called where this

19   information recorded?

20   A.  Call detail record.

21   Q.  Are they sometimes referred to a CDRs for short?

22   A.  Yes.

23   Q.  Do you have experience reviewing CDRs from phone companies?

24   A.  Yes.

25   Q.  Would you just explain how you use CDRs in your cell site

1    analysis?

2    A.   Sure.  CDRs contain lots of information.  They contain the

3    information about the communication between the cellular device

4    and the cellular network including the date and time of the

5    communication and they also include specific information about

6    the cellular facility or cell site that handled that

7    communication.  Oftentimes that includes the location in the

8    form of a latitude and longitude and also specific cell

9    identifiers that the network operator uses to specifically

10   identify its assets.

11   Q.   Could you explain at a basic level what the cell site

12   analysis is?

13   A.   Cell site analysis is the use of the historic call detail

14   records to approximate the location of a device when it

15   interacted with the cellular network.

16   Q.   Does cell site analysis allow you to indicate the exact

17   location of a particular device?

18   A.   No.

19   Q.   How does it compare to say GPS data?

20   A.   It is less refined from GPS data.

21   Q.   You mentioned earlier that cellphones connect to cell sites

22   through radio waves.  What happens to those radio waves when a

23   cellphone is farther away from a cellphone tower?

24   A.   The strength of radio waves will decrease with the distance

25   according to the freeze equation which dictates that decrease

1    is proportional to the distant square.  So it is an exponential

2    decrease in strength and distance.

3    Q.  So in laymen's terms what does that mean?

4    A.  Radio signals in general get weaker very quickly as

5    distance increases from the transmitting device.

6    Q.  Generally, what determines which cell site a cellphone

7    connects to?

8    A.  Generally speaking, the device will connect to the

9    strongest clearest signal that is often but not always the most

10   proximate cell site.

11   Q.  Why does a cellphone connect to the cell site with the

12   strongest clearest signal?

13   A.  The strongest clearest signal is the most efficient way for

14   the network operators to make use of their licensed radio

15   waves.  So as a tenant of radio frequency network design it's

16   imperative this that the device connect to the network asset

17   providing that strongest clearest signal.

18   Q.  Are there factors that can affect the strength of a

19   particular cell site signal?

20   A.  Yes.

21   Q.  What are some of those factors?

22   A.  Any man made or environmental clutter that would be

23   intervening would serve to attenuate that signal.

24   Q.  What happens if there's a big obstacle in the path of a

25   cell site such as a big apartment building, what happens to a

N8TAAPER2                    Gordon - Redirect

1   signal?

2   A.  Well, the signal will decrease depending on the specifics

3   that signal may still reach the user with a tolerable signal

4   strength and quality.  As it reflects or retracts around a

5   large structure but it will certainly decrease its strength.

6   Q.  You said earlier that cellphones usually connect to the

7   closest tower; is that correct?

8   A.  Yes.

9   Q.  Do they always connect to the closest tower?

10  A.  No.

11  Q.  How common is it for cellphones in your experience to

12  correct to the cell sites that are not the closest to them?

13              MS. NICHOLAS:  Objection.

14              THE COURT:  Sustained.

15  Q.  Mr. Petersohn, to which cell site would a cellphone connect

16  in the event that it doesn't connect to the closest cell tower?

17  A.  If the closest tower is not very strong, the strongest

18  clearest signal it could be for a number of reasons in this

19  case, the cellphone will likely connect to one of the next few

20  closest facilities.  Certainly, a facility that is within the

21  first group of surrounding cites with some notable exceptions

22  including sites that may be in a building can serve only in the

23  building area or some cites of smaller design that are

24  intentional designed to serve a smaller area.

25  Q.  In an urban area like the Bronx, how far away is this first

1    group of cell site towers that you are referencing?

2    A.   In an urban area there are usually like the Bronx, so huge

3    cell sites just a every few blocks.  So that first group of

4    surrounding cites may include five or six cites within just two

5    or three blocks.

6    Q.   During the course of your career have you done any testing

7    or analysis to determine which cell sites cellphones typically

8    correct to?

9    A.   Yes, I have.

10   Q.   What kind of testing?

11   A.   I've been involved in many drive tests and walk tests where

12   we utilize special equipment mounted in a vehicle or handheld

13   where we are scanning and also logging call details from

14   multiple devices at a single time as we drive or walk through a

15   geography that date is collected and then analyzed back in an

16   office through some post processing software where we can

17   relive the events of calls and data sessions in time lapse

18   fashion or real time fashion and look at the details of those

19   calls in order to do trouble shooting on a network.

20   Q.   What did you learn from this drive testing and walk testing

21   about the cell sites that phones typically connect to?

22   A.   Typically the phones that we were testing in the network

23   environment we're testing the devices are connecting to the

24   strongest clearest site which is usually the closest site.

25   Q.   Would you ever see an instance in this testing where a

1  cellphone did not connect to those cell towers in those first

2  three or four cell sites?

3           MS. NICHOLAS:  Objection, your Honor.

4           THE COURT:  Let me have the reporter read the question

5  please.

6           (Question read back)

7           THE COURT:  Overruled.  You may answer.

8  A.  No, I didn't ever see that scenario with a notable

9  exception that I made earlier.  If we are talking about cites

10 that may be in building and design to cover a building or let's

11 say subway cites where they there may be cites below that

12 they're covering a subway and we're testing above ground and

13 smaller statue design site is as designed to cover very limited

14 areas.

15 Q.  How many limited of these drive or walk tests that you have

16 conducted?

17 A.  Hundreds.

18 Q.  How many times have you performed cell site analysis?

19 A.  Probably a few dozen times.  At this point maybe 30 or 40.

20 Q.  Generally, in what context are you performing cell site

21 analysis?

22 A.  Usually criminal trials.

23 Q.  In addition to that engineering work that you discussed

24 before do you also offer witness services on a contractual

25 basis?

1    A.  Yes.

2    Q.  Have you testified before?

3    A.  Yes.

4    Q.  Generally, about what topics have you testified?

5    A.  In court proceeding is usually call detail analysis

6    criminal trials also court proceedings in civil matters.  And I

7    also testified frequently in municipal proceedings like zoning

8    hearings, board meetings, planning meetings on topics having to

9    do with site development, site design and radio frequency,

10    admission safety.

11    Q.  Did you ultimately conduct a cell site analysis in this

12    case?

13    A.  Yes.

14    Q.  Did you come to any conclusions?

15    A.  Yes.

16    Q.  You did you have sufficient facts and data to reach those

17    conclusions?

18    A.  Yes.

19    Q.  Did you use the principals and methods relied on upon

20    others in your field?

21    A.  Yes.

22    Q.  Did you recently apply the principals and methods to your

23    work in this case?

24    A.  Yes.

25    Q.  Mr. Petersohn, I want to talk about your work in this case

N8TAAPER2                    Gordon - Redirect

1   next.

2            Were you retained as witness for this case?

3   A.   Yes.

4            MS. BAHARANYI:  Your Honor, sorry to interrupt.  May

5   we approach?

6            THE COURT:  Sure.

7            (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (side bar)

2          MS. BAHARANYI:  To things.  Mr. Lucha needs to use the

3    bathroom.  That is one.

4          And second is that we just want to maintain our

5    objection on the record to this expert testimony.

6          THE COURT:  Okay.  So I think this has already been

7    done but we'll say it one more time.  You have a continuing

8    objection to the testimony of this witness which the Court has

9    overruled for reasons already stated.

10         And why don't we give the jury a 15-minute break at

11   this time.

12         (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

N8TAAPER2                          Gordon – Redirect

1              (In Open Court)

2              THE COURT:  Ladies and gentlemen, counsel are of the

3     view that we should give you your midmorning break right now.

4     I said no way.  We've got to continue.  But they overruled me.

5     So we will give you a 15-minute break right now for your

6     midmorning break and you can continue, and you can go back to

7     the jury room.

8              (Jury not present)

9              THE COURT:  You may step down.  I'll see you in 15

10    minutes.

11             All right.  I'll see you all in 15 minutes.

12             (Recess)

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

N8TBPER3                     Petersohn – Direct

1           THE COURT:  Let's get the witness back on the stand.

2           (Jury present)

3           THE COURT:  Please be seated.  Counsel.

4    BY MS. SMYSER:

5    Q.  Mr. Petersohn, just before the break you were about to

6    start talking about your analysis and work in this case.

7           First I want to ask you, were you retained as a

8    witness in this case?

9    A.  Yes.

10   Q.  Who retained you?

11   A.  U.S. Attorney's office.

12   Q.  Are you being paid for your work and time in this case?

13   A.  Yes.

14   Q.  What is your hourly rate?

15   A.  $285.

16   Q.  At a high level, can you explain what you were asked to do

17   in this case?

18   A.  I was asked to analyze four T-Mobile call detail records.

19   Q.  And conduct a cell site analysis?

20   A.  Yes.

21   Q.  Did you in fact do those things?

22   A.  Yes.

23   Q.  Have you worked with the U.S. Attorney's office on any

24   other occasions?

25   A.  Yes.

N8TBPER3                    Petersohn - Direct

1   Q.  Approximately how many times?

2   A.  Three dozen or so.

3   Q.  Did your engagement with the government on any other

4   occasion in any way influence your analysis of records in this

5   case?

6   A.  No.

7   Q.  I now want to discuss that analysis.

8           Are you familiar with the charges or allegations in

9   this case?

10  A.  No.

11  Q.  Are you familiar with the government's proof aside from the

12  call detail records that you analyzed?

13  A.  No.

14  Q.  I'm going to show you what's in front of you.  There's a

15  disk that contains Government Exhibit 701 through 721 which are

16  already in evidence.

17          Do you recognize this disk?

18  A.  Yes.

19  Q.  Have you reviewed its contents?

20  A.  Yes.

21  Q.  How do you know?

22  A.  I initialed and dated this disk.

23  Q.  What does this disk contain?

24  A.  It contains the call detail records as well as the NDCAC

25  data, which is the data from the National Domestic

N8TBPER3                    Petersohn - Direct

Communications Assistance Center that is a repository for the

T-Mobile network configuration at the time of the records.

Q.  Is this the data that you used to conduct your analysis?

A.  Yes.

Q.  Does this cell site data provide a continuous record of

where these four cell phones were located?

A.  No.

Q.  When is the location of these cell phones recorded in the

CDRs?

A.  The cell phones themselves don't have their location

recorded, only the location of the cellular facility that

served them at any given time of communication.

Q.  So like a call or an SMS message?

A.  Yes.

Q.  Is it possible for a cell phone to be present at a

particular location without that being reflected in the CDRs?

A.  Yes.

Q.  Did you use any software in this case to help conduct your

analysis?

A.  Yes, I used a software package called CellHawk.  It's

manufactured by Hawk Analytics.

Q.  What does CellHawk do at a high level?

A.  It's a software package that digest the call detail records

as well as the NDCAC data which is the network typography for

T-Mobile at the time of the calls.

N8TBPER3                        Petersohn - Direct

1            And then the software allows us to analyze the call

2    detail records in a number of ways, including mapping them,

3    examining call frequencies, accounts between certain numbers.

4    We can also look at the most used cell sites and sectors, so it

5    gives us the ability to examine call detail records quickly and

6    accurately in a number of ways.

7    Q.  Have you prepared any documents that reflect your analysis

8    in this case?

9    A.  Yes.

10   Q.  Mr. Ahuja could you display for the witness only what's

11   been marked for identification as Government Exhibit 901.

12            Mr. Petersohn, do you recognize what's on the screen?

13   A.  Yes.

14   Q.  What is this?

15   A.  It's the cover page to the power point slide deck that I

16   prepared in anticipation of my testimony.

17   Q.  Are the contents of this power point true and accurate

18   copies of the work product that you prepared in this connection

19   with the case?

20   A.  Yes.

21   Q.  Did you review it before testifying today?

22   A.  Yes.

23            MS. SMYSER:  Your Honor, the government offers

24   Government Exhibit 901.

25            MS. BAHARANYI:  Objection, your Honor.

N8TBPER3                        Petersohn - Direct

1              THE COURT:  The exhibit is received.

2              (Government's Exhibit 901 received in evidence)

3              MS. SMYSER:  May we publish?

4              THE COURT:  Yes.

5    BY MS. SMYSER:

6    Q.   Looking at slide one, Mr. Petersohn, what cell phones did

7    you analyze for this report?

8    A.   There were four sets of T-Mobile records that were

9    analyzed.  They were for the numbers ending in 1561, 0166, 4171

10   and 1041.

11   Q.   Have you attributed these cell phone numbers to particular

12   individuals?

13   A.   Yes.

14   Q.   How did you attribute them?

15   A.   I was given the individual's names by the U.S. Attorney's

16   office, and those names and number relationships were

17   corroborated with a Western Union document that I also

18   reviewed.

19   Q.   Who is the user of the number ending in 1561?

20   A.   That is identified as the Steven Perez device.

21   Q.   And how is the device ending in 0166 identified?

22   A.   That's identified as the Keith Vereen device.

23   Q.   What about the device ending in 4171?

24   A.   The Jamil Bey device.

25   Q.   And the 1041?

N8TBPER3                           Petersohn - Direct

1   A.  The Ricardo Rodriguez device.

2   Q.  In this presentation and in your testimony today, are you

3   referring to these devices as the Perez device, Vereen device,

4   Bey device and Rodriguez device respectively?

5   A.  Yes.

6   Q.  Mr. Petersohn, do these numbers have any significance to

7   you?

8   A.  No.

9   Q.  Why did you analyze these particular phone numbers.

10  A.  I was asked to by the U.S. Attorney's office.

11  Q.  Let's turn to the next slide.

12          What is depicted on this slide?

13  A.  This slide depicts cell sites that we would find in

14  suburban and rural areas where we use traditional towers to

15  serve as antenna support platforms.

16  Q.  What is the range or coverage area typically for suburban

17  or rural cell sites like the ones we see here?

18  A.  It can vary depending on specifics, but anywhere from a

19  mile to a few miles.

20  Q.  If we can go to the next slide, Mr. Ahuja.

21          What is depicted here Mr. Petersohn?

22  A.  This slide depicts some typical cellular installations we

23  would find in urban areas like New York City where we

24  predominately use rooftops as antenna support platforms.

25  Q.  Is there a name or terms for these kind of cell sites that

N8TBPER3                        Petersohn - Direct

1    we see here?

2    A.  These and the slide preceding we would term those as macro

3    sites.

4    Q.  Do these sites and the sites in the slide before serve the

5    same function?

6    A.  Yes.

7    Q.  Typically what is a coverage area for a macro cell site in

8    an urban area like the Bronx?

9    A.  Again, it will vary depending on the specifics, but

10   anywhere from a couple of blocks to three blocks, four blocks,

11   five blocks really at most.

12   Q.  Go to the next slide.  What do you see here?

13   A.  This slide gives an example of a rooftop cell site.  This

14   is a satellite view.  This happens to be a site that we will

15   see quite often in the records.  It's located on the corner of

16   Bainbridge Avenue and East Gun Hill Road in the Bronx.

17          We are indicating here the location of the three sets

18   of antennas.  We refer to those as sectors.  Sectors comprise

19   of usually two or three antennas, sometimes four, and they

20   generally point in the same direction.  They're indicated with

21   the yellow arrows.  And as is typical, those sectors of

22   antennas are pushed towards the edge of the rooftop that way

23   they have the best line of site to the surrounding geography.

24   Then there's an equipment platform that's indicated with the

25   gray arrow on the western side of the rooftop.

N8TBPER3                    Petersohn - Direct

Q.  Are these three sectors part of the same cell site?

A.  Yes.

Q.  Could you just explain a little bit more what a sector is and what function it serves?

A.  Usually a cell site is comprised of three sectors of antennas.  Those antennas will point in the same direction.  They're comprised of highly directional antennas, analogous to the way a flashlight mirror is able to direct the light energy and focus it.

        The antenna use a rays inside each of the panel style antennas to focus the electromagnetic energy in a specific direction.  And then the antennas are placed in sectors.  As I said usually two to four antennas in a sector.  They're mounted in a rooftop scenario, usually towards the edge of the roof that way the roof itself does not obstruct their line of sight into the surrounding geography.

        And they point in a very specific direction that we call the azimuth, and we'll discuss that further.

Q.  How does a cell phone determine which sector of a cell site to connect to?

A.  The cell phone is going to connect through the signal that is the strongest and clearest.  The sector that is pointed most towards that cell phone will be the sector that is going to be the one to serve the facility in the likely scenario.

Q.  Can we go to the next slide, please.  What is depicted on

N8TBPER3                        Petersohn - Direct

1    this slide?

2    A.   This slide depicts the same cell site.  It is the T-Mobile

3    cell site at the corner of Bainbridge Avenue and East Gun Hill

4    Road in the Bronx.

5             This is a historic photograph from Google street view

6    from November of 20419, so this is in the timeframe of the

7    records.  You can see the building on the left side of the view

8    here, and the two sectors are visible that are along East Gun

9    Hill Road.  The sector that is most obvious is on the edge of

10   the rooftop closest to the photographer, and it has four

11   antennas that point generally down the East Gun Hill Road

12   corridor which is southeast away from the site.

13            And then there is a second sector that's also called

14   out that is a little bit further away from the photographer

15   that points in the opposite direction along East Gun Hill Road.

16   Q.   You mentioned that this cell site appears frequently in the

17   data that you analyzed, correct?

18   A.   Yes.

19   Q.   Did you look up any other cell sites that appeared in the

20   data?

21   A.   Yes, I did.

22   Q.   How many cell sites?

23   A.   I verified the existence of all of the cell sites in the

24   data to which I refer for specific call interactions.

25   Q.   Why did you do that?

N8TBPER3                         Petersohn - Direct

A.  I did that to verify the existence of the facility in a

historical fashion at or before the time that the communication

was made between the device and the network.

Q.  How did you conduct that verification?

A.  Using Google Street View, there's a historical

functionality in there that let's the user go back in time to

photographs that were taken in the time period of the records.

Q.  Can we go to the next slide, please.  What is depicted

here?

A.  This slide depicts an example of a small cell.  A small

cell site differs from a macro site in that it is a much more

modest installation.

        There is a smaller equipment set that's typically

housed in an equipment shroud that's indicated here about half

way up the structure.  And then atop the light standard there

is a signal omnidirectional antenna.  That antenna has an

antenna pattern that evenly distributes the radio frequency

energy from the site to the surrounding area with a 360 degree

pattern.

        So as opposed to the panel style antennas of a macro

site that are very directional, this omnidirectional antenna

focuses the energy, but does so in a 360 degree fashion.

Q.  Do these small cell sites typically provide coverage inside

of buildings or outdoors?

A.  Their footprint is quite limited.  Typically a thousand

N8TBPER3                        Petersohn - Direct

feet at most of radius in coverage.  And because of their

shorter stature and lower power, they don't penetrate into

buildings very well.  They may cover into some of the homes you

see that are immediately adjacent in this picture, but they are

mostly utilized to provide a outdoor coverage up and down

streets.

Q.  Are there small cell sites like this in the Bronx?

A.  Yes, there are.

Q.  Can we go to the next slide.  What is an azimuth?

A.  An azimuth is the orientation of a sector's antennas with

respect to true north.  In this illustration we're showing an

overly simplified view of a cell site with three sectors.  The

azimuth of those sectors are zero or 12:00 facing.  That is the

red sector.

         The blue sector is 4:00 facing or 120 degrees with

respect to true north, and then the green sector is facing the

8:00 position or 240 degrees with respect to true north.

Q.  How is the azimuth relevant to cell site analysis?

A.  The call detail records often time give us not only the

location of the facility that served a particular call, but

will also give us the azimuth of the antennas.  So if by way of

example we have a call that utilizes the blue 120 degree facing

sector, then it's very likely that the user of that device and

the device itself during the call were on the southeastern side

of the facility because that sector is directing its energy in

N8TBPER3                      Petersohn - Direct

1    the 120-degree direction.

2    Q.  Go to the next slide.  What is this slide showing?

3    A.  This slide is meant to show the viewer exactly how the

4    CellHawk software will display a sector of a facility when it

5    is utilized to connect a call or an SMS text.

6           In this case it is a southeasterly sector with an

7    azimuth of 150 degrees.  The sector has a direction of its

8    transmitted signal in this case that is being illustrated in

9    purple.  The cell location would be at the intersection of the

10   edge defining boundaries of that sector, and that is called out

11   with the cell location box.

12          I've also added a center of sector arrow call out with

13   a box to indicate where the 150 degrees would be in this case,

14   and that is known as the azimuth.  And I've added a note that

15   the shaded area represents only the direction of a sector's

16   transmitted signal.  It does not represent the sector's

17   coverage area, nor does it reflect any device's specific

18   location.  So the shaded area is only meant to show the

19   direction of the energy from that sector, not necessarily its

20   coverage area.

21   Q.  Just to be very clear on that last point, if a cell phone

22   connects to a particular cell site, is it necessarily located

23   within that shaded area that's depicted on the slide?

24   A.  No.

25   Q.  If we can go to the next slide.

N8TBPER3                          Petersohn – Direct

1              Mr. Petersohn, what is the time period of the records

2       that are reflected in this power point?

3       A.   The time period is September 14 of 2020 through November 3

4       of 2020.

5       Q.   Did you also look at location data that span from November

6       3, 2020 through a portion of July 2021?

7       A.   Yes.

8       Q.   We'll address that second portion later.  First I want to

9       focus on September 14, 2020, through November 3, 2020.

10             What is indicated on this slide about that time

11      period?

12      A.   This slide contains information specific to the Keith

13      Vereen device.  We are displaying all of the cell sites that

14      were utilized by the Keith Vereen device in the time period

15      September 14 through November 3 of 2020, on this slide.

16             And I note that there are voice records in the Bronx,

17      New York in four separate time periods.  They include September

18      14 through September 16 of 2020; October 3 through October 5 of

19      2020; October 22 of 2020, and then November 1 through 2 of

20      2020.

21             Additionally, there's a note on the bottom of the

22      slide indicating that 73 percent of the first or last

23      communications of the day for that device, the Keith Vereen

24      device.  Those communications that had location information

25      were on cell sites located in the Myrtle Beach area 73 percent

N8TBPER3                    Petersohn - Direct

1    of the time.

2    Q.  What does that first and last communication analysis mean

3    that's discussed at the bottom of this slide?

4    A.  So that's a functionality that's available on the CellHawk

5    software that allows the user to focus on the first and last

6    communications of the day.  So the last being prior to

7    midnight, and the first being just after midnight along the

8    next day.

9          And in this 51-day period over 102 of those, and at

10   least 75 of those 102 were made through facilities in the

11   Myrtle Beach area.  And based on that, it's my opinion that

12   that device spent much of its time in the Myrtle Beach area,

13   and likely called the Myrtle Beach area home.

14   Q.  Looking at the box in the upper right-hand corner, you

15   walked through four sets of the dates when the Vereen device

16   connected to cell sites in New York.  What, if any, conclusions

17   did you draw from that information?

18   A.  Based on that information, my opinion would be that that

19   device traveled to areas in the Bronx, New York, in those time

20   periods.

21   Q.  Did you analyze the data corresponding to each of those

22   four trips?

23   A.  Yes.

24   Q.  And are each of those trips featured in this presentation?

25   A.  Yes.

N8TBPER3                        Petersohn – Direct

1   Q.  I want to start with the first trip.  If we can go to the

2   next slide, please.

3            What does this slide show, Mr. Petersohn?

4   A.  This slide shows cell locations that were utilized by the

5   Keith Vereen device on September 14 of 2020.  Those connections

6   start at the bottom of the page, and they are numbered in

7   chronological order from one through four.

8            The first is a voice record at 3:27 a.m. in the Myrtle

9   Beach area, then the second another voice record at 7:33 south

10  of Raleigh, North Carolina.

11  Q.  Can we go back, please.

12  A.  Then the third is a voice record just before noon near

13  Fredericksburg, Virginia.  And then this is a voice record in

14  the area of the Bronx at 4:33 p.m.

15  Q.  Do these call out boxes indicate all of the Vereen device's

16  connections to cell sites from the 3:27 a.m. to 4:43 p.m.?

17  A.  No.

18  Q.  What do they indicate?

19  A.  They just indicate four connections that were made in that

20  time period.

21  Q.  What, if any, conclusions can you draw from the information

22  here?

23  A.  I can conclude the Keith Vereen device traveled generally

24  north from the Myrtle Beach to the Bronx area on September 14

25  of 2020.

N8TBPER3                        Petersohn - Direct

1   Q.  If we can turn to the next slide, please.  What location is

2   being shown here?

3   A.  This is the Bronx.

4   Q.  What is the date and time period for the location

5   information that's displayed on the screen?

6   A.  This is September 14, 2020 from 8:10 p.m. to 8:25 p.m.

7   Q.  I want to focus on the location information which is in the

8   top two thirds of this screen.

9           Which devices connected to cell sites in this area in

10  that specific time period on September 14?

11  A.  The Keith Vereen device and the Steven Perez device.

12  Q.  Is the Steven Perez device indicated by the red or magenta

13  color?

14  A.  Yes.

15  Q.  What color is the Keith Vereen device?

16  A.  Green.

17  Q.  Could you walk us through the connections that are

18  indicated with the Steven Perez device?

19  A.  The first connection is at 8:13 p.m., and that's on the

20  bottom right of the exhibit.  That connection was made through

21  a small cell facility.  That facility is located on the

22  northeast side of the Williams Bridge Oval.  And at 8:13 p.m.,

23  there was a call to the Perez device from the Vereen device.

24          Next there is 8:20 voice record recorded for the Perez

25  device that utilized the southeasterly facing sector of

N8TBPER3                          Petersohn - Direct

1    antennas of the facility that we looked at earlier at the

2    corner of East Gun Hill Road and Bainbridge.

3    Q.  What does the location information show about the Keith

4    Vereen device during this time?

5    A.  The call detail record for the Keith Vereen device shows

6    that there are two calls, both processed through the same

7    southeasterly facing set of antennas on the facility that sits

8    atop the roof at East Gun Hill Road and Bainbridge.

9              Those calls were at 8:13 p.m., and that was the call

10   to the Perez device, and then there was another call at 8:21

11   p.m.

12   Q.  Focusing on that cell site in the upper left-hand corner,

13   what kind of cell site is this?

14   A.  That's a macro site.

15   Q.  With different sectors?

16   A.  Yes.

17   Q.  What is the significance of the red shading and the green

18   shading here?

19   A.  The concentric semi-circles, they indicate the use of the

20   southeasterly facing sector.  The only reason for their

21   difference in size is so that the viewer will notice that it's

22   both green and red utilizing that sector.

23   Q.  This indicates that both the Perez device and the Vereen

24   device connected to this particular sector of this particular

25   cell site?

N8TBPER3                         Petersohn - Direct

1   A.  Yes.

2   Q.  I want to address just for a second this small cell site

3   that's indicated to the bottom right.

4            Could you describe that cell site how it's indicated

5   here.

6   A.  Sure.  The small cell is illustrated here with a black dot

7   just on the northeast side of the Williams Bridge Oval.  That

8   is a facility that is very similar in its design to the small

9   cell facility that we saw in the introductory slides.

10  Q.  Can you remind us how the coverage area compares to the

11  small cell site and the macro cell site?

12  A.  A small cell site is going to have a much more modest

13  coverage area due to its lower power and its equipment and the

14  antenna configuration.  Usually the coverage area is limited to

15  less than a thousand feet of radius.

16  Q.  Mr. Petersohn, what, if any, conclusions could you draw

17  from these connections between the Perez device and the Vereen

18  device to particular cell sites here?

19  A.  I can conclude that the two devices were in close proximity

20  to one another in the time period from 8:10 p.m. to 8:25 p.m.

21  on September 14, 2020.

22  Q.  Next I want to draw your attention to this log at the

23  bottom left-hand side of the screen.

24            What kind of information does that contain?

25  A.  That log contains call record information for the Keith

N8TBPER3                         Petersohn - Direct

1    Vereen device, the Steven Perez device and the Jamil Bey

2    device.

3    Q.   What color is associated with the Jamil Bey device?

4    A.   That's yellow.

5    Q.   Is the Perez device still red?

6    A.   Yes.

7    Q.   Is the Vereen device still green?

8    A.   Yes.

9    Q.   Could you please walk the jury through each of these

10   locations that are in the log?

11   A.   The first two communications are listed as a null call

12   duration and another call type.  They're indicated as being

13   initiated by the Steven Perez device to the Jamil Bey device at

14   10:52 a.m. on September 14.

15           They may have been call hang up.  I'm unsure of the

16   exact nature of those communications.  Then there is a 6:07

17   p.m. call from the Perez device to the Vereen device.  That was

18   a voice call of 46 seconds.  And then later that evening there

19   is a call from the Vereen device to the Perez device that was

20   at 8:13 p.m. for 15 seconds.

21   Q.   Would messages on apps like WhatsApp or Signal for example

22   show up in the CDRs that you analyzed?

23   A.   No.

24   Q.   Is it generally just calls and SMS messages?

25   A.   Yes.

N8TBPER3                        Petersohn - Direct

1   Q.  Is that what your cell site analysis is based on?

2   A.  Yes.

3   Q.  Speaking just for a moment about the Jamil Bey device.

4           Have you reviewed Bey's communication from September

5   to November 2020 that are in the CDRs?

6   A.  Yes.

7   Q.  Does Bey have other instances of communication with the

8   Perez device?

9   A.  Yes.

10  Q.  Does Bey's device ever contact the Vereen device?

11  A.  No.

12  Q.  Does the Vereen device ever contact Bey?

13  A.  No.

14  Q.  Can we turn to the next slide.

15          What kind of information is contained in this slide?

16  A.  This is a call log of voice and SMS communications.  The

17  devices involved are the Rodriguez device and the Vereen device

18  as well as the Rodriguez device and the Perez device.

19  Q.  What date do these communications occur on?

20  A.  September 14, 2020.

21  Q.  The same day as the location information we just looked at?

22  A.  Yes.

23  Q.  Could you please walk us through the communications that

24  are in this log?

25  A.  Sure.  There is first a call, a call from the Perez device

N8TBPER3                          Petersohn - Direct

to the Rodriguez device at 11:02 a.m. that is forwarded to

voicemail.  That is represented by the first two lines.  In the

first line we see the actual call, and then the second we see

the forwarding to voicemail and that's evident by the number

360-842-9999 which is a known T-Mobile voicemail box number.

          Next there is a call at 11:07 a.m. that is from the

Vereen device to the Rodriguez device to voice call.  It last

40 seconds.

          Next there is another instance of forwarding to

voicemail of a call from the Perez device to the Rodriguez

device.  That's at 11:17 a.m.  Next there is a text from the

Rodriguez device to the Steven Perez device.  That is at 11:19

a.m. Then we have a call from the Perez device to the Rodriguez

device of one minute and three seconds.  That's at 11:20 a.m.

Then there is a text from the Perez device to the Rodriguez

device.  That's at 11:28 a.m.

Q.  Go to the next slide, please.  What kind of information is

contained here?

A.  This is a call log from September 15, 2020, between the

Vereen device and Perez device?

Q.  How does the date of these calls compare to the location

data and the calls that we just looked at?

A.  That's the next day.

Q.  How many communications were there between the Vereen phone

and the Perez phone on September 15?

N8TBPER3                        Petersohn - Direct

A.  There were six that are detailed in these seven lines, the

first two lines being one communication forwarded to voicemail.

Q.  Were they both calling each other during this time period?

A.  Yes.

Q.  You can go to the next slide.  I want to start again with

the location information at the top of the screen.  What time

period does this location information cover?

A.  This is September 16 of 2020 between 5:30 p.m. and 6:30

p.m.

Q.  What phones have location data that's depicted on this

slide?

A.  The Vereen device, Perez device, Bey device and Rodriguez

device.

Q.  In the two days since we last reviewed location data, the

last date was September 14.  This date is September 16.  Could

you tell generally where the Vereen device was in that time

period?

A.  Yes, it was in the area of the Bronx, New York.  I think

there were some north jersey activity.

Q.  I just want to walk through the location data for each of

these devices.

        What is the location data slide show for the Bey

device?

A.  The location data show use of the same southeasterly facing

set of antennas on the facility at the corner of East Gun Hill

N8TBPER3                          Petersohn – Direct

Road and Bainbridge.  There's a voice record that indicates

that usage at 5:36 p.m. on September 16, 2020.

Q.   What about for the Vereen and Rodriguez devices?

A.   Both of those devices utilize the small cell facility that

was discussed earlier on the northeast side of the Williams

Bridge Oval.

          The Vereen device utilizes that facility four times

between 6:01 and 6:17 p.m. on September 16, and the Rodriguez

device utilizes that facility once at 6:12 p.m.

Q.   What about for the Perez device?

A.   There are two voice records for the Perez device that

utilizes a macro site on the south end of the exhibit.  Those

records reflect that the westerly facing sector was utilized

twice, once at 6:04 and once more at 6:13 p.m.

Q.   What the blue dot in the center of the screen for 3318

Perry Avenue, do you see that?

A.   Yes.

Q.   Why is that there?

A.   I was asked to indicate that address by the U.S. Attorney's

office.

Q.   Could that location be served by the macro cell site that

the Perez device is connecting to?

A.   Yes, it could.

Q.   What, if any, conclusions can you draw from the totality of

this location information that's on the screen?

N8TBPER3                          Petersohn – Direct

1    A.  I can conclude that these four devices were in somewhat

2    close proximity in the timeframe between 5:30 and 6:30 p.m. on

3    September 16, 2020.

4    Q.  I now want to direct your attention to the table at the

5    bottom left of the screen.  What is contained in this table?

6    A.  That table contained voice records for the Vereen and Perez

7    devices on September 16.

8    Q.  How many communications are there here?

9    A.  There are two, one that's forwarded to voicemail and then

10   the second.

11   Q.  What time did these occur?

12   A.  These occur at 2:38 p.m.

13   Q.  How does that timing compare with the timing of the

14   location data that we have for the same day?

15   A.  It's a few hours prior.

16   Q.  Can we turn to the next slide, please.

17            What kind of information is depicted here?

18   A.  This is call log information for the Rodriguez, Vereen,

19   Perez and Bey devices.

20   Q.  For which day?

21   A.  September 16, 2020.

22   Q.  The same day we just looked at location data for?

23   A.  Yes.

24   Q.  Who is the first communication of this log between?

25   A.  The first is between the Rodriguez and Vereen device.

N8TBPER3                        Petersohn – Direct

1    Q.  Who are the next 14 rows, all but the last row, who is

2    communicating in those rows?

3    A.  Rodriguez device and the Perez device.

4    Q.  What about the last communication?

5    A.  That communication is between the Rodriguez and Bey

6    devices.

7    Q.  You can turn to the next slide.

8          What information is depicted on this slide,

9    Mr. Petersohn?

10   A.  This slide depicts cell sites utilized by the Vereen device

11   on September 17, 2020.

12   Q.  What does the location data here show?

13   A.  It shows generally south travel from a location south of

14   Richmond, Virginia to the Myrtle Beach area between 8:43 a.m.

15   and 3:02 p.m.

16   Q.  What conclusion did you draw from this information?

17   A.  That the Vereen device traveled south on September 17, and

18   arrived in the Myrtle Beach area sometime at or about 3:02 p.m.

19   Q.  Can you go to the next slide.

20          What information is depicted here?

21   A.  This is a call log from September 21, 2020, between the

22   Vereen and Perez devices.

23   Q.  And how does the timing of these compare to the location

24   data we just looked at?

25   A.  It's four days after.

N8TBPER3                          Petersohn - Direct

Q.   Approximately how many communications are there between the
Vereen and Perez devices on September 21?

A.   Six.

Q.   Were there any communications between the Vereen and Perez
devices for the time period of September 17 through the log
shown here on September 21?

A.   No.

Q.   You can go to the next slide.

        What does this slide show?

A.   This slide shows general northerly travel by the Keith
Vereen device between October 2nd of 2020, and October 3rd of
2020, between the Myrtle Beach area and the Bronx, New York.

Q.   What conclusions did you draw from that location
information?

A.   That the Keith Vereen device traveled north from the Myrtle
Beach to the Bronx area between 2:34 p.m. on October 2, 2020
and arriving in the Bronx area sometime prior to 2:12 a.m. on
October 3 of 2020.

Q.   Looking at the call log at the bottom right-hand side of
the screen, what does that contain?

A.   That call log contains call detail between the Jamil Bey
device and the Steven Perez device.

Q.   When are those communications occurring?

A.   Those are occurring at 6:05 p.m. and 7:38 p.m. on October
2nd.

N8TBPER3                    Petersohn - Direct

1   Q.  So when the Vereen device is traveling northward?

2   A.  Yes, in that timeframe.

3   Q.  If you can turn to the next slide.

4           When is the location data, when does it occur that's

5   featured on this slide?

6   A.  This location data occurs on October 3 of 2020 at about 3

7   in the morning.

8   Q.  And which devices are featured here?

9   A.  The Keith Vereen and the Steven Perez device.

10  Q.  Could you walk us through the location data for Mr. Perez?

11  A.  Yes.  There is a voice record of a call from the Vereen

12  device at 3 a.m. processed by the same small cell site on the

13  northeast side of the Williams Bridge Oval.

14          And then there is a voice record processed by a

15  different small cell site on the southeast side of the Williams

16  Bridge Oval at 3:01 a.m.

17  Q.  And what about for the Vereen device?

18  A.  There is a voice record processed by the small cell

19  facility, the same one on the southeast side of the Williams

20  Bridge Oval.  That is a 3 a.m. call, and that was the call to

21  the Perez device.

22  Q.  So around that time the Vereen device and the Perez device

23  were connecting to the same small cell facility?

24  A.  Yes.

25  Q.  What conclusions could you draw from this information?

N8TBPER3                    Petersohn – Direct

1    A.   That those devices were in very close proximity around 3

2    a.m.

3    Q.   Mr. Petersohn, could these cell site serve 3318 Perry

4    Avenue?

5    A.   They could, yes.

6    Q.   Did Vereen and Perez have any other communications on

7    October 3?

8    A.   Yes, they did.

9    Q.   Could you walk us through those communications.

10   A.   Yes.  There are a number of communications in the table on

11   the bottom of this page.  There is an incoming call.  The call

12   was placed from the Vereen device to the Perez device, lasted

13   23 seconds.  That was at 2:31 a.m. on October 3rd.

14        And then there is the 3 a.m. call, the calling number

15   is the Vereen device calls the Perez device and it's forwarded

16   to voicemail.  And again that same pattern of a call from

17   Vereen device to the Perez device is forwarded to voicemail.

18   Both of those are at 3 a.m. One at 3 a.m. and seven seconds,

19   one at 3 a.m. and 12 seconds.

20        And then there is a text from the Perez device to the

21   Vereen device.  That happens at 3:28 a.m. And finally in the

22   evening of that same day there is a voice call from the Perez

23   device to the Vereen device at 6:43 p.m.

24   Q.   Can we turn to the next slide.

25        What is shown on this slide?

N8TBPER3                          Petersohn – Direct

1    A.  This slide shows mapped call detail record information for

2    the Vereen, Perez, Bey and Rodriguez devices on October 4,

3    2020, between 9 and 11 p.m.

4    Q.  For what phones?

5    A.  The Vereen, Perez, Bey and Rodriguez devices.

6    Q.  Could you walk through the location data for the Perez, Bey

7    and Vereen devices?

8    A.  Sure. First we see there are three voice records processed

9    by the same southeasterly facing set of antennas of the

10   facility at the intersection of Gun Hill Road and Bainbridge.

11   That set of antennas processes calls for the Perez device at

12   9:20, 10:46 and 10:47 p.m.

13        That set of antennas also processes calls for the

14   Keith Vereen device at 9:57 and 10:25 p.m., and then it also

15   processes nine voice records for the Jamil Bey device between

16   9:04 and 9:55 p.m.

17        And then further east there is the use of a small cell

18   facility that.  Small cell facility processes seven voice

19   records between 9:48 and 10:48 p.m. for the Rodriguez device.

20   Q.  So in this hour and change timeframe, do the Perez, Bey and

21   Vereen devices connect to the same cell site?

22   A.  Yes.

23   Q.  Could this macro cell site on Bainbridge and East Gun Hill,

24   would that serve 3318 Perry Avenue?

25   A.  It could, but it would be very unlikely.

N8TBPER3                         Petersohn - Direct

1    Q.   Why do you say that?

2    A.   There are a number of sites closer to 3318 Perry Avenue,

3    including the small cell sites that we were looking at.

4    There's also a macro cell site that's much closer.  It's about

5    700 feet away.  It's to the southeast of 3318 Perry Avenue,

6    whereas the facility at East Gun Hill Road and Bainbridge is

7    about 1500 feet away, so about twice the distance away.

8    Q.   What conclusions did you draw from the location data on

9    this slide?

10   A.   I conclude that these devices, the Vereen, Perez, Bey and

11   Rodriguez device were all in close proximity in the time period

12   of 9 to 11 p.m. on October 4.

13   Q.   Can we turn to the next slide, please.

14        What kind of information is displayed in this slide?

15   A.   This is another view of the voice and SMS communication

16   between the Vereen, Perez and Bey devices from October 2 to

17   October 3rd of 2020.

18        In this view the calls and SMS text are given with

19   directional arrows to show who is initiating and who is

20   receiving the communication, and they're displayed

21   chronologically from top to bottom.

22   Q.   So each arrow here indicates a communication?

23   A.   Yes.

24   Q.   What is the device on the left side of the screen?

25   A.   The farthest left is the Perez device in red.

N8TBPER3                          Petersohn - Direct

1    Q.   What about the yellow device in the middle?

2    A.   That's the Bey device.

3    Q.   What about the device on the right-hand side of the screen?

4    A.   That is the Vereen device in green.

5    Q.   Could you walk us briefly through the communications

6    between these cell phones on this day?

7    A.   This shows the communication from the Bey to the Perez

8    device on October 2nd at roughly 6 p.m., and a communication in

9    the other direction from the Perez to Bey device sometime

10   between 7 and 8 p.m. on October 2nd.

11         And then there are two communications on October 3rd,

12   2020, before 3 a.m. from the Vereen device to the Perez device

13   indicated by the two arrows there, and then communication in

14   the other direction after 3 a.m. from the Perez device to the

15   Vereen device.  And then sometime between 6 and 7 p.m., a

16   communication from the Perez device to the Vereen device.

17   Q.   Those the same communications that we reviewed in the

18   location data?

19   A.   Yes.

20   Q.   Can we turn to the next slide.

21         What does this slide show?

22   A.   This slide shows cell site locations that were utilized by

23   the Keith Vereen device October 5, 2020 through October 6,

24   2020.

25   Q.   And what do the top and bottom boxes indicate here?

N8TBPER3                         Petersohn - Direct

A.  Indicate that that device traveled generally south between

7:11 p.m. on October 5, and 10:12 a.m. on October 6, from the

area of Northern New Jersey to the Myrtle Beach Area.

Q.  Can we go to the next slide.

          Does the Vereen device ever return to New York?

A.  Yes.

Q.  And what does this slide show?

A.  This slide shows generally north travel of the Vereen

device on October 21, 2020 through October 22, 2020.

Q.  When is the first connection and the last connection on

this slide?

A.  The first is a 9:24 p.m. connection in the Myrtle Beach

area on 10/21/2020, and then the last is a 10:35 a.m.

connection in the area of the Bronx on 10/22/2020.

          (Continued on next page)

BY MS. SMYSER:

Q.  Could we turn to the next slide.  What kind of location
information is depicted here?

A.  This slide depicts location information for the Vereen and
Perez devices on October 22nd between 2:30 and 4:50 p.m.

Q.  What does the location data show for the Perez device?

A.  Shows that that device utilized the same south easterly
facing set of antennas of the facility corner of Gun Hill Road
and Bainbridge.  That facility processed six voice records for
the Perez twice between 2:55 and 4:49 p.m.  The records also
indicate that small cell few blocks east was utilized to
process a voice record for the Perez device at 4:31 p.m.

Q.  This small cell that the Perez device connected to at 4:31
p.m. to that 3318 Perry Avenue?

A.  Highly unlikely.

Q.  And why?

A.  It's significantly distant from the 3318 Perry Avenue
address where the small cell would not likely serve that
distance.

Q.  What is the location information for the Vereen device
show.

A.  The Vereen device shows voice record processed by the same
set of south easterly facing antennas on the facility that is
located on the rooftop of the building at Bainbridge and East
Gun Hill Road with that set of antennas processing two voice

1    records, one at 3:40 and another at 4:44 p.m. on October 22nd.

2    Q.   What conclusions could you draw from this?

3    A.   I conclude that these devices, the Vereen device and Perez

4    device were in close proximity to one another during the time

5    period 2:30 p.m. to 4:50 p.m. on October 2.

6              MS. SMYSER:   Could we go to the next slide.

7              (Pause)

8    Q.   What is shown in this slide, Mr. Petersohn?

9    A.   This slide shows generally southerly travel by the Keith

10   Vereen device between October 22 and October 23, 2020, leaving

11   the Bronx area at roughly 7:23 p.m. on October 22nd and

12   arriving into the Myrtle Beach area at some time before 11 a.m.

13   on October 23, 2020.  And then there is a call out box labeled

14   "five" that illustrates there was a record in the call detail

15   records indicating a call to the Steven Perez device later that

16   evening of October 23, 2020 at 7:22 p.m.

17             MS. SMYSER:   Could we go to the next slide please.

18             (Pause)

19   Q.   Does the Vereen device return to New York?

20   A.   Yes.

21   Q.   When?

22   A.   It returns on November 1st of 2020.

23   Q.   And when does it arrive?

24   A.   At some time prior to 10:45 a.m. on November 1st.

25             MS. SMYSER:   Could we turn to the next slide.

1        (Pause)

2    Q.   What the time period covered by the location data here?

3    A.   This is November 1, 2020 from 1:30 p.m. to 10:15 p.m.

4    Q.   What does the location data show for the Vereen device

5    during this time period?

6    A.   The location data shows that the Vereen device utilized the

7    same set of southerly facing antennas on the facility at

8    Bainbridge and East Gun Hill Road.  That facility processed

9    calls at 1:35 p.m., 9:54 p.m. and 9:55 p.m. for the Vereen

10   device.

11   Q.   What about for the Perez device?

12   A.   The record for the Perez device show use for the same

13   certain set of antennas at Bainbridge and East Gun Hill Road.

14   There are multiple instances of voice records processed by

15   those antennas.  There were eight between 2:24 p.m. and 10:10

16   p.m.  Those files are listed in the call out box on the far

17   left.  Then there are instances of use of small cell facilities

18   in the area by the Perez device, one at 2:26 p.m. on a small

19   cell site immediately southeast of the macro site that we

20   discussed that's call out with the second call out box.  From

21   the top left.  Then there's a third call out box below that

22   indicating use of the small cell site on the northeast side of

23   the Williams Bridge over the Perez device at 5:43 and 5:45 p.m.

24   There's also use of small cell site a few blocks east by the

25   Perez device at 1:44 p.m.

1  Q.  Would these small cell sites serve 3318 Perry?

2  A.  With the exception of maybe the facility on the north

3  eastern side of the Williams Bridge oval, I'd said no.  Even

4  for that facility to do so would be a bit of a stretch just due

5  to how that facility is oriented with respect to the address.

6  Q.  Circling back to that macro cell site in the upper left

7  hand portion.  On multiple times on this afternoon/evening, the

8  Vereen device and Perez device connected to the same sector?

9  A.  Yes.

10  Q.  What conclusions can you draw from this data?

11  A.  I conclude that at certain points in time period 1:30 p.m.

12  to 10:15 p.m. the Vereen and Perez devices were in close

13  proximity to one another.

14          MS. SMYSER:  Turn to the next slide.

15          (Pause)

16  Q.  What location information is shown here?

17  A.  This is location information for the Keith Vereen device

18  November 2nd through November 3rd, 2020.

19  Q.  What does that location show?

20  A.  Shows that that device traveled south leaving the area of

21  the Bronx sometime after 7:07 p.m. on November 2nd and arriving

22  in the area of Myrtle Beach at some point before 9:11 a.m. on

23  November 3rd.

24  Q.  The call log on the bottom right, what information does

25  that contain?

1  A.  That shows call records between the Jamil Bey and Steven

2  Perez devices on November 3rd.

3       MS. SMYSER:  You can turn to the next slide.

4       (Pause)

5  Q.  What kind of information specific is listed here?

6  A.  This shows information for the Jamil Bey device.

7  Specifically, this is the most frequently utilized cellular

8  facility information for that device in the time period for

9  November 14, 2020 through November 3rd of 2020.

10 Q.  What does the box on the left-hand side indicate?

11 A.  That's similar to the information that we saw in a prior

12 slide that indicates greater than 59 percent of the first

13 communications of the day that had location information or last

14 communications of each day in that time period.  Utilized the

15 south easterly facing antenna set of the facility at East Gun

16 Hill Road and Bainbridge.

17 Q.  What about the box on the right?

18 A.  That shows that greater than 65 percent of all

19 communications in that time period that had location

20 information were processed by the south easterly facing set of

21 antennas facility at Bainbridge and East Gun Hill Road.

22 Q.  There's a marker here for 236 East Gun Hill Road; do you

23 see that?

24 A.  Yes.

25 Q.  Why is that there?

N8TAAPER4                    Petersohn - Direct

1    A.  I was asked to indicate that address by the U.S. Attorney's

2    Office.

3    Q.  Does this sector of the macro cell site depicted here

4    appears to serve East 33 Gun Hill Road?

5    A.  In my opinion it would.

6    Q.  What conclusion, if any, would you draw from this data?

7    A.  I conclude that the Jamil Bey spent, Jamil Bey device spent

8    a good amount of time in this time period in the coverage

9    footprint of the south easterly facing set of antennas of the

10   facility at the corner of Gun Hill Road and Bainbridge.

11             MS. SMYSER:  Could we turn to the next slide.

12             (Pause)

13   Q.  What does this slide show?

14   A.  This slide shows communication counts between the Rodriguez

15   and Vereen device the Rodriguez and Perez device and the

16   Rodriguez and Bey device in the time period, September 14

17   through November 3, 2020.

18   Q.  How many communications were there between Rodriguez and

19   Vereen during that time period?

20   A.  There were two.

21   Q.  What about Rodriguez and Bey?

22   A.  There were at least 63.

23   Q.  And Rodriguez and Perez?

24   A.  There were at least 195.

25   Q.  What does the chart say at least?

1  A.  Depending on the perspective of the call records, let's say

2  for instance that the Perez device called the Rodriguez device

3  and then quickly hung up so it didn't register in the other

4  record as an incoming call.  Then that would inflate the number

5  on the Perez device records and not show up on the Rodriguez

6  device records.  So what I did was I looked at the calls from

7  both perspectives and then reported the fewer number of calls.

8  Q.  Does this communication count include the forward to voice

9  mail that we looked at earlier?

10  A.  Yes, it would.

11          MS. SMYSER:  Turn to the next slide.

12          (Pause)

13  Q.  What information is shown here?

14  A.  These are communication counts between the Perez and Vereen

15  device, Perez and Bey device and Vereen and Bey device for that

16  same time period, November 14, through November 3, 2020.

17  Q.  How many communications were there approximately between

18  Perez and Vereen device during this time period?

19  A.  At least 22.

20  Q.  What about between the Perez device and Bey device?

21  A.  At least 48.

22  Q.  Finally, between the Vereen device and the Bey device?

23  A.  There were zero.

24  Q.  Mr. Petersohn, did you review cell site information that

25  spans farther than November 3, 2020?

N8TAAPER4                    Petersohn – Direct

1    A.  Yes.

2    Q.  How far did that time period span?

3    A.  Into July of 2021.

4    Q.  Did the Vereen device make any additional trips to New York

5    after November 3, 2020?

6    A.  None that were indicated in the call detail records.

7              MS. SMYSER:  May I have just a moment, your Honor?

8              THE COURT:  Yep.

9              (Pause)

10             MS. SMYSER:  No further questions.

11             THE COURT:  Cross-examination?

12             MS. BAHARANYI:  Yes, your Honor, I do have

13   cross-examination.  I would ask for a very brief break maybe to

14   allow the jury to stretch their legs and also for defense

15   counsel needs as well, approximately, two minutes?

16             THE COURT:  Well, I'm happy to oblige.  I think

17   realistically we should make it five minutes.  So why don't we

18   take a five-minute break at this time.  We are still going to

19   take our lunch break around one o'clock but let's take a

20   five-minute brake.

21             MS. BAHARANYI:  Thank you, your Honor.

22             (Jury not present)

23             (side bar)

24             MS. BAHARANYI:  We're is having some bladder issues on

25   the defense side.

1           THE COURT:  With your client I inferred that.  All

2    right.  I think while you've handled it very well, I think this

3    afternoon if we have to take more than one break we will just,

4    I think the easiest way to handle this is just ask for a side

5    bar and then give me a heads up and I'll accommodate that

6    request.

7           MS. BAHARANYI:  Will do.  Thank you.

8           (Recess)

9           THE COURT:  Let's bring in the jury.

10          (Jury present)

11          THE COURT:  Please be seated.

12          Okay.  Cross-examination?

13          MS. BAHARANYI:  Yes, your Honor.

14   CROSS-EXAMINATION

15   BY MS. BAHARANYI:

16   Q.  Good afternoon, Mr. Petersohn.

17   A.  Good afternoon.

18   Q.  Let's go back to call detail records.  So call detail

19   records show you what number might have been used to make a

20   phone call?

21   A.  Yes.

22   Q.  What number was used, what number was dialed to make the

23   phone call as well?

24   A.  Yes.

25   Q.  The time of a particular call?

1   A.  Yes.

2   Q.  And it can show you whether that call went through as well?

3   A.  Yes.

4   Q.  Or if a call went to voice mail?

5   A.  Correct.

6   Q.  These call detail records don't contain the substance of

7   the call?

8   A.  No, they don't.

9   Q.  There are no recordings of the phone call?

10  A.  Correct.

11  Q.  And in reviewing those records you can't learn what one

12  cellphone user said to another?

13  A.  Correct.

14  Q.  It's the same for text messages as to --

15  A.  Correct.

16  Q.  So these call detail records don't contain any recordings

17  of what's typed or written inside of SMS messages?

18  A.  Correct.

19  Q.  You testified that call detail records contain certain

20  information about cell site location?

21  A.  Yes.

22  Q.  Specifically, what cell site location globally was used to

23  make a phone call or send a message?

24  A.  I don't think I understand the question.

25  Q.  Let me reword that.  You testified about what cell site

N8TAAPER4                    Petersohn – Cross

1   location might have been used to send a phone call?

2   A.  I testified that the records will contain the specific

3   identifiers for the cell site used to process calls.

4   Q.  So to break it down a bit, in the call detail records

5   there's a notation for every call, for a call that's made about

6   what location, what tower was used to make a phone call?

7   A.  Yes.

8   Q.  And what sector on this tower or cell site might have been

9   used to make that phone call?

10  A.  Not always, but oftentimes the sector information is also

11  given.

12  Q.  Certainly, the cell site tower location information would

13  be there on the call detail record?

14  A.  Not always but oftentimes, yes.

15  Q.  So, for those times in which -- withdrawn.

16          For the call detail records that we have been speaking

17  about, these are records created by cellular companies?

18  A.  Yes.

19  Q.  You don't have any role in creating these call detail

20  record?

21  A.  No, I don't.

22  Q.  As we've established, you don't work for a cellular company

23  right now?

24  A.  Correct.

25  Q.  And the call detail records are established for the purpose

1    of billing, right?

2    A.   That's their main purpose, yes.

3    Q.   Their main purpose is to provide billing information to

4    customers, right?

5    A.   Correct.

6    Q.   They are not created or call detail records are not created

7    for the purpose of providing the location of cellphone users?

8    A.   No, not the users.

9    Q.   And in fact, in call detail records there's no recording of

10   a cellphone user's device location?

11   A.   That's correct.

12   Q.   You testified about GPS data on direct briefly?

13   A.   Yes.

14   Q.   GPS data global positioning system data, correct?

15   A.   Yes.

16   Q.   And these call detail records don't contain any GPS data,

17   right?

18   A.   Correct.

19   Q.   And GPS data would provide a phone's precise location?

20   A.   Precise to a certain granularity but more precise than call

21   detail records.

22   Q.   Certainly, more precise than the location information from

23   that we were able to receive from a call detail record, right?

24   A.   Yes.

25   Q.   And from your review of the cell site location information

N8TAAPER4                    Petersohn - Cross

1    in these call derail records you're not able to pinpoint a

2    device's precise location, right?

3    A.   Correct.

4    Q.   It is your testimony that you can -- withdrawn.

5            You testified on direct about which cellphone cell

6    site location or which cell site towers a phone might connect

7    to, right?

8    A.   Yes.

9    Q.   And you testified that to use a cellular network as in to

10   make a phone call or send an SMS, a phone device will typically

11   connect to a tower with the strongest signal?

12   A.   Yes.

13   Q.   And the tower with a clearest signal?

14   A.   Correct.

15   Q.   And this is not always the closest tower to a particular

16   device?

17   A.   That's right.

18   Q.   I want to go into some of the reasons why a cellphone might

19   not connect to the closest tower.  So you testified a bit about

20   environmental clutter, right?  Environmental clutter are

21   different types of structures that might be around a cell site

22   tower, right?

23   A.   Usually, would refer to tree foliage.

24   Q.   So, tree foliage can affect a cellphone's connection to a

25   tower?

1    A.  It could, yes.

2    Q.  Even something like a large truck, semi truck in the area

3    can affect a phone's connection to a particular tower?

4    A.  Yes.  I would say it's man made clutter.

5    Q.  So if there are a couple of categories of clutter that can

6    interfere with a cellphone's connection to a tower, right?

7    A.  Yes.

8    Q.  I believe you testified that whether a phone is used in a

9    subway or under ground or above ground can also affect a

10   phone's connection to a particular tower?

11   A.  It could.

12   Q.  And certain obstructions like what we have been discussing

13   have the ability to block a cellphone from connecting to the

14   closest tower?

15   A.  Yes.

16   Q.  Mr. Petersohn, based off of the call detail records that

17   you've reviewed you don't have the ability to say whether two

18   phones that connect to the same tower are in the same location?

19   A.  No, I can't say if they're in the exact same location.

20   Q.  With some of that background, let's turn to your work in

21   this particular case.  Now, you were asked to review some data

22   on behalf of the prosecutor's office?

23   A.  Yes.

24   Q.  And this is not specifically the prosecutor sitting at this

25   table here?

N8TAAPER4                         Petersohn - Cross

```
1    A.   Correct.
2    Q.   This is not your first time working with the United Stated
3    States Attorney's Office for the Southern District of New York,
4    right?
5    A.   That's correct.
6    Q.   In fact, you've testified I believe three dozen times for
7    this particular prosecutor's office?
8    A.   I think the number of testimony occurrences is probably
9    more like half of that.  I have been involved in call detail
10   record analysis for probably close to three thousand now.
11   Q.   When you say been involved in call detail record analysis,
12   that's work you've done for the prosecutor's office?
13   A.   Yes.
14   Q.   And you're not employed by the Southern District of New
15   York, the U.S. Attorney's Office?
16   A.   Only on a contractual basis.
17   Q.   You are employed, you're self-employed.  You run your own
18   business, correct?
19   A.   Correct.
20   Q.   DBM Engineering?
21   A.   Yes.
22   Q.   And DBM Engineering provides certain consultation services,
23   correct?
24   A.   Yes.
25   Q.   And these consultation services are provided to other
```

N8TAAPER4                          Petersohn - Cross

1    organizations or entities, right?

2    A.  Yes.

3    Q.  And you provide these services for pay?

4    A.  Yes.

5    Q.  And in fact, you have been paid by the prosecutor's office

6    for your services in connection to this case?

7    A.  No.  I haven't billed for this case at all yet.

8    Q.  You're expecting to be paid by the prosecutor's office in

9    connection to your testimony in this case?

10   A.  Yeah.

11   Q.  Let's talk about what you expect to be paid.  In this

12   particular case for testifying today you'll be paid almost four

13   thousand dollars, right?

14   A.  Yes.

15   Q.  And in this case for your other work that doesn't include

16   your testimony today you'll be paid some additional amount of

17   money, right?

18   A.  Yes.

19   Q.  I believe that's in the range of $5,700, right?

20   A.  I'll have to take a look at the hours when all is said and

21   done.  I'd approximate 20 or so hours at this point.

22   Q.  You've provided an estimate of what the costs will be to

23   the prosecutors, right?

24   A.  Yes, I did.

25   Q.  And that estimate is based off of your hourly rate, right?

1  A.  Yes.  Before I really had an idea of the time that would be

2  required.

3  Q.  In the estimate that you provided prosecutors you estimated

4  an hourly rate that would lead to a 5,570 to overall payment,

5  right?

6  A.  That sounds accurate.

7  Q.  So, if we were to add the amount that you would receive for

8  your testimony and the amount that you're expecting to put into

9  the case all together, you are looking at making almost

10 $10,000, right?

11 A.  Correct.

12 Q.  And this is consistent with the amount that you have been

13 paid in prior cases working with their office, right?

14 A.  Probably, roughly consistent.

15 Q.  As part of your work with the prosecutor's office, you were

16 asked to analyze certain call detail information, right?

17 A.  Yes.

18 Q.  The prosecutors in this case provided you -- Actually,

19 withdrawn.

20      The data that you reviewed as part of this case was

21 provided by the prosecutor's in this case?

22 A.  Correct.

23 Q.  You didn't select what data to review on your own?

24 A.  Correct.

25 Q.  You did not independently decide which call detail records

N8TAAPER4                          Petersohn - Cross

1    to pull?

2    A.   Correct.

3    Q.   And you were provided with the call detail records

4    specifically for four individuals?

5    A.   For four devices, yes.

6    Q.   Excuse me.  Four devices?

7    A.   Correct.

8    Q.   And those four devices the prosecutors have linked to four

9    different individual sincerely?

10   A.   Correct.

11   Q.   And those devices are for a device linked to someone named

12   Keith Vereen?

13   A.   Yes.

14   Q.   A device linked to someone that you've referred to a Steven

15   Perez?

16   A.   Yes.

17   Q.   And you understand that Steven Perez is the same as like

18   El?

19   A.   I've seen reference to that, yes.

20   Q.   If I refer to Lucha El as 1 Perez you, know I am talking

21   about the same person?

22   A.   Yes.

23   Q.   So devices for Jamil Bey as well?

24   A.   Yes.

25   Q.   And a device for Ricardo Rodriguez?

1    A.  Correct.

2    Q.  And you were asked to analyze the communications between

3    those four devices?

4    A.  Yes.

5    Q.  And you were asked to analyze certain cell site location

6    information for these four devices?

7    A.  Yes.

8    Q.  The prosecutors provided you with a specific timeframe to

9    analyze for those four devices, right?

10    A.  Yes.

11    Q.  And that timeframe began in September 2020?

12    A.  Yes.

13    Q.  And your presentation covered through November 2020?

14    A.  Correct.

15    Q.  The call detail records that you received for each of four

16    devices begins in September 2020?

17    A.  I think so.

18    Q.  And you did not analyze call detail records before

19    September 2020?

20    A.  No.

21    Q.  Not for any of the four devices?

22    A.  No.

23         MS. BAHARANYI:  I'd like us to take a look at what you

24    created what's been marked as Government Exhibit 901.  See if

25    we can show that to Mr. Petersohn and the jury.

1          (Pause)

2          MS. BAHARANYI:  If you can go to page 11.

3          (Pause)

4          THE COURT:  Since we have to give the jury their lunch

5    break around now, do you want to do it now and then you can get

6    organized, so to speak.

7          MS. BAHARANYI:  Yes.  I'll find that location and

8    we'll have it ready by post lunch.

9          THE COURT:  All right.  So, ladies and gentlemen,

10   we'll take an hour lunch break at this time and resume at two

11   o'clock.

12         (Jury not present)

13         THE COURT:  You may step down and we'll see you at two

14   o'clock.

15         THE WITNESS:  Thank you.

16         (Witness not present)

17         THE COURT:  Okay.  During the lunch break I'll try to

18   send you the draft of my charge.  And we'll see you at two

19   o'clock.

20         (Luncheon Recess)

21                     AFTERNOON SESSION

22                         2:00 p.m.

23         (Jury present)

24         THE COURT:  Please be seated.

25         Cross-examination.

1    CONTINUED CROSS-EXAMINATION

2    BY MS. BAHARANYI:

3    Q.  Good afternoon again, Mr. Petersohn.

4    A.  Good afternoon.

5           MS. BAHARANYI:  So, when we left off I was looking for

6    a map to show you.  I'd like Sarah to pull up Government

7    Exhibit 901 at page 11.  And please display that to the jury as

8    well.

9           (Pause)

10   Q.  Mr. Petersohn, what we're looking at is a visual that

11   you've created for the purpose of your testimony today?

12   A.  Yes.

13   Q.  And at the intersection of Gun Hill Road and Bainbridge

14   there's an icon indicating a cell site location?

15   A.  Correct.

16          MS. BAHARANYI:  And there are also, I believe there is

17   also a cell site or a small tower located, the black dot if we

18   could circle that black dot reservoir please.

19          (Pause)

20   Q.  Do you see that black dot?

21   A.  Yes, I do.

22   Q.  Now, these locations -- withdrawn.  Now the information

23   about these locations you obtained from call detail records?

24   A.  Correct.

25   Q.  You have never visited the intersection of Gun Hill Road

1   and Bainbridge in the Bronx?

2   A.  Not, not physically, no.

3   Q.  And you've never visited the intersection of Reservoir Oval

4   Way and Reservoir Place in the Bronx?

5   A.  Just on Google, never personally, no.

6            MS. BAHARANYI:  In terms of Google Earth, let's show

7   Mr. Petersohn Government Exhibit 901 at page four.

8   Q.  This image of Bainbridge Avenue and East Gun Hill Road this

9   is from Google Earth, right?

10  A.  This is from Google Maps.

11  Q.  This is the image that you've used to verify or back up

12  what you see in the call detail records, right?

13  A.  No.  The next slide, the street view is that's the imagery

14  that I use to verify the existence of the facility.

15           MS. BAHARANYI:  Sarah, show Mr. Petersohn Government

16  Exhibit 901 at page five.

17           (Pause)

18  Q.  So, on this particular photograph or this particular

19  photograph you received or took from Google Maps, right?

20  A.  That's correct.

21  Q.  And this provides historical information or certain places

22  on Google Maps?

23  A.  Yes.

24  Q.  And in this photo around the right-hand corner you can see

25  a date or a month and year, November 2019?

1    A.  Yes.

2    Q.  And that's the year that this photo was taken of that area,

3    right?

4    A.  Yes.

5    Q.  And as you testified earlier the particular dates and time

6    that you were asked to analyze were between September 2020 and

7    November 2020?

8    A.  That's correct.

9    Q.  So this photo is about a year before those relevant dates?

10   A.  Yes, it's the closest imagery temporal to date of the

11   record that predates the record.

12   Q.  You don't have any photos of what the buildings or sectors

13   would have looked like in September 2020?

14   A.  No.

15   Q.  Or October 2020?

16   A.  I don't.

17   Q.  Or for the following month?

18   A.  Correct.  I don't.

19   Q.  And since you have been hired to work on this case you

20   haven't gone to the Bronx to conduct any in-person

21   investigation, right?

22   A.  Correct.

23   Q.  And one of the ways that you sometimes will verify cell

24   site location information is through something called "drive

25   test", right?

1  A.  We use that more to troubleshoot the network, not

2  necessarily to verify a location.

3  Q.  Well, let's talk a little bit about drive test.  I

4  understand it can certainly be used to test coverage in an

5  area?

6  A.  Yes.

7  Q.  And a drive test has the ability to give you specific

8  information about a device and its connection to a tower in the

9  area?

10  A.  Correct.

11  Q.  And a drive test can allow you to see what cell site, a

12  particular device connects to at a particular time, right?

13  A.  Yes.

14  Q.  Now, a drive test actually involves you driving around in a

15  car, right, or a vehicle?

16  A.  Yes.

17  Q.  And the walk test involving you walking around with the

18  same sort of data and equipment that you use in a drive test?

19  A.  Correct.

20  Q.  And it requires you to be in the area with the cell site

21  tower?

22  A.  Yes.

23  Q.  And you did not go to the area to do a drive test, right?

24  A.  Correct.

25  Q.  You didn't go to the reservoir test area to do a drive test

N8TAAPER4                    Petersohn - Cross

1    of the smaller sector?

2    A.  Correct.

3    Q.  You didn't go to East Gun Hill Road and Bainbridge area too

4    do a drive test in that area?

5    A.  Correct.

6    Q.  And you testified on direct that about your opinions on

7    macro cell sites near 3318 Perry Avenue?

8    A.  Yes.

9    Q.  And specifically, you testified that the macro cell site

10   that's at Gun Hill Road and Bainbridge could but is not likely

11   to serve 3318 Perry Avenue?

12   A.  Correct.

13   Q.  It's a macro cell site that you did not visit in person?

14   A.  Correct.

15   Q.  And that's a cell site that you did not conduct any drive

16   test for?

17   A.  Correct.

18   Q.  Or and certainly not in 2020 during the relevant time

19   period?

20   A.  Correct.

21   Q.  Mr. Petersohn, focusing still on this area around Gun Hill

22   Road and Bainbridge you don't know the number of small sites,

23   small cell sites in that area, right, the number?

24   A.  I do have data to that effect from T-Mobile, historical

25   data.

1   Q.  But the number of small cell sites in that area in 2020, at
2   this time you don't have the number for that?
3   A.  No, I don't personally but I studied the topography in that
4   area.
5   Q.  In terms of macro cell sites in that area you can't tell
6   the jury today the number of macro cell sites in that area
7   around East Gun Hill Road and Bainbridge?
8   A.  There were two that were serving geography and interest,
9   the one at East Gun Hill and Bainbridge, then the one slightly
10  southeast of the Perry Avenue address.
11  Q.  Beyond those two there are others in this neighborhood in
12  the Bronx, right?
13  A.  There are.  But kind of out of the area that they were
14  focusing out of the geography that we were focusing on, those
15  were the only two.
16  Q.  By the geography that is being focused on this is what the
17  prosecutors told you to focus on?
18  A.  Correct.
19  Q.  So let's talk a little bit about the particular devices
20  that you reviewed.  You received call detail records for Keith
21  Vereen's device?
22  A.  Yes.
23  Q.  And that's the device ending in 0166, right?
24  A.  I don't have it in front of me but I think so.
25          MS. BAHARANYI:  If we can pull up Government Exhibit

1    page one for Mr. Petersohn and the jury.

2                   (Pause)

3    Q.   Mr. Vereen's device, the device ending in 0166?

4    A.   Correct.

5    Q.   You testified about Vereen's device communicating with

6    certain numbers, right?

7    A.   Right.

8    Q.   Lucha El's number?

9    A.   Right.

10   Q.   And with Ricardo Rodriguez's number?

11   A.   Yes.

12   Q.   Now, you also testified about different text communications

13   between those numbers as well?

14   A.   Yes.

15   Q.   You had the full for the time period between September 2020

16   and November 2020, you were able to see all the different

17   numbers Keith Vereen called on that particular device?

18   A.   Yes.

19   Q.   And any SMS messages that Keith Vereen sent out on that

20   device.

21   A.   Yes.

22   Q.   And you were able to see that there were numbers called

23   that were not the Lucha device?

24   A.   Yes.

25   Q.   And numbers called for devices that weren't the Ricardo

1    Rodriguez device?

2    A.   Yes.

3    Q.   And you also briefly testified about calls or messages that

4    might be able to send outside of the cellular, the network,

5    right?

6    A.   They would still use the cellular data network to access

7    services like What's App or a signal that were referenced.

8    Q.   But certain communications on say What's App can take place

9    over wifi, right?

10   A.   They could, yes.

11   Q.   And they may not show up in a call detail record?

12   A.   Correct.

13   Q.   So if I make a phone call to What's App, that phone call is

14   not showing up on the call detail record you received?

15   A.   Correct.

16   Q.   If I send a text message on the What's App app, that

17   message is not showing up on a call detail record?

18   A.   Correct.

19   Q.   Unlike say SMS messages?

20   A.   That's correct.

21   Q.   Phone calls using cellular data?

22   A.   Yes.

23   Q.   So you haven't been able to analyze, you haven't been able

24   to see any communications that were sent by What's App for

25   example?

N8TAAPER4                    Petersohn - Cross

1    A.  Correct.

2    Q.  Or any messages that were sent on What's App, right?

3    A.  Yes.

4    Q.  Or any other wifi based app service, right?

5    A.  Yes.

6    Q.  But you certainly can analyze that was contained in the

7    call detail record, right?

8    A.  Yes.

9    Q.  Now for Mr. Vereen's call detail record there are say well

10   over a thousand phone calls and messages between September and

11   November 2020.  Right?

12   A.  That sounds right.

13   Q.  Some of these phone calls were to Lucha, right?

14   A.  Yes.

15   Q.  Not all of them, right?

16   A.  No, correct.

17   Q.  Some of these phone calls were to Rodriguez but --

18   A.  Yes.

19   Q.  -- but not all of them?

20   A.  Correct.

21   Q.  Now for these other phone calls you did not include them in

22   your presentation today?

23   A.  Correct.

24   Q.  And there are some phone calls made to numbers -- there are

25   some phone calls made from the Keith Vereen device to other

1   numbers quite frequently, right?

2   A.  I don't know.

3        MS. BAHARANYI:  Sarah, will you pull up Government

4   Exhibit 707.

5        (Pause)

6        MS. BAHARANYI:  Bear with us one moment as we pull

7   that up.

8        (Pause)

9        MS. BAHARANYI:  I am going to come back to that number

10  in a moment while we resolve some technical difficulties.

11       Let's talk a little bit about the places you believe

12  Keith Vereen device was located in or around this time period.

13  Q.  Now you testified that his phone appeared to travel from

14  South Carolina north, right?

15  A.  Yes.

16  Q.  On multiple occasions?

17  A.  Yes.

18  Q.  And you testified that it went north to New York City,

19  specifically?

20  A.  Yes.

21  Q.  To the Bronx?

22  A.  Correct.

23  Q.  And you based this testimony on the cell site location

24  information and Keith Vereen's call detail information?

25  A.  Yes.

1   Q.  And your PowerPoint focused on four specific time period to

2   trips as you explained right?

3   A.  Yes.

4   Q.  So a trip between September 14th and September 16th?

5   A.  Yes.

6   Q.  2020?

7   A.  Yes.

8   Q.  A trip between October 2nd and October 3rd, 2020?

9   A.  Yes.

10  Q.  And trip between October 21 and 22nd, 2020?

11  A.  Yes.

12  Q.  And then a final trip between the 31st and 1st?

13  A.  Yes.  I'd have to see that last date.  I thought it was a

14  little later, beginning of November.

15          MS. BAHARANYI:  One moment.

16          (Pause)

17  A.  Maybe the trip not was 30th or 31st.

18  Q.  Sometime around the 31st and 30th, some trip north to New

19  York City, right?

20  A.  Correct.

21  Q.  And you looked at the call detail record for the time

22  period that Keith Vereen was making these trips north and

23  south, right?

24  A.  Yes.

25  Q.  I'm going to turn back to Government Exhibit 707 which we

1    now have up.

2                During this time period that Keith Vereen is making

3    these trips north he made a repeated number of calls to

4    different numbers outside of the numbers you studied, right?

5    A.   I don't know.

6                MS. BAHARANYI:   Sarah, can you search in Government

7    Exhibit 707 the number 917-803-8650.

8                (Pause)

9    Q.   This is just one number that you did not analyze the call

10   detail record for, right?

11   A.   Correct.

12   Q.   And this is one number that shows up 138 instances on Keith

13   Vereen's phone call detail record, right?

14   A.   Yeah.  But this is through July of 2021 though but yes.

15   That number shows -- there are 138 cells found with that

16   number.  I don't know if that means there are 138 instances of

17   calls to that.  I'd have to take a hard look at the records.

18   Q.   What we can tell from what's on the screen is that it shows

19   up 138 times in this call detail record, right?

20   A.   Yes, but that number is in 138 cells in the spreadsheet.

21   Q.   In fact, as you can see on screen one of the cells on row

22   58, September 12th, that number is dialed by Keith Vereen's

23   device on September 12, right?

24   A.   Yes.

25   Q.   So beginning around the time you started to analyze these

1  records this number shows up?

2  A.  I see that, yes.

3  Q.  And in fact row 116, if we can highlight row 116, the

4  number shows up again as text message sent from that number to

5  Keith Vereen's device, right?

6  A.  Yes.

7  Q.  And row 328 another message between those two numbers Keith

8  Vereen's device and this 805 number?

9  A.  Yes.

10  Q.  Those examples we've just shown you are during the

11  timeframe you were asked to analyze right between September

12  2020 and October 2020?

13  A.  Yeah.  The first I think predated by a couple days the

14  September 14 start date.

15  Q.  And the one we're looking at right now is September 22nd.

16  So, right in that timeframe, right?

17  A.  Yes.

18          MS. BAHARANYI:  It goes on row 603.  Sarah, if you

19  could highlight that.

20          (Pause)

21  Q.  This is yet another call from this number on October 5,

22  2020, right?

23  A.  I think that would be October 4th because of the UTV

24  conversion but, yes, that is a call from the Vereen device to

25  that number.

1    Q.   That's also during this timeframe you were asked to

2    analyze, right?

3    A.   Yes.

4    Q.   Between September and November 2020?

5    A.   Yes.

6    Q.   And this number doesn't show up anywhere in your

7    presentation, right?

8    A.   Correct.

9    Q.   You didn't choose to include it in your maps, right?

10   A.   I wasn't asked to.

11   Q.   You weren't asked to by the prosecutors in this case,

12   right?

13   A.   That's correct.

14   Q.   You also testified on direct about moving beyond the

15   communications.  Let's talk about the location of the Vereen

16   devices.

17           Between September 2020 and October 2020 Keith Vereen's

18   device was located at times in New York City, right?

19   A.   Yes.

20   Q.   You also testified on direct that Keith Vereen's device

21   during this time period had some New Jersey activity, right?

22   A.   I think there was some northern New Jersey activity, yeah.

23   Q.   And by "activity" you mean his device would have used a

24   tower in the northern New Jersey area, right?

25   A.   Right.  By virtue, certainly, by virtue of the route of

N8TAAPER4                          Petersohn - Cross

 1    travel it would have been in northern New Jersey.

 2              MS. BAHARANYI:  Sarah, can you pull up Government

 3    Exhibit 707.

 4              (Pause)

 5              MS. BAHARANYI:  Can you search the term "Passaic",

 6    P-a-s-s-a-i-c, or rather "N-J" for New Jersey.

 7              (Pause)

 8    Q.  I am showing you at Government Exhibit 707 a few different

 9    instances where Vereen's phone uses towers that are located in

10    state of New Jersey, right?

11    A.  I do see one, yes.

12              MS. BAHARANYI:  And if we can scroll to the next one,

13    Sarah.

14              (Pause)

15    Q.  This location we're now highlighting row 174 and above it

16    is row 173 and both lists towers in Ramsey, New Jersey, right?

17    A.  Yes.

18              MS. BAHARANYI:  And if we can scroll to the very first

19    column, Sarah.

20              (Pause)

21    Q.  And this again would have been within the September 2020 to

22    October 2020 timeframe, right?

23    A.  Yes.

24    Q.  And this is information that you did not include in your

25    report, right?

N8TAAPER4                      Petersohn – Cross

1  A.  I don't know if I had an overview on 9/16, which I may

2  have.  Those would have been included.  I'm not sure.

3              (Continued on next page)

N8TBPER5                      Petersohn - Cross

1    BY MS. BAHARANYI:

2    Q.  You did discuss the time period between September 14 and

3    September 16 on direct, right?

4    A.  Yes.

5    Q.  You did not discuss Keith Vereen's device using towers in

6    Ramsey, New Jersey, right?

7    A.  Not specifically, but I think it might have been 9/17 or 16

8    when there was southerly travel that showed all of the sites

9    used, so these may have appeared there.  I can't be sure.

10   Q.  Let's show Government's Exhibit 901, and this is at page

11   14.  Please display that to the jury.

12           Mr. Petersohn, this is a map that you created for the

13   9/16/2020 date, right?

14   A.  Yes.

15   Q.  So you were analyzing call records for this particular date

16   September 16?

17   A.  Yes.

18   Q.  And certainly nowhere in this particular map did you

19   indicate devices Keith Vereen's devices using towers outside of

20   this location, East Gun Hill location?

21   A.  No, this map only captures usage between 5:30 p.m. and 6:30

22   p.m. for the Keith Vereen device.

23   Q.  You didn't include any device usage for other areas outside

24   of this timeframe on September 16, right?

25   A.  I don't believe there were any usage outside of these areas

N8TBPER5                         Petersohn - Cross

in that timeframe for the Keith Vereen device.  I can't be sure
though.

Q.  From the previous Exhibit of 707 which is the T-Mobile call
detail record, you're able to see that Keith Vereen's cell
phone does use towers outside of this neighborhood in September
2020, right?

A.  Yeah, September 2020.  But this particular exhibit only
captures September 16, 2020 between 5:30 and 6:30 p.m.

Q.  That reflects what the prosecutor ask you to focus on for
your presentation today, right?

A.  Yes.

Q.  Sarah, let's pull back up Government Exhibit 707.  As we're
pulling that up, Mr. Petersohn, even inside of New York City
Keith Vereen's phone wasn't only connecting to devices in the
Gun Hill Road area, right?

A.  Correct.

Q.  And his device -- in fact in September 2020 his device
connected to towers in different parts of Bronx, New York,
right?

A.  I think so.

Q.  One example of this, Mr. Petersohn, let's show you row
number 203.

        And, Sarah, what I'm going to have you do is highlight
that row.  This is for September 16, 2020, what we're
highlighting, Mr. Petersohn.  And you can see a time in that

N8TBPER5                      Petersohn - Cross

1    second column that says 2243, right?

2    A.  Yes.

3    Q.  That's in universal time?

4    A.  Universal coordinated time, yes.

5    Q.  And if we want to convert that to eastern standard time,

6    we'd have to subtract some hours, right?

7    A.  Yes, that's ahead of eastern time.

8    Q.  So while this indicates 10:43 in universal coordinated

9    time, we'd have to subtract or go back four hours to get

10   eastern time, right?

11   A.  That varies with daylight savings time.

12   Q.  And September 16, would be well within the daylight savings

13   time window?

14   A.  I think so.

15   Q.  So at 22:43 or 6:43 there is a notation on the call detail

16   record that you're looking at, right?

17   A.  Yes.

18   Q.  And if we can go to column V.  Now we've highlighted column

19   V at row 203, and there's a particular address at that column

20   which is 643 Tinton Avenue, right?

21   A.  Yes.

22   Q.  And that address indicates the location of the tower,

23   right?

24   A.  Yes.

25   Q.  And this is a tower that would have been used by the Keith

N8TBPER5                     Petersohn - Cross

1    Vereen device?

2    A.  Yes.

3    Q.  And the Keith Vereen device in September 2020?

4    A.  Yes.

5    Q.  And if we can just look below, there are about four

6    additional entries with this same location right below it.  Do

7    you see that?

8    A.  I do.

9    Q.  And this means that this tower was used repeatedly in

10   succession by the Keith Vereen device, right?

11   A.  Yes.

12   Q.  This tower address is not an address you included on your

13   presentation, right?

14   A.  No.

15   Q.  And you did not look up what other devices were using that

16   same tower at this time, right?

17   A.  No.

18   Q.  The prosecutors did not provide you with call detail

19   records of other devices using that tower, right?

20   A.  They provided me with three other call detail records.  I

21   don't know if those records indicate use of that tower by those

22   devices.

23   Q.  Sarah, I know this might be a little cumbersome, can you

24   pull up Government Exhibit 715, and please publish to the jury.

25           Mr. Petersohn, in Government's Exhibit 715, you're now

N8TBPER5                          Petersohn - Cross

1    reviewing a different set of call detail records, right?

2    A.  Yes.

3    Q.  And this is for the call detail records that are for the

4    1516 device, right?

5    A.  1561.

6    Q.  Excuse me. 1561 device, right?

7    A.  Yes.

8    Q.  And as we established earlier that's the device connected

9    to Lucha, right?

10   A.  Yes.

11   Q.  Sarah, if you could please search that same address, the

12   643 Tinton.

13            That address does not show up in Lucha's call detail

14   records, right?

15   A.  I don't know.  I'd have to search myself.  I saw that there

16   was no -- that it wasn't found, but earlier New Jersey wasn't

17   found at first, so I would want to check myself.

18   Q.  New Jersey was in fact found at some point in those call

19   detail records, right?

20   A.  With the first search it was not, so I'm not sure if

21   we're -- if we need to change one of the settings.

22   Q.  You were able to see New Jersey on the last search we did,

23   right?

24   A.  I did, yes.

25   Q.  And for this particular call detail record, you see we've

1   typed in the same address we've been discussing on cross, 643

2   Tinton?

3           MS. SMYSER:  Objection.

4           MS. BAHARANYI:  I'm happy to move on, your Honor.

5           THE COURT:  All right.

6   Q.  That address the 643 Tinton Avenue as we said did not show

7   up on any of your maps or presentation today, right?

8   A.  It did not.

9   Q.  You were asked to look up call detail records for some

10  dates in October as well?

11  A.  Yes, October 2020.

12  Q.  October 2020, and specifically dates between October 2 and

13  October 3, right?

14  A.  Yes.

15  Q.  And again your map of Keith Vereen's device during this

16  time.  Withdrawn.

17          You created a map showing where different devices were

18  located during this October 2 and October 3rd time period,

19  right?

20  A.  Yes.

21  Q.  And those maps focus on the East Gun Hill Road area, right?

22  A.  I believe some of them do, yes.

23  Q.  Or the area around the intersection of East Gun Hill Road

24  and Bainbridge Avenue, right?

25  A.  Yes.

N8TBPER5                        Petersohn – Cross

1    Q.  And on your maps it didn't reflect any other New York City

2    neighborhoods that were used by these devices in October,

3    right?

4    A.  No.

5    Q.  But Keith Vereen used the towers at 643 Tinton again during

6    this time period of October of 2020, right?

7    A.  I don't know.

8    Q.  Sarah, if you can once again pull up Government Exhibit

9    707, and can you go to row 573 which is highlighted already.

10   Thank you, Sarah.

11          Row 572 shows an entry for 2305, right?

12   A.  Yes.

13   Q.  And this entry has an outgoing call from the Keith Vereen,

14   device, right?

15   A.  Yes.

16   Q.  Doesn't seem like the call was necessarily completed, but

17   it's in the record?

18   A.  Correct.

19   Q.  And if we can go to -- scroll down to the tower column.

20          Now again, this tower at 643 Tinton Avenue, it was

21   used again by Vereen's device?

22   A.  Yes.

23   Q.  And this is on October 3rd, right?

24   A.  Yes.

25   Q.  So within the dates that you were asked to review, right?

N8TBPER5                      Petersohn – Cross

1    A.  Yes.

2    Q.  Sarah, can you go to row 578.  This is row 578 shows an

3    entry for October 4, 2020, right?

4    A.  Yes, that would actually be October 3rd with the UTC

5    adjustment.

6    Q.  That's right.  With that adjustment a day before October 3,

7    2020, right?

8    A.  Yes.

9    Q.  And that's well within the range of dates you were asked to

10   analyze for your testimony today?

11   A.  Yes.

12   Q.  Sarah, if you can again go to the tower column.

13           Now, as you can see Vereen's device uses the address

14   at 643 Tinton Avenue at that time, right?

15   A.  Yes.

16   Q.  And, in fact, right before this entry there's another 643

17   Tinton Avenue entry, right?

18   A.  Yes.

19   Q.  There's space between row 574 and row 577, but before that

20   space you see two additional entries, the one we discussed

21   earlier for 643 Tinton Avenue, correct?

22   A.  Yes.

23   Q.  Now, for Vereen device's use of these towers in October

24   2020, you didn't include -- excuse me.  Let me withdraw and

25   rephrase that.

N8TBPER5                        Petersohn – Cross

1      You didn't include Vereen's use of these towers in

2  your maps on your presentation for October 3, 2020?

3  A.  Correct.

4  Q.  And the prosecutors didn't ask you to include that

5  information, right?

6  A.  Correct.

7  Q.  And there's one more timeframe that I want us to look at.

8  Sarah, can you go to row 957.

9      On row 957 you can see an entry for October 22, 2020?

10 A.  Yes.

11 Q.  And October 22, 2020, is within the time frame you were

12 asked to review by the prosecutors in this case?

13 A.  Yes.

14 Q.  And row 957 shows a call detail entry for 1602, right?

15 A.  Yes.

16 Q.  And that's an outgoing phone call made from Keith Vereen's

17 device?

18 A.  Yes.

19 Q.  And on October 22nd, if we can go to the tower column.  On

20 October 22, that device uses another Bronx base address on

21 Gerard Avenue?

22 A.  Yes.

23 Q.  And it uses that address again in the next entry?

24 A.  Yes.

25 Q.  And neither of these entries were included on your

N8TBPER5                        Petersohn – Cross

1    presentation today, right?

2    A.  I don't think so.

3    Q.  And finally if we can go to row 958.  This is an incoming

4    call that Keith Vereen receive on October 22?

5    A.  Yes.

6    Q.  And this call was at 16:25?

7    A.  Yes.

8    Q.  And we discussed that briefly, but that was at the same

9    address 815 Gerard Avenue?

10   A.  Yes.

11   Q.  And you looked at -- I said finally before, I do mean

12   finally now.  You looked at one last set of dates at the end of

13   October, early November, right?

14   A.  Yes.

15   Q.  And specifically October 31, you looked at call detail

16   records for that time period?

17   A.  Yes.

18   Q.  And as well as November 1?

19   A.  Yes.

20   Q.  And if you can go to row 1187, Sarah.

21        This row, Mr. Petersohn, an entry for an outgoing

22   phone call on November 1, right?

23   A.  Yes.

24   Q.  And that's for a call that was made by Vereen's device,

25   right?

```
       N8TBPER5                    Petersohn - Cross
 1     A.  Yes.
 2     Q.  And at 15:45 Vereen's device use a certain tower also in
 3     the Bronx?
 4     A.  Yes.
 5     Q.  And that was at 815 Gerard avenue?
 6     A.  Yes.
 7     Q.  And this is during the last trip that you testified about
 8     testified that Vereen made to New York City, right?
 9     A.  Yes.
10     Q.  The Gerard Avenue address is not one that was included in
11     your power point, right?
12     A.  No.
13     Q.  That tower was not a tower that showed up on your maps,
14     right?
15     A.  No, I don't think so.  I don't know.
16     Q.  You didn't note it in your maps that you presented for
17     direct testimony?
18     A.  No, I didn't note that address, but I didn't look at
19     individual addresses for anything that was noted so I don't
20     know.
21     Q.  The prosecutors in this case didn't ask you to look up the
22     815 Gerard Avenue address, right?
23     A.  No.
24     Q.  Or to plot that address or include that address in your
25     maps, right?
```

N8TBPER5                         Petersohn - Cross

1   A.  No, they didn't.

2   Q.  The prosecutors didn't provide you with any call detail

3   records connected to that address, right?

4        Did not provide you with any information on cell phone

5   devices that used the tower at that address, right?

6   A.  Well, they did cause they provided me these records and the

7   records contain that address.

8   Q.  But you weren't asked to include any analysis about that

9   address in your presentation today, right?

10  A.  That's right.

11  Q.  And this power point that you presented today is not the

12  only version of the power point that you created in this case,

13  right?

14  A.  Correct.

15  Q.  You've created multiple versions to review with the

16  prosecutors, right?

17  A.  Yes.

18  Q.  And the maps that are included in this presentation, are

19  not the only maps you've created in preparation for your

20  testimony today, right?

21  A.  Correct.

22  Q.  You previewed some of the maps that you intended to use

23  with the prosecutors, right?

24  A.  Yes.

25  Q.  You received their input on what to include?

1    A.  Yes.

2    Q.  And what to exclude?

3    A.  Yes.

4    Q.  And the power point that you presented to us today only

5    includes the places that the prosecutor asked you to focus on

6    today, right?

7    A.  Well, it was more of the timeframes and what the data said

8    about those timeframes.

9    Q.  And their office gave you the time to focus on?

10   A.  Yes.

11   Q.  And gave you the location to focus on?

12   A.  Yes.

13             MS. BAHARANYI:  One moment.  No further questions.

14             THE COURT:  Redirect.

15             MS. SMYSER:  Just briefly.

16   REDIRECT EXAMINATION

17   BY MS. SMYSER:

18   Q.  Mr. Petersohn, you were asked a series of questions on

19   cross-examination about drive test and walk test.  You remember

20   those?

21   A.  Yes.

22   Q.  You typically conduct drive and walk test to test the

23   cellular network; is that right?

24   A.  To test to troubleshoot, yes.

25   Q.  You don't typically conduct them in order to do CDR or cell

N8TBPER5                        Petersohn - Redirect

1    site analysis, correct?

2              MS. BAHARANYI:  Objection, your Honor.

3              THE COURT:  Overruled.  You may answer.

4    A.  Correct.

5    Q.  Where is your business based?

6    A.  Outside of Philadelphia.

7    Q.  Also on cross-examination you were asked a series of

8    questions about the dates and times that you had been asked to

9    analyze in this case.  Do you remember that?

10   A.  Yes.

11   Q.  You mapped cell site for four phones, correct?

12   A.  Yes.

13   Q.  And the maps here indicate times that the Vereen phone was

14   in the general vicinity of any of the other three phones; is

15   that correct?

16   A.  Yes.

17   Q.  From September 14 through November 3rd the time period that

18   we saw on the power point did your power point incapsulate all

19   of the trips that the Vereen device took from South Carolina to

20   New York and back?

21   A.  Yes, everything that was cataloged in the call detail

22   record.

23   Q.  And you also looked at the remainder of the records which

24   span from November 3rd to mid-July 2021, right?

25   A.  Yes.

N8TBPER5                          Petersohn - Redirect

1   Q.  And did the Vereen device as reflected in the call detail

2   records take any additional trips to New York?

3   A.  No.

4   Q.  Finally, Mr. Petersohn, you were asked a series of

5   questions on cross-examination about the work you've done with

6   the U.S. Attorney's Office and the amount you expect to be paid

7   in this case.  Do you remember that?

8   A.  Yes.

9   Q.  Is the majority of the work that you do as a professional

10  with the U.S. Attorney's office?

11  A.  No.

12  Q.  About what percentage of your work is done with the U.S.

13  Attorney's office?

14  A.  Last year it was somewhere between five and 10 percent of

15  revenue.

16  Q.  Does the fact that you will be paid in this case effect

17  your work in any way?

18  A.  No.

19  Q.  Were you asked to make any particular conclusions in this

20  case by the U.S. Attorney's office?

21  A.  No.

22              MS. SMYSER:  No further questions.

23              THE COURT:  Anything else?

24              MS. BAHARANYI:  No, your Honor.

25              THE COURT:  Thank you very much.  You may step down.

N8TBPER5                        Petersohn - Redirect

 1              (Witness excused)

 2              THE COURT:  Please call your next witness.

 3              MS. NICHOLAS:  Your Honor, the government calls

 4    Massachusetts Trooper Ryan Casey.

 5              MS. BAHARANYI:  Your Honor, there might be a couple of

 6    issues that we'd like to address at sidebar before he takes the

 7    stand.

 8              THE COURT:  Sure.

 9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

N8TBPER5                    Petersohn – Redirect

1               (At sidebar)

2               MS. BAHARANYI:  Your Honor, this sidebar has two

3     purposes, substantive sidebar, but Lucha does need to use the

4     restroom.  Could he do that while we're at the sidebar.

5               THE COURT:  Why don't I excuse the jury now.

6               (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

N8TBPER5                       Petersohn - Redirect

1              (In open court)

2              THE COURT:  All right.  Ladies and gentlemen, counsel

3    has raised some issues that will take a few minutes, so why

4    tonight you take a five-minute break at this time, and we'll

5    take another break later in the afternoon.

6              (Jury not present)

7              THE COURT:  Since the jury is excused, we'll excuse

8    the witness and he can come back and then we don't need a

9    sidebar.  I take it defense counsel agrees that since the break

10   was required for her client, it's okay to proceed even though

11   he's in the restroom?

12             MS. BAHARANYI:  It is your Honor.  Your Honor, I

13   anticipate with this witness Trooper Ryan Casey that there are

14   a number of exhibits that the government is going to seek to

15   admit that we believe are highly prejudicial and related to the

16   Massachusetts incident.  I think instead of us jumping up and

17   down every time, it'd probably make sense to address them now.

18             I think the first category I'll address both for Casey

19   and Jones who's the state trooper they're going to call right

20   after, the first category are images of various guns, rifles,

21   that were allegedly seized during the Massachusetts incident or

22   stop if you will.  If I can show Government Exhibit 311.

23             Your Honor, this is an example of a firearm not

24   purchased by Keith Vereen that the government wants to admit a

25   photograph of.  And we're certainly not going to dispute --

N8TBPER5                      Petersohn - Redirect

1    we're not saying firearms weren't seized, or the type or the

2    image or the quality of it has nothing to do with the charge

3    here.  And this particular firearm is so different from the

4    firearm that they're alleged that Lucha El ever possessed, so

5    like the firearm in June 23, 2021 during the stop or the other

6    firearm they're trying to connect him through, through Vereen

7    which was a handgun --

8               THE COURT:  The record should reflect that this is a

9    much larger --

10              MS. BAHARANYI:  AR-15 style assault looking rifle,

11   your Honor.

12              THE COURT:  I think I saw this in a Bruce Lee movie

13   but not otherwise.

14              MS. BAHARANYI:  They don't need these images to be

15   able to talk about the stop, to be able to talk about firearms

16   being recovered.  We're not going to say they were fake

17   firearms either.  We're not making those arguments.  I think

18   this would only serve to --

19              THE COURT:  I see that as to this particular item

20   which conveys its own suggestion of heavy violence, but I'm not

21   sure how strong your argument is with respect to other photos.

22   What are some of the other photos?

23              MS. BAHARANYI:  The others are similar in nature, your

24   Honor.

25              THE COURT:  Actually, let me hear from the government.

N8TBPER5                    Petersohn - Redirect

1              MS. NICHOLAS:  I do think it's important not to

2    consider this picture in isolation.  Taking a step back, the

3    defendant is charged in a conspiracy to transport or receive in

4    his state of residence firearms purchased outside that state.

5    One of the government's exhibits that we'll be offering through

6    this witness two. One video shows the defendant taking

7    possession, physically holding a firearm that appears to be

8    either this firearm or one looking very similar to this

9    firearm.  I think that's important because the other video the

10   defendant nods or shakes his head in response to a question

11   about whether or not the firearms are stolen.

12             Taken together, I think what we're trying to convey

13   here is that these are essentially guns that belong to the

14   group, and that the defendant and Jamil Bey were responsible

15   for providing this group with firearms.  This has never been

16   just about Keith Vereen.

17             THE COURT:  I don't have any doubt -- and I don't

18   think defense counsel is asserting any lack of relevance.  This

19   is clearly relevant.  The argument of defense counsel is my

20   understanding is that it's a 403 argument, that the prejudice

21   outweighs the probative value since they're not going to

22   contest that a bunch of firearms were seized.

23             But I am reconsidering a little bit when you tell me

24   that one of the photos is of the defendant himself holding a

25   gun of this sort because that certainly suggests that he was

1    involved in more than just the one gun that is the subject of

2    Count Two.

3            MS. BAHARANYI:  Your Honor, I'd like to correct that.

4    There is no photo of him holding a gun.  I think this is

5    another video we'd like to discuss with the Court.  During this

6    incident there's a moment where one of the individual's named

7    Mr. Jamal Abdullah Bey, there's one incident where he's about

8    to crack open a can of beans and then ask Lucha to hold this

9    while he's cracking open a can of beans.

10           THE COURT:  But what that shows is -- I'll take a look

11   at it in a minute, but at least in the abstract what it shows

12   is that the defendant was involved as part of the alleged

13   conspiracy in the possession or transportation of guns that are

14   not only many in volume, but that are considerably different

15   from the gun in Count Two where his assertion was, among other

16   things, that I had no wrongful intent.  I showed them the gun

17   right away and so forth.  And I think this puts a different

18   gloss on that argument, but let me see the video you're talking

19   about.

20           MS. NICHOLAS:  Your Honor, if I may before we watch

21   the video.  I think this is relevant to your viewing of the

22   video when that other member of the militia hands off the

23   firearm to the defendant, it's also quite visible the defendant

24   has a strap consistent with the strap of this firearm across

25   his chest.  He's carrying a gun very similar to this one.

1    We're trying to sanitize a gun case here.  This is a gun case.

2    Understand 403, but this is not a case where the probative

3    value is substantially outweighed by the prejudice.  It's a gun

4    case.

5            THE COURT:  You're making a good point that gun cases

6    by their very nature will involve in the normal course

7    visualization and pictures and photos of harmful weapons, but

8    let me see the video.

9            MS. BAHARANYI:  Your Honor, as we're cueing up this

10   video, I think it's also important to note this assertion that

11   he has a firearm on his strap to his back is not true.

12           THE COURT:  Let me see the video, and we'll be able to

13   discuss it further.

14           (Media played)

15           (Media stopped)

16           THE COURT:  The defendant is the gentleman on the

17   right side of the screen in the first part of this?

18           MS. NICHOLAS:  That is correct, your Honor.  The

19   camera being worn is by another member of the conspiracy.  He's

20   wearing a camera on his chest.  Right now we're looking at the

21   defendant.

22           THE COURT:  So you see the defendant with a strap

23   across his chest.  It certainly looks like a gun receiving.

24           MS. NICHOLAS:  I think right here, your Honor, too, if

25   you pause.  You can see the scope on his hip which is

1  consistent.

2          MS. BAHARANYI:  I certainly think that's the

3  government's view and spin on it.  I do not see that that is

4  necessarily a gun on his hip.

5          THE COURT:  You're welcome to argue about that, but

6  certainly it's not so obvious to me that it's anything other

7  than a gun.  And I think the government has enough there to

8  argue that it is a gun.

9          MS. BAHARANYI:  Ultimately, your Honor, the type of

10 firearm here though --

11         THE COURT:  The government has brought me around and

12 it is well to remember that 403 only applies when the prejudice

13 is so substantial that it overcomes the probative value or

14 diminishes the probative value to a minor role.

15         Here I think the government has convinced me that the

16 probative value is substantial.  And given the nature of the

17 case, the prejudice is at most modest.  So I overrule the

18 objection and both the video and the picture of the gun will

19 come into evidence.

20         MS. BAHARANYI:  Your Honor, I'll move on to our next

21 category.  I will just note this case is not about a particular

22 type of firearm being transported interstate.  They don't need

23 to prove that is not an element, so all that's really needed in

24 our view is some proffer that, yes, these firearms and number

25 of firearms were seized if anything.

1          THE COURT:  But the nature and the handling and the

2    altitude of the defendant toward the firearms speaks to his

3    knowledge and intent which is the critical issue in this case.

4    Go ahead.

5          MS. BAHARANYI:  On the other points, there are certain

6    exhibits that show body armor.  There are certain exhibits that

7    show holster and ammunition.  All of these again are unrelated

8    to the interstate transportation of firearms, and we do believe

9    it would be unduly prejudicial.

10         THE COURT:  I don't need to hear for the government.

11   For similar reasons that have already been detailed that

12   objection is overruled.

13         MS. BAHARANYI:  Your Honor, can we show you the actual

14   photos of ammunition I do think it's helpful to see.

15         THE COURT:  That's fair enough.

16         MS. BAHARANYI:  Government Exhibit 315.  I think the

17   Court can see rows and rows of ammunition, rows of bullets all

18   gathered I think compound the prejudicial effect of this photo.

19   He's not being charged with anything related to this

20   transportation of ammunition.  It's all related to the

21   transportation of firearms into their state of residence.  And

22   as we've already established --

23         THE COURT:  The point is one of probabilities and

24   degree.  It's one thing if the jury is led to believe that,

25   well, there is this one gun that's the subject of Count Two and

1    maybe some other guns that we're not seeing or some other

2    ammunition or other accouterments.  It's something else for

3    them to see the scope of this, which I think they could

4    reasonably infer cast very grave doubt on his defense of lack

5    of intent.  So the objection is overruled.

6         MS. BAHARANYI:  Your Honor, there's a lot of

7    Massachusetts -- I think our issue is how much Massachusetts

8    evidence they're trying to get in, in this trial in the

9    Southern District of New York.

10        THE COURT:  By the way, I'm not sure I understand that

11   argument at all.  This is part of the conspiracy.  The

12   conspiracy they will have to establish to the preponderance

13   standard for the jury that at least some act in furtherance of

14   the conspiracy occurred in the Southern District of New York,

15   but that's all they need to show, and then they can show acts

16   from the entire world for that matter.

17        MS. BAHARANYI:  Your Honor, what we're essentially

18   doing beginning at this stage of the case is shifting to the

19   facts incidents that are going to be litigated in Massachusetts

20   in February of next year in that appropriate forum.

21        THE COURT:  That may or may not be, but the question

22   is what's relevant to this jury in this case.  And the fact

23   that some of the important events occurred out of state, well,

24   that's the whole point.  The charge is that he was bringing and

25   conspiring with others to bring out-of-state guns into states

1    where people could then receive them without complying with

2    federal law.

3            MS. BAHARANYI:  Into states that people resided, and

4    Massachusetts doesn't qualify for any of those individuals.

5            THE COURT:  It's one of the out-of-state places where

6    these guns were being transported.

7            MS. BAHARANYI:  Your Honor, the statute requires in

8    order for Lucha to be found guilty that he's receiving or

9    conspiring with others to receive guns into their state of

10   residence or his state of residence.

11           THE COURT:  No.  No.  For the substantive count it has

12   to be his state of residence.  For the conspiracy, it just has

13   to be into anyone's, any co-conspirators state of residence.

14   That's different from the state where the guns were originated.

15           MS. BAHARANYI:  I think that's the problem with

16   Massachusetts.  It doesn't fit.  It's not anyone's state of

17   residence.

18           THE COURT:  Well, that's because this is evidence of

19   being transported from out of state.

20           MS. BAHARANYI:  Your Honor, I think what the issue is

21   here perhaps is again the speculative nature of the

22   government's evidence.  They have not connected any of these

23   dots, so we have this New York conduct, and now we're

24   presenting to the jury this Massachusetts conduct without any

25   connections of how they're going to tell the story between A to

N8TBPER5                    Petersohn – Redirect

1    B.  But they certainly want to tell that story.  I think

2    they're going to ask the jury to speculate wildly to complete

3    this narrative.

4              THE COURT:  Well, as always I am impressed by the

5    eloquence of defense counsel, but in this case I'm not

6    persuaded and I adhere to my prior ruling.

7              MS. BAHARANYI:  If I may have a moment with my

8    co-counsel?

9              THE COURT:  Yes.

10             MS. BAHARANYI:  Nothing further from us.

11             THE COURT:  I should note for the record that over

12   lunch I sent a draft of my charge to counsel, and I just sent

13   them a very slightly revised draft just correcting a few typos

14   and we'll take that up at the charging conference today.

15   Please bring in the jury.

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

1                (Jury present)

2                THE COURT:  Please be seated.  Please bring in your

3      witness.  I'm glad we gave you that break because that five

4      minutes of issues became considerably more, so I'm glad you

5      didn't have to sit here and just watch our backs so to speak.

6      All right.  So we'll swear in the witness.

7      RYAN CASEY,

8           called as a witness by the government,

9           having been duly sworn, testified as follows:

10               THE DEPUTY CLERK:  State your name and spell it slowly

11     for the record.

12               THE WITNESS:  Ryan Casey, R-Y-A-N, C-A-S-E-Y.

13               MS. NICHOLAS:  Your Honor, before I address this

14     witness, I'd like to offer two stipulations from the

15     government.

16               THE COURT:  My heart would have been broken if you

17     never had a witness that you didn't first offer a stipulation.

18               MS. NICHOLAS:  Government Exhibit 1005, your Honor, is

19     a stipulation between the parties.  Stipulation reads that'

20     Government Exhibit 601 is a true and accurate copy of the

21     abstract of the lifetime driving record for Steven Perez, aka

22     Lucha, the defendant, maintained in the ordinary course of

23     business by the state of New York Department of Motor Vehicles

24     New York DMV.

25               Paragraph two Government Exhibit 602 is a true and

accurate copy of the abstract of lifetime driving record for

Aaron Jimenez, aka, Alban El Curragh, maintained in the

ordinary course of business by the New York DMV.

Government Exhibit 603 is a true and accurate copy of

the abstract of lifetime driving records for Jamil Razoul Bey

maintained in the ordinary course of business by the New York

DMV.

Government Exhibit 604 is a true and accurate copy of

the abstract of lifetime driving records for Brandon Britton,

aka, Messiah Bey, maintained in ordinary course of business by

the New York DMV.

Government Exhibit 605 is a true and accurate copy of

the driving record abstract for Jahmal Latimer, aka, Jahmal

Abdullah Bey, maintained in the ordinary course of business by

the Rhode Island Division of Motor Vehicles, the Rhode Island

DMV.

Government Exhibit 606 is a true and accurate copy of

the driving record abstract for Quinn Cumberlander, aka, Quinn

Khabir, maintained in the ordinary course of business by the

Rhode Island Division of Motor Vehicles.

It's further stipulated and agreed that this

stipulation is marked as Government Exhibit 1005, as well as

Government's Exhibits 601 to 606 may be received at trial, and

at this, your Honor, the government offer governments 1005 as

well as 601 through 606.

1              THE COURT:  Received.

2              (Government's Exhibits 601, 602, 603, 604, 605, 606

3     and 1005 received in evidence)

4              MS. NICHOLAS:  Next, your Honor, is Government Exhibit

5     1003.  It is stipulated and agreed between the parties that on

6     or about June 23, 2021, law enforcement officers in the Bronx

7     New York, arrested Steven Perez, aka, Lucha, the defendant,

8     which is referred to as the Bronx arrest, and recovered from

9     his person Government Exhibit 523, a black LG cell phone used

10    by the defendant, which we'll refer to as the Lucha phone.

11             Government's Exhibits 1001 through 1110, including all

12    subparts, are true and accurate copies of data extracted from

13    the Lucha phone.

14             On or about July 3, 2021, law enforcement officers

15    arrested Steven Perez, aka, Lucha, the defendant; Lamar Dow,

16    aka, Jamil Bey; Aaron Lamont Johnson, aka, Tarrif Shariff Bey;

17    Jamal Latimer, aka, Jahmal Abdullah Bey; Quinn Cumberlander,

18    aka, Quinn Khabir; Brandon Britton; aka, Messiah Bey; Wilfredo

19    Hernandez, aka, Will Musa; Conald Pierre, Antonio Omar Malik;

20    and Aaron Jimenez, aka, Alban El Curragh on highway I95 near

21    Wakefield, Massachusetts.  It will be referred to as the

22    Massachusetts arrest.

23             Government Exhibit 302 is a true and accurate copy of

24    an image captured by law enforcement from a drone surveilling

25    the Massachusetts arrest.  During the Massachusetts arrest and

N8TBPER5                    Petersohn – Redirect

subsequent vehicle searches, law enforcement seized an iPhone 8

belonging to Latimer, an iPhone XS belonging to Latimer, a

universal Android cell phone belonging to Cumberlander and a

universal Android cell phone belonging to Johnson.

Government Exhibits 1201 to 1210, including all

subparts, are true and accurate copies of data extracted from

the Latimer iPhone 8.

Government's Exhibits 1301 to 1304, including all

subparts, are true and accurate copies of data extracted from

the Cumberlander phone.

Government Exhibits 1401 to 1403, including all

subparts, are true and accurate copies of data extracted from

the Johnson phone.

During the Massachusetts arrest law enforcement agents

seized Government Exhibit 530, a body worn camera from Latimer,

the Latimer body worn camera.

Government Exhibit 330, including all subparts, are

true and accurate copies of footage captured by the Latimer

body worn camera during the Massachusetts arrest.

Government Exhibit 330P1 is a still image captured

from the Latimer body worn camera depicting Steven Perez, aka,

Lucha, the defendant, on the right; and Lamar Dow, aka, Jamil

Bey on the left.

Government Exhibit 330P2 is a still image captured

from the Latimer body worn camera depicting Jamal Latimer, aka,

1    Jahmal Abdullah Bey.

2         Government Exhibit 330P3 is a still image captured

3    from the Latimer body worn camera depicting Aaron Jiminez, aka,

4    Alban El Curragh.

5         Government Exhibit 330P4 is a still image captured

6    from the Latimer body worn camera depicting Steven Perez, aka,

7    Lucha, the defendant.

8         Government Exhibit 330P5 is a still image captured

9    from the Latimer body worn camera depicting Lamar Dow, aka,

10   Jamil Bey.

11        Government Exhibit 330P6 is a still image captured

12   from the Latimer body worn camera depicting Aaron Johnson, aka,

13   Tarrif Shariff Bey.

14        Government Exhibit 330P7 is a still image captured

15   from the Latimer body worn camera depicting Quinn Cumberland,

16   aka, Quinn Khabir.

17        It's further stipulated and agreed that no party will

18   raise any objection under Federal Rule of Evidence 901 with

19   respect to any exhibit referenced above.

20        It's further stipulated and agreed that to the extent

21   any of the exhibits referenced above are admitted in evidence

22   at trial in this matter, this stipulation marked as Government

23   Exhibit 1003 may also be received in evidence as a government

24   exhibit at trial.

25        At this time your Honor strictly offering the

N8TBPER5                          Casey- Direct

1    stipulation as Government Exhibit 1003.

2              THE COURT:  Received.

3              (Government's Exhibit 1003 received in evidence)

4    DIRECT EXAMINATION

5    BY MS. NICHOLAS:

6    Q.  With that government, good afternoon.  Please state your

7    name.

8    A.  Ryan Casey.

9    Q.  Mr. Casey, where do you presently work?

10   A.  Massachusetts state police.

11   Q.  What's your title there?

12   A.  Trooper.

13   Q.  How many years have you been a Massachusetts state trooper?

14   A.  Since June of 2019.

15   Q.  Are you assigned to a particular team or unit with in the

16   state troopers?

17   A.  I work out of division of field services.

18   Q.  What does the division of field services do?

19   A.  It's essentially just the uniform patrol, just the trooper

20   you'd see on the highway.

21   Q.  Are you assigned to a particular barracks?

22   A.  I work out of state police Concord barracks.

23   Q.  Were you assigned to the Concord barracks in July of 2021?

24   A.  I was not.

25   Q.  Where were you assigned in July of 2021?

N8TBPER5                         Casey- Direct

1    A.   State police Danvers barracks.

2    Q.   When you were assigned to the state police Danvers

3    barracks, what were some of your duties and responsibilities?

4    A.   Many of us is just on highway safety, whether that be

5    responding to crashes, making sure impaired drivers are off the

6    roadway, responding to disabled motor vehicles in the breakdown

7    lane, etc.

8    Q.   I want to direct your attention to July 3rd of 2021, were

9    you working that evening?

10   A.   I was.

11   Q.   What was your assignment that night?

12   A.   I was the south patrol.

13   Q.   We'll come back to what the south patrol was in a minute.

14   What shift were you working?

15   A.   The midnight shift.

16   Q.   What hours of the midnight shift?

17   A.   That's from 11 p.m. to 7 a.m.

18   Q.   Ms. Sankar, can you show for the witness only what's been

19   marked for identification as Government Exhibit 300.

20            Trooper Casey, do you recognize this?

21   A.   Yes.

22   Q.   What is this?

23   A.   This is a map of the state police Danvers patrol area.

24   Q.   Is this a fair and accurate depiction of the area you were

25   responsible to parole on July 3, 2021?

N8TBPER5                          Casey- Direct

1   A.  Yes.

2            MS. NICHOLAS:  Your Honor, the government offers

3   Government Exhibit 300.

4            MS. BAHARANYI:  No objection.

5            THE COURT:  Received.

6            (Government's Exhibit 300 received in evidence)

7   BY MS. NICHOLAS:

8   Q.  Ms. Sankar, if you can publish Government Exhibit 300 for

9   the jury.

10           Trooper Casey, just referencing the map, if you can

11  describe for the jury the area of Massachusetts that you were

12  responsible for that evening on July 3rd of 2021?

13  A.  The area of Massachusetts?

14  Q.  Where you were responsible for along I95?

15  A.  I cover from route three where 95 meets three.  I don't

16  know if you guys can see the markings.

17           MS. NICHOLAS:  Let the record reflect that the witness

18  has drawn a red line at the intersection of Route three and I95

19  in the bottom left corner of Government Exhibit 300.

20           THE COURT:  Yes.

21  A.  Just continues up route 95 to just about where 95 and 128

22  split off.

23           MS. NICHOLAS:  Let the record reflect the witness has

24  drawn a red line along I95 following the road all the way up to

25  the intersection of Route One just into the right half of the

N8TBPER5                    Casey- Direct

1  screen.

2              THE COURT:  It appears from this line to be driving on

3  the curb.

4  Q.  Around 1:10 a.m. Trooper Casey approximately where on the

5  map were you?

6  A.  Just about right around this general area on the northbound

7  side.

8              MS. NICHOLAS:  Let the record reflect the witness has

9  drawn a circle next to the body of water in the center of the

10  screen just above the word "Wakefield."

11              THE COURT:  Yes.

12  Q.  What, if anything, happened around 1:10 a.m.?

13  A.  I observed a Ford transit van with its hazard lights on in

14  the breakdown lane.

15  Q.  When you were patrolling this length of highway, were you

16  in a marked car?

17  A.  I was.

18  Q.  Were you also wearing a uniform?

19  A.  Yes, I was wearing my uniform.

20  Q.  Were you patrolling on your own or were you with a partner?

21  A.  I was by myself.

22  Q.  Is that typical?

23  A.  Yes.

24  Q.  In your uniform, does that uniform require you to wear a

25  body worn camera?

N8TBPER5                          Casey- Direct

1    A.  It does.

2    Q.  Were you wearing a body worn camera on July 3 of '21?

3    A.  I was.

4    Q.  Trooper Casey do you see a disk in front of you that's

5    marked as Government Exhibit 301A.  It's in that manila folder

6    just to your right?

7    A.  I do.

8    Q.  Do you know what that is?

9    A.  It's a disk that contains footage from my body camera.

10   Q.  Have you reviewed it?

11   A.  I have.

12   Q.  How do you know it's the disk that you reviewed?

13   A.  Because it's initialed and dated with my initials that I

14   see.

15   Q.  Did you apply your initials to it?

16   A.  I did.

17   Q.  Is it a fair and accurate representation of the events of

18   July 3, '21, as recorded by your body worn camera?

19   A.  Yes.

20        MS. NICHOLAS:  Your Honor, at this time the government

21   offers Government Exhibit 301A.

22        MS. BAHARANYI:  Your Honor, we note our prior

23   objection.

24        THE COURT:  Yes, those objections are overruled for

25   the reasons stated at the sidebar and the exhibit is received.

N8TBPER5                       Casey- Direct

1           (Government's Exhibit 301A received in evidence)

2    BY MS. NICHOLAS:

3    Q.  Before we move forward Trooper Casey there should be a

4    button on your screen to clear off your drawing.

5           Before we proceed, I want to direct your attention

6    back to 1:10 a.m. on July 3 of 2021, you testified you were on

7    patrol near Wakefield at that time around 1:10 a.m., what

8    happened?

9    A.  So around 1:10 a.m. I noticed a Ford transit van in the

10   right breakdown lane with its hazard lights on.

11   Q.  Once you saw that van, what did you do?

12   A.  I pulled my cruiser behind it in the breakdown lane and

13   activated my emergency lights.

14   Q.  After you pulled your cruiser behind, what did you do next?

15   A.  I then exited my cruiser, attempted to make a passenger

16   side approach on the van.

17   Q.  As you tried to make that passenger side approach, what

18   happened next?

19   A.  I was greeted by a male party.  He was walking from in

20   front of the van.  He's wearing full camouflage attire with an

21   armored vest and a long gun slung across his chest.

22           MS. NICHOLAS:  Your Honor, at this time we'd ask to

23   publish Government Exhibit 301A side by side with Government

24   Exhibit 301AT.  301AT is a transcript intended as an aid to the

25   jury and is not in evidence.

1           THE COURT:  Yes, that's permitted.

2           Ladies and gentlemen, you should understand whenever

3   you have these transcripts, they're to help you understand

4   what's being said, but the ultimate evidence is the video or

5   the recording as the case may be.  Go ahead.

6   BY MS. NICHOLAS:

7   Q.  Before we play this once it's up on the screens, Trooper

8   Casey, could you just describe the perspective that we're

9   looking at here in 301A?

10  A.  Yes.  So as I said earlier, I was wearing my body worn

11  camera.  I usually wear it like right here on my chest and it's

12  facing outwards.

13          So in the beginning of this video you see me exiting

14  my cruiser and approaching the van.

15  Q.  Could you read the timestamp in the upper right-hand corner

16  there?

17  A.  Yes, it says 07/03/2021 and it says 01:10 hours.

18  Q.  You said this moment is capturing you getting out of your

19  patrol car?

20  A.  Yes.

21          MS. NICHOLAS:  Ms. Sankar, go ahead and publish the

22  video.

23          (Media played)

24          (Media stopped)

25          (continued on next page)

1          MS. NICHOLAS:  And we can pull those down.

2          (Pause)

3  Q.  Trooper Casey, that individual who approached you when you

4  first got on the scene, did you learn his name?

5  A.  Yes.

6  Q.  What was his name?

7  A.  Jamal Latimer.

8  Q.  Did you know him by any other names?

9  A.  Jahmal Abdullah Bey.

10  Q.  Based off of that first minute interaction when you arrived

11  on the scene, what did you understand the situation to be?

12          MS. BAHARANYI:  Objection, your Honor.

13          THE COURT:  No.  I think it's helpful background.

14  Overruled.

15  A.  Jamal advised me that they were on their way from Rhode

16  Island to Maine and that they were part of a militia.

17  Q.  At the end of that clip Latimer asked you to call a

18  supervisor; did you do that?

19  A.  Yes.

20  Q.  Before we get to that section I want to talk a little bit

21  about the three government exhibits that are in that manila

22  folder next to you marked as Government Exhibits 302, 303 and

23  304.

24          Can you flip through those.

25          (Pause)

N8TAAPER6                        Casey - Direct

Q.  Trooper Casey, do you know what 302, 303 and 304 are?

A.  They look like pictures taken of the scene on Route 95 in Wakefield later on in the morning.

Q.  Are they fair and accurate depictions of the scene on I-95 on July 3rd of 2021?

A.  Yes.

        MS. NICHOLAS:  At this time, your Honor, the government offers Government Exhibits 302, 303 and 304.

        MS. BAHARANYI:  Your Honor, we maintain our objection.

        THE COURT:  Yes.  Overruled and the exhibits are received.

        (Government's Exhibits 302, 303 and 304 received in evidence)

        MS. NICHOLAS:  Ms. Sankar, could you please publish for the jury Government Exhibit 302.

        (Pause)

Q.  Trooper Casey, can you just explain to the jury what's captured in this image?

A.  The aerial footage or bird's eye view of the scene of Route 95 in Wakefield.

Q.  Do you see your cruiser?

A.  I do.

Q.  Where is that?

A.  It's up in the breakdown lane behind the van.  It's French an electric blue cruiser.

1          MS. NICHOLAS:  Ms. Sankar, pull that down and publish

2     what's in evidence as Government Exhibit 303.

3          (Pause)

4     Q.  Trooper Casey, if you could just describe for the jury what

5     we see in Government Exhibit 303?

6     A.  This is Route 95 northbound in Wakefield.  Again, there's

7     my cruiser on my right side and the van's in front of it.

8          MS. NICHOLAS:  Ms. Sankar you can pull that down.

9          (Pause)

10    Q.  You testified a moment ago that after you introduced

11    yourself to Latimer you called a supervisor?

12    A.  I did.

13    Q.  Did you continue to interact with Latimer while you waited

14    for the supervisor?

15    A.  I did.

16    Q.  What happened during those interactions?

17    A.  I tried to identify as many people on the scene as I could.

18    I also just spoke with them about what their plans were.

19    Q.  During that period did you ever have an opportunity to

20    check to see if anyone had a gun license?

21    A.  I asked if anyone had a license to carry and Jahmal said

22    no.

23    Q.  Now, at some point during your interaction did you ask

24    Latimer to put his gun down?

25    A.  I did.

1    Q.   How did he respond?

2    A.   He advised that they would not be putting their firearms

3    down.

4    Q.   During that interaction did you notice any recording

5    devices?

6    A.   I did.

7    Q.   Can you describe what you noticed?

8    A.   On Jahmal's chest I observed a black device, looked like it

9    had a lens on it with a red light.

10         MS. NICHOLAS:   Your Honor, at this time the government

11   offers Government Exhibits 330A and 330C per stipulation marked

12   as Government Exhibit 1003.   Those items are true and accurate

13   copies of footage captured from the Latimer body-worn camera

14   during the Massachusetts arrest.

15         THE COURT:   Counsel, are there other objections?

16   During the various exhibits that were dealt with during the

17   last break are preserved, but the objections are overruled and

18   the exhibits are received.

19         (Government's Exhibits 330A and 330C received in

20   evidence)

21   BY MS. NICHOLAS:

22   Q.   We're going set is that aside for a moment.   I want to talk

23   for a bit more about Jahmal Latimer.

24         Based on that initial interaction with him, what did

25   you conclude about his role in the group?

1   A.  It seemed like he was their leader or spokesperson.

2   Q.  Why did you conclude that?

3   A.  He was the most verbal.  He talked to me the most.  Any

4   time I attempted to talk to anyone else who was on the scene he

5   would follow me and sometimes interrupt in our conversations.

6   Q.  Were you able to interact with anybody else on the scene?

7   A.  Yes.

8   Q.  Did you learn those people's names?

9   A.  The ones that I ended up, yes, I ended up learning their

10  names.

11  Q.  Whose names did you learn?

12  A.  I learned Quinn Cumberlander, Aaron Johnson, Robert

13  Rodriguez, Will Musa, and that was pretty much it from on

14  scene.

15  Q.  Were there people on scene who refused to identify

16  themselves?

17  A.  Yes.

18  Q.  Did you have any interactions with someone named Steven

19  Perez?

20  A.  Not that I recall.

21  Q.  Any interactions with anyone calling himself Lucha El?

22  A.  Not that I recall.

23          MS. NICHOLAS:  At this time I'd like to again return

24  to Government Exhibit 102, which is the stipulation.

25          Ms. Sankar, I ask you to please publish at this

N8TAAPER6                        Casey - Direct

1   time --

2          Your Honor, before we publish, the government offers

3   Government Exhibit 330 P1 through P7 which is set forth in the

4   stipulation, are still images of the individuals arrested in

5   Massachusetts

6          THE COURT:  Yes.  On the same terms as previously

7   mentioned, they are received.

8          (Government's Exhibits 330/P1-P7 received in evidence)

9          MS. NICHOLAS:  Ms. Sankar, could you please publish

10  Government Exhibit 330 P1.

11         (Pause)

12         MS. NICHOLAS:  Reading from the stipulation:

13         Government Exhibit 330 P1 is a still image captured

14  from the Latimer body-worn camera which depicts Steven Perez,

15  a/k/a "Lucha", the defendant, on the right and Lamar Dow, a/k/a

16  "Jamil", based on the left.

17         Ms. Sankar, would you please publish Government

18  Exhibit 330 P2.

19         (Pause)

20         MS. NICHOLAS:  330 P1, per the stipulation is also a

21  still image from the Latimer body-worn camera.  It depicts

22  Jamal Latimer, a/k/a Jahmal Abdullah Bey.

23         Please publish 330 P3.

24         (Pause)

25         MS. NICHOLAS:  Per the stipulation, 330 P3 is an image

1    of Aaron Jiminez, a/k/a "Alban El Curragh".

2              Please, publish 330 P4.

3              (pause)

4              MS. NICHOLAS:  Per the stipulation 330 P4 is a still

5    image of Steven Perez, a/k/a "Lucha", the defendant.

6              330 P5 please.

7              (Pause)

8              MS. NICHOLAS:  Per the stipulation, 330 P5 is a still

9    image of Lamar Dow, a/k/a "Jamil Bey".

10             Ms. Sankar, publish P330 P6.

11             (Pause)

12             MS. NICHOLAS:  Per the stipulation, 330 P6 is a still

13   image depicting Aaron Johnson, a/k/a "Tarrif Bey".

14             And 330 P7.

15             (Pause)

16             MS. NICHOLAS:  Per the stipulation, 330 P7 is an image

17   of Quinn Cumberlander, a/k/a "Quinn Khabir".

18             You can pull those down.

19             (Pause)

20   Q.  Trooper Casey, did your supervisor eventually arrive on the

21   scene?

22   A.  He did.

23   Q.  And after your supervisor arrived, did you become aware of

24   any efforts by law endorsement to end the stop?

25   A.  Yes.

1  Q.  Did you know if law enforcement was communicating with

2  members of the group?

3  A.  Yes.

4  Q.  How were they communicating?

5  A.  Via cellphone.

6  Q.  Earlier you testified that Latimer appeared to you to be

7  wearing a body-worn camera; do you recall that?

8  A.  Yes.

9  Q.  Did you learn that if the body-worn camera continued to

10  record during the stop?

11  A.  I have.

12  Q.  Are you familiar with the videos on Government Exhibit 330A

13  and 330C?

14  A.  Yes.

15  Q.  Have you reviewed them?

16  A.  I have.

17  Q.  How do you know that you've reviewed them?

18  A.  Because I initialed and dated it.

19        MS. NICHOLAS:  Your Honor, if I could have one moment?

20        (Pause)

21  Q.  Trooper Casey, you just said you watched those videos.

22  Were you physically present for the interactions that are

23  captured on those videos?

24  A.  I was not.

25        MS. NICHOLAS:  At this time can you please publish

1    what's in evidence as Government Exhibit 330A side-by-side with

2    the transcript that's marked as 330AT which given I'll note not

3    in evidence but is designed as an aid for the jury.

4              (Pause)

5              MS. NICHOLAS:  Before you hit "play", Ms. Sankar --

6    okay.

7              Go ahead and play Government Exhibit 330A.

8              (Video played)

9              MS. NICHOLAS:  Ms. Sankar, if you could please publish

10   what's in evidence as Government Exhibit 330C.

11             (Pause)

12             MS. NICHOLAS:  Side-by-side with the transcripts

13   marked as 330 C-T.

14             (Pause)

15             (Video played)

16             MS. NICHOLAS:  Ms. Sankar, if you could play that

17   again from second 35 to the end.

18             (Video played)

19             MS. NICHOLAS:  Can you please pull the exhibits down.

20   Q.  Trooper Casey, how many guns did you see amongst that group

21   on July 3rd of 2021?

22   A.  I saw at least three.

23   Q.  Did you personally seize any guns in connection with this

24   stop?

25   A.  I did not.

N8TAAPER6                        Casey – Cross

1    Q.  Did you participate in any of the searches of the vehicles?

2    A.  I did not.

3    Q.  Did you personally place anyone under arrest?

4    A.  No.

5    Q.  Why not?

6    A.  We have, given the gravitas of the size of the situation,

7    we have specialized units to take care of disturbances like

8    this.  I eventually went and started to write the paperwork.

9    That was it.

10             MS. NICHOLAS:  Your Honor, may I have one moment?

11             THE COURT:  Yes.

12             (Pause)

13             MS. NICHOLAS:  Nothing further, your Honor.

14             THE COURT:  Cross-examination?

15             MS. BAHARANYI:  Yes, your Honor.

16   CROSS-EXAMINATION

17   BY MS. BAHARANYI:

18   Q.  Good afternoon, Trooper Casey.

19   A.  Good afternoon.

20   Q.  You testified about a group that you interacted with in

21   Massachusetts, right?

22   A.  Yes.

23   Q.  On July 3rd, 2021?

24   A.  Yes.

25   Q.  Now, I want to talk about what didn't happen during this

N8TAAPER6                      Casey - Cross

1   interaction.  No one was injured during this interaction,

2   right?

3              MS. NICHOLAS:  Objection.

4              THE COURT:  No.  I'll allow it.

5   Q.  Trooper Casey, no one was injured during this interaction?

6   A.  No.

7   Q.  No one in the group fired a weapon?

8   A.  No.

9   Q.  No one fired a weapon at an officer on the scene?

10  A.  Thankfully, no.

11  Q.  That didn't happen, right?

12  A.  Did not happen.

13  Q.  And turning to how this interaction started, you didn't

14  stop this group, right?

15  A.  I was checking on there was a community caretaking

16  situation.

17  Q.  Community caretaking because you saw a van with its hazards

18  on the side of the road, right?

19  A.  Yes.

20  Q.  And on that day -- you approached the van to potentially

21  provide assistance, right?

22  A.  Yes.

23  Q.  And as you approached the van you were approached by

24  someone you've now identified as Mr. Abdullah Bey?

25  A.  Yes.

N8TAAPER6                        Casey – Cross

1    Q.  And you testified a bit about your initial contact with

2    Mr. Abdullah Bey.  He greeted you, right?

3    A.  He did.

4    Q.  He introduced himself?

5    A.  He did.

6    Q.  He told you his name?

7    A.  Yes.

8    Q.  He reached his hand out to shake your hand?

9    A.  He did.

10   Q.  He was courteous, right?

11   A.  I would say so.

12   Q.  You didn't shake his hand, right?

13   A.  I didn't.

14   Q.  You spent, the most of your interactions during this time

15   were with Mr. Jahmal Abdullah Bey, right?

16   A.  Yes.

17   Q.  He was the person who explained to you what the group was

18   doing, right?

19   A.  Yes.

20   Q.  Where they were going?

21   A.  Yes.

22   Q.  He explained that they were passing through Massachusetts

23   on their way to Maine?

24   A.  That's what he told me.

25   Q.  And he was again the primary person speaking directly with

N8TAAPER6                         Casey - Cross

1    you, right?

2    A.  Yes.

3    Q.  Now, you saw Mr. Abdullah Bey talking to other people

4    during this interaction, right?  You saw Mr. Abdullah Bey

5    talking to other people in his group during this interaction?

6    A.  Yes.

7    Q.  I think you testified to him at times interrupting your

8    conversations with others?

9    A.  Yes.

10   Q.  When you observed Mr. Abdullah Bey you also observed him

11   approaching other people in the group during this interaction,

12   right?

13   A.  By approaching, just walking over to other people in the

14   group.

15   Q.  Walking over to other people in the group, right?

16   A.  Yes.

17   Q.  Mr. Abdullah Bey asked -- well, appeared to give

18   instructions to others in the group right?

19   A.  I don't recall any specific instructions that I saw.

20   Q.  Your observations that evening, Mr. Abdullah Bey appeared

21   to be the spokesperson for that group, right?

22   A.  That's what I said, yes.

23   Q.  And he appeared to be the leader of this group?

24   A.  That's what I gathered, yes.

25   Q.  And early in your conversation with Mr. Abdullah Bey he

1    asked you to call a shift supervisor to the interaction, right?

2    A.  He.

3    Q.  And that's your supervisor as an officer, right?

4    A.  Yes, it's, so it was a patrol sergeant.

5    Q.  You testified that you don't recall Lucha El Por

6    interacting with Lucha El that day, right?

7    A.  I don't.

8    Q.  Would it refresh your recollection to see footage of your

9    body-worn camera footage from July 3rd, 2021?

10   A.  Yeah.  If it is my actual body cam footage, that could

11   help.

12   Q.  Yes.  You were wearing body worn camera on July 3rd, 2021?

13   A.  Yes.

14   Q.  You were wearing body-worn camera during your entire

15   interaction with individuals that day?

16   A.  Yes.

17   Q.  Would it refresh your recollection to see who you

18   interacted with during your interaction that day?

19   A.  It would.

20          MS. BAHARANYI:  We would need one moment to show it to

21   the witness.

22          (Pause)

23   Q.  Trooper Casey, we're going to show you what we'll mark for

24   Defense Exhibit --

25          MS. NICHOLAS:  Your Honor, may the government see it?

1          MS. BAHARANYI:  Yes.

2              (Pause)

3          MS. BAHARANYI:  For the purposes of refreshing your

4     recollection we'll have you put on headphones and have you

5     watch and listen to the video beginning at minute 1:10 to

6     minute 1:45.

7          THE WITNESS:  Okay.

8              (Pause)

9     Q.  Trooper Casey, have you finished reviewing the position of

10    the body-worn camera we showed you?

11    A.  I have.

12    Q.  At this time does that refresh your recollection as to your

13    conversation with Lucha on July 3rd?

14         MS. NICHOLAS:  Objection.

15         THE COURT:  Well, does it refresh your recollection as

16    to whether or not you had a conversation with someone who you

17    either then or later learned went by the name of "Lucha"?

18         THE WITNESS:  So at this time the person that was at

19    the car was wearing a face covering and didn't identify

20    themselves.

21         THE COURT:  All right.

22    Q.  You did at some point during this interaction approach a

23    truck, right?

24    A.  Yes.

25    Q.  And that was a silver -- let me get the right truck.  A

N8TAAPER6                         Casey - Cross

1   pick-up truck?

2   A.  Yes.  It was a Honda Ridgeline.

3   Q.  You approached the driver's side of that truck during this

4   interaction?

5   A.  I did.

6   Q.  You spoke to the driver of that truck?

7   A.  I did.

8   Q.  And that is the only time that you spoke to the driver of

9   that truck, right?

10  A.  Yes.

11  Q.  And your testimony today is that the driver of that truck

12  was wearing some sort of covering over their face?

13  A.  Yes.

14  Q.  Now, during this interaction, at no point did the driver of

15  the truck get out of the truck, right?  Well, that you

16  observed?

17  A.  I didn't observe that at all.

18  Q.  And the driver of the truck did not approach you, right?

19  A.  No.

20  Q.  During your conversations with Mr. Abdullah Bey, other

21  people in the group -- withdrawn.

22          While you were speaking with Mr. Abdullah Bey during

23  your interactions on July 3rd there were other people in the

24  group who approached you and Mr. Abdullah Bey, right?

25  A.  Yes.

1  Q.  Specifically, I believe Mr. Tarrif Bey at one point

2  approached you and Mr. Abdullah Bey?

3  A.  Yes.  He was always around like in the general circle of

4  conversation of people and he said a few words at points.

5  Q.  Okay.  Mr. Tarrif Bey was somewhere around during your

6  conversation with Mr. Abdullah Bey?

7  A.  Yes.

8  Q.  Mr. Alban Curragh was around at points during your

9  conversation with Mr. Abdullah Bey?

10  A.  Yes.

11  Q.  You don't recall Lucha ever approaching you during those

12  conversations?

13          MS. NICHOLAS:  Okay.

14          THE COURT:  No.  I'll allow that.  I understand the

15  objection.  But I think the person that you later learned was

16  Lucha did not approach you as far as you can recall?

17          THE WITNESS:  From what I recall, no.

18  Q.  And isn't the individual that you see sitting here today,

19  you don't recall this individual approaching you during this

20  interaction?

21  A.  I did not.

22  Q.  You testified on direct that during this interaction you

23  asked Mr. Abdullah Bey if anyone had a license to carry?

24  A.  I did.

25  Q.  And you were talking about a license to carry a firearm,

N8TAAPER6                          Casey – Cross

1    right?

2    A.   In Massachusetts, license to carry a firearm in

3    Massachusetts.

4    Q.   So, specifically, did anyone have a license to carry a

5    firearm in Massachusetts; is what you were interested in?

6    A.   Yes.

7    Q.   And you asked this question to Mr. Abdullah Bey?

8    A.   I did.

9    Q.   You only asked this question to Mr. Abdullah Bey?

10   A.   I did.

11   Q.   And Mr. Abdullah Bey responded no to this question?

12   A.   He responded "no".

13   Q.   But no one had a license to carry a firearm in

14   Massachusetts?

15   A.   Yes.  I believe he said that something along the lines of

16   he specifically told everyone involved not to bring any

17   identification with them.

18   Q.   And this was identification related to their driver's

19   licenses, right?

20   A.   Or one of the forms of identification you told people not

21   to bring was driver's licenses.

22              MS. NICHOLAS:  Objection, your Honor.

23              THE COURT:  Well, just to move this along and so that

24   I'm clear, were you told or did you otherwise ascertain that no

25   one had a driver's license?

1          THE WITNESS:  So there were two points.  So there was

2     initial point when I first approached Jahmal and you know I

3     asked him for his license and he says he doesn't have a

4     driver's license and there's a point later on where I asked if

5     anyone had a license to carry and he said no and they also

6     added that he told everyone involved that not to bring a form

7     of identification.  So, that's what he told me.

8          THE COURT:  Okay.

9     Q.  That does answer the question.  Thank you, Trooper Casey.

10         Now, in that conversation about the license to carry

11    you weren't asking, you didn't ask any questions about --

12    Withdrawn.

13         You did not ask Mr. Abdullah Bey where any of the

14    firearms that you observed were purchased?

15    A.  I didn't ask that question, no.

16    Q.  You didn't ask Mr. Abdullah Bey where any of the firearms

17    that you observed came from?

18    A.  I didn't ask that question, no.

19    Q.  And at no point did you ask the person sitting here, Lucha

20    El, any questions about any firearms?

21    A.  I didn't.

22    Q.  And you didn't ask Lucha El about the origins of any

23    firearms?

24    A.  I did not.

25         MS. BAHARANYI:  One moment.

 1              (Pause)

 2              MS. BAHARANYI:  No further questions.

 3              THE COURT:  Any redirect?

 4              MS. NICHOLAS:  A couple of questions, your Honor.

 5    REDIRECT EXAMINATION

 6    BY MS. NICHOLAS:

 7    Q.  Trooper Casey, when this event occurred on July 3rd of

 8    2021, how long had you been a Massachusetts State trooper?

 9    A.  Approximately, two years.

10              MS. BAHARANYI:  Two years on the job.

11              Ms. Sankar, can you pull up Government Exhibit 300.

12              (Pause)

13    Q.  In this stretch of I-95 that we looked at in Government

14    Exhibit 3000 that you were responsible for, how long is that

15    stretch of road?

16    A.  It's approximately 15 miles northbound and 15 miles

17    southbound.

18    Q.  So 30 miles total?

19    A.  Yes.

20    Q.  And July 3rd of 2021, were there any other Massachusetts

21    state troopers on patrol on that section of I-95?

22    A.  No.

23    Q.  When you arrived on the scene you testified you weren't

24    patrolling with a partner?

25    A.  I was not.

N8TAAPER6                          Casey – Recross

1   Q.  So when you arrived on that scene, what was your primary

2   concern?

3   A.  My primary concern was first trying to get home and then I

4   also wanted to make sure that everyone was safely brought into

5   custody.

6           MS. BAHARANYI:  Objection, your Honor.

7           MS. NICHOLAS:  No further questions, your Honor.

8           THE COURT:  The objection was waived by not being made

9   till after a fair amount, the answer had come out.  So,

10  overruled, but you may have recross if you'd like.

11          MS. BAHARANYI:  Thank you, your Honor.

12  RECROSS-EXAMINATION

13  BY MS. BAHARANYI:

14  Q.  Trooper Casey, you did in fact get home safely on July,

15  perhaps, that morning of July 3rd?

16  A.  I did.

17  Q.  And no other -- you did?

18  A.  After all the reports and everything, I technically was

19  home at midnight the following night.

20  Q.  So, July 4th you made it home after your administrative

21  duties?

22  A.  Night, July 4th.

23  Q.  You made it home safely?

24  A.  Yes.

25  Q.  And the other officers who were present at this

N8TAAPER6                    Casey - Recross

1    interaction, none of them were injured during this interaction?

2    A.  No one was injured.

3    Q.  And as discussed a bit briefly on our initial cross you had

4    no interactions or your -- Withdrawn.

5            THE COURT:  This is recross, counsel.  I want to give

6    the jury their final break before we go to 4:30.  I think they

7    could use a five-minute break but you can ask a question if

8    it's a recross but not if it's just a repetition of earlier

9    questions.

10           MS. BAHARANYI:  Yes.  Your Honor.  If I can have a

11   brief side bar with you and the parties, very brief?

12           THE COURT:  I'll tell you what, we'll give the jury,

13   why don't you take a five-minute break.  This will be your last

14   break.  We are going to end at 4:30.

15           (Jury not present)

16           THE COURT:  Please be seated.

17           MS. BAHARANYI:  Your Honor, brief request for a

18   recess, really a logistical question.

19           THE COURT:  You want the witness to leave?

20           MS. BAHARANYI:  Yes, or I can come to the side bar.

21           THE COURT:  No.  We'll have the witness leave.

22           (Witness not present).

23           (Defendant not present)

24           MS. BAHARANYI:  With respect to our recross, there is

25   one piece of evidence we are going to seek to admit that's with

1    respect to the body-worn camera footage once he lays the

2    foundation for it.

3           THE COURT:  Okay.  Any objection?

4           MS. NICHOLAS:  Not knowing what it is, your Honor, I

5    think it's likely outside the scope of recross on what --

6           THE COURT:  Yeah.  I don't usually bother about scope

7    but I do object to, as I have previously with the government

8    and now with the defense, the cumulative recross is not an

9    opportunity to just repeat questions you've already asked but

10   this is something new.  So, is it the portion you showed him

11   before that you want to put into evidence?

12          MS. BAHARANYI:  That's right.  And for that particular

13   portion it does, I think we showed the government previously it

14   shows Lucha in the car but he is not threatening anyone.  He

15   doesn't try to injure or hurt the officer.  The officer got

16   home safely.  So, we want to make sure that's clear to the

17   jury.

18          MS. NICHOLAS:  Your Honor, if I may, it's simply not

19   relevant.  Defense counsel put at issue whether or not

20   Detective Casey was -- the duty in the course of their cross

21   examination.  It was relevant to make sure the jury understood

22   he was all alone and trying to be safe, perhaps, not doing

23   every little detail.  There's been no accusation or allegation

24   of violence they brought out that no one got hurt.  There's

25   been testimony that no one got hurt.  And frankly, your Honor,

1    that the government not introducing a considerable amount of

2    body worn cam are to suggest otherwise.  I think this is

3    opening the door to things that the government's not put at

4    issue in the case and want to flag that for the Court.

5          MS. BAHARANYI:  It might be helpful for the judge to

6    review the brief footage that we're talking about.

7          THE COURT:  So, I'm going to allow you to put that

8    into evidence but I worry that some of your questions came

9    close.  I don't think they crossed the line yet, opening the

10   door to stuff I excluded at your request in the motion in

11   limine stage about how long a standoff lasted and what it was

12   and all like that.  There when you are talking about Did you

13   get home safely?  Yes, he answered that by pointing out he

14   didn't get home till many, many, many hours later.

15         MS. BAHARANYI:  Which he tried to address with his

16   administrative duties, your Honor.

17         THE COURT:  I think I'm going to, unless you want to

18   open that door, I think I'm going to limit you to just showing

19   the tape.

20         MS. NICHOLAS:  Your Honor, if I may, on the nature of

21   the tape.  It's the same tape that was used to refresh I think

22   the witness' answer was, he didn't know who that person was and

23   now defense counsel is offering that they are going to use that

24   video to show that the defendant --

25         THE COURT:  Well, the jury has now seen the defendant

1    both in court and in various photographs that you --

2              MS. NICHOLAS:  The person in the video is not visible,

3    your Honor.  They're behind a rolled up window with the mask

4    on.

5              MS. BAHARANYI:  They've rolled down the window and you

6    can hear their voice, your Honor.  I do think it might be

7    worthy to see.  The government knows it's Lucha El.  We know

8    it's Lucha El.

9              MS. NICHOLAS:  I actually think the prior testimony in

10   the 3500 suggests nobody's sure that's Lucha El.

11             THE COURT:  Well, that's interesting.  All right.  Let

12   me see it.

13             (Videotape played)

14             THE COURT:  No, no.  I think there's no way the jury

15   can rationally know that that's his voice as opposed to other

16   person's voices.  It's much too small a snippet to make an

17   informed decision given that and given that you cannot see his

18   face at all, the objection is sustained.

19             Let me ask the government, do you want to proceed to

20   your next witness?

21             MS. NICHOLAS:  Yes, your Honor, we do.

22             THE COURT:  All right.  So let's bring in the jury.

23             (Jury present)

24             THE COURT:  Please call your next witness.

25             MS. SMYSER:  Your Honor, the government calls

1    Massachusetts State Trooper Gregory Jones.

2     GREGORY JONES,

3         called as a witness by the Government,

4         having been duly sworn, testified as follows:

5             COURTROOM DEPUTY:  Please state and spell your name

6    slowly for the record.

7             THE WITNESS:  Gregory Jones, G-r-e-g-o-r-y, last name

8    Jones, J-o-n-e-s.

9             THE COURT:  Go ahead.

10   DIRECT EXAMINATION

11   BY MS. SMYSER:

12   Q.  Good afternoon, Sergeant Jones?

13   A.  Good afternoon, ma'am.

14   Q.  Where you do you presently work?

15   A.  For the Massachusetts State Police.

16   Q.  How long have you worked for the Massachusetts State

17   Police?

18   A.  17 years.

19   Q.  What is your title there?

20   A.  Sergeant.

21   Q.  Are you assigned to a particular unit or team with the

22   Massachusetts State Police?

23   A.  Yes, the firearms identification section.

24   Q.  What are some of your responsibilities?

25   A.  Firearms identification.  I go to crime scenes, collect

1   ballistics or firearms identification, evidence.  I attend

2   autopsies to collect evidence from deceased, as well as

3   comparison cases where we compare discharged cartridge cases

4   and projectiles to unknown and known weapons.

5   Q.  How long have you been a member of the firearm

6   Identification Section?

7   A.  11 years.

8   Q.  Sergeant Jones, I want to direct your attention to July 3,

9   2021.  Did you do any work with the Firearms Identification

10  Section that day?

11  A.  Yes, ma'am.

12  Q.  What did you do?

13  A.  I responded to a call out from the on-call.

14  Q.  What's a call out?

15  A.  It's a call from whoever the on-call is that day.  They

16  would say you are, your response is necessary at a particular

17  scene.

18  Q.  Can you just pull the mic a little bit closer to you,

19  Sergeant Jones.

20          Where was that scene that you received a call from?

21  A.  Route 95 north in the area of Wakefield, Massachusetts.

22  Q.  After you received that call, what did you do?

23  A.  I proceeded to get dressed in my state police attire and

24  proceeded to go to the scene in which I was requested.

25  Q.  Approximately, what time did you arrive at the scene?

1    A.  Eight o'clock in the morning.

2    Q.  When you got to the scene, what was your role there?

3    A.  Immediately, I wasn't able to proceed to the exact scene.

4    We went to a command post and waited for the order to move

5    forward and process what was the scene at that time.

6    Q.  Did you eventually get to the scene on I-95?

7    A.  Yes.

8    Q.  Did you process any evidence on that scene?

9    A.  No.

10   Q.  What did you do there?

11   A.  Checked the area for any firearms or anything that needed

12   to be made safe at that particular time.

13   Q.  When you say "made safe", what do you mean?

14   A.  By that I mean checking to see if there were any firearms

15   on the ground, any ballistics related evidence in the form of

16   live ammunition or discharged cartridge cases.  In this

17   particular case there was nothing that needed to be made safe

18   at this point.

19   Q.  Did there come a time when you were able to collect and

20   process ballistics evidence?

21   A.  Yes.

22   Q.  When was that?

23   A.  Later on in the evening when we myself and my co-workers

24   then moved over to the Danvers State Police Barracks.

25   Q.  I am going to show you what's in evidence as Government

N8TAAPER6                         Jones - Direct

1    Exhibit 304.

2              MS. SMYSER:  We can publish this for the jury?

3    Q.  Sergeant Jones, can you explain what we're looking at here?

4    A.  These are the two vehicles that were at the primary scene

5    on Route 95 north Wakefield.  The first vehicle is a gray in

6    color Honda Ridgeline pick-up truck.  The second vehicle behind

7    this, it was the exact same vehicle I saw at the scene as a

8    Ford Transit black in color van.

9    Q.  So you mentioned that you went to the Danvers barracks

10   after being on the scene; is that correct?

11   A.  That's correct.

12   Q.  Where were these vehicles at that time?

13   A.  These exact same vehicles were towed to the Danvers

14   barracks.

15   Q.  Did you follow those vehicles to the Danvers barracks?

16   A.  Yes.  I was assigned to drive directly behind the tow

17   trucks that were towing these vehicles.

18   Q.  What did you do when you got to the barracks?

19   A.  When I got the barracks we made sure they were secured in

20   the mechanics barrage bay.  At that time they were not, the

21   warrants were not established, processed the vehicles as of

22   yet.  So, we stood by and waited for warrants.

23   Q.  When you are referencing "warrants", what are you talking

24   about there?

25   A.  The ability to go through and process the vehicles was not

1  authorized as of yet.  So we had to wait for the warrants to be

2  signed by the magistrate or judge.

3  Q.  So you were waiting for search warrants for a vehicle?

4  A.  Yes.

5  Q.  Were those search warrants obtained at some point in time?

6  A.  Yes.

7  Q.  Were the vehicles searched after that?

8  A.  They were.

9  Q.  Did you participate in those searched?

10  A.  Yes.

11         MS. SMYSER:  We can take that down.

12  Q.  Sergeant Jones, can you just look in front of you.  There's

13  binder there and could you flip through the binder for the

14  exhibits marked for identification as Government Exhibits 305,

15  306, and 316 and 317.

16         Do you recognize those?

17  A.  I do.

18  Q.  What are those?

19  A.  This is the exact same vehicle, the gray Honda Ridgeline

20  pick-up truck.  The first Exhibit 316 is a side view of that

21  vehicle.  Exhibit 317 is a rear photo of the rear of the

22  vehicle.

23  Q.  And is the other vehicle pictured in 305 and 306?

24  A.  Yes.

25  Q.  Are these photographs fair and accurate representations of

1    those vehicles on that day at the barracks?

2    A.  They are, yes.

3            MS. SMYSER:  Your Honor, the government offers

4    Government Exhibit 305, 306, 316 and 317.

5            THE COURT:  It's all previously entered objections

6    that were dealt with generically previously are preserved and

7    the exhibits are received.

8            (Government's Exhibits 305, 306, 316 and 317 received

9    in evidence)

10            MS. SMYSER:  May we publish?

11            THE COURT:  Yes.

12            MS. SMYSER:  Ms. Sankar, could you please display

13    Government Exhibit 305 along with Government Exhibit 306.  And

14    publish them for the jury.

15            (Pause)

16    Q.  What are we looking at here in the picture on left?

17    A.  The picture on the left is the exact same vehicle, the

18    black in color Ford Transit van.  The picture on the right is

19    the vehicle's rear doors opened and photo of the vehicle in its

20    natural state at the Danvers barracks.

21    Q.  When were those photographs taken relevant to when the

22    search of the vehicles occurred?

23    A.  Prior to the active search being actually in progress.

24            MS. SMYSER:  Ms. Sankar, can you please display

25    Government Exhibits 316 and 317 side-by-side.

N8TAAPER6                        Jones - Direct

1              (Pause)

2    Q.   Sergeant Jones, what do you see here?

3    A.   The exact same gray in color Honda Ridgeline pick-up truck

4    side view and rearview of the same vehicle that was at one time

5    on Route 95 north Wakefield in the mechanics bay at Danvers

6    barracks.

7    Q.   Were those photographs also before a search occurred?

8    A.   Yes.

9    Q.   Were these vehicles searched?

10   A.   Yes, they were.

11   Q.   Could you explain at a high level what your role was during

12   that search?

13   A.   During the search my job was to point out to the crime

14   scene section what I saw as a firearms related evidence.  They

15   photoed the evidence.  Then I documented exactly what I saw.

16   Q.   Were any firearms found?

17   A.   Yes.

18   Q.   What about ammunition?

19   A.   Yes.

20   Q.   Could you please look back in your binder and just flip

21   through what's been marked for identification as Government

22   Exhibits 308 through 315 and also 318 and then look up when you

23   are you done.

24              (Pause)

25   Q.   Do you recognize these photographs?

1   A.   I do.

2   Q.   What are they?

3   A.   The firearms and ammunition that was seized on that day

4   from these vehicles.

5   Q.   How do you know?

6   A.   Because I personally handled these weapons and ammunition

7   and documented same.

8   Q.   Are these a fair and accurate reputation of the firearms

9   and ammunition that was seized that day?

10  A.   Yes.

11          MS. SMYSER:   Your Honor, the government offers

12  Government Exhibit 308 to 315 and 318.

13          THE COURT:   Yes, with the same qualifications

14  previously mentioned, those are received.

15          (Government's Exhibits 308 - 315 and 318 received in

16  evidence)

17  Q.   Sergeant Jones, approximately, how many firearms were

18  seized on that day?

19  A.   Approximately, nine.

20          MS. SMYSER:   Ms. Sankar, could you please display

21  Government Exhibit 308.

22          (Pause)

23  Q.   What is this, Sergeant Jones?

24  A.   This is a .22 caliber Glock.

25  Q.   Where was it seized from?

1  A.  This was seized from the black Ford Transit van in between

2  the driver and the passenger seated area in the front.

3          MS. SMYSER:  Ms. Sankar, could you please display

4  Government Exhibit 309.

5          (Pause)

6  Q.  Sergeant Jones, is this the same gun that we were just

7  looking at?

8  A.  Yes.

9  Q.  Can you see the serial number?

10 A.  I can.

11 Q.  Could you please read the serial number?

12 A.  "A" as in apple, "E" as in echo, "L" as in lima, "Y" is in

13 Yankee, 222.

14 Q.  Sergeant Jones, could you please look to your right for the

15 items that's been marked for identification as Government

16 Exhibit 531.

17 A.  What I'm doing now, I'm just checking to make sure it's

18 safe to handle, clear and empty.

19 Q.  Do you recognize this?

20 A.  I do.

21 Q.  What is it?

22 A.  This is the same .22 caliber Glock model 44 that I just

23 explained as the serial number matching the same numbers that I

24 just read off.

25          MS. SMYSER:  Your Honor, the government offers

1   Government Exhibit 531.

2           THE COURT:  Received.

3           (Government's Exhibit 531 received in evidence)

4   Q.  Sergeant Jones, can this gun be loaded right now?

5   A.  Presently, no.

6   Q.  Why not?

7   A.  There's a zip tie making, to show that there's no piece of

8   live ammunition capable of being placed into the area where it

9   would be fired.

10          MS. SMYSER:  Your Honor, could the witness walk this

11  firearm in front of the jury?

12          THE COURT:  Yes.

13          (Pause)

14  Q.  Sergeant Jones, did you examine this firearm?

15  A.  Yes.

16  Q.  Was it loaded at the time that it was recovered?

17  A.  No.

18  Q.  What caliber of gun was this?

19  A.  .22 long rifle.

20  Q.  Was any .22 caliber ammunition found in the van?

21  A.  Yes.

22  Q.  Where was that ammunition found in relation to where this

23  gun was found?

24  A.  It was about 12 to 16 inches behind the firearm in a

25  magazine.

N8TAAPER6                          Jones - Direct

1    Q.  So it was contained inside of a magazine?

2    A.  Yes.

3    Q.  Can the .22 caliber ammunition that you just mentioned in

4    that magazine be used with Government Exhibit 531?

5    A.  Yes, it could.

6    Q.  Could it successfully be loaded into and used with any

7    other gun that was seized that day?

8    A.  No.

9    Q.  Okay.  Sergeant Jones, could you please flip in the back of

10   your binder?

11          THE COURT:  Counsel, I think that's as far as we can

12   go today.  So we'll continue tomorrow.

13          So, ladies and gentlemen, tomorrow because of another

14   matter I have, we'll start at 10:00.  So you don't need to be

15   here, water main breaks notwithstanding, until 9:45 and then

16   we'll start promptly at 10:00.

17          You'll be glad to know that we're right on schedule.

18   In fact, I think the government will probably conclude its case

19   sometime tomorrow.  We're making great progress.

20          Have a very good evening and we'll see you tomorrow at

21   a few minutes before 10:00.

22          (Jury not present)

23          THE COURT:  Sergeant, you can step down.  We'll see

24   you tomorrow at 10:00.

25          THE WITNESS:  Thank you, sir.

1          THE COURT:  Okay.  I am going to take another matter

2     for a half hour and then we'll have your charging conference at

3     five o'clock.  So, you can leave your stuff at the table I

4     think but just vacate the premises, so to speak, and we'll see

5     you at five o'clock.

6          (Recess)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

N8TBPER7

1         (Jury not present)

2         THE COURT:  So before we get to the charging

3    conference, I had directed defense counsel to tell me by 24

4    hours before the close of the government's case whether they're

5    going to call Ms. Otero or not, so what's the answer.

6         MS. MAYO:  Your Honor, yes, I believe we are calling

7    Ms. Otero.

8         THE COURT:  Okay.  And what is the government's

9    estimate as to when they're case will end.

10        MS. SMYSER:  Probably another hour of direct

11   testimony, your Honor.

12        THE COURT:  And I'm guessing, who do we have other

13   than the witness on the stand?

14        MS. SMYSER:  The witness on the stand followed by

15   Julia Gutierrez who is a paralegal in our office.

16        THE COURT:  You mean a paralegal specialist.

17        MS. SMYSER:  Of course.

18        THE COURT:  So it sounds like you will, even with

19   substantial cross-examination, that the government might rest

20   by 11:30, 11:45 tomorrow, so then we'll hear any motions.  That

21   would take us to noon, so Ms. Otero has to be here by noon.

22        MS. MAYO:  Understood, your Honor.

23        THE COURT:  And of course at the time that the

24   government does rest, then you'll tell me whether the defendant

25   is taking the stand or not.

N8TBPER7

1          MS. MAYO:  Yes, your Honor.

2          THE COURT:  Very good.  Assuming, I'm sorry, yes.

3          MS. SMYSER:  Sorry, your Honor.  We would just ask if

4     the defense could advise us as to how long Ms. Otero will be on

5     the stand.

6          MS. MAYO:  Your Honor, I would anticipate no more than

7     30 minutes of direct testimony if that.

8          MS. SMYSER:  I just want to put on the record, your

9     Honor.  We did receive a production under Rule 26.2 last night

10     late from the defense.  It was not a meaningful production at

11     all.  It said, discussed testimony.  We ask the defense to

12     provide a more descriptive summary of their conversation with

13     the witness, which they decline to do.

14          THE COURT:  Well, I'm not sure they have any

15     obligation to do.  They provided reverse 3500 material, right?

16          MS. SMYSER:  They did provide very brief reverse 3500.

17     As the Court knows when the government provides 3500 it is a

18     more fulsome statement of what the witness has said to us.

19          THE COURT:  You say that, but let's actually be clear.

20     It wasn't until about 10 or 15 years ago that the Second

21     Circuit in an opinion by Judge Leval reprimanded the Southern

22     District of New York for purposefully either not taking notes

23     at all in order to avoid disclosure under 3500, or at taking

24     the most cryptic notes.  I'm glad and delighted that the

25     government has learned its lesson, but it's not exactly a long

N8TBPER7

1  tradition with the Southern District of New York.

2          MS. SMYSER:  Understood, your Honor.  We just would

3  formalize our request for the fulsome 26.2 material from the

4  defense which we asked for previously on multiple occasions.

5          THE COURT:  By the way you, and everyone else use the

6  term "fulsome" thinking it means very full, but the actual

7  primary dictionary definition is, it is derogatory as if

8  fulsome praise means overdone praise and so forth, but we can

9  excuse that derogation, but I'll ask.

10          What's Ms. Otero going to say?

11          MS. MAYO:  Your Honor, if I could just have one moment

12  to consult with my colleagues.

13          THE COURT:  Sure.

14          MS. MAYO:  Your Honor, if you would allow me to just

15  consult with the first chair who is not here right now before I

16  answer your Honor's question and we can turn over papers later

17  if necessary.

18          THE COURT:  Okay.  I mean here's the situation you

19  face.  If you don't give me a full description now so I can

20  anticipate any disputes and rulings I might have to make, then

21  we'll proceed.  We'll take maybe two minutes of your witness's

22  testimony, then we'll break for ten minutes to discuss any

23  disputes, then we'll take another two minutes of your witness's

24  testimony and then we'll break for two hours.  You got the

25  idea.

N8TBPER7

1          MS. MAYO:  Yes, your Honor.

2          THE COURT:  Very good.  Okay.  In terms of summations,

3    I think we'll have summations then tomorrow afternoon, and we

4    may or may not get to the charge if it goes the full two and a

5    half hours then we will not get to the charge till Thursday

6    morning, but we'll see if it goes that long, but at least we'll

7    get started on summations and hopefully complete them tomorrow

8    afternoon.

9          In terms of -- and this can wait till tomorrow night

10   since you my have other things to occupy yourself between now

11   and then -- we're going to need an exhibit list including any

12   defense exhibits, and so it needs to be shown to both sides to

13   make sure both sides agree. And then all the exhibits, except

14   for the guns and ammunition will go into the jury; except I

15   didn't realize until this afternoon that we're going to have a

16   few videos.  So with videos, what I'd like to do is have

17   counsel prepare a little thumb drive and a laptop to go into

18   the jury room so they could look at the videos if they want to.

19         MS. SMYSER:  We're prepared to do that.  We also have

20   a few Excel documents.

21         THE COURT:  Yes.  Okay.  And I will change my charge

22   to make sure that the jury understands that the thumb drive

23   will also include the Excel documents or the laptop will have

24   access to it, whatever you want to work out.  You let me know

25   before I charge the jury.  Okay.  Very good.  Let's turn to the

N8TBPER7

1    charge.  I see defense counsel brought in the heavy guns.

2              MS. HUTCHINSON:  Good afternoon.  Kendra Hutchinson.

3    I've been assisting with the trial team.

4              THE COURT:  Nice to have you aboard.

5              MS. HUTCHINSON:  Thank you so much.

6              THE COURT:  Any objections to the general instructions

7    one through eight?  Of course number eight would be changed if

8    the defendant does choose to testify, but any objections other

9    than that possibility?  Anything from the government, one

10   through eight?

11             MS. SMYSER:  No, your Honor.

12             THE COURT:  From the defense?

13             MS. HUTCHINSON:  No, your Honor.

14             THE COURT:  So let's talk about the more substantive

15   charges beginning with instruction nine.  Here we'll do it

16   individually.  Any objection or addition to instruction number

17   nine from the government?

18             MS. SMYSER:  No, your Honor.

19             THE COURT:  From the defense?

20             MS. HUTCHINSON:  No, your Honor.

21             THE COURT:  Number 10, anything from the government?

22             MS. SMYSER:  No objection.

23             THE COURT:  Anything from the defense?

24             MS. HUTCHINSON:  No, your Honor.  We think that

25   breaking it out into the four elements like Sand it does in the

N8TBPER7

1    modern pattern instruction is preferable.  Your Honor has it

2    perfectly fine here.

3        THE COURT:  Thank you.  It is Sand, et al, and one of

4    the als is Judge Rakoff.  If you look carefully through the

5    multiple volumes of Sand, et al, you will see periodically

6    short form instructions, and they are authored by me because I

7    think most of Sand's instructions are too long.  So, anyway, I

8    am pleased that you've accepted the three element approach.

9        So turning to the first element instruction number 11.

10   Any objections from the government, objections or suggestions?

11       MS. SMYSER:  No, your Honor.

12       THE COURT:  From the defense?

13       MS. HUTCHINSON:  Yes, Judge.  I was actually going to

14   point out during this that one of the things we do appreciate

15   is your Honor's brevity in the instruction because we believe

16   that the jury can understand it better.  That's the whole

17   point, that we don't want them to be confused.

18       On the other hand, we do think the particular

19   formation omits several important concepts and we ask the Court

20   to include them.  And we did make a request to charge.  It was

21   our request to charge number three.  I'm assuming the Court is

22   not accepting the entirety of that.

23       THE COURT:  Well, the fact that I rejected any given

24   charge that you or the government requested is often because it

25   is overwrought or includes -- and the law of the Second

N8TBPER7

Circuit, as I'm sure you know, is that the Court can reject any charge, any portion of which is wrong, even if the rest of the charge is right.  So feel free to suggest the portions you now feel are most important to be included.

MS. HUTCHINSON:  I really welcome that.  Thank you very much, your Honor.  I'd like to request basically two lines be added, and I'm happy to file papers later tonight if that would be helpful to the Court.

THE COURT:  Give it to me orally.

MS. HUTCHINSON:  Line number one would be, "The government must prove that the defendant and one or more other person, people, agreed upon future conduct that includes all the elements of the object crime."  That comes from United States v. Pinckney, 85 F.3d 4, and that's verbatim from that case.

And the second line would be in particular, "The government must prove that the defendant specifically intended to commit the object crime and acted intentionally, willfully and knowingly," and that is from United States v. Anderson.

THE COURT:  I don't think the first one can be ripe because I don't think that the conspirators have to agree to commit an overt act.  Do you know anything to the contrary?

MS. HUTCHINSON:  I'm aware of that law, your Honor, but I actually said under the object crime.  I agree with your Honor about the overt act.

N8TBPER7

1          THE COURT:  One possibility would be to say, The

2     elements of this crime are more specifically set forth in the

3     substantive count, and you should refer to that.  And that the

4     first two elements of that or the first three, whatever it is,

5     all but the overt act.  Well, the overt act is part of the

6     conspiracy, but I do think you may be entitled to something

7     that they have to agree to commit the underlying crime.  But I

8     wonder if the best way to handle that is simply to say, And the

9     elements of the underlying crime are more specifically set

10     forth in instructions, whatever the numbers are.

11          MS. HUTCHINSON:  That's one suggestion that we made in

12     our longer request of charge.  I was a little worried after

13     reviewing your Honor's instructions in desire to be concise to

14     the jury that maybe breaking it down a little more carefully

15     might be better, but if that makes sense to your Honor.

16          THE COURT:  I tell you, another possibilities, let me

17     just throw out possibility, is to start first with Count Two,

18     and instruct them as to the elements of the substantive.  And

19     then when we get to conspiracy, we can say, you already know

20     what the elements and now you have to know that the parties

21     have to agree to it, to commit the crime we've just described.

22          MS. HUTCHINSON:  I don't know that we object to going

23     out of order.  And I've seen your Honor's past instructions.  I

24     understand you've done in the past for ease.  I want to really

25     stress here that the willfulness -- the willfulness of the

N8TBPER7

1    underlying predicate crime is important here, and that the jury

2    needs to have the specific intent and they need to be

3    instructed that.

4              THE COURT:  That's going to be the big part of the

5    discussion I've already anticipated.  But I'll tell you what, I

6    am going to ask you.  I think you're right.  Send me by 8:00

7    tonight any specific suggestions that I ask you to send me, and

8    I'm asking you to send me the two.  I don't think you get both.

9    You get one or the other at best, but I'll take a look at that.

10   I do think -- I want to hear from the government, but I do

11   think in someway the jury has to be or should be, they don't

12   have to be, but they should be apprised that the elements of

13   the substantive count are basically what the parties have to

14   agree to if they're guilty of conspiracy.

15             MS. SMYSER:  Your Honor, we agree generally it would

16   be fine to instruct them as to the agreement as to the

17   underlying object, underlying offense here, and perhaps as your

18   Honor suggested it would make sense to move up Count Two to do

19   that first.

20             THE COURT:  That's what I've done as in other cases,

21   and I'm sorry I didn't.  This case is moving I'm delighted to

22   say so quickly that I didn't have a chance to think that

23   through before getting you this draft.  But, in one of those

24   ways I will make clear to the jury that they have to find those

25   elements, that the agreement incorporates the elements of the

N8TBPER7

1  underlying crime.

2          Anything else on instruction number 11?  Okay.  Let's

3  turn to instruction number 12, and I think here -- and the key,

4  if I'm not mistaken, key paragraph of possible dispute is the

5  second paragraph which in the present form reads -- by the way

6  have we given a copy of this to the court reporter.  Let's do

7  that right now.  We're on page 20 instruction number 12.

8          The section paragraph reads:  "Unlawfully simply means

9  contrary to law.  A defendant need not have known that the

10  purpose of the conspiracy was to violate any particular or a

11  specific law, but he needs to have been aware that the purpose

12  of the conspiracy was generally unlawful in nature.  Knowingly

13  means that the defendant actually knew the object of the

14  conspiracy as opposed to acting negligently or by accident, and

15  intentionally means that the defendant purposely agreed to the

16  unlawful object.  Now we could change the word "intentionally"

17  to willfully, but "willfully" as the Supreme Court has said a

18  hundred times has many meanings.  So I don't think it is

19  particularly useful to use "willfully" when what we mean is

20  intentionally.

21          But I think the real issue -- and counsel raise any

22  other issues they have -- the real question is, Do you have to

23  know that it's illegal to transport guns in interstate commerce

24  to a state where -- to a state where the receiver is not from

25  the state where the guns originated, and in case of conspiracy

N8TBPER7

and agreement to do that.  In other words, that kind of

specific intent.  Or whether it's just enough to have a general

recognition of what you're doing is unlawful or bad.  So I was

originally leading as part of a little bit reflected in my

preliminary charge towards the more specific knowledge, and

then my able law clerk call to my attention the case of Bryan

v. United States decided by the Supreme Court in 1998, 524 U.S.

184, which involves another sale of firearms without a license.

And the defense argued that you had to have the more

specific knowledge that is reflected in cases like Cheek and

Ratzlaf.  But the Supreme Court in an opinion by Justice

Stevens rejected that and said that in this context "willful"

just means knowledge that the conduct was unlawful in a general

sense, so let me give two quotes from that opinion.

First at page 191 "As a general matter when used in

the criminal context, a willful act is one undertaken with a

bad purpose.  In other words, in order to establish a willful

violation of the statute, the government must prove that the

defendant acted with knowledge that his conduct was unlawful."

The Court then goes on to reject the notion that more needs to

be shown in this rather similar case involving un-licensed sale

guns and says "thus -- this is on page 196 "thus the willful

requirement of Section 924(a)(1)(D) that was the specific

subsection of 924 involved in that case, "Thus the willfulness

requirement of Section 924(a)(1)(D) does not carve out an

N8TBPER7

1    exception to the traditional rule that ignorance of the law is

2    no excuse; knowledge that the conduct is unlawful is all that

3    is required."  So that's how I wound up drafting this the way I

4    did.  So let me hear -- focusing just on that paragraph and

5    then we'll talk about the rest of the charge.  Any problems

6    with that from the government?

7              MS. SMYSER:  Your Honor, our one issue with the

8    paragraph, which I'll address in just a moment, but I do want

9    to stress that we agree entirely with Bryan -- and I want to

10   point out to the Court just that the statute at issue there was

11   924(a)(1)(D) as your Honor said.  That is the provision that

12   provides the willfulness requirement from 922(a)(3) --

13             THE COURT:  I agree.

14             MS. SMYSER:  So we think it governs entirely.  As to

15   this particular paragraph, we were a little concerned about the

16   use of unlawfully and it being confusing to the jury and

17   perhaps just providing.

18             THE COURT:  It use to be in every indictment, but it

19   wasn't in this indictment if I'm not mistaken.  Let me double

20   check that.  No.  This is paragraph one of Count One of the

21   superseding indictment.  Willfully and knowingly are the two

22   terms used.  So we could change this to willfully and knowingly

23   and the willfully would essentially be the same language that

24   is in Bryan, so that might be an easier way to deal with it.

25   What about that from the government's standpoint?

N8TBPER7

1          MS. NICHOLAS:  The government is fine with that, your

2     Honor.

3          THE COURT:  So now let's turn to defense counsel.

4          MS. HUTCHINSON:  We agree with the government that

5     "unlawfully" here is better replaced with "willfully," and I

6     think that the precedent supports that because the requirement

7     of a willful -- the defendant willfully join in the conspiracy

8     and I understand --

9          THE COURT:  The reason "unlawfully" is there -- and

10     this is really my mistake.  From approximately 1789 to 1980

11     every indictment issued in the Southern District of New York

12     said unlawfully, willfully and knowingly, and then they got

13     smart and cut out unlawfully, and I forgot about that, but I

14     agree with both sides.  We'll take unlawfully out.

15          MS. HUTCHINSON:  I'm happy to engage when we get to

16     the substantive offense about the Court's question about Bryan,

17     the very interesting questions.

18          THE COURT:  Go ahead now.  As you correctly pointed

19     out, conspirators have to agree to the elements of the crime.

20          MS. HUTCHINSON:  So our contention is that at a

21     minimum the Court as to the substantive 922(a)(3) and

22     consistent with Bryan, at a minimum the Court would have to

23     give an expanded willfulness charge that as both the defense

24     and the government have requested that explains "willfulness"

25     in terms of the language that you your Honor just cited in

N8TBPER7

1    Bryan about intent to disobey, etc. There's an additional

2    contention now that your Honor is bringing up which is whether

3    922(a)(3) potentially requires a higher showing now.

4         And, your Honor, Brewen certainly shows -- and again

5    we're not contesting the constitutionality.  That's not a

6    defense before a jury.

7         THE COURT:  That you may recall in Cheek which is the

8    first case that kind of get into this horace. They said in that

9    case tax offense you had to know the law, but you didn't have

10   to know the Constitution; or to put it more affirmatively, that

11   same reasoning did not apply to a constitutional defense.

12        MS. HUTCHINSON:  Exactly, your Honor.  And so I think

13   there's an argument now after Brewen upended like reasonable

14   jurist, decades of reasonable jurist beliefs and people's

15   beliefs about what the Second Amendment meant.  There's an

16   interesting argument now that innocent conduct can be swept up

17   in or that people can differ in their beliefs as to their right

18   to bear arms.  And so we would argue that here this is a

19   case -- and also these are technical statutes.  This is not

20   922(g)(1) --

21        THE COURT:  Right now -- and this can change if the

22   defendant takes the stand -- but right now there's zero

23   evidence that the defendant was relying on Brewen or his

24   interpretation of where the law was.  He has raised that in his

25   pro se filing in this case which was -- I won't spend anymore

N8TBPER7

1    time on because it's so dear to my heart, but what's the

2    evidence that this was his belief?

3         MS. HUTCHINSON:  Certainly, your Honor.  Well, I mean,

4    the evidence hasn't come in entirely yet, but I will say that

5    this can be -- a good faith defense can be premised upon the

6    prosecution's evidence here.  We have their very body cam

7    footage that they put in themselves in which Lucha El states, I

8    didn't do anything at all.  It's my constitutional right.  I

9    have constitutional papers in my pocket.  It's my arm. It's my

10   constitutional right to carry.

11        THE COURT:  That's the argument I think that Cheek

12   rejects.

13        MS. HUTCHINSON:  I think what we're getting at here is

14   whether or not according to a good faith defense if he actually

15   beliefs this, however erroneously.  And the jury can consider

16   whether that's reasonable, and as a good faith defense charge,

17   we proposed.  But if the defendant truly believes and actually

18   believes this, then that is a defense.

19        THE COURT:  Let's talk about Cheek because I think

20   that Cheek rejects that.  In Cheek what the court Said was that

21   because the tax laws are so technical, one could have a defense

22   saying that wages are not income, which was the defendant there

23   was an American airline pilot who had gone to a seminar

24   conducted by an attorney that said that wages aren't income,

25   but his further claim that the Constitution prohibits income

N8TBPER7

1  taxes was held notwithstanding the amendment and all like that

2  was held to be not -- even if he held that belief in good

3  faith, that was not a defense.

4  So by analogy here, if the defendant was arguing --

5  although there's no evidence of this yet, but there may be --

6  arguing that, I believe that the exceptions to the registration

7  and licensing requirement don't apply to interstate or

8  something like that, that he might have a defense.  But if his

9  argument is simply, I don't think the Constitution allows this

10  statute, that's exactly what Cheek rejected.

11  MS. HUTCHINSON:  I think your Honor that is up in play

12  still now because of Brewen I think it is.

13  THE COURT:  You think Brewen overruled Cheek?

14  MS. HUTCHINSON:  No, your Honor.  But I think that the

15  reasoning of Bryan in distinguishing Cheek and Ratzlaf is

16  potentially at issue now, now that --

17  THE COURT:  Here's the -- and I apologize for

18  interrupting you, and I'm happy to hear anything you want to

19  say.  The point I'm trying to make is this:  If the defense

20  were that I had to know the statute that prohibits -- or at

21  least the concept -- that interstate trafficking in guns is

22  illegal when a guns wind up in a state of the defendant's

23  residency that's different from the state in which it

24  originated, that is the argument that I think Bryan in effect

25  rejects for the reasons the government said.

N8TBPER7

Were it not for Bryan, I frankly think that argument
is not without some force, and that's why in my preliminary
instruction I actually put in some indication that I was
leaning that way but after reading Bryan.  But if the argument
of the defense is that after Brewen one could reasonably have
the belief that anything involving the transportation and sale
of guns is okay, that I think is impermissible under Cheek.  I
think that's what Cheek rejected in the tax context, so that's
what I think is your problem.

MS. HUTCHINSON:  I understand.  Thank you, your Honor.
I would reiterate that, even if the Court does not wish to give
a good faith instruction, and I understand your ruling on this,
that it would have to give a willfulness in this instance.  And
we would request a defense theory of the case which might in
some ways encroach about that.

THE COURT:  I think what I'll do is, I am agreed with,
I think both sides, that for this paragraph -- and there's a
corresponding paragraph in the substantive count, we'll forget
about "unlawfully" and we'll expand "willfully."  But if either
side wants to give me by 8:00 tonight -- I'll tell you what,
I'll make it 9:00 because I'm a generous fellah, a sentence
that you think captures what you're saying, not a megillah, but
a sentence, I'm willing to take a look at that.  But I think it
will, at least as of now where I'm leaning is, constitutional
argument is rejected by Cheek, so I don't have to charge that.

N8TBPER7

1          The statutory argument is rejected by Brewen, so I

2   don't have to charge that.  All I have to charge is general

3   belief that what you were do something unlawful.  You still

4   have the argument, he didn't think he was doing anything wrong.

5   And I might put in, cause it's also referred to in the Bryan

6   case, did I say Brewen, I meant Bryan, in Bryan.  Bryan does

7   refer to bad purpose as well as unlawfulness.  I'm certainly

8   willing to put in bad purpose, but that's as far as I think the

9   law allows.

10          MS. HUTCHINSON:  If I may clarify, your Honor,

11   quickly.  In terms would you like me to propose what our theory

12   of a defense charge would be in a line or two?

13          THE COURT:  Yeah, that's a good idea too.

14          MS. HUTCHINSON:  Thank you so much.

15          THE COURT:  All right.  Let's move on.  Anything else

16   on instruction number 12 from the government?

17          Anything from the defense?

18          I did include in the last paragraph what you requested

19   about no guilt by association, that was because you quoted it

20   from my prior charges.

21          MS. HUTCHINSON:  That's right, your Honor.  It would

22   be too much for me to ask for two paragraphs.  But, yes, thank

23   you, your Honor.

24          THE COURT:  Instruction number 12, overt act.

25   Anything, any objections or additions from the government?

N8TBPER7

1        MS. SMYSER:  Nothing substantive, your Honor.  We just

2   wanted to flag that it says Keith Green in the second

3   paragraph.

4        THE COURT:  Yes.  Thank you very much for catching

5   that.  Anything from the defense?

6        MS. HUTCHINSON:  Yes, your Honor.  I'd like to object

7   to, in the third paragraph, the language any other act taking

8   by any other conspirators.  I understand that some case law

9   allows the government to prove even unindicted overt acts, but

10  only if it does not prejudice the defendant.  Here, allowing

11  conviction on unindicted acts does prejudice us, and it's a

12  constructive amendment of the indictment.

13       THE COURT:  That's a good point.  Let me ask the

14  government.  As I understand from the proof that's already

15  coming in, these are the two overt acts that you're relying on,

16  but are there other overt acts that you're relying on?

17       MS. SMYSER:  Your Honor, we believe we've proven these

18  two overt acts, but we also don't believe that we're restricted

19  to those.

20       THE COURT:  No, but I don't think -- this sort of

21  gets -- I'm not sure.  I disagree with the defense that it's an

22  improper amendment of the indictment, but I think what is

23  required is that you let the defense know and let the jury know

24  that we're relying on the following overt acts, not just going

25  to speculate and find an overt act.

N8TBPER7

So if there's some third or fourth or fifth overt act,
I think you need to maybe put them in your submission tonight,
and maybe I'll put them into the charge.  Now assuming then
they put in three overt acts that are not in the indictment,
the case law I think says that they can do that.

MS. HUTCHINSON:  Well, I think that the case law says
they can if it does not prejudice the defense.  I understand
your Honor is getting at fair notice here.  The problem is, the
government filed this superseding indictment alleging different
time periods and different places a little late in the game,
and then only on Friday did we learn that they have these
conspiracies are interstate not just New York.  So I want to
note this is actually does matter.  Are they alleging an overt
act in Massachusetts?

THE COURT:  Well, all right.  Here's what I'll do,
I'll think about that, but at least the government has to put
into their 9:00 submission any other overt acts that they
intend to argue satisfy the overt act.  It cannot be left to
the jury -- and another reason it can't be left to the jury is,
as I point out in my charge, the jury has to be unanimous.

And if you just say go find an overt act, there's no
guarantee.  One juror will pick number three and one juror will
pick number seven and so forth.  If you notice in the very last
sentence, However while the government need not prove more than
one overt act, you must unanimously agree on which specific

N8TBPER7

1    overt act or acts, if any, the government has proved beyond a

2    reasonable doubt.  And I think that only has practical meaning

3    if they're told exactly what the overt acts are that are being

4    charged.  So I understand your argument, but at least for now

5    I'm inclined to include other overt acts as long as they're in

6    the letter tonight that I'll receive at 9 o'clock.

7              MS. SMYSER:  Understood, your Honor.  We think that

8    there are so many potential overt acts here, so it's a little

9    difficult.

10             THE COURT:  What are you planning to argue to the

11   jury?  If your argument to the jury is, ladies and gentlemen,

12   you've heard 94 overt acts, I'm not going to tell what you they

13   are, but you can figure them out.  I don't think that is --

14             MS. SMYSER:  For example, we would say that every gun

15   purchase that Keith Vereen made is an overt act, just one

16   example.  That doesn't even include the guns that were

17   transported into Massachusetts.

18             THE COURT:  I'll think about this overall some more,

19   but in any event for now, even if it's couched the way you just

20   did, every gun purchased that was done by so and so.  Put that

21   in your letter and I'll consider it.

22             MS. SMYSER:  Can I flag one thing on the written

23   charge here.  So the second paragraph discusses Lucha El

24   sending a wire transfer in the amount of $350, and I know we're

25   often referring to the defendant as Lucha El by his preferred

N8TBPER7

1  name, I think it's important to have here Steven Perez.

2           THE COURT:  That's fine.  I have no problem changing

3  that.  On to Count Two, any problems with instruction number

4  14?  Okay.  Instruction number 15?

5           MS. SMYSER:  Your Honor, on instruction number 14.

6  The government would ask to remove "unlawfully and knowingly"

7  from the third element.

8           THE COURT:  Thank you very much.  That all has to be

9  changed.  I missed that in the summary.  That will be changed

10  just as in the way we already talked about, and I'm going to

11  give "willfully and knowingly" and I'm going to expand

12  willfully after receiving your papers.  Okay.

13           By the way, just so you all know the logistics, I will

14  get you, after reviewing your papers tonight, I will get you

15  the final charge no later than the start of lunch break

16  tomorrow so that before each side sums up you'll know what the

17  final rulings are.

18           MS. HUTCHINSON:  Judge, I'm sorry.  I made a mistake

19  before when the government ask for Lucha El to be changed to

20  Steven Perez. I understand that they are concerned because it's

21  paper, but could we also known as --

22           THE COURT:  Yes, also known as.

23           MS. HUTCHINSON:  Thank you.

24           THE COURT:  Instruction number 15, any problems with

25  that?  Instruction number 16?

N8TBPER7

1          MS. SMYSER:  Your Honor, the government has a few

2   things on instruction number 16.

3          THE COURT:  Go ahead.

4          MS. SMYSER:  First in line two, there's the reference

5   to the Canik 9mm handgun.  There are multiple Canik 9mm in this

6   case.  We would ask to add the serial number.

7          THE COURT:  I agree with that.  I meant to put that

8   in, so that will be done.  Anything else?

9          MS. SMYSER:  The other thing, your Honor, is that we

10  want to make clear in this instruction that the defendant

11  himself does not have to purchase the guns out of state.  The

12  language of the statute also includes otherwise obtained, which

13  case law has interpreted to mean through straw purchasers,

14  which is what occurred in this case.

15         And looking at the text of the statute, I think that

16  can be a little bit confusing.  The government propose in its

17  request number 13 a paragraph about this issue, and it's based

18  on --

19         THE COURT:  Wait a minute, just before we get to that.

20  I thought the government put in all those exhibits about the

21  purchase of the gun and what was recorded at the time and what

22  was recorded later on because their view is it was purchased.

23         MS. SMYSER:  Absolutely, your Honor.  We want to make

24  clear that the defendant himself doesn't have to be the one who

25  purchases the gun.

N8TBPER7

1          THE COURT:  Yeah, so I agree with that, but I'm

2     looking at -- it says a specific firearm in this case, and we

3     have the serial number and all like that was obtained outside

4     of the defendant's state of residence, and it was then

5     transported into or received by the defendant in his state of

6     residence.  What's wrong with that?

7          MS. SMYSER:  We do agree that the passive voice is

8     helpful here, though as I said in our request we made this

9     clear that the defendant doesn't have to be the person who

10    purchases the firearms out of state, but it's enough if the

11    defendant only received or accepted the guns in his state of

12    residence.  And that we would have been found to have satisfied

13    that element if he caused an agent, employee or other associate

14    to purchase and bring those guns into his state of residence.

15    This falls under the otherwise obtained text.

16         THE COURT:  Put into your letter tonight, I don't want

17    to go back to your charges exactly how you would change those

18    two sentences.  I think it's something of a -- I think the

19    present sense to say what you're saying, you want to say it

20    more explicitly, I'll consider that.

21         Anything from the defense on 16?

22         MS. HUTCHINSON:  In fact, I think we like the

23    formulation as it is your Honor.

24         THE COURT:  I'll consider that as well.  Okay.  Now 17

25    is going to be changed in the same way that I changed the

N8TBPER7

corresponding willfully and knowingly under the conspiracy

charge.  It will be the same intent, but it will be spelled out

in the new language.

Instruction number 18.  This is because the grand jury

added section two to Count Two.  Any problems with 18 from the

government?

MS. SMYSER:  No, your Honor.

THE COURT:  From the defense?

MS. HUTCHINSON:  We object to inclusion of this

instruction, your Honor.  I understand that he's indicted for

aiding and abetting.  It's just I think it's confusing in this

case.

THE COURT:  I'm glad you raised that because I was

thinking about that too.  What is the theory that the

government could argue to the jury that he aided and abetted

someone else to commit the substantive crime when the

substantive crime, all the evidence is that it was the gun

found on him that was the gun at issue?

MS. SMYSER:  Yes, your Honor.  I do think the evidence

supports that he was the one who received the firearm. But the

grand jury did indict on the aiding and abetting theory, and I

want to point out that the evidence came in today that around

the same time that Keith Vereen had purchased these guns,

including that particular Canik, he was in the same vicinity

and had calls with Rodriguez, for example, who was also talking

N8TBPER7

with the defendant, and also was meeting with Jamil Bey.  So I
think it is helpful to have that aiding and abetting
instruction in the charge, and especially we don't know exactly
what the defense is going to argue in their closing.

THE COURT:  Well, that's a good point.  Let me ask the
defense.  Are you going to make an argument of any kind that if
anyone is to blame here substantively it's X, Y or Z and not
the defendant?

MS. MAYO:  Your Honor, certainly on the conspiracy
charge I think evidence came in today on the cross-examination
of --

THE COURT:  Conspiracy is a different question.  Now
we're talking about the substantive charge.  And so I mean the
argument that I don't think you're going to make, but you
correct me if I'm wrong is, ladies and gentlemen, just because
it was in his possession doesn't mean much because really for
all you know he was just carrying that for a friend, and then
aiding and abetting would be relevant.

MS. MAYO:  On the substantive charge, no, your Honor.
I don't think we're making that argument.  I think previewed in
our opening willfulness is -- not to box us in, I don't think
we will be making that argument, no.

THE COURT:  So I wonder if aiding and abetting is just
confusing here because it doesn't apply to any facts that goes
to the argument.

N8TBPER7

1          MS. SMYSER:  Your Honor, given what the defense has

2     proffered about their argument about the conspiracy, I think

3     they're going to hear argument from the defense about other

4     people involved in these things.

5          THE COURT:  Clearly they're going to say like the guy

6     who the witness said was the leader, they're going to say, and

7     what was poor Mr. Lucha doing.  He was just driving the car and

8     all like that, but that only goes to the conspiracy.

9          MS. SMYSER:  Absolutely, your Honor, but we don't know

10    the extent of their argument, so I think it may be difficult

11    for the jury to parse them between conspiracy and substantive

12    counts here.  And the aiding and abetting instruction could

13    help clarify.

14         THE COURT:  Here's what I think makes sense.  I will

15    leave it in for now.  If after hearing summations, since I

16    won't be charging till the day after, I've heard nothing from

17    either side that remotely supports an aiding and abetting

18    approach, then I'll cut it out and we'll renumber the last

19    charges and that will be simple enough.  Okay.

20              Instruction number 19, venue, any problem with that?

21              MS. SMYSER:  No, your Honor.

22         THE COURT:  Any problem from either side on 19, 20 or

23    21?

24         MS. SMYSER:  Your Honor, we have no problems with

25    those.  We did have a few other general instructions to

N8TBPER7

1    suggest.

2            THE COURT:  Go ahead, but first any problems with

3    those from the defense, those three?

4            MS. HUTCHINSON:  No.

5            THE COURT:  Other instructions that you want.  I have

6    to be a little mindful of the time because as possibly you

7    know, but probably not, my hobby is ballroom dancing and I'm

8    meeting my wife to go dancing at 7:00.  But nevertheless, when

9    I get back from dancing, I'll have the romantic advantage of

10   reading your papers.  What a way to end the evening.  But,

11   anyway, go ahead?  What else would you like to add?

12           MS. SMYSER:  We have three proposed general

13   instructions to add which were included in our request to

14   charge.  The first is a person's not on trial charge.  I think

15   we've heard testimony about unindicted co-conspirators.  It's

16   the government's request number 20.

17           THE COURT:  I say I included, not that, but I did

18   include in instruction -- the second instruction, instruction

19   number two.  This is at page six.

20           Furthermore, you should be careful not to speculate

21   about matters not in evidence.  For example, there is no legal

22   requirement that the government prove its case through a

23   particular witness, or by use of a particular law enforcement

24   technique, nor should you speculate about why one or another

25   persons whose name may have figured in the evidence is not part

N8TBPER7

1    of this trial, or what his or her situation may be.  Your focus

2    should be entirely on assessing the evidence that was presented

3    here for your consideration.  Why doesn't that eliminate the

4    problem you're talking about?

5              MS. SMYSER:  We're actually fine with that.

6              THE COURT:  What was your second one?

7              MS. SMYSER:  The final request is a motive

8    instruction, that proof of motive is not a necessary element of

9    these crimes.  It's request number 17.

10             THE COURT:  I may put in something along that.  Okay

11   and the third?

12             MS. SMYSER:  The final thing, your Honor, is that we

13   would like the opportunity to perhaps propose language about

14   potentially instructing on what is required under New York law

15   to purchase a gun.  We think that there may have been some

16   confusion about that created with the expert Special Agent

17   Gordon, and we have introduced evidence that the defendant does

18   not have a permit to carry a firearm in New York, and is also

19   not to purchase a firearm in New York.  So it is obviously the

20   role of the Court to instruct on the law, and so we think it

21   would be helpful to have a short instruction on.

22             THE COURT:  I'll consider it, although I think I cut

23   off the cross-examination on that.  So if there was any

24   confusion, it was created on your direct.  But why don't you

25   give me like a two sentence version of that in your letter and

N8TBPER7

1    I'll consider it.  Okay.  Finally, anything else from the

2    defense?

3              MS. HUTCHINSON:  Yes, your Honor.  I don't want to

4    take your Honor past where you want to be, but I think we're

5    going to request a multiple conspiracy instruction in this

6    case.

7              THE COURT:  I thought about that.  I don't really

8    think you have the basis for that, but why do you think you do?

9              MS. HUTCHINSON:  I think we do here.

10             THE COURT:  Very rare in single defendant cases.

11             MS. HUTCHINSON:  Yeah, I wanted to note, your Honor.

12    I know that this is rare in a single defendant case, but I

13    think this is a different type of case here.  The government

14    has made these alleged co-conspirators sort of the centerpiece

15    of the case.  I mean today was a lot of evidence about what was

16    happening in a district other than ours, quite frankly, but

17    they're not being tried.  It's almost as if they're present.

18    So I think this is one of those cases where there might still

19    be over-prejudice on a single defendant here.  I just want to

20    note one last thing is that the government did say that this is

21    both a conspiracy to import into New York and a conspiracy

22    nationally.

23             THE COURT:  What they're saying is -- and I think

24    they've been consistent on this from the getgo -- there was a

25    conspiracy to bring weapons that had been purchased in one part

N8TBPER7

1    of the country illegally into another part of the country, and

2    that part of that was the specific weapon that the defendant

3    wound up receiving here in New York.

4         Why do you think that's two conspiracies?  It sounds

5    to me that you're saying the substantive count is apart of the

6    overall conspiracy.

7         MS. HUTCHINSON:  I understand that, your Honor.  I

8    think one of the things we're focusing on here is that -- I

9    don't think this has happened yet.  This will happen tomorrow,

10   but I think the government is intending to introduce many

11   numerous text messages between individuals who don't involve

12   our client, and that he is not --

13        THE COURT:  He received them if I recall correctly.

14        MS. HUTCHINSON:  I believe -- and maybe the government

15   can clarify this.  I believe these are all messages that are

16   between other people other than Lucha.

17        MS. SMYSER:  Not all of the text messages that we will

18   introduce tomorrow did not involve the defendant, but there was

19   a group text that included individuals who were arrested at the

20   Massachusetts arrest.

21        THE COURT:  But, anyway, getting back to defense

22   assuming, so what.  It's classic conspiracy that the defendant

23   doesn't have to know what his co-conspirators are saying, as

24   long as it's in furtherance of the conspiracy.

25        MS. HUTCHINSON:  I understand that, your Honor.  But I

N8TBPER7

1   think what we have the possibility of here is several separate

2   and independent agreements in this instance, and I think that

3   might support it here.

4         THE COURT:  I haven't heard anything the government

5   arguing that.  But if you want to put in, again, a very short

6   proposed multiple conspiracy charge, I will consider it.  I

7   will tell you upfront that I've thought about that issue and

8   I'm disinclined to give that in this case, but you may persuade

9   me otherwise.

10        MS. HUTCHINSON:  Thank you very much, your Honor.  And

11  I think this might be interesting to your Honor as well, and

12  I'll put this in as well, which is in the alternative perhaps

13  we want a multiple objects unanimity type of charge here.

14        THE COURT:  Well, you're certainly entitled to

15  unanimity if there are multiple objects.  I thought the sole

16  object was to move guns illegally from one state to another.

17        MS. HUTCHINSON:  Again, I refer to the government's

18  stating its both a conspiracy to import into New York and a

19  conspiracy to import -- rather transport through interstate.

20        THE COURT:  I remember them saying that I think that

21  was said in the context of your colleague saying is it either

22  or, and they were both saying both.  I don't think they meant

23  they're two different conspiracies.  I think they meant that

24  the parting into New York was a subset of the broader

25  conspiracy, at least that's how I interpreted.

N8TBPER7

1              That wasn't said to the jury in any event.  It was

2      said here in colloquy outside the presence of the jury.  You'll

3      put in whatever you want.  So I got to go, but if there's

4      anything you think of on either side that we haven't discussed,

5      put it into those letters.  I am putting no length restriction

6      on the letters, but I am putting a time restriction.  It needs

7      to be emailed, and you should email it to my law clerk who will

8      then get it emailed to me.

9              I think you have the general chambers email, but if

10     you want his specific email, he's not entitled to privacy so

11     you can get it from him, and I look forward to reading it

12     tonight.  You will have my rulings and the final charge by the

13     beginning of lunch tomorrow.  We'll have summations following

14     lunch, and I think the charge will probably be then Thursday

15     morning first thing.  We'll send you also tonight the verdict

16     form.  And if there's any -- I know the defense wants something

17     other than a general verdict, I don't think I've ever done that

18     except when clear Second Circuit evidence requires me to do it

19     because I honestly think it's not what the jury decision is all

20     about.  But, I will not prejudge it more than I already have.

21     So I'll hear you during a break tomorrow something on that on

22     the verdict form.  Okay.  Many, many thanks.  I will see you

23     all tomorrow.

24              (Adjourned to August 30, 2023, at 10:00 a.m.)

25

1                        INDEX OF EXAMINATION

2    Examination of:                              Page

3    LENNEA GORDON

4    Direct By Ms. Nicholas . . . . . . . . . . . 134

5    Cross By Ms. Baharanyi . . . . . . . . . . . 137

6    Redirect By Ms. Nicholas . . . . . . . . . . 169

7     ANDREW PETERSOHN

8    Cross By Ms. Baharanyi . . . . . . . . . . . 225

9    Cross By Ms. Baharanyi . . . . . . . . . . . 237

10   Redirect By Ms. Smyser . . . . . . . . . . . 265

11   RYAN CASEY

12   Direct By Ms. Nicholas . . . . . . . . . . . 285

13   Cross By Ms. Baharanyi . . . . . . . . . . . 301

14   Redirect By Ms. Nicholas . . . . . . . . . . 311

15   Cross By Ms. Baharanyi . . . . . . . . . . . 312

16    GREGORY JONES

17   Direct By Ms. Smyser . . . . . . . . . . . . 317

18                      GOVERNMENT EXHIBITS

19   Exhibit No.                               Received

20    426   . . . . . . . . . . . . . . . . . . . 135

21    1002, 801, 802 and 701 – 721  . . . . . . . 171

22    901   . . . . . . . . . . . . . . . . . . . 189

23    601, 602, 603, 604, 605, 606 and 1005  . . . 282

24    1003  . . . . . . . . . . . . . . . . . . . 285

25    300   . . . . . . . . . . . . . . . . . . . 287

301A   . . . . . . . . . . . . . . . . 290

302, 303 and 304  . . . . . . . . . . . . 293

330A and 330C  . . . . . . . . . . . . 295

330/P1-P7  . . . . . . . . . . . . . . . 297

305, 306, 316 and 317  . . . . . . . . . . 322

308 - 315 and 318  . . . . . . . . . . . 324

531  . . . . . . . . . . . . . . . . . 326