```
N8VBPER1                        JURY TRIAL
```

 1  UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
 2  ------------------------------x

 3  UNITED STATES OF AMERICA,

 4              v.                          S1 22 CR 644 (JSR)

 5  STEVEN PEREZ, A/K/A "LUCHA,",

 6              Defendant.

 7  ------------------------------x

 8                                  New York, N.Y.
                                    August 31, 2023
 9                                  9:30 a.m.

10
    Before:
11
                      HON. JED S. RAKOFF,
12
                                    District Judge
13

14                          APPEARANCES

15  DAMIAN WILLIAMS
         United States Attorney for the
16       Southern District of New York
    ASHLEY NICHOLAS
17  MADISON SMYSER
    SARAH MORTAZAVI
18       Assistant United States Attorneys

19  FEDERAL DEFENDERS OF NEW YORK
         Attorneys for Defendant Perez
20  ZAWADI BAHARANYI
    AMANDA MAYO
21
    ALSO PRESENT:  ANANYA SANKAR, Paralegal, U.S. Attorney's Office
22       ARJUN AHUJA, Paralegal, U.S. Attorney's Office
         SARAH KWON, Paralegal, Federal Defenders of New York
23

24

25


                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

N8VBPER1                         JURY TRIAL

1          (Trial resumed; jury not present)

2          THE COURT:  While we're waiting for that juror, at the

3     end of yesterday we had an interesting discussion about a

4     sentence in my charge beginning with the words "the gist."

5     Counsel for both sides and the Court were all looking at the

6     wrong version, what was labeled the revised version, but not

7     the second revised version.

8          And in fact, even though I stout the defendant the

9     language in the revised version, I had changed the language

10    pretty much in accordance with the issues that both sides had

11    raised.  So you got last night the final version, and I will

12    give my courtroom deputy a copy of my charge marked as Court

13    Exhibit 1 to docket.

14         THE DEPUTY CLERK:  And all jurors are present now.

15         THE COURT:  Now we've just received three, four, five

16    notes from the jury.  They're all dated 9:30, so there's no

17    particular order.  But the notes are -- and it's unclear who

18    they're from.  One was any search made in the house of the

19    accused.  Two, if yes, were any firearms found that was

20    purchased by the straw purchaser.

21         Next note.  What is the law on searching someone's

22    belongings?  Does he have to provide permission?

23         Third note.  Your Honor, it is important what state

24    the defendant received the gun in.  If he received the gun in a

25    different state other than New York, did he still break the

N8VBPER1                    JURY TRIAL

law.  With regard to charge number two, the same.

         Your Honor, I find the definition of "willfulness" is
operating with bad intent to be too vague to reason about.
What is "bad" and by whose judgment must it be bad.  Certainly
many cases are connected by people who do not think they are
doing something bad, and yet they are doing something bad by
someone else's judgment.  Can you help make this more clear.
Thank you.  And finally, can we hear the 911 call.

         You will recall that the government wanted to put that
in.  Defense objected, and I sustained the objection.  So it's
clear they've been thinking about this overnight.  My
suggestion is that we bring them in, deliver the charge, and
then tell them if they still have any questions, then's the
time to send us a new note through their foreperson and we'll
deal with the note then.  Any objection to that?

         MS. NICHOLAS:  No objection, your Honor.  I just will
raise that in particular I think the third note about which
state the guns were obtained in is exactly what the government
was getting at with the proposed instruction about use of an
agent.  So I think we would want to renew that request to add
the sentence back in about that being otherwise attaining
within the definition of the law.

         THE COURT:  I'm not going to change the charge at this
point, but I will respond to any questions they have after
we've given them the charge.

N8VBPER1                    JURY TRIAL

1              MS. NICHOLAS:  Understood.

2              MS. BAHARANYI:  That's fine, your Honor.

3              THE COURT:  That's fine from the defense?

4              MS. BAHARANYI:  Yes, your Honor.  That's fine.

5              THE COURT:  Okay.  Very good.  Okay.  Let's bring in

6       the jury.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury present)

2          THE COURT:  Good morning, ladies and gentlemen.  Thank

3    you again for your promptness.  Please be seated.  Thank you

4    also for your notes.  We're going to read together now and then

5    you'll have with you to take into the jury room my instructions

6    of law.  I this that will answer some of your questions.

7          But if it doesn't answer all your questions, then

8    after you get back in the jury room, the formal way to do this

9    is to have your foreperson, whoever you select as your

10   foreperson, then send me a note with whatever questions you

11   still have and I'll be happy to answer them at that time.  But

12   let's take a look at the instructions of law.  As you will see

13   from the table of contents, they're divided into three

14   sections.

15         First, there are general instructions which pretty

16   much apply not just to this case, but all criminal cases.  Then

17   there is a section on the specific charges in this case, and

18   finally there's some concluding instructions about how you fill

19   out your verdict form and things like that.  So let's turn to

20   page four and begin with instruction number four.

21         We are now approaching the most important part of this

22   case, your deliberations. You have heard all the evidence in

23   the case, as well as the final arguments of the lawyers for the

24   parties. Before you retire to deliberate, it is my duty to

25   instruct you as to the law that will govern your deliberations.

1    These are the final and binding instructions, which entirely

2    replace the preliminary instruction I gave you earlier. As I

3    told you at the start of this case, and as you agreed, it is

4    your duty to accept my instructions of law and apply them to

5    the facts as you determine them.

6            Regardless of any opinion that you may have as to what

7    the law may be or ought to be, it is your sworn duty to follow

8    the law as I give it to you. Also, if any attorney or other

9    person has stated a legal principle different from any that I

10   state to you in my instructions, it is my instructions that you

11   must follow.

12           Because my instructions cover many points, I have

13   provided each of you with a copy of them, not only so that you

14   can follow them as I read them to you now, but also so that you

15   can have them with you for reference throughout your

16   deliberations. In listening to them now and reviewing them

17   later, you should not single out any particular instruction as

18   alone stating the law, but you should instead consider my

19   instructions as a whole.

20           Your duty is to decide the fact issues in the case and

21   arrive, if you can, at a verdict. You, the members of the jury,

22   are the sole and exclusive judges of the facts. You pass upon

23   the weight of the evidence; you determine the credibility of

24   the witnesses; you resolve such conflicts as there may be in

25   the testimony; and you draw whatever reasonable inferences you

1    decide to draw from the facts as you determine them.

2    In determining the facts, you must rely upon your own

3    recollection of the evidence.

4         To aid your recollection, we will send you at the

5    start of your deliberations a list of all the exhibits, a

6    laptop on which you can view the videotapes, all the other

7    exhibits themselves except the guns and ammunition (which will

8    remain outside unless you ask to see them, and certain Excel

9    spreadsheets that, for convenience, you can view on the

10   laptop). If you need to review particular items of testimony,

11   we can also arrange to provide them to you in transcript or

12   read-back form.

13        Please remember that none of what the lawyers have

14   said in their opening statements, in their closing arguments,

15   in their objections, or in their questions, is evidence. Nor is

16   anything I may have said evidence. The evidence before you

17   consists of just three things: the testimony given by witnesses

18   that was received in evidence, the exhibits that were received

19   in evidence, and the stipulations of the parties that were

20   received in evidence.

21        Testimony consists of the answers that were given by

22   the witnesses to the questions that were permitted. Please

23   remember that questions, although they may provide the context

24   for answers, are not themselves evidence; only answers are

25   evidence, and you should therefore disregard any question to

which I sustained an objection. Also, you may not consider any
answer that I directed you to disregard or that I directed be
stricken from the record. Likewise, you may not consider
anything you heard about the contents of any exhibit that was
not received in evidence.

Furthermore, you should be careful not to speculate
about matters not in evidence. For example, there is no legal
requirement that the Government prove its case through a
particular witness or by use of a particular law enforcement
technique. Nor should you speculate about why one or another
person whose name may have figured in the evidence is not part
of this trial or what his or her situation may be. Your focus
should be entirely on assessing the evidence that was presented
here for your consideration.

It is the duty of the attorney for each side of a case
to object when the other side offers testimony or other
evidence that the attorney believes is not properly admissible.
Counsel also have the right and duty to ask the Court to make
rulings of law and to request conferences at the side bar out
of the hearing of the jury. All such questions of law must be
decided by me. You should not show any prejudice against any
attorney or party because the attorney objected to the
admissibility of evidence, asked for a conference out of the
hearing of the jury, or asked me for a ruling on the law.

I also ask you to draw no inference from my rulings or

1    from the fact that on occasion I asked questions of certain

2    witnesses. My rulings were no more than applications of the law

3    and my questions were only intended for clarification or to

4    expedite matters. You are expressly to understand that I have

5    no opinion as to the verdict you should render in this case.

6            You are to perform your duty of finding the facts

7    without bias or prejudice as to any party. You are to perform

8    your final duty in an attitude of complete fairness and

9    impartiality. You are not to be swayed by rhetoric or emotional

10   appeals.

11           The fact that the prosecution is brought in the name

12   of the United States of America entitles the Government to no

13   greater consideration than that accorded any other party. By

14   the same token, it is entitled to no less consideration. All

15   parties, whether the Government or individuals, stand as equals

16   at the bar of justice.

17           Please also be aware that the question of possible

18   punishment is the province of the judge, not the jury, and it

19   should therefore not enter into or influence your deliberations

20   in any way. Your duty is to weigh the evidence and not be

21   affected by extraneous considerations.  It must be clear to you

22   that if you were to let bias, or prejudice, or fear, or

23   sympathy, or any other irrelevant consideration interfere with

24   your thinking, there would be a risk that you would not arrive

25   at a true and just verdict. So do not be guided by anything

1    except clear thinking and calm analysis of the evidence.

2              The defendant here, Steven Perez, also known as Lucha

3    El, is charged with two federal crimes about which I will

4    instruct you shortly. Please bear in mind, however, that the

5    charges, or "counts" as they are called, are not themselves

6    evidence of anything.

7              The defendant has pleaded not guilty. To prevail

8    against the defendant on a given charge, the Government must

9    prove each essential element of that charge beyond a reasonable

10   doubt. If the Government succeeds in meeting this burden, your

11   verdict should be guilty on that charge; if it fails, your

12   verdict must be not guilty on that charge. This burden never

13   shifts to the defendant, for the simple reason that the law

14   presumes a defendant to be innocent and never imposes upon a

15   defendant in a criminal case the burden or duty of calling any

16   witness or producing any evidence.

17             In other words, as to each charge, the defendant

18   starts with a clean slate and is presumed innocent until such

19   time, if ever, that you as a jury are satisfied that the

20   Government has proved that he is guilty of that charge beyond a

21   reasonable doubt.

22             Since, to convict the defendant of a given charge, the

23   Government is required to prove that charge beyond a reasonable

24   doubt, the question then is: What is a reasonable doubt? The

25   words almost define themselves. It is a doubt based upon

N8VBPER1                    Charge

1    reason. It is doubt that a reasonable person has after

2    carefully weighing all of the evidence. It is a doubt that

3    would cause a reasonable person to hesitate to act in a matter

4    of importance in his or her personal life. Proof beyond a

5    reasonable doubt must therefore be proof of a convincing

6    character that a reasonable person would not hesitate to rely

7    on in making an important decision.

8          A reasonable doubt is not caprice or whim. It is not

9    speculation or suspicion. It is not an excuse to avoid the

10   performance of an unpleasant duty. The law does not require

11   that the Government prove guilt beyond all possible or

12   imaginable doubt: proof beyond a reasonable doubt is sufficient

13   to convict.

14         If, after fair and impartial consideration of the

15   evidence, you have a reasonable doubt as to the defendant's

16   guilt with respect to a particular charge against him, you must

17   find the defendant not guilty of that charge. On the other

18   hand, if, after fair and impartial consideration of all the

19   evidence, you are satisfied beyond a reasonable doubt of the

20   defendant's guilt with respect to a particular charge against

21   him, you should not hesitate to find the defendant guilty of

22   that charge.

23         In deciding whether the Government has met its burden

24   of proof, you may consider both direct evidence and

25   circumstantial evidence.

1          Direct evidence is evidence that proves a fact
2    directly. For example, where a witness testifies to what he or
3    she saw, heard, or observed, that is called direct evidence.
4    Circumstantial evidence is evidence that tends to prove a fact
5    by proof of other facts. To give a simple example, suppose that
6    when you came into the courthouse today the sun was shining and
7    it was a nice day, but the courtroom blinds were drawn and you
8    could not look outside.  Later, as you were sitting here,
9    someone walked in with a dripping wet umbrella, and, soon
10   after, somebody else walked in with a dripping wet raincoat.
11   Now, on our assumed facts, you cannot look outside of the
12   courtroom and you cannot see whether it is raining. So you have
13   no direct evidence of that fact. But on the combination of the
14   facts about the umbrella and the raincoat, it would be
15   reasonable for you to infer that it had begun raining.
16   That is all there is to circumstantial evidence.

17          Using your reason and experience, you infer from
18   established facts the existence or the nonexistence of some
19   other fact. Please note, however, that it is not a matter of
20   speculation or guess: it is a matter of logical inference.
21   The law makes no distinction between direct and circumstantial
22   evidence. Circumstantial evidence is of no less value than
23   direct evidence, and you may consider either or both, and may
24   give them such weight as you conclude is warranted.

25          It must be clear to you by now that counsel for the

N8VBPER1                        Charge

1    Government and counsel for the defendant are asking you to draw

2    very different conclusions about various factual issues in the

3    case. Deciding these issues will involve making judgments about

4    the testimony of the witnesses you have listened to and

5    observed. In making these judgments, you should carefully

6    scrutinize all of the testimony of each witness, the

7    circumstances under which each witness testified, and any other

8    matter in evidence that may help you to decide the truth and

9    the importance of each witness's testimony.

10          Your decision to believe or to not believe a witness

11   may depend on how that witness impressed you. How did the

12   witness appear? Was the witness candid, frank, and forthright,

13   or did the witness seem to be evasive or suspect in some way?

14   How did the way the witness testified on direct examination

15   compare with how the witness testified on cross-examination?

16   Was the witness consistent or contradictory? Did the witness

17   appear to know what he or she was talking about? Did the

18   witness strike you as someone who was trying to report his or

19   her knowledge accurately? These are examples of the kinds of

20   common sense questions you should ask yourselves in deciding

21   whether a witness is or is not truthful.

22          How much you choose to believe a witness may also be

23   influenced by the witness's bias. Does the witness have a

24   relationship with the Government or the defendant that may

25   affect how he or she testified? Does the witness have some

1    incentive, loyalty, or motive that might cause him or her to

2    shade the truth? Does the witness have some bias, prejudice, or

3    hostility that may cause the witness to give you something

4    other than a completely accurate account of the facts he or she

5    testified to?

6         As to all witnesses, you should also consider whether

7    a witness had an opportunity to observe the facts he or she

8    testified about and whether the witness's recollection of the

9    facts stands up in light of the other evidence in the case.

10   In other words, what you must try to do in deciding credibility

11   is to size up a person just as you would in any important

12   matter where you are trying to decide if a person is truthful,

13   straightforward, and accurate in his or her recollection.

14        The defendant did not testify in this case. Under our

15   Constitution, a defendant has no obligation to testify or to

16   present any evidence, because it is the Government's burden to

17   prove a defendant guilty beyond a reasonable doubt. A defendant

18   is never required to prove that he or she is innocent.

19   Accordingly, you must not attach any significance to the fact

20   that the defendant did not testify. No adverse inference

21   against the defendant may be drawn by you because he did not

22   take the witness stand, and you may not consider it against the

23   defendant in any way in your deliberations in the jury room.

24        With these preliminary instructions in mind, let us

25   turn to the two specific charges against the defendant, Steven

1    Perez, who goes by the name Lucha El Por Libertad or (as he

2    prefers) Lucha El. These charges were originally set forth in

3    what is called an Indictment, which is simply a charging

4    instrument and is not itself evidence, so it will not be

5    presented to you. The Indictment in this case charges Lucha El

6    with a total of two charges, or "counts" as they are called,

7    and each count charges a different crime. I will, for

8    convenience, refer to each charge or count by its number as it

9    appears in the Indictment.

10           Count One charges the defendant with conspiring to

11   unlawfully transport or receive firearms that were purchased

12   out-of-state into the state of residency of the person

13   receiving or transporting the firearm. Count Two charges the

14   defendant with unlawfully receiving or transporting a specific

15   firearm purchased out-of-state into his state of residence.

16   Before the defendant can be convicted of any of these charges,

17   the Government must prove every essential element of the

18   particular charge you are considering beyond a reasonable

19   doubt. In your deliberations and in reaching your verdict, you

20   must consider each charge separately and determine whether the

21   Government has carried its burden of proof with respect to each

22   essential element of that particular charge.

23           For convenience, I will start with Count Two, which

24   charges the defendant with willfully receiving a specific

25   out-of-state firearm in his state of residency, New York. After

1    that, I will turn to Count One, which charges the defendant

2    with conspiring with other people to willfully transport or

3    receive out-of-state firearms in states of their residency.

4          Count Two, sometimes referred to as a "substantive

5    count," charges the defendant with unlawfully receiving or

6    transporting a specific out-of-state firearm into his state of

7    residence. Before the defendant can be convicted on this Count,

8    the Government must prove beyond a reasonable doubt three

9    elements:

10         First, that the defendant was not licensed to receive

11    out-of-state firearms, specifically, that he was not a licensed

12    importer, licensed manufacturer, licensed dealer or licensed

13    collector of firearms; second, that the defendant transported

14    or received into the state in which he resided a specific

15    firearm purchased or otherwise obtained outside that state; and

16    Third, that the defendant acted knowingly and willfully.

17    I will now address each of the three elements of Count Two in

18    detail.

19

20         Starting with the first essential element, the

21    Government must prove beyond a reasonable doubt that the

22    defendant was not licensed to receive out-of-state firearms,

23    specifically, that he was not a licensed importer,

24    manufacturer, dealer or collector of firearms.

25         A person is an "importer" when he is "engaged in the

N8VBPER1                      Charge

business of importing or bringing firearms or ammunition into
the United States for purposes of sale or distribution."
A person is a "manufacturer" when he is "engaged in the
business of manufacturing firearms or ammunition for purposes
of sale or distribution."

A person is a "dealer" when he is "engaged in the
business of selling firearms at wholesale or retail."
A person is a "collector" when he "acquires, holds, or disposes
of firearms as curios or relics."

The terms "licensed importer," "licensed
manufacturer," "licensed dealer" and "licensed collector" mean
any such persons who are licensed under the provisions of the
federal Gun Control Act. In order to be a "licensed dealer" a
person must file an application with and receive a license from
the United States Secretary of the Treasury.

The second essential element that the Government must
prove beyond a reasonable doubt is that a specific firearm – in
this case, a Century Arms Canik 9mm handgun, serial number
20CB25810 – was purchased or obtained outside of the
defendant's state of residence and then was received by the
defendant in his state of residence. In order to satisfy this
element, the Government must prove that the state in which the
firearm was purchased or was otherwise obtained was not the
defendant's state of residence and that the state in which the
defendant received the firearm was the defendant's state of

1    residence.

2         The defendant does not have to himself purchase the

3    firearm out-of-state. A defendant who, knowing that another

4    person has purchased the gun out of state, then receives the

5    gun in the defendant's state of residence, satisfies the second

6    essential element.

7         The third essential element the Government must prove

8    beyond a reasonable doubt is that the defendant, in receiving

9    the out-of-state firearm into his state of residency, acted

10   knowingly and willfully. "Knowingly" means purposely, rather

11   than negligently or accidentally; but the defendant need not be

12   aware of the specific law that his conduct is violating.

13   "Willfully" means to act with a bad purpose and intent to act

14   unlawfully even if the defendant does not know the specific law

15   he is violating.

16        Count One, sometimes referred to as the "conspiracy

17   count," charges the defendant with conspiring with others to

18   unlawfully transport firearms that were purchased out-of-state

19   into the state of residency of the persons actually receiving

20   the firearm. Before the defendant can be convicted of this

21   Count, the Government must prove beyond a reasonable doubt

22   three elements:

23        First, the existence of the charged conspiracy;

24   Second, that the defendant knowingly and willfully became a

25   member of that conspiracy; and third, that at least one of the

co-conspirators committed an overt act in furtherance of the
conspiracy.

I will now address each of the three elements of Count
One in detail.  Starting with the first essential element, what
is a conspiracy? A conspiracy is an agreement, or an
understanding, of two or more persons to accomplish by
concerted action one or more unlawful purposes, known as the
"object" or "objects" of the conspiracy.

In Count One, the unlawful purpose alleged to be the
object of the conspiracy is an agreement to transport firearms
that were obtained outside the states of residency of the
eventual receivers into the states of residency of the
receivers. I have already instructed you on the essential
elements of that underlying crime when I instructed you on
Count Two. The conspiracy here charged is that several persons,
including the defendant, agreed to a plan to commit the same
kind of substantive violations.

Please bear in mind that conspiracy is an entirely
distinct and separate offense from the particular substantive
crime charged in Count Two of the defendant actually receiving
a specific out-of-state firearm in the defendant's state of
residency. The actual commission of the object of the
conspiracy is not an essential element of the crime of
conspiracy. Rather, the Government is required to prove beyond
a reasonable doubt only that two or more persons, in some way

or manner, explicitly or implicitly, came to an understanding
to accomplish the objective of unlawfully obtaining or
transporting one or more out-of-state firearms in order to
enable one or more conspirators to receive them in their states
of residency.

While the indictment charges that the alleged
conspiracy began in or around May 2020 and continued up to in
or around July 2021, it is not essential that the Government
prove that the conspiracy started and ended on those specific
dates or that it existed throughout that period. Rather, it is
sufficient to satisfy the first element that you find that in
fact a conspiracy was formed and that it existed for any time
within the charged period.

If you conclude that the Government has proved beyond
a reasonable doubt that the charged conspiracy existed, you
must then consider whether the Government has proved beyond a
reasonable doubt the second essential element: that the
defendant joined and participated in the conspiracy and did so
knowingly and willfully. I have already defined the terms
"knowingly" and "willfully" for you in in Instruction No. 13,
and the same definitions apply here.

To join and participate in a conspiracy, it is not
necessary that the defendant be fully informed of all the
details of the conspiracy in order to justify an inference of
membership on his part. Nor does the defendant need to know the

full extent of the conspiracy or all of its participants. It is
also not necessary that the defendant receive any monetary
benefit from participating in the conspiracy. All that is
necessary is proof beyond a reasonable doubt that the defendant
joined and participated in the conspiracy knowingly, and with
the intent to aid in the accomplishment of its unlawful object
as previously discussed.

The defendant also need not have joined the conspiracy
at the outset. The defendant may have joined it at any time in
its progress, and he will still be held responsible for all
that was done before he joined, as well as all that was done
during the conspiracy's existence while the defendant was a
member. The law does not require that each conspirator have an
equal role in the conspiracy. Even a single act may be
sufficient to draw the defendant within the ambit of a
conspiracy if it meets the essential requirements I have
described.

However, I want to caution you that the mere
association or friendship by one person with another person
does not make the first person a member of the conspiracy, even
when coupled with knowledge that second person is committing a
crime. In other words, knowledge without participation is not
sufficient. What is necessary is that the defendant have
participated in the conspiracy with knowledge its object and
with an intent to aid in the accomplishment of that unlawful

1    object.

2            The third essential element of Count One is that one

3    of the conspirators – not necessarily the defendant, but any

4    one of the conspirators – took at least one overt act in

5    furtherance of the conspiracy. An overt act in furtherance of

6    the conspiracy can be any act of any kind taken by any member

7    of the conspiracy that is done to effectuate the conspiracy in

8    any respect. The overt act, itself, need not have been an

9    unlawful act. While the Government need not prove more than one

10   overt act, you must unanimously agree on which specific overt

11   act or acts, if any, the Government has proven beyond a

12   reasonable doubt.

13           Proof of motive is not a necessary element of any of

14   the crimes with which the defendant is charged. Proof of motive

15   does not establish guilt, nor does the lack of proof of motive

16   establish that the defendant is not guilty. If the guilt of a

17   defendant is shown beyond a reasonable doubt, it is immaterial

18   what that defendant's motive for the crime or crimes may be, or

19   whether that defendant's motive was shown at all. The presence

20   or absence of motive is, however, a circumstance which you may

21   consider as bearing on the intent of a defendant.

22           One last requirement. Before the defendant can be

23   convicted of any of the foregoing charges, the Government must

24   also establish what is called "venue," that is, that some act

25   in furtherance of that charge occurred in the Southern District

1   of New York. As relevant here, the Southern District of New

2   York is the judicial district that includes (among other

3   places) Manhattan, the Bronx, and Westchester. Venue is proven

4   if any act in furtherance of the count you are considering

5   occurred in any of these counties, regardless of whether it was

6   an act of the charged defendant or anyone else.

7        Furthermore, on the issue of venue–and on this

8   alone–the Government can meet its burden by a preponderance of

9   the evidence, that is, by showing that it was more likely than

10  not that an act in furtherance of a given charge occurred in

11  the Southern District of New York.

12       You will shortly retire to the jury room to begin your

13  deliberations. As soon as you get to the jury room, please

14  select one of your number as the foreperson, to preside over

15  your deliberations and to serve as your spokesperson if you

16  need to communicate with the Court.  You will be bringing with

17  you into the jury room a copy of my instructions of law and a

18  verdict form on which to record your verdict.

19       Let me just show you the verdict form.  It's a very

20  simple white page, and it just ask you to determine as to each

21  of the respective counts whether you find the defendant guilty

22  or not guilty on that count.  After you've made that

23  determination, your foreperson will sign the verdict form, date

24  it, and seal it in this envelope very cleverly marked verdict,

25  and that will then be brought to me.

1          And I will not open that envelope until you'll all

2     back here in the courtroom, and then we will open it, read it,

3     and ask each of you individually whether that is in fact your

4     verdict.  And we go through all those technicalities to be

5     absolutely sure we have your verdict as you have decided.  Back

6     to instructions.

7          In addition, we will send into the jury room a list of

8     all the exhibits; a laptop that can be used to see and hear the

9     videos and see certain Excel spreadsheets that were also

10    admitted into evidence; and all the other exhibits that were

11    admitted into evidence except for the guns and ammunition

12    (which will be kept here but which you can examine on request).

13    If you want any of the testimony provided, that can also be

14    done, in either transcript or read-back form. But please

15    remember that it is not always easy to locate what you might

16    want, so be as specific as you possibly can be in requesting

17    portions of the testimony.

18         Any of your requests, in fact any communication with

19    the Court, should be made to me in writing, signed by your

20    foreperson, and given to the marshal, who will be available

21    outside the jury room throughout your deliberations. After

22    consulting with counsel, I will respond to any question or

23    request you have as promptly as possible, either in writing or

24    by having you return to the courtroom so that I can speak with

25    you in person.

1         You should not, however, tell me or anyone else how

2    the jury stands on any issue until you have reached your

3    verdict and recorded it on your verdict form. As I have already

4    explained, the Government, to prevail on a particular charge

5    against the defendant, must prove each essential element of

6    that charge beyond a reasonable doubt. If the Government

7    carries this burden, you should find the defendant guilty of

8    that charge. Otherwise, you must find the defendant not guilty

9    of that charge.

10        Each of you must decide the case for yourself, after

11   consideration, with your fellow jurors, of the evidence in the

12   case, and your verdict must be unanimous. In deliberating, bear

13   in mind that while each juror is entitled to his or her

14   opinion, you should exchange views with your fellow jurors.

15   That is the very purpose of jury deliberation-to discuss and

16   consider the evidence; to listen to the arguments of fellow

17   jurors; to present your individual views; to consult with one

18   another; and to reach a verdict based solely and wholly on the

19   evidence.

20        If, after carefully considering all the evidence and

21   the arguments of your fellow jurors, you entertain a

22   conscientious view that differs from the others', you are not

23   to yield your view simply because you are outnumbered. On the

24   other hand, you should not hesitate to change an opinion that,

25   after discussion with your fellow jurors, now appears to you

1    erroneous.

2            In short, your verdict must reflect your individual

3    views and must also be unanimous.  This completes my

4    instructions of law.

5            Now before we swear in the marshal and excuse you to

6    your deliberations, a couple of housekeeping items.  First, you

7    can take as little, as long as you want for your deliberations.

8    I've had juries return a verdict in ten minutes.  I've had

9    juries return a verdict in ten days.  You may not want to adopt

10   that latter position, but the point is, it's totally up to you

11   how much time you need.

12           We will be here till 4:30, but I will excuse the

13   lawyers and parties for a one-hour break at 1:00 for lunch, and

14   you'll have your lunch in the jury room as well from 1:00 to

15   2:00.  So if you send out any notes at or shortly before 1:00,

16   we probably won't be able to respond to you until 2:00.  I want

17   you to be aware of that one hour break that will occur.  If you

18   haven't reached a verdict by 4:30, you should just go home and

19   return at 9:30 tomorrow morning, and your foreperson will be in

20   charge of making sure you don't resume your deliberations until

21   all 12 of you are back in the jury room.

22           Now we come now to the one part of this process that I

23   don't like, which is excusing our alternate jurors.  But you're

24   not off the hook yet because if for some unfortunate reason

25   some juror later on had to be excused or got sick or something

N8VBPER1                        Charge

1    like that, we would call you back and then start deliberations

2    all over again.  So you still should not discuss the case with

3    anyone.  We'll let you know when the case is over, but I want

4    to thank you immensely for your very excellent service.  And

5    what you should do now is go back in the jury room, get your

6    stuff and leave before the jury comes in to begin their

7    deliberations.  Thanks again.  We will swear in the marshal.

8             (Marshal sworn)

9             THE DEPUTY CLERK:  Jurors, please follow the marshal.

10            (At 10:11 a.m., the jury retired to deliberate)

11            (Continued on next page)

N8VBPER1                        Charge

1           (Jury not present)

2           THE COURT:  Please be seated.  All objections to the

3    charge that were previously made are preserved for purposes of

4    appeal.  Now, where do we stand on the exhibits, the laptop and

5    so forth?

6           MS. NICHOLAS:  Everything is here, your Honor.  We

7    have the laptop as well as the thumb drive with the videos and

8    a sanitized exhibit list that I believe defense counsel has had

9    a chance to review, and we're in agreement.  We have provided

10   written instructions as to logging in to the laptop.  I know

11   that is sometimes a bit of a difficulty.

12          THE COURT:  If the jury has problems, they'll let us

13   know and we'll send in some techy guy to work it out.  So give

14   all that to my courtroom deputy and she will take it to the

15   marshal to give to the jury.

16          MS. BAHARANYI:  Your Honor, we have our single exhibit

17   which is our photograph.

18          THE COURT:  Yes.  So my practice is that the defendant

19   and at least one attorney from each side who is authorized to

20   answer any questions has to remain on this floor.  You can go

21   outside the courtroom, but you can't leave the floor because we

22   don't want to go searching for you when a note comes in.  The

23   only exception is between one and two, which as I already

24   indicated to the jury you're excused for lunch during that

25   hour.

N8VBPER1                         Charge

1              I want to take a moment to commend counsel for both

2      sides in this case, regardless of the verdict, and I never

3      comment on a verdict.  I thought this was a very well-tried

4      case by both sides, very professional, and you all have reason

5      to be proud of your work on this case.  So I thank you for that

6      because it makes my job a lot easier.  And I should include in

7      that commendation the appellate counsel for the defense who's

8      sitting beyond the table.  So very good.  Thanks so much.

9              (Recess pending verdict)

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (Jury not present - 12:04 p.m.)

2           THE COURT:  So my law clerk says that the defense

3      wanted to have marked as exhibits those five unsolicited notes

4      that we received this morning before I charged the jury.  I

5      don't think they should be marked as exhibits because really

6      they were nullities.  I told the jury that after they heard my

7      charge, they had any questions, they should put them, and they

8      chose not to put any further questions.  And I read those

9      unsolicited notes into the record, but I will give a copy of

10     them to counsel for each side just so you can compare them with

11     the transcript in case you think there was any typos or things

12     like that.

13          MS. BAHARANYI:  Your Honor, on that point, before we

14     proceed. We do think that -- well, not think.  The Second

15     Circuit has made clear the type of procedures for handling any

16     inquiries by the jury, and that's in *United States v. Ronder*,

17     and specifically any notes that are sent to the Court by the

18     jury should be marked as exhibits.

19          THE COURT:  I don't think that applies to this

20     situation.  They're not even signed.  Of course any

21     communication by a juror with the Court or with my staff, I

22     immediately report it, put on the record.  And in this case,

23     they were, in my view, the Court could have just simply

24     rejected them out of hand because it was before the charge.

25     And most of the questions were answered by the charges, events

 1   have proven, but what do you mean mark them as exhibits?

 2           MS. BAHARANYI:  Well, given that these were

 3   communications from the jury about this case.

 4           THE COURT:  What do you mean physically by marking

 5   them as exhibits?

 6           MS. BAHARANYI:  Taking the notes themselves just like

 7   we would any defense --

 8           THE COURT:  And marking them as what kind of exhibits?

 9           MS. BAHARANYI:  Court exhibits.

10           THE COURT:  No, I'm not going to mark them as court

11   exhibits, because I think I could have rejected them.  I will

12   tell you what, I will give the originals to my courtroom deputy

13   and ask her to docket them as unsolicited jury notes.  Any

14   problem with that?

15           MS. BAHARANYI:  Your Honor, if I may have one moment.

16           THE COURT:  Yeah.

17           (Pause)

18           MS. BAHARANYI:  Your Honor, we maintain our objection.

19           THE COURT:  I don't understand it.  The only purpose

20   that you could want them marked is so that you can make

21   reference to them on any appeal, if there is a conviction.  And

22   of course we're waiting on the verdict.  It may be acquittal

23   for all we know.  But assuming it's a conviction, you have, I

24   read them into the record.  I gave you copies, and I'm going to

25   have them placed on the docket.  So the Second Circuit can have

N8VBPER1                        Charge

1    numerous references to them verbatim.  What more do you want?

2    The reason I'm not willing to mark them as court exhibits is

3    because I think that we didn't have occasion to discuss it that

4    I could have rejected them out of hand and ripped them up as

5    improper communication from unknown jurors, but I didn't do

6    that.

7          Instead, I told them if you still have any of these

8    questions after you, or any other question, after you've heard

9    my charge, you can put the question to me in the proper form

10   through your foreperson, and they chose not to do that.  So

11   you're going to have three different ways of having them on the

12   record.  I don't understand why they have to be "court

13   exhibits."  Denied.  Bring in the jury.

14         THE DEPUTY CLERK:  Officer, can you please bring in

15   the jury.  Defense counsel, can you please spell the name of

16   that case for the court reporter.

17         MS. BAHARANYI:  R-O-N-D-E-R.

18         THE DEPUTY CLERK:  Thank you.

19         (Continued on next page)

20

21

22

23

24

25

1              THE MARSHAL:  Jury entering.

2              (Jury present – 12:09 p.m.)

3              THE DEPUTY CLERK:  Will the foreperson please rise.

4              THE COURT:  The rest of you can be seated.

5              THE DEPUTY CLERK:  You've say you've agreed upon a

6      verdict?

7              FOREPERSON:  Yes.

8              THE COURT:  All right.  I'm going to open the verdict

9      envelope in a second, but I won't comment on it, because

10     deciding a verdict is your job, not mine, but I do want to

11     comment on what a great jury you were.  I have been watching

12     you carefully out of the corners of my eye, and you were all so

13     attentive throughout this trial.

14             And, you know, I have another trial starting in a week

15     or two, would you like to come -- no, I guess not.  Actually,

16     you'll be glad to know that you're excused from federal jury

17     service for four years now.  Okay.  I will open the verdict

18     form.  So the verdict appears to be in proper form.  I will

19     give it to my courtroom deputy to take the reading of the

20     verdict.

21             THE DEPUTY CLERK:  Will the foreperson please rise.

22     In *United States v. Steven Perez, AKA "Lucha El Por Libertad*,"

23     Dkt. No. 22 Cr. 466.  On Count One, the charge of conspiracy to

24     transport or receive firearms from outside states of residency,

25     you the jury find defendant Steven Perez, also known as, Lucha

N8VBPER1                        Charge

 1  El Por Libertad, guilty or not guilty.  You say?

 2              FOREPERSON:  Guilty.

 3              THE DEPUTY CLERK:  On Count Two, the charge of

 4  interstate transport or receipt of a specific out-of-state

 5  firearm, you the jury find defendant Steven Perez, also known

 6  as, Lucha El Por Libertad, guilty or not guilty.  You say?

 7              FOREPERSON:  Guilty.

 8              THE DEPUTY CLERK:  Shall I poll --

 9              THE COURT:  I'll do it.  Ladies and gentlemen, you

10  heard your verdict read by your foreperson.

11              Ms. Foreperson, is that your verdict?

12              FOREPERSON:  Yes.

13              THE COURT:  Juror No. 2, is that your verdict?

14              JUROR:  Yes.

15              THE COURT:  Juror No. 3, is that your verdict?

16              JUROR:  Yes.

17              THE COURT:  Juror No. 4, is that your verdict?

18              JUROR:  Yes.

19              THE COURT:  Juror No. 5, is that your verdict?

20              JUROR:  Yes.

21              THE COURT:  Juror No. 6, is that your verdict?

22              JUROR:  Yes.

23              THE COURT:  Juror No. 7, is that your verdict?

24              JUROR:  Yes.

25              THE COURT:  Juror No. 8, is that your verdict?

N8VBPER1                         Charge

1          JUROR:  Yes.

2          THE COURT:  Juror No. 9, is that your verdict?

3          JUROR:  Yes.

4          THE COURT:  Juror No. 10, is that verdict?

5          JUROR:  Yes.

6          THE COURT:  Juror No. 11, is that verdict?

7          JUROR:  Yes.

8          THE COURT:  Juror No. 12, is that your verdict?

9          JUROR:  Yes.

10          THE COURT:  Jury polled. Verdict unanimous.

11          All right.  Ladies and gentlemen, again my very great

12     thank for your excellent service, and you are now excused.

13     Have a very good weekend.

14          (Jury excused)

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

 1          THE COURT:  Please be seated.  All right.  We need to
 2   set a sentence date.  Linda.
 3          THE DEPUTY CLERK:  Monday, December 4th, at 2.
 4          THE COURT:  Monday, December 4th, at 2 p.m.  Let me
 5   ask the government do you have any bail application.
 6          MS. NICHOLAS:  Yes, your Honor.  The government's
 7   position is detention is mandatory in this, and we are seeking
 8   detention as we have at every point throughout this litigation.
 9          THE COURT:  Let me hear from defense counsel.
10          MS. BAHARANYI:  Your Honor, as the Court is aware, the
11   Court does have the ability to continue bail in this case even
12   following a conviction.  The Court has seen Lucha El show up to
13   court numerous times, and at this point during this week
14   without any sort of even ankle monitoring condition.  He is
15   eager to be part of every single step of this process.  He is
16   not a flight risk, and certainly I think the family that he has
17   here today, his younger brother Israel Perez, the family that
18   is on their way back having briefly stepped outside are further
19   testaments to the ties to this community that he has.  They're
20   extensive. They're long lasting.
21          THE COURT:  My recollection is it's not at this point
22   just a question of flight risk, it's mandatory unless you
23   establish certain conditions.  Maybe the government can remind
24   me of the statute.
25          MS. NICHOLAS:  Yes, your Honor, 3143(a)(2).

1          THE COURT:  Hold on.

2          MS. BAHARANYI:  Your Honor, flight is one of the

3    factors for the Court to consider.

4          THE COURT:  I'm not saying that.  I'm just saying it's

5    not the whole story, but let me look at 3143.

6          MS. BAHARANYI:  I think to clarify, it's a presumption

7    of detention, not mandatory.

8          THE COURT:  3143, which is entitled, Release or

9    Detention of the Defendant Pending Sentence or Appeal.

10          (a) except as provided in paragraph two, the judicial

11    officer shall order that a person who has been found guilty of

12    an offense and who is awaiting imposition or execution of

13    sentence be detained unless the judicial officer finds by clear

14    and convincing evidence that the person is not likely to flee

15    or pose a danger to the safety of any other person or the

16    community.

17          Then paragraph two says, The judicial officer shall

18    order that a person who has been found guilty of an offense in

19    a case described in subparagraphs A, B or C of subsection (f)

20    (1) of section 3142, and is awaiting imposition or execution of

21    sentence be detained unless,;(a)(1),  the judicial officer

22    finds there is a substantial likelihood of a motion for an

23    acquittal or a new trial will be granted; or (2) an attorney

24    for the government has recommended that no sentence of

25    imprisonment be imposed on the person; and the judicial officer

1    finds by clear and convincing evidence that the person is not

2    likely to flee or pose a danger to any other person or the

3    community.

4            And then, let me ask the government, does this

5    conviction fall within any of the provisions of A, B or C of

6    subsection (f)(1) of section 3142 or not?

7            MS. NICHOLAS:  Our position is that it does, your

8    Honor, for the same reason that a felon in possession case

9    does.  And I'm happy to provide the Court with the cite that

10   the government is relying on for that argument.

11           THE COURT:  If, going back to defense counsel, if it's

12   falls within 3143(2), then the defendant must be detained

13   unless there is a substantial likelihood that a motion for

14   acquittal or a new trial be granted.  I would say at this point

15   without prejudging any such motion, I think that's not a

16   finding I would remotely be able to make at this time; or, an

17   attorney for the government has recommended that no sentence of

18   imprisonment be imposed on the person.  The government

19   obviously is not recommending that.  And then there's again the

20   question of flight or danger to the community.

21           So if it's under the second paragraph of sub 3143,

22   it's not a question of just flight or even flight is not even a

23   question of discretion, it's a question of mandatory detention.

24           MS. BAHARANYI:  Your Honor, we disagree with the

25   government's characterization or position on where this offense

falls, and perhaps a proffer from them would be helpful.

THE COURT:  Yeah, I think that's fair.  So why do you think it falls within section two.

MS. NICHOLAS:  Yes, your Honor.  The case is *Watkins*.  It's 940 F.3d 152, which is a 2019, Second Circuit case. That case is specifically about possession of ammunition under 922(g)(1).  That case looks back at how the Second Circuit has looked at crimes involving the possession of a firearm, and says clearly -- and I'll quote directly, "It's long been the law of our Circuit, that possession of a firearm is unequivocally a crime of violence for the purposes of Section 3142(f)(1)(A)".

And really the turning stone of the reasoning the Court uses here is the idea that there is some risk even in where it's just the possession of ammunition, the ammunition can find its way into a gun, and we're in the world of a crime of violence.  I think there's clearly the same risks here in a case involving possession transportation of firearms.

MS. BAHARANYI:  Your Honor, if I may respond?

THE COURT:  Yes.

MS. BAHARANYI:  He certainly has not been charged with 922(g) or any subsection there.  He's not charged with the possession of a firearm, and I think the differences between the section under which he's been charged with and what the government has discussed are significant.  One of the primary

1    differences is, Congress treats these two statutes quite

2    differently.  There's a maximum punishment of 15 years imposed

3    if someone's charged with 922(g).  The maximum punishment for a

4    922(a)(3) offense is five years.  I think they treat the

5    conduct differently -- or the statutes differently because it's

6    also meant to capture different conduct, different *mens rea*,

7    different elements.

8            We're asking the Court to follow I think the command

9    or the instructions, guidance given to us by Congress, given to

10   us to by the codebook.  And I think that the arguments that we

11   would make about flight and danger are still arguments that the

12   Court can consider even if the Court were to find that this

13   fell under prong two because mandatory -- I think the Court is

14   very familiar -- mandatory remand cases come before this Court

15   often, even in the conduct of 922(g) cases, which we don't have

16   here.

17           And if there are certain compelling reasons, certain

18   exceptional reasons that exist, then a person may be allowed to

19   continue and remain in the community.

20           THE COURT:  I will, before ruling on whether this

21   falls within (2) or not, what do you want to say on all those

22   other grounds.

23           MS. BAHARANYI:  One of the first and primary grounds

24   is I think the ability of this Court over several months to see

25   that, while Lucha El may have different, very different

1    opinions from the Court, very different opinions about how the

2    Court even wishes to be communicated with, he certainly has not

3    in the months since December of 2022 ever once violated a

4    condition of release, ever once failed to show up where he was

5    supposed to show up, failed to stay in touch with his pretrial

6    officer, failed to come to court.  He has shown the ability to

7    abide by these very important and serious conditions that have

8    been put in place.  And he was able to do that even under

9    strict conditions, home incarceration and a curfew, and under

10   the more lenient conditions that he was able to experience over

11   the past few days.

12        No matter what type of conditions the Court imposes,

13   he's able to follow them.  And that segways to safety in the

14   community, his ability to maintain and conduct himself in the

15   community that does not pose a danger.  Over the past several

16   months while he's been on pretrial supervision under the

17   supervision of his pretrial officer Mr. Jonathan Lettieri, he's

18   also never once had any contact with law enforcement.  He's

19   never once violated any laws.  In fact, in the community, his

20   community, he's been the person feeding the community.  He host

21   barbecues for individuals just right outside of his home on

22   3318 Perry Avenue.  He takes care of people.  He's sort of the

23   community caretaker if you will.

24        Your Honor, just yesterday leaving the courthouse, one

25   of the individuals who helps sweep up outside, the different

1    floors in this courthouse says hi to Lucha, greets him.  They

2    talk about their families.  They talk about each other.  Lucha

3    El tells us about how he is doing after the lost of his wife

4    because that person is part of his neighbor, that person is

5    part of his community.  And Lucha El looks out for him and

6    looks out for everyone in his sort of purview in the community

7    around 3318 Perry Avenue.  That's not the first and only person

8    even in this courthouse that Lucha El is somewhat of a

9    caretaker for when he goes back home to the Bronx.

10            When he goes back home, he's also a caretaker for

11    those in his family.  He has a son, a six-year-old named

12    Hayden.  That son is his entire world.  He speaks with him

13    quite regularly, daily since we've been on trial.  That would

14    be another devastating loss, for that communication to no

15    longer be able to continue, for that relationship to at this

16    point be broken by his incarceration, an incarceration on

17    charges that don't involve any violence or danger on his part.

18    He did not shoot.  He did not threaten.  He did not assault.

19            THE COURT:  What do you make of the fact that the

20    evidence showed overwhelmingly in my view that he had allied

21    himself with a "militia group" who intended to transport a

22    large number of arms to various places, and who felt strongly,

23    as he seemingly did as well, that the law be damned.  They

24    thought, this was their view of the law was the law, and they

25    could do with guns and transport, receive, obtain, and

N8VBPER1                      Charge

otherwise handle weapons, indeed train to handle weapons, in

any way they chose because that was in their view the law.  So

how can I have even the slightest confidence that he would

abide by the law now that he knows that he faces sentence?

MS. BAHARANYI:  Your Honor, since he was arrested, he

knew that he faced potential serious consequences in this case.

He's been very involved at every stage of this case.  He knows

what the punishments have been.  Today is not the first day

that he knew what could happen.  He's conducted himself in a

way that has shown the Court that he is certainly able to abide

by the laws, the Court's rules, the Court's pretrial rules in

his community.  He's not pose any sort of danger.  He's not

threatened or hurt or assaulted anyone.  And that goes just

generally, your Honor, but certainly also during this time that

the Court has known him and has the opportunity to spend time

with him if you will as part of this case.

I do want to point out that for this militia, for this

group, there again is no allegation that they threatened or

hurt or assaulted anyone.  This conduct that happened in

Massachusetts, I know we've heard a great deal about it.  We

haven't heard everything about it, but we've heard a great deal

about it.  I think what's salient is, this is an arrest or

incident that ended peacefully.  It's an arrest or incident

that I think even as it started the group leader said, we don't

intend this to be a violent interaction.  And I don't think

1    there's been any evidence in the record that they ever once

2    were intending violence or destruction or to threaten anyone or

3    assault anyone.

4            THE COURT:  What were they doing with all those

5    weapons?

6            MS. BAHARANYI:  I think what did come out -- well,

7    maybe it didn't come out here, but what we know from the

8    discovery they've provided that they were planning to do

9    trainings.  They had camping gear.  They plan to go into the

10   woods and eat out of cans of beans and sleep outside and really

11   camp and train, learn how to use firearms, not use firearms on

12   individuals, not threaten anyone with firearms.  It was truly

13   sort of a camping and training exercise, not with any violent

14   or violent intent behind it.  And that's for that group.

15           I think what's also been hopefully clear from the

16   evidence is, Lucha El's involvement in that group is not as a

17   leader.  It's not a longterm involvement.  The only messages

18   that came in, the discussion was for about a month or two

19   before his arrest in Massachusetts.  So I think to suggest that

20   he's some core member, a leader of the group I think is

21   misleading.  And also to suggest that this group itself, his

22   association in any way with this group, who has a First

23   Amendment to espouse their beliefs, to speak about what they

24   believe in.  But to suggest that his association with that

25   group that did not engage in violence somehow makes Lucha

1   violent is not a fair suggestion in this case.  It's quite
2   misleading.
3           I would just note that for his -- I think the Court
4   may not know this because you were not part of the initial bail
5   hearing, but Lucha stands before the court with a single prior
6   conviction that's for misdemeanor drug possession from ten
7   years ago at this point.  So this is a person who has, in his
8   33 years, has a very minimal record, who's facing conviction on
9   crimes that carry a five-year statutory maximum, who did not
10  engage in any sort of violent, assaultive conduct, did not
11  threaten anyone.  And the 911 call wasn't initiated because he
12  threatened anyone or engaged in violence or assaultive conduct
13  against anyone, that's not who he is.  He has no convictions of
14  the nature for that.  And I think he's shown the Court over
15  several months now his ability to remain in the community, his
16  ability to remain in the community and not pose any sort of
17  danger or not pose any sort of violence to anyone.
18          THE COURT:  Thank you.  Let me hear from the
19  government.
20          MS. BAHARANYI:  I'm sorry.  The last thing, your
21  Honor, because I think this is also important.  And thank you
22  for my co-counsel.
23          When it comes to mandatory detention, I think we're
24  talking a bit about the standard.  I want to be a bit more
25  precise about the Court's power, ability there.  If there are

N8VBPER1                    Charge

1    exceptional circumstances, and I think the exceptional

2    circumstances are those we laid out to the Court, then your

3    Honor absolutely has the ability to allow him to stay out

4    remain with his family.

5         THE COURT:  My recollection is that by exceptional

6    circumstances, you're not talking about just that you've shown

7    that he's not a flight risk and/or a danger to the community,

8    because that would mean that the mandatory aspects of these

9    statutes are irrelevant.  I think exceptional circumstances

10   means things like someone whose got a very serious heart

11   condition and needs immediate hospitalization or something like

12   that.  I don't see anything like that here.  What you've just

13   been arguing are the standard positions for under the first

14   section of 3143, not anything that is exceptional.

15        MS. BAHARANYI:  Certainly the arguments for -- we

16   believe still your Honor should be considering this under the

17   first section.  But, I think even his background, what we've

18   explained about his background, his exceptional behavior on

19   pretrial release is proof that these backgrounds would even fit

20   the exceptional circumstances that the Court is required to

21   consider.  I will also note his position as someone who is a

22   community caretaker, his position as someone who is taking care

23   of his family as well, his position as a young father who has

24   again a very minimal crime history, that is exceptional in this

25   case as well.

1          THE COURT:  I want to hear from the government, but

2    just on that narrow point of, none of that strikes me as

3    exceptional.  It's very common because unfortunately most

4    crimes are committed by young males who often have dependents,

5    but let me hear from the government.

6          MS. NICHOLAS:  Thank you, your Honor.  I want to begin

7    by going back to 3143(a)(2) as to why this is in fact

8    mandatory.  And again, *Watkins* is controlling here.  *Watkins* is

9    not about anything other than possession of a firearm.  It's

10   the operative concept there is crime of violence.  And I think

11   all the Court needs to know is what the Second Circuit said and

12   has long said, which is that it's unequivocal that possession

13   of a firearm is a crime of violence for purposes of Bail Reform

14   Act.  I think that gets us there.

15         Your Honor, I want to be clear that the government

16   would be seeking remand here as well under the non-mandatory

17   provisions for both danger and flight reasons as have been

18   articulated frequently throughout the case, but I want to

19   respond to a couple of specific arguments.  First is defense

20   counsel's characterization of this group, Rise of the Moors.

21   This militia group that was traveling to Maine.  The government

22   provided an extremely narrow set of materials to the jury.

23         Taken on their own, defense counsel's characterization

24   maybe plausible.  Taken together, the full scope of what we

25   know about this group, what they were talking about, what they

1   were planning, what they did in response to the defendant's

2   first arrest in the Bronx, there is nothing about them that

3   would suggest this was some kind of harmless camping trip in

4   Maine.  What this was, was a group of people training with

5   firearms because they contemplated eventual violence.

6            In response to defendant's arrest in the Bronx, Al

7   Aban, one of the people arrested with him in Massachusetts,

8   told Jamal Latimer, make me lethal.  They were frustrated with

9   law enforcement.  They had no regard for the law, and that was

10  the response.  This is not a harmless group, and that's the

11  first point I want to make.  I think it's just completely

12  misleading to go off of what was shown to the jury based on

13  decisions --

14           THE COURT:  The Court as well kept from the jury much

15  of the information regarding what that militia was doing and

16  what they were up to; but of course I can consider it now on

17  bail.

18           MS. NICHOLAS:  And in that vein, this group refused to

19  disarm.  They refused to give their names to law enforcement.

20  The defendant has repeatedly refused to be fingerprinted.  This

21  is not a group that respects the law, the mandates issued by

22  courts.  We also have a sample set of information about how the

23  defendant has conducted himself in his case in Massachusetts,

24  which has been again adjourned till February.  This defendant

25  has multiple sentences that are coming that he has every reason

N8VBPER1                    Charge

1    to want to try to avoid, which is a very clear risk of flight.

2    Even under the non-mandatory provisions, the government would

3    be seeking detention here, think it's a very compelling

4    argument both on danger and on flight.

5         MS. BAHARANYI:  Your Honor, if I may respond to a few

6    points that have been raised.

7         THE COURT:  Sure.

8         MS. BAHARANYI:  First, regarding the characterization

9    of the group, the militia training, all of what has been raised

10   by the government.  I think it's important to note that there

11   has never been once been an allegation by the government, they

12   certainly aren't charged with violent conduct in Massachusetts.

13   They have not been -- there's no allegation that they ever

14   engaged in violence.

15        I think what the government has cited or talked about

16   are messages where people are expressing frustrations, but

17   certainly not an intent to threaten or harm or assault anyone.

18   And I think the idea that this was -- not to go so far into the

19   training details, but the idea that this training was only for

20   the purpose of conducting violence is a certain speculative

21   lens; or, I would say, a filter that the government is viewing

22   the evidence through.  I think the group's own words and their

23   actions, the fact that they alerted the sheriff in Maine that

24   they were going to be training there; the fact that they were

25   given permission to train in Maine; the fact that they tried --

1    albeit perhaps in an incorrect way, they tried to go about

2    their business peacefully, all of that is proof that his

3    association with this group does not make him violent.

4            But I think to turn to some particular exceptional

5    circumstances that exist here.  One, if Lucha El is remanded,

6    if he's placed in jail, it's going to be at the MDC Brooklyn.

7    I think the Court is aware of generally how dysfunctional and

8    chaotic that space is. It's only getting more so by the day

9    because of staffing shortages.  They're operating at about 50

10   percent capacity for their staff right now, which means that

11   he's going to go into a cell and stay in his cell, sometimes

12   24/48 hours or a whole weekend at a time.  This is problematic

13   not just because of truly how inhumane those conditions are,

14   it's also problematic because he has a pending criminal case in

15   Massachusetts that he has been attending.  He's been on bail

16   for a few years now, and that pending case is going to trial in

17   February and requires his input, his participation.  He's

18   actually *pro se* there, so he's instrumental in his need to have

19   access to discovery, his need to be able to talk to witnesses

20   is quite instrumental.

21           And I think the Court has seen, contrary to the

22   government's assertions, that Lucha El is someone who does have

23   a desire to be deeply involved in his legal cases.  He will be

24   completely hamstrung if he's sitting at the MDC Brooklyn on

25   lockdown 24/72 hours at a time because a guard or staff member

N8VBPER1                    Charge

1    won't let him out of his cell.  It also means during those time

2    periods he's not speaking with his son Hayden.  He's certainly

3    not having any communication with his family, with Israel

4    Perez, with his mother Maria who is here, and also his cousin

5    Maria who the Court had the opportunity to meet.  It is a

6    completely exceptional circumstance that he would be sent to a

7    place that is so isolating, so chaotic, and so violent at this

8    time, and that would hamstring, and that would completely

9    prevent him from defending himself in this other pending action

10   that the Court has been aware of now for sometime as well.  One

11   moment, your Honor.

12           (Counsel and defendant conferred)

13           MS. BAHARANYI:  Two more things, your Honor.  The case

14   that my colleague just handed up to me which is, *United States*

15   *v. Boyd*, and I'm just looking for the cite in front of me.

16   I'll give the exact cite to the Court.  The cite is 2022

17   WLS90771. This was a case decided out of this district, the

18   Southern District.  There the Court held that the conditions at

19   the MDC were in fact an exceptional circumstance warranting

20   someone's continued release even after conviction.

21           The conditions have truly, your Honor, only gotten

22   worse since the pandemic, not better; that's Covid, staffing

23   related.  It's truly an inhumane place to be.  But one of the

24   reasons why I wanted to take a moment was to speak to Lucha El,

25   because as the Court knows, he's been very deeply involved in

1    this case.  One thing he wants the Court to know, he is not a

2    violent man.  He's not a violent person.  He isn't committed or

3    conducted himself ever in a violent way.  He is someone who is

4    moved by love, certainly the community around him knows that

5    well, and it is certainly hard for your Honor to see that

6    because you don't see him everyday.

7              THE COURT:  I received a love letter from him.

8              MS. BAHARANYI:  That's not representative of who he is

9    in terms of how he feels and how he takes care of those in his

10   community.  He certainly had no intent or desire at any point

11   to receive firearms to conduct violence.  And I think what

12   certainly is clear from the government's preparation today is

13   they don't have any evidence to the contrary.  He's not a

14   violent person.  He has no history of it, and that was not the

15   goal of the conduct in this case.

16             THE COURT:  All right.  So the first thing the Court

17   needs to consider is whether this case fits within Section 3143

18   (a)(2) such that detention is mandatory unless there are

19   exceptional circumstances.  The only thing raised by the

20   defense that this Court considers to fit within the notion of

21   exceptional circumstances would hypothetically be the

22   conditions at the MDC, although they effect.  And many of the

23   same respects that were just mentioned by defense counsel the

24   conditions at the MDC negatively effect numerous defendants in

25   their ability to feel safe and their ability to prepare

1   properly for their legal defense and so forth.  So that is a

2   serious problem that has bothered this Court otherwise as well.

3           Now having said that, what I have been able to do in

4   individual cases before me, not this case, but cases where

5   there were difficulties preparing for trial or so forth is

6   arrange with the warden for appropriate provisions to be made.

7   I don't know that I have the power to do that in regard to a

8   case pending in Massachusetts, but certainly a judge there

9   could do that.  The warden is very receptive to that kind of

10  arrangement.

11          So while I don't mean to in any way minimize the

12  serious problems at the MDC, I don't think they meet the

13  requirements for exceptional circumstances in this context of

14  bail, so I think I am obliged under section 3143(a)(2) to

15  detain the defendant.

16          Now assuming for the sake of argument that the

17  conditions at the MDC would meet the exceptional circumstance

18  provision, though as I say I don't they that's right, if I had

19  to consider the factors under section 3143(a)(1), although it'd

20  be a closer call, I would still detain the defendant because

21  what I think has emerged from the proof in this case

22  overwhelmingly is how totally he disrespects the law when it

23  comes to firearms.  And however much he may respect the law

24  with respect to the showing up for court before a conviction,

25  though the risk of flight is now obviously increased by the

1  fact of conviction, it pales by comparison to his deep-seeded

2  belief that he is the law when it comes to dangerous weapons.

3        Now I went to great lengths throughout this trial to

4  make sure to put out of my mind his letter to the Court and

5  told myself repeatedly during the course of the trial, if

6  anything, Judge, lean in his favor, because you must not allow

7  that letter to impact.  But when it comes to the issues made

8  here of bail, I think I can consider that letter as well.  And

9  that letter just further shows that he's not just a follower,

10  he has a deep-seeded heartfelt unfortunately belief that he is

11  the law when it comes to weapons, he and his co-conspirators.

12        So even under section 3143(a)(1), I would still detain

13  him, so the marshal will take the defendant into custody at

14  this time.

15        MS. BAHARANYI:  Your Honor, before that happens, I

16  think there are still a couple of points the Court should know,

17  and I understand what the Court has said.  What the government

18  hasn't shared with the Court, but I'm sure the government is

19  aware of, is that these firearms in Massachusetts, except for

20  the one from Keith Vereen, were firearms that had been

21  purchased by other people, not by Lucha; firearms that had been

22  purchased legally too, not by Lucha, but by other individuals

23  in their own states of residence.  I could see them talking

24  here, but I believe that's some information they are privy to,

25  your Honor.

1          I think more important is, his views on the Second

2     Amendment, those are views.  And those are views that he's now

3     heard that the Court strongly, strongly disagrees with.  His

4     conduct over the past several month shows that even if there

5     are disagreements, he can follow by whatever the Court --

6     whatever conditions are imposed, whatever the Court says he

7     must do, he can do it.  And that includes not being around, not

8     using, not holding firearms.  He's done that for several

9     months.  He will continue to do that.  And throughout, up until

10    the time of his sentencing and throughout, because now it would

11    be a felony for him to have a firearm.  He's shown he can abide

12    by the Court's conditions.

13          THE COURT:  I need to at this point cut you off

14    because I've heard your arguments.  I will hear the government

15    on the last point you made that you said was within their

16    knowledge; but of course you can appeal this ruling to the

17    Second Circuit as you know.  And if they take a different view,

18    so be it.

19          MS. BAHARANYI:  We would ask for the ability to have a

20    stay pending appeal for that purpose.

21          THE COURT:  No.  Denied.

22          MS. BAHARANYI:  Or a surrender date for Lucha El so

23    that he can at least say good-bye to his family and his son.

24          THE COURT:  Denied.  Let me hear from the government

25    if they want to say anything on that.

N8VBPER1                        Charge

1              MS. NICHOLAS:  Very shortly, your Honor.  The

2      government has never alleged there was only one straw purchaser

3      in this case.  As to the names on the purchase reports, at

4      least two of the firearms were purchased by Quinn Cumberlander,

5      also of the militia arrest on behalf of Al Aban, who was in New

6      York with the defendant. It's not relevant to this question,

7      your Honor.

8              THE COURT:  One who even saw even the small snippets

9      of the Massachusetts events that the Court saw would join with

10     the government in saying this was not just a friendly camping

11     trip in Maine.  That is ridiculous.  These folks were up to no

12     good, and it's self-evident to any objective observer.  That

13     concludes this proceeding.  The marshals may proceed with

14     taking the defendant into custody.

15              (Adjourned)

16

17

18

19

20

21

22

23

24

25