

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

January 5, 2024

**By ECF**
The Honorable Jed S. Rakoff
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

    Re: *United States v. Steven Perez*, S1 22 Cr. 644 (JSR)

Dear Judge Rakoff:

  The Government respectfully submits this letter in advance of the sentencing of Steven Perez, a/k/a "Lucha," ("Perez" or the "defendant") in the above-captioned case, which is scheduled for January 8, 2024. On August 31, 2023, the defendant was convicted after a jury trial of violations of Title 18, United States Code, Sections 371 and 922(a)(3), in connection with his participation in a months-long conspiracy to illegally acquire firearms from outside New York State. As explained below, the Government submits that a sentence of at least 33 months' imprisonment is necessary to serve the legitimate purposes of sentencing. The Department of Probation ("Probation") has likewise recommended a 33-month term of imprisonment in the final Presentence Report ("PSR"). (PSR p. 25).

**I.**  **Factual Background**

  **a.** **Overview**

  Between at least in or about May 2020 and in or about July 2021, the defendant — a Bronx native who at all relevant times resided in New York — participated in a scheme through which the defendant and others acquired firearms from outside of New York. During the scheme, the defendant used his co-defendant Keith Vereen, with whom he claims to share a vague familial connection, as a straw purchaser. (PSR ¶ 14). In his role as a straw purchaser, Vereen purchased approximately 25 firearms (the "Vereen Guns") in South Carolina on behalf of others, including Perez, by lying about the nature of the purchases. (*See id.* ¶¶ 13-14). Specifically, Vereen, who is not a licensed firearms dealer, falsely stated on mandated federal forms that he was the true purchaser of the firearm he was buying. (*See id.* ¶ 15). In using Vereen to make these purchases, Perez, who was on multiple occasions the true purchaser of a firearm, was able to circumvent laws and regulations that limit the purchase and transport of guns outside of one's state of residence. (*See id.* ¶ 14). After completing these purchases, Vereen then transported the firearms to New York, among other places, for resale to Perez and others. Specifically, after purchasing firearms, Vereen made at least four roundtrips from South Carolina to New York, during which Vereen

contacted Perez and, as demonstrated by cell site location information, met Perez in person to exchange guns and money. (*Id.* ¶ 16).

During the course of the scheme, Perez and his co-conspirators, who included Jamil Bey and Ricardo Rodriguez, paid Vereen for acting as their straw purchaser during these out-of-state gun purchases. For example, on or about September 22, 2020, Perez sent Vereen a $350 Western Union payment from a check cashing store in the Bronx, which was directed to Vereen at a South Carolina address. (*Id.* ¶ 17). On or about October 1, 2020, Vereen purchased a Canik TP9 9mm firearm (the "Canik") at a federal firearms licensee ("FFL") in South Carolina. (*Id.*). Two days later, on or about October 3, 2020, Vereen traveled to New York, transporting several firearms, including the Canik, to New York residents, including Perez. (*Id.*). The Canik was ultimately recovered from Perez following Perez's arrest on or about June 23, 2021. (*Id.* ¶ 18).

Similarly, on or about September 12, 2020 — the same day Vereen purchased six firearms in South Carolina — Vereen received two wire payments from a check cashing store in the Bronx, New York. (*Id.*). The first payment was a $600 transfer from Bey, and the second was a $911 transfer from Rodriguez. (*See id.*). Perez, who was in contact with both Bey and Rodriguez, acted as the middleman to facilitate their gun purchases from Vereen. (*See id.* ¶ 16).

Of the Vereen Guns seized by law enforcement in this case, at least six have been recovered in states outside South Carolina: three firearms were recovered in New York, including one from Perez in the Bronx; one firearm was recovered in Wakefield, Massachusetts, following a traffic stop and search of vehicles driven by a militia group, which included Perez, Bey, and several other individuals who resided in either New York or Rhode Island; one firearm was recovered in New Jersey; and one firearm was recovered in Springfield, Pennsylvania. (*See id.* ¶¶ 13, 20).

  b. **The Bronx Arrest (June 23, 2021)**

On or about June 23, 2021, the defendant was arrested in the Bronx, New York (the "Bronx Arrest"), in possession of the Canik that Vereen had purchased in South Carolina on or about October 1, 2020. (PSR ¶ 19). The Canik is depicted below. The Bronx Arrest was the subject of a suppression hearing during which the arresting officers — New York City Police Department ("NYPD") Officers Smalls and Cotter — testified. At trial, the jury heard testimony from Officer Smalls and viewed body worn camera footage from the Bronx Arrest. In the footage, the defendant can be heard telling officers that he "doesn't need a permit for [the gun]." (GX 205A). He continues telling the officers, "I have my constitutional right, I'm not worried about a permission, a permit is a permission. I'm not giving my right away." (GX 205B).



*Canik seized from the defendant during the Bronx Arrest.*

### c. The Massachusetts Arrest (July 3, 2021)

Just two weeks after the Bronx Arrest, on or about July 3, 2021, the defendant was again arrested with firearms (the "Massachusetts Arrest"), including a Glock Model 44, .22 caliber pistol (the "Glock"), which Vereen had purchased in South Carolina on or about July 23, 2020. (PSR ¶ 19). At the time of this second arrest, the defendant was stopped on I-95 in Massachusetts with a group of individuals, including Bey, who self-identified as members of a militia group called the "Rise of the Moors." (*Id.*). The group, who at the time of the traffic stop were armed and dressed in camouflage uniforms and ballistic vests, were en route from Rhode Island to Maine to attend a training exercise that they called "Operation Fountainhead." (*Id.* ¶ 20). During their initial interaction with law enforcement, the group's leader identified the group as a militia from Rhode Island. In total, the group had over ten firearms with them, including military-style rifles and handguns; over a thousand rounds of ammunition; over two dozen magazines, including a loaded, large-capacity drum magazine; and other equipment, including night vision goggles. (*Id.*). They had planned the event for weeks, referring to it as the "east coast training exercise," and instructing one another on proper preparations, including packing firearms and other military equipment. (*Id.*). As depicted below, the defendant was a full participant in the event — he was dressed from head to toe as if he was heading into battle, having donned a ballistic vest and strapped a firearm across his chest. (GX 330C).

3



*The defendant with a firearm slung over his shoulder while reaching for another firearm during the Massachusetts Arrest.*

Despite repeated requests to drop their weapons, the defendant and his co-conspirators refused to comply, thereby shutting down the highway and triggering the response of dozens of law enforcement officers. Through their blatant disregard for firearms laws and regulations, the group created a highly volatile situation that had the potential to turn deadly in a split second. Eventually, after several hours of negotiation with law enforcement, the defendant and his co-conspirators peacefully surrendered, in part to allow members of the group to seek medical attention for the effects of exhaustion and dehydration.[1] Ultimately, as depicted below, law enforcement recovered nine firearms, over a thousand rounds of ammunition, and almost 20 magazines from the scene.



*Firearms and ammunition seized during the Massachusetts Arrest.*

---

[1] *See, e.g.*, https://www.npr.org/2021/07/03/1012924207/i-95-partially-closed-for-hours-after-police-standoff-with-armed-men; https://apnews.com/article/armed-standoff-wakefield-massachusetts-9ee61b69ca96bb5ce212f56651f0dd11.

4

After his arrest, the defendant spoke with law enforcement, explaining (just as he had done two weeks earlier) that he "d[id]n't need a license to carry, it's my Second Amendment right." Members of the Rise of the Moors used the event to enlarge the group's profile. In particular, during the pendency of his case, the defendant published a manuscript on the Rise of the Moors website, which, as depicted below, used a snapshot of body worn camera footage from the Massachusetts Arrest as cover art.



In the manuscript, entitled "Writings by Lucha El Por Libertad," the defendant complained that he had been made a "political prisoner" and that he is a "simple man whose only crime is following the law of the land." The manuscript also included a section specifically discussing the instant case in which the defendant explained that "the great object is that every man be armed and everyone who is able might have a gun." He continued, "I am being charged with receiving an arm. I am being tried for taking it upon myself to preserve my life which is my right and my duty to make sure that I prevent anything or anyone from harming me. The crime is against me. The criminal act is being done to me by the prosecutor and judge in this case who are with disgusting and malicious intent treating me as a minor and not a man at the age of maturity who is able to make my own decisions on how to go about the prevention of harm in my own life." Many of the same sentiments were contained in *pro se* letters that the defendant sent to the Court in advance of trial. (*See* Dkt. 18).

### d. Perez's Federal Arrest and Trial

On or about December 7, 2022, the defendant self-surrendered to federal authorities. The defendant was released and supervised by Pretrial Services until his conviction on August 31, 2023. The defendant was remanded at the time of his conviction and has been housed at MDC Brooklyn since that time.

After a week-long trial, the defendant was convicted by a jury on both counts charged in the superseding indictment. At trial, the jury heard testimony from law enforcement officers involved in both the Bronx and Massachusetts Arrests. The jury also heard from an ATF expert

who explained the firearm purchasing process and the paperwork required to complete a legal firearms transaction. The jury also saw cell site location information and heard testimony from an expert who analyzed phone records that corroborated the relationship between Vereen and Perez, as well as Perez's co-conspirators, Bey and Rodriguez.

On or about October 12, 2023, following the entry of a guilty plea, Vereen was sentenced to a term of imprisonment of 24 months.

### e. Guidelines Calculation

The Government agrees with the Probation Office's calculation of the defendant's Guidelines range. (PSR at 25.) That range is based on an offense level of 20, which includes a base offense level of 12, pursuant to U.S.S.G. §§ 2X1.1(a) and 2K2.1(a)(7), as well as a four-level enhancement, pursuant to U.S.S.G. § 2K2.1(b)(1), because the offense involved between 8 and 24 firearms, and a four-level enhancement, pursuant to U.S.S.G. § 2K2.1(b)(6)(B), because the defendant possessed firearms in connection with another felony offense. (*See* PSR ¶¶ 29-40). Because the defendant is in Criminal History Category I (*see id.* ¶¶ 43-44), his resulting Guidelines range is between 33 and 41-months' imprisonment.

### i. Application of Enhancement Under § 2K2.1(b)(1)

Under § 2KI2.1(b)(1), a four-level enhancement applies where the offense involved between 8 and 25 firearms. Application note 5 clarifies that the calculation should include "those firearms that were unlawfully sought to be obtained, unlawfully possessed, or unlawfully distributed, including any firearm that a defendant obtained or attempted to obtain by making a false statement to a licensed dealer."

"To hold a defendant accountable for jointly undertaken criminal activity, a district court must make two 'particularized findings': (1) 'that the acts were within the scope of the defendant's agreement' and (2) 'that they were foreseeable to the defendant.'" *United States v. Galanis*, 758 F. App'x 71, 74-75 (2d Cir. 2018) (quoting *United States v. Studley*, 47 F.3d 569, 574 (2d Cir. 1995)). "An offense by a co-conspirator is deemed to be reasonably foreseeable if it is a necessary or natural consequence of the unlawful agreement." *United States v. Germosen*, 605 F. App'x 16, 18 (2d Cir. 2015) (quoting *United States v. Parkes*, 497 F.3d 220, 232 (2d Cir. 2007)). Once the Government establishes, by a preponderance of the evidence, the existence of jointly undertaken criminal activity, the burden rests on the defendant to prove that the acts or omissions of his coconspirators were not reasonably foreseeable to him. *See United States v. Martinez Rios*, 143 F.3d 662, 677 (2d Cir. 1998) (citing cases); *see also United States v. Firment*, 296 F.3d 118, 122 (2d Cir. 2002).

Count One charges the defendant in a conspiracy with Keith Vereen to acquire firearms from South Carolina. Over the course of the scheme, Vereen purchased 25 firearms. *See* Exhibit A (cataloguing Vereen's gun purchases). The evidence at trial, including these purchases, cell site location information, and communications between Vereen, the defendant, and others, established that the defendant and Vereen were engaged in a joint criminal enterprise. Specifically:

6

**First Trip (September 14-17):** Specifically, between September 12 and 13, 2020, Vereen purchased **seven** firearms from FFLs in South Carolina. On September 14, 2020, Vereen received a Western Union payment from Bey and traveled to New York, communicating with the defendant once. Over the course of the next two days — September 15 and 16, 2020 — Vereen and the defendant communicated at least nine times. On the evening of September 16, 2020, cellphones belonging to Vereen and the defendant both connected to the same cellphone tower in the Bronx. On September 17, 2020, Vereen returned to South Carolina.

**Second Trip (October 2-6):** Vereen and the defendant then communicated six times on September 21, 2020. The next day, the defendant sent Vereen a $350 wire transfer before Vereen purchased an additional **five** firearms, including the Canik, between October 1 and 2, 2020. On October 3, 2020, Vereen communicated with the defendant five times and traveled to New York. The same day, cellphones belonging to Vereen and the defendant connected to the same cellphone tower in the Bronx at approximately 3:00 a.m. Then, on the evening of October 4, the defendant's phone, Vereen's phone, and Bey's phone all pinged on the same cell tower within an hour of each another, suggesting that the users of these phones met in person before Vereen returned to South Carolina on October 6, 2020.

**Third Trip (October 22-23):** After returning to South Carolina, Vereen purchased **three** guns on or about October 21, 2020. He then traveled to New York on October 22, 2020. That day, Vereen and the defendant's cellphones connected to the same cell tower multiple times in the Bronx. The next day, Vereen arrived back in South Carolina, and the defendant attempted to contact him.

**Fourth Trip (November 1-3):** Finally, on or about October 31, 2020, Vereen purchased **two** firearms in South Carolina. Following the same pattern, Vereen arrived in New York the next day, and pinged off of the same cell towers as the defendant multiple times. Vereen was back in South Carolina by the morning of November 3, 2020.

In addition, the defendant was arrested in possession of a firearm (the Glock) purchased by Vereen on July 23, 2020, suggesting that the conspiracy included firearms purchased before the first cell site location information was obtained by the Government. Even if the Court were to account solely for the Glock and the seventeen firearms Vereen purchased before his four trips to New York, the § 2KI2.1(b)(1) enhancement still applies.

### ii. Application of Enhancement Under § 2K2.1(b)(6)(B)

Under § 2K2.1(b)(6)(B), a four-level enhancement applies where a defendant possesses a firearm in connection with another felony offense. The "'in–connection–with' requirement is satisfied so long as a firearm has the potential to 'serve[ ] some purpose with respect' to a defendant's 'felonious conduct'" that is more than "merely coincidental." *United States v. Ryan*, 935 F.3d 40, 42 (2d Cir. 2019) (quoting *United States v. Spurgeon*, 117 F.3d 641, 644 (2d Cir. 1997)).

Application note 14(c) further clarifies that "another felony offense" is any "federal, state, or local offense, other than *the* explosive or firearms trafficking offense, punishable by a term of

7

imprisonment for a term exceeding one year," regardless of whether or not charges are brought. U.S.S.G. § 2K2.1, app. n. 14(c) (emphasis added). The use of the word "the" in the application note to § 2K2.1(b)(6)(B) is significant. As Judge Cronan recently explained, the addition of the word "the" in this guideline served to "make[] clear that it only excludes from the scope of 'another felony offense' the very offense that gave rise to the instant conviction, not any possible firearms possession or trafficking offense." *United States v. Otero*, 21 Cr. 239 (JPC), 2022 WL 683043, at *4-5 (S.D.N.Y. March 8, 2022).

In the instant case, the defendant was convicted of violations of 18 U.S.C. §§ 371 and 922(a)(3), relating to the manner in which he acquired firearms. At the time of the Bronx Arrest, the defendant possessed the Canik which he had acquired by virtue of the underlying firearms offense, in connection with at least three felonies in violation of New York State law: (i) N.Y. Penal Law Section 265.03 (criminal possession of a firearm in the second degree); (ii) N.Y. Penal Law Section 265.02 (criminal possession of a firearm in the third degree); and (iii) N.Y. Penal Law Section 265.01-b(1) (criminal possession of a firearm). Further, at the time of the Massachusetts Arrest, the defendant was engaged in multiple felony offenses aside from the offenses for which he was charged and convicted. In particular, the defendant's possession of the Glock was in connection his violation of a at least two Massachusetts statues: (i) possession of a large capacity firearm in violation of Massachusetts General Laws, Chapter 269, section 10(m), and (ii) wearing body armor during the commission of a felony, in violation of Massachusetts General Laws, Chapter 269, section 10D.

## II.   Discussion

### A.  A Sentence of at Least 33 Months Imprisonment is Necessary and Appropriate

The Government respectfully submits that the statutory sentencing factors set forth in Title 18, United States Code, Section 3553(a) weigh in favor of a sentence of at least 33 months imprisonment. The factors particularly applicable here include the need for the sentence to reflect the nature and seriousness of the offense, to afford adequate deterrence to this defendant, and to promote respect for the law. 18 U.S.C. § 3553(a)(2)(A)-(C).

Rarely has there been a case where there is such a clear need for a serious sentence to promote specific deterrence. As was made clear at trial, the defendant knew that his acquisition and ultimate possession of firearms was illegal. He knew when he acquired guns from out of state through a straw purchaser. He knew when he was arrested in the Bronx. And he knew when he was arrested again — just two weeks later — in Massachusetts. He knew, but as the evidence at trial showed, he did not care; instead, he repeatedly stated that "a permit is a permission" and that he did not need a "permission" to possess a firearm. (GX 205B). The defendant's brazen criminal conduct cannot be taken lightly. As discussed above, the defendant engaged in this conduct with total disregard for its inherent danger, in repeated, willful violations of the law. He must be held accountable.

So too is there a compelling need to promote respect for the law. Repeatedly, the defendant and other members of the Rise of the Moors have made clear that they believe that they can and should disregard the gun laws for which they have personal distaste without consequence.

Throughout the pendency of this case and the events leading up to charging, the defendant's conduct demonstrated a genuine lack of respect for the authority of the Court and the rule of law. For example, during multiple interactions with law enforcement, the defendant has refused to comply with basic directives, from identifying himself to completing the booking process. When he was ordered to put down his firearm and surrender to law enforcement during the Massachusetts Arrest, he refused. When he was ordered not to direct correspondence to the Court, he failed to comply. And, when confronted with the law as it relates to firearms, he chose to ignore "the legalities and the regulations and the mandates and all that extra stuff," because he decided he was above the law. (GX 205T).

At this point, there is nothing to indicate that, absent a substantial term of incarceration, the defendant will abide by the law — particularly firearms laws — in the future. As the Court previously observed, the defendant has a "deep-seeded belief that he is the law when it comes to dangerous weapons." (Trial Tr. at 579.) The sentence imposed in this case should send the message that violations of the firearms laws are serious offenses and that people cannot act as though laws, especially those designed to protect the public's safety, do not apply to them.

The nature and circumstances of the crime and general deterrence are also compelling considerations supporting the Government's request for a significant term of incarceration. As the Court has previously acknowledged, this was a "very serious crime. And we only have to look at the violence and threats of violence that are bought about through the illegal purchase and sale of guns on a daily basis to see how terrible this crime is." (Vereen Sent. Tr. at 17.) Individuals like the defendant, who illegally acquire firearms through the use of straw purchasers, contribute directly to flood of illegal firearms into New York City. According to a recent report published by the New York City Mayor's Office, "[i]n 2021 alone, the NYPD removed more than 6,000 guns off New York City Streets."[2] There are no gun manufacturers in New York City. Guns flow into the city via traffickers, traveling by car, train, plane, and bus from outside the state, often through the "Iron Pipeline" or the "New York Pipeline"[3] — the very route that the defendant's guns traveled after they were purchased in South Carolina. The New York Attorney General estimates that 76% of trafficked guns come into New York from seven states including — as in this case — South Carolina.[4] Lack of access and strict local gun laws create a black market for guns for people like the defendant to exploit. *See United States v. Cavera*, 550 F.3d 180 (2d. Cir. 2008) (district court's decision to consider New York market conditions in order to accomplish the goal of general deterrence in a gun trafficking case not an abuse of discretion). Motivated by their selfish desire to acquire guns without regard for the safety of the community, the defendant and others like him exploit the seams in the national gun regulation framework, acting with complete disregard for the danger they create and the lives they put at risk through their misanthropy.

---

[2] https://www1.nyc.gov/assets/home/downloads/pdf/press-releases/2022/the-blueprint-to-end-gun-violence.pdf.

[3] www.documentcloud.org/documents/21185516-nyc-mayors-blueprint-to-end-gun-violence.

[4] https://targettrafficking.ag.ny.gov. *See also* https://www.nbcnewyork.com/news/local/gun-trafficking-new-york-laws-violence-eric-schneiderman-illegal-weapon/2040315.

In sum, a sentence of at least 33 months — nine months more than the sentence imposed in Vereen's case — would adequately balance the various considerations under § 3553(a) and achieve the statute's stated objectives.

### III.    Conclusion

For the reasons set forth above, the Government respectfully requests that the Court impose a sentence of at least 33 months' imprisonment, as such a sentence would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: *Ashley C. Nicolas*
Ashley C. Nicolas
Madison Reddick Smyser
Sarah Mortazavi
Assistant United States Attorneys
(212) 637-2467/-2381/-2520

cc:    Zawadi Baharanyi, Esq. (by ECF)

# EXHIBIT A

**Master Gun List**

- FN 503, 9mm handgun, Serial Number ("SN") CV006976;

- MC1 9mm pistol, SN 035736CP;

- Glock 43, 9mm handgun, SN ADWH603;

- Taurus G2C, 9mm handgun, SN ABDWH603;

- Glock 44, 22LR handgun, SN AELY222;

- Glock 19GEN4, 9mm handgun, SN ACMB656;

- Hellcat 9mm Pistol, SN BY306999;

- Taurus Poly Revolver, SN JZ20483;

- Beretta APX 9mm, SN AXC030812;

- Beretta APX 9mm, SN AXC030805;

- Springfield 9mm pistol, SN HG970741;

- Ruger LCR revolver, SN 154025585;

- Beretta 21A .22 pistol, SN BCS19935U;

- Smith & Wesson M&P 9mm handgun, SN JEV8303;

- Canik TP9 9mm handgun, SN 20CB25810;

- Taurus PT738 .380 handgun, SN 1D117214;

- Smith & Wesson 9mm handgun, SN JFC0427;

- SCCY Model CPX2 9mm handgun, SN C023420;

- Smith & Wesson M&P .380 handgun, SN RJB4429;

- Glock GMBH 9mm handgun, SN BRFT833;

- Mossberg MC1SC 9mm handgun, SN 034425C;

- Ruger LCR 38 revolver, SN 1541-34460;

- Glock GMBH 9mm handgun, SN AEYB797;

- Taurus G2C 9mm handgun, SN ABK021341; and

- Canik TP9 9mm handgun, SN 20CB33183