**Federal Defenders
OF NEW YORK, INC.**

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

David E. Patton
Executive Director
and Attorney-in-Chief

Southern District of New York
Jennifer L. Brown
Attorney-in-Charge

January 5, 2024

**BY ECF AND EMAIL**

Honorable Jed S. Rakoff
United States District Judge
500 Pearl Street
New York, NY 10007

> Re: **United States v. Lucha El Por Libertad**
> **22 Cr. 644 (JSR)**

Dear Judge Rakoff:

     Your Honor first met Lucha El Por Libertad a little over a year ago, during an arraignment in which he shared his strong opinions on the law and his rights, and his skepticism about the justice system. Over the course of a year, Lucha El continued to share his views on gun possession, the Second Amendment, and self-protection; sometimes in ways the Court cautioned were unwise and unwelcome. And, after a three-day trial, a jury rejected his belief that his conduct (years earlier) of receiving a firearm from out of state was lawful.

     Lucha El's thoughts and beliefs have been a consistent and defining characteristic of this case since the beginning. But what has often been lost over the course of this case, is that Lucha El, regardless of his beliefs on what the law should or could be, is completely capable of abiding by the law as it is and being a productive member of his community. Eight months in county jail in Massachusetts after his arrest on July 4, 2021—was all the lesson he needed that he could not possess or receive a firearm illegally ever again. It was a lesson he has heeded ever since, personal views aside.

     After posting bond in Massachusetts, Lucha was released on March 30, 2022. He returned home and focused on building up his community— he cooked and fed those in need of a warm meal, mentored and coached his youngest neighbors, grocery shopped for the oldest, cared for his son, and worked odd jobs to support his community. He was able to continue this work on federal pretrial release after his voluntary surrender on December 7, 2022, for conduct related to his Massachusetts arrest. Lucha El spent the next

eight months fully compliant on pretrial release[1] and free of any arrests or police contact, until the conclusion of trial and his immediate remand by the Court.

Since Lucha El's arrest in 2021, he has not held a firearm, violated the law, or facilitated others in violating the law. The lesson from eight months of incarceration in Massachusetts and four months at the Metropolitan Detention Center of Brooklyn, has been sufficient.

On January 8, 2024, Your Honor will sentence Lucha El for his receipt of a firearm interstate and his participation in a conspiracy to receive firearms interstate. Given the non-violent nature of this case, Lucha El's compliance on pretrial release, his extensive community engagement, his limited criminal history, and the lengthy time served in state custody for related offense conduct, I will ask the Court to impose a sentence of five months with three years' supervised release, with the special condition of community service. Five months imposed by this Court, in addition to the eight months he already served in Massachusetts, is "no greater than necessary" to serve the ends of sentencing.

Certainly, Probation's recommendation for a sentence of 33 months is far too long and appears driven by Lucha El's decision to exercise his Sixth Amendment right to trial and an unfair equivalence drawn between Lucha's conduct and that of his co-defendant, a gun trafficker who purchased and distributed at least 25 firearms along the Eastern seaboard, most without Lucha El's involvement. *See* PSR at 26.

A sentence of five months followed by three years' supervised release, with the special condition that Lucha El complete community service hours, is all the punishment needed. This sentence would allow Lucha El's release from custody in time to fully and effectively participate in trial preparations for his Massachusetts trial, which begins on February 27, 2024.

---

[1] PSR ¶ 7: "[T]he defendant was compliant with all bail conditions."

Honorable Jed S. Rakoff                                      January 5, 2024
United States District Judge                                  Page 3 of 16

# A SENTENCE OF FIVE MONTHS IS APPROPRIATE AND WOULD RESULT IN 14 MONTHS OF IMPRISONMENT TOTAL WHEN CONSIDERED WITH LUCHA EL'S INCARCERATION IN MASSACHUSETTS.

### A. *Lucha El's Background Warrants a Sentence Far Below Probation's Recommendation.*

    a. *The immense weight of being the oldest child and constant protector.*

Lucha El Por Libertad was born Steven Perez on December 9, 1990, in Manhattan, New York. Son to Israel Perez and Maria Gonzalez, he grew up in the Bronx alongside his younger brother, Israel Perez Jr. Lucha El is the oldest of his parents' union. With this position came responsibility too great for a child. Lucha El loves his mother and deeply respects his father, but for much of his childhood he occupied a front seat to their toxic relationship that featured verbal arguments and physical abuse. *See* PSR ¶ 55. Maria Gonzalez distinctly recalls Lucha El springing to action every time she and his father argued. "When Steve was a little boy, he would come to my rescue whenever he heard his father and myself arguing about anything. He would come in between us so that we could stop arguing." Ex. A (Letter from Maria Gonzalez). The fights often stemmed from his father's extramarital relationships. While the violence was rarely ever directed at Lucha, he could not sit by as his father yelled at or slapped his mother. He also tried his best to shield his little brother from the fights and arguments. In his letter to the Court, Israel Jr. writes: "Our parents did not have the best relationship and their arguments could get physical at times. Lucha definitely saw more of the violence in the house. He would tell me to stay in the room when things got bad. As the older brother, he's always been the one shielding me" Ex. B (Letter from Israel Perez).

Being a protector and learning how to protect himself were therefore seared into his identity as a young child. Fortunately, his parents recognized the unhealthy home environment stemming from their relationship and ultimately divorced when Lucha El was 12 years old. His father moved out but still maintained a presence in Lucha and his sibling's life. And Lucha El will be the first to say that despite what he witnessed he knows his father was not a bad person. "[Israel Perez] was a good man but he was not a great husband." PSR ¶ 55. The elder Perez gave to those in the community with the least and he supported his children, but his "own demons haunted him" and Lucha El had to witness his father's violent struggle with those demons for much of his childhood.

      As inside the home, Lucha El bore the role of the protector outside as well. Growing up in the Bronx he experienced two starkly contrasting sides to his neighborhood. On the one hand, his block was a colorful, immigrant-heavy community space where he thrived on daily interactions with his neighbors and playing sports in Oval Park. As he described to Probation, his neighborhood gave him a childhood "full of adventure and joy." PSR ¶ 54. On the other, his community suffered from open drug use and and gang activity, and dodging violence and drugs became its own sport outside of the park. Lucha El took it upon himself to help his brother safely navigate the neighborhood and stay on track. Israel Jr. writes:

> As a kid, I always knew that in any bad situation, Lucha was there for me. Growing up in the South Bronx as children, we saw a lot of poverty and violence. It was the good, the bad, and the ugly so to say. My mom and Lucha tried to keep my innocence as long as possible… Through it all, Lucha was my big brother, the one who told me to be careful every time we were out in the neighborhood and felt like some teenagers were following us. I always felt a comfort in him being there.

Ex. B.

      For Lucha El and his brother, sports became a safe distraction and pastime. They both played baseball under their father's guidance as a coach. *See id.* Lucha El also boxed. The sport kept him disciplined. He never experimented with smoking or drinking as a teen or young adult because of his commitment to the sport and the importance of maintaining his physical health. PSR ¶ 72. While he hoped to launch a professional career as a boxer, these dreams were cut short nearly ten years ago. In 2014, he was in his car with his girlfriend's uncle when they were pulled over and drugs were found in the car. Although the drugs did not belong to Lucha El, it was his car and he felt pressure to take the blame— to once again be the "protector" in the situation. He was younger, had no record, and was promised no prison time. In that moment, Lucha El became one of the countless in this country who plead guilty to conduct he did not do out of fear, pressure, and uncertainty about navigating a legal system that appeared stacked against him. The arrest resulted in his first and only criminal conviction. While his punishment included a suspended license, no prison time, and a misdemeanor conviction, the consequences to his life were devastating. The boxing career he had worked hard to develop stalled and petered out after his arrest. Lucha El had also been working for five years as a paraprofessional in New York City Schools. His conviction closed the door on that career path as well. *See* PSR ¶ 85.

Honorable Jed S. Rakoff  January 5, 2024
United States District Judge  Page 5 of 16

> b. *The added joy and weight of fatherhood in a changing world.*

Without boxing and his paraprofessional job, Lucha El was lost. His life felt like it lacked meaning and direction until February 13, 2017— the day Lucha El became a father. ▮▮▮ Perez arrived and immediately became Lucha El's entire world. Lucha El and ▮▮▮ mother had an on-again off-again relationship that was off-again when he discovered she was pregnant. Nevertheless, he was thrilled about becoming a father. For all the burdens of protecting his brother and mother during his childhood, he felt immense joy in being able to care for and look after a loved one— that joy grew immeasurably with his son. Whenever possible, Lucha El is with his son— playing in the park, hanging out with family. When they aren't together, ▮▮▮ is always still present. Lucha El speaks of his son every chance he gets, to all who will listen. As his mother, ▮▮▮ grandmother writes: "Steven is always talking about his six-year-old son ▮▮▮ to everyone he can, he is just the proudest father to this little boy." Ex. A



*Lucha El and ▮▮▮ hand in hand on Perry Avenue.*

Lucha El was learning how to be a father to a precious and precocious 3-year-old when COVID-19 arrived and devastated his corner of the world. COVID seemed to be tearing away at the fabric of the community through death, illness and desperation. His particular neighborhood suffered immensely. As Officer Jarren Smalls testified during trial, Lucha El's neighborhood in 2021 was experiencing "a lot of gang violence at that particular time." Smalls and fellow officers were tasked with patrolling the area "because of an increase of crime around that time period." Tr. Trans. dated Aug. 28, 2023, at 59-60. The neighborhood that he loved was

struggling and Lucha felt helpless and in search of a sense of security for himself and his family, as a father and protector.

In the midst of the isolation and devastation of COVID, Lucha El learned about the Rise of the Moors, an organization that is part of the Moorish American Movement. He changed his name, from Steven Perez to Lucha El Por Libertad. He eagerly absorbed information about Moorish ideology, Islam, and individual rights. He felt a sense of security through his affiliation with a group, ideology and theology that spoke to his deepest desire for security and protection in a changing world. He was not a helpless young father in an increasingly dangerous neighborhood, he was a protector.

### B. Lucha El's Specific Offense Conduct, and his Motivations, Warrant the Requested 5-month Sentence.

Rise of the Moors is an organization led by Jamhal Talib Abdullah Bey, a charismatic former marine and resident of Rhode Island. One aspect of the organization's stated mission is civic and legal education. The website for Rise of the Moors has a link specifically dedicated to the Second Amendment.[2]

As Lucha El learned more about Mr. Bey and the Rise of the Moors, he was also indoctrinated on the Second Amendment. Lucha El's need for protection during a time when the world was still so uncertain, combined with what he learned and interpreted about the Second Amendment, led him to the period of 2020 to 2021 that served as the focus of this federal case.

From a three-day trial the Court learned the following: Lucha El carried, but never used, a firearm in the Bronx in June 2021. He received this firearm from his cousin and co-defendant, Keith Vereen, who purchased it for $495.00, significantly less than the $350.00 Lucha El had provided to him in a Western Union transaction. Lucha El was also arrested with a group of individuals in Rise of the Moors for publicly carrying, but not using, firearms without a license in Massachusetts. The group's text chain, admitted at trial, revealed that they were *en route* to Maine, a permitless carry state[3], to camp and train on private land with firearms. Lucha El was not part of the group chat nor did he organize it or the training.

The government presented cell site location data to show that after Keith Vereen made firearm purchases in his home state in South Carolina, his phone travelled to New York in close proximity to Lucha El's and certain individuals the government identified as co-conspirators. The phone data

---

[2] https://www.riseofthemoors.org/second-amendment.html
[3] https://everytownresearch.org/rankings/state/maine/

admitted at trial also revealed that during these trips, Vereen's phone travelled to New Jersey, Upstate New York, and repeatedly to neighborhoods in the Bronx with no connection to Lucha El. From this evidence, the government argued Lucha El's participation in a conspiracy to receive 24 guns interstate— the number of guns purchased by Keith Vereen in South Carolina, traced outside of the state. The jury found Lucha El guilty of receiving a firearm outside his state of residency and conspiracy to do the same.

The jury was specifically instructed that Lucha El need not "know the full extent of the conspiracy or all of its participants" and that "the law does not require that each conspirator have an equal role in the conspiracy." Tr. Trans. dated Aug. 31, 2023, at 545-546.  The jury was not asked to specify the scope of the conspiracy—i.e., the jury was not asked to determine whether it found the existence of a conspiracy from an agreement between Lucha El and Keith Vereen for one firearm or a wider conspiracy involving dozens of firearms and an undefined number of co-conspirators. The jury's verdict established only that Lucha El was stopped on June 30, 2021, in possession of a firearm purchased by Keith Vereen, and he participated in an illegal agreement with at least one other person to transport or receive firearms outside states of residency.

While Keith Vereen was frequently named a trial, his case was resolved separately by plea in which he admitted to trafficking firearms. Vereen's conduct over several months in 2020 was far more severe than Lucha El's.  Lucha El was not a gun trafficker and was not convicted of trafficking firearms along the East coast. He did not obstruct justice like his cousin. His conduct as established at trial warrants a sentence far less than the 24 months received by Vereen. Rather, 14 months of total incarceration, based on 5 months in federal custody and 8 months in state custody, is more than sufficient punishment for Lucha El's actions.

### C. *Considering Lucha El's Specific Offense Conduct, the Guidelines Should be Significantly Lower.*

While the defense appreciates the Court's skepticism regarding the Guidelines, we ask the Court to take note of the flaws in Probation's calculation in the Guidelines range and consider that the applicable range should be significantly lower— 10 to 16 months of imprisonment— considering Lucha El's specific offense conduct.

Probation calculates Lucha El's Guidelines range at 33 to 41 months, based on a Total Offense Level of 20 and his placement in criminal history category I. This Guidelines range incorrectly applies enhancements under §2K2.1(b)(1)(B), for the offense involving 8 and 24 firearms, and

Honorable Jed S. Rakoff  January 5, 2024
United States District Judge  Page 8 of 16

§2K2.1(b)(6)(B), for the firearm being possessed in connection with another felony offense. The Court should reject the application of both enhancements.

    i.    *§2K2.1(b)(1)(B)*

The Court should reject application of §2K2.1(b)(1)(B) because the government has failed to prove by a preponderance of the evidence that the two dozen firearms purchased by Keith Vereen were part of jointly undertaken criminal activity with Lucha El and that Vereen's purchases were reasonably foreseeable. Lucha El's conviction for conspiracy does not settle this matter. The Sentencing Commission's Guidelines comment on relevant conduct explains that "[b]ecause a count may be worded broadly and include the conduct of many participants over time, the scope of a 'jointly undertaken criminal activity' for relevant conduct purposes is not necessarily the same as the scope of the entire conspiracy, and hence relevant conduct is not necessarily the same for every participant." USSG §1B1.3, comment. (n.3(B)). This Circuit has made clear the same. "A defendant convicted of conspiracy may be sentenced for relevant conduct committed by a co-conspirator in furtherance of the conspiracy only if that conduct was reasonably foreseeable by the defendant." *United States v. Lanni,* 970 F.2d 1092, 1093 (2d Cir. 1992). Because of this reasonable foreseeability test, "the scope of conduct for which a defendant can be held accountable under the sentencing guidelines is significantly narrower than the conduct embraced by the law of conspiracy." *See United States v. Perrone*, 936 F.2d 1403, 1416 (2d Cir.).

The jury was not asked to define the scope of the conspiracy in this case as part of its verdict, yet even if the jury found the overall conspiracy to involve the 24 firearms purchased by Vereen, the government's trial evidence did not prove that all of Vereen's purchases were reasonably foreseeable to Lucha El. At trial, the government presented cell site location data covering seven weeks in 2020: 9/14/2020 to 11/3/2020. *See* GX 901. The government argued that this information proved Lucha El's involvement in his cousin's purchase of firearms but as discussed above, this cell site data fails to establish by a preponderance of the evidence that Vereen's purchases of the 24 firearms, beyond the two found in or near Lucha El's possession, were foreseeable. The call detail records admitted at trial show that Vereen travelled throughout the Northeast after his firearms purchase and interacted with several other people on his trips. Moreover, Vereen began purchasing firearms in May 2020, months before the communications with Lucha El discussed at trial. And certainly, no communications (texts, phone calls, voice recordings) or agreements between Lucha El and Vereen were discussed at trial to suggest that Lucha El was aware of the extent of Vereen's firearm purchases and firearm sales in various states across several

months in 2020. Probation and the government insist on Lucha El's accountability for 24 firearms based purely on the quantity allegedly involved in the overall conspiracy, but the Sentencing Commission and Second Circuit have made clear that this is not the appropriate standard for assessing relevant conduct at sentencing. The Court must therefore reject the §2K2.1(b)(1)(B) enhancement.

    *ii.*    *§2K2.1(b)(6)(B)*

The Court should also decline to apply the enhancement pursuant to §2K21.1(b)(6)(B). The enhancement at issue states that a four-level increase in the offense level should be applied where "the defendant…used or possessed any firearm or ammunition in connection with another felony offense; or possessed or transferred any firearm or ammunition with knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony offense." §2K21.1(b)(6)(B). Application Note 14(C) to § 2K2.1(b)(6)(B) defines "another felony offense" as "any federal, state, or local offense, other than the explosive or firearms possession or trafficking offense, punishable by imprisonment for a term exceeding one year, regardless of whether a criminal charge was brought, or a conviction obtained" (emphasis added).

Further, the Guidelines provide that § 2K2.1(b)(6)(B) applies "if the firearm or ammunition facilitated, or had the potential of facilitating, another felony offense or another offense." U.S.S.G. § 2K2.1(b)(6) cmt. 14(A). Sister Circuits have stated that "[t]he plain and commonly understood meaning of 'facilitate' is to make easier." *United States v. Marrufo*, 661 F.3d 1204, 1207 (10th Cir. 2011).

Here, the application notes make clear that the 4-level enhancement cannot apply. Lucha El's possession of a firearm in Massachusetts does not qualify as "another felony offense… other than the firearms possession…" Probation and the government seek enhancements for a crime precluded by Application Note 14. Moreover, the firearms Lucha El is accused of possessing or transferring were never used or intended to facilitate the Massachusetts offenses, namely firearms possession and wearing body armor in connection with a felony. The federal offense does not "make easier" the Massachusetts possession offenses. If anything, it would be body armor that could arguably facilitate possession of a firearm but that is not the federal offense in question.

While Keith Vereen purchased and trafficked 25+ firearms throughout the Northeast, Lucha El did not and his Guidelines should reflect this

importance difference. With the corrections above, Lucha El's base offense level should be 12 with a resulting Guidelines range of 10 to 16 months.

### D. Lucha El's Conditions of Pre-trial Detention in Massachusetts and Brooklyn Warrant a Sentence Substantially Less Than That Requested by Probation.

For his conduct in this case, Lucha El has already spent a total of 13 months in jail in conditions made unreasonably harsh by COVID-19 and severe institutional understaffing.

On July 4, 2021, Lucha El was arrested in Massachusetts. For the next 8 months and 3 weeks he languished in Massachusetts county jails. According to his standby counsel in Massachusetts, Lucha El was first held at the Billerica House of Correction, then at the Essex County House of Correction (Middleton), where he spent most of his time in custody. His incarceration in Massachusetts came at a time when COVID-19 ran rampant.[4] His access to facilities outside of his cell, like the law library, was severely limited. He did not see his family or his son during this time, because of suspended social visits. Once visits were permitted, the distance was simply too great for his family to manage.

Lucha El was released on bond in Massachusetts in March 2022, but returned to custody 17 months later on August 31, 2023, following the conclusion of his federal case. This time, Lucha El was detained at the Metropolitan Detention Center in Brooklyn. In 2020, this Court acknowledged that the conditions created by COVID-19 made time in federal custody particularly hard. "[I]t is fair to say that conditions in the prison system now result in a harshness that is not the norm and that ought to be recognized by the court as a mitigating factor. In effect, you are serving harder time every day you are in the federal prisons" *United States v. Jervis Cerino*, 19 Cr. 323 (JSR) (S.D.N.Y. July 21, 2020) (granting a variance from a Guidelines range of 57 to 71 months for a Hobbs Act robbery and imposing a sentence of 10 months). It is now 2024 and the conditions have not improved.

Lucha El's time in federal custody is a test of survival. Will he be the victim of a stabbing or other vicious assault today? Will he be provided a warm halal meal consistent with his dietary and religious needs? Will he see anything other than the four walls of his two-person cell for the next week? The answers too often are not what they should be because of the severe dysfunction of the MDC Brooklyn. He has spent most of the last three weeks

---

[4] "Massachusetts jail deals with new COVID-19 outbreak," *Boston Globe*, available at: https://www.bostonglobe.com/2021/11/11/nation/massachusetts-jail-deals-with-new-covid-19-outbreak/

Honorable Jed S. Rakoff  January 5, 2024
United States District Judge  Page 11 of 16

confined to his cell because of an assault on an officer on another housing unit. Since his remand in August, isolation in his cell has been the norm with him being locked down most weekends for 72 hours and, often again during the week.

During the brief moments of "freedom" outside of his cell, he stays on edge. Severe understaffing has led to frequent acts of violence between those detained and sometimes involving staff. He keeps his head down and clutches his Qu'ran, his most reliable source of religious support at the jail. He was provided a prayer mat but no tools to clean it. Moreover, the jail has completely stopped providing Friday prayer services, or Jum'ah. In Islam, Friday is a particularly important day for worship and congregational prayer led by an imam.[5] Yet, in his four months at the MDC, Jum'ah services have taken place once. Two months ago. The jail has repeatedly used the excuse of lockdowns and staffing shortages to justify denying Lucha El and fellow Muslim prisoners, access to important religious services.

Lucha El's experience is consistent with that detailed in a release order issued by Judge Jesse M. Furman *in United States v. Chasez*, 22 Cr. 303 (JMF) (S.D.N.Y. Jan. 4, 2024), attached as Exhibit C. In his order granting release pending sentencing for an individual charged with drug trafficking, Judge Furman detailed the persistently "dreadful" conditions of the MDC. The facility routinely fails to care for the medical needs of its sickest residents. Ex. C at 11. While Lucha El is fortunately in good health, institutional medical neglect and incompetence has put his health in jeopardy. James Young, a detainee at MDC who, despite court orders, was repeatedly denied transfer to a medical facility to treat a highly contagious and potentially fatal MRSA infection. *Id.*[6] Instead of being treated for his contagious infection in an appropriate setting, he was left on Lucha El's unit and permitted access to the same communal phones and prayer mats used by Lucha El and others.

Beyond medical neglect, MDC's prisoners "spend an inordinate time on 'lockdown'— that is, locked in their cells, prohibited from leaving for visits,

---

[5] "A Correctional Institution's Guide to Islamic Religious Practices," Council on American-Islamic Relations (CAIR), available at: https://www.cair.com/wp-content/uploads/2020/02/A-Correctional-Institution%E2%80%99s-Guide-to-Islamic-Religious-Practices.pdf

[6] *See also* "Brooklyn Judge Calls Sunset Park Federal Jail 'an Abomination' After Staff Ignore Order to Send Ailing Inmate to Medical Facility," N.Y. Daily News (Dec. 20, 2023), *available at* https://www.nydailynews.com/2023/12/20/brooklyn-judge-calls-sunset-park-federal-jail-an-abomination-after-staff-ignore-order-to-send-ailing-inmate-to-medical-facility.

calls, showers, or exercise." *Id.* at 9. A recent three-week lockdown has left individuals like Lucha El confined to their cell in isolation for the past three weeks, with at most 2 hours of "reprieve" a day. *Id.* The lockdowns of 2023 mirror the harsh conditions of 2020, only the reason is no longer COVID-19 but rather extreme understaffing. "[A]s of November 2023, the MDC was operating at only about 55% of its full correctional officer staffing level." *Id.* at 3. While staff numbers are at record lows, the number of prisoners at the MDC has continued to rise. The result for Lucha El has been four months experiencing the extremes of isolation and violent chaos. Jail was never intended to be easy, but it certainly should not be this tortuous and dangerous for those required to remain there.

A sentence of five months at the MDC Brooklyn, coupled with Lucha El's prior eight months and three weeks in Massachusetts jail, is sufficient punishment for his conduct.

### E. *A Community Mourns the Absence of its Caretaker.*

After Lucha El's release from custody in March 2022 he returned to his mother's home on Perry Avenue in the Bronx, where he remained for seventeen months until his remand last August. This was a much welcome return to a community that desperately missed him and mourned his absence. Lucha didn't just live at his mother's home on Perry Avenue in Norwood. He was and is an integral part of the community.

At first impression, some of the stories about Lucha El sound like Hallmark clichés. The young man helping the elderly cross the road and breaking up fights amongst the hotheaded. That is, until you actually visit Perry Avenue and speak to the grandmas, neighbors and kids who are part of Lucha's community. Over the past four months, during the defense team's visits to Perry Avenue, it became common place for one conversation with a neighbor to be interrupted by another offering their own story of Lucha painting their house, bringing food to their sick grandmother, or coaching kids in the neighborhood. Some of these stories are reflected in the many letters of support we received from Lucha's neighbors.

When Daniel Jimenez slipped into depression following a series of deaths in his family and friend circle, his neighbor Lucha El, knocked on his door daily to take him outside for fresh air, a walk, and someone to talk to. Daniel credits Lucha for helping him reach a better mental space. *See* Ex. D (Letter from Daniel Jimenez).

When Cheryl James ("CJ")'s older brother got into a fight with another young man in the neighborhood, Lucha El was there to break them up and force them to talk through their differences. That was the beginning of CJ's

Honorable Jed S. Rakoff                                                      January 5, 2024
United States District Judge                                                  Page 13 of 16

years long friendship with Lucha. *See* Ex. E (Letter from CJ). They continued to bond for many years by organizing cookouts for the community.

When Bernadine Reyes, age 91, needs groceries, wants a hot meal or simply wants to walk to the salon to get her nails done, Lucha El is her delivery person, her chef, and her personal escort. Ms. Reyes is his "grandmother," bonded not by blood but by community. Because of how well he has cared for her over the years, Ms. Reyes to this day prays every night for Lucha El's safety and return home. *See* Ex. F (Letter from Bernadine Brown, Bernadine Reyes's granddaughter).



*Ms. Reyes showing undersigned counsel the candle she lights during her nightly prayers for Lucha.*

But words on paper cannot fully capture what Lucha means to his community. With the Court's permission, we request that Lucha El's longtime neighbor, Jacqueline Jimenez, be permitted to speak at his sentencing to share with the Court who Lucha El is to the Norwood community in the Bronx and the impact of his absence. Ms. Jimenez has lived in Norwood for over 30 years and has known Lucha for two decades. *See* Ex.

Honorable Jed S. Rakoff  January 5, 2024
United States District Judge  Page 14 of 16

G (Letter from Jacqueline Jimenez). She welcomes the opportunity to provide the Court with more information on Lucha El, beyond his conviction.

What Ms. Jimenez and Lucha El's many neighbors and loved ones make clear in their letters of support, is that Lucha El cares for his community in a way that is increasingly rare and that warrants his return sooner rather than later.[7]

### F. Lucha El's Remorse and Commitment to Growth and Learning Warrants Leniency.

During Lucha El's 17 months in the community after his Massachusetts arrest, he stopped carrying a firearm. He worked odd jobs when and where he could. He took care of his extensive network of neighbors and loved ones. After his federal arrest and release, he perfectly complied with the conditions of release set forward in his bond. This included over two months of home confinement and six months on a curfew enforced by location monitoring. He did not leave home without permission or miss a single curfew, demonstrating that he can be supervised in the community.

Unfortunately, Lucha El's compliance on pretrial release was overshadowed by his own actions, specifically his pro se communications to the Court despite Your Honor's admonishments. At the time, he viewed his letters to the Court as an expression of his ideology. An impassioned plea for his rights. A critical take on his treatment in the legal system. He never viewed or intended them as statements of his intent to violate the law. In fact, while he talks about his rights as a man and the court's obligations, he did not threaten to or suggest that he would in fact be carrying or illegally receiving a firearm again. Not after the eight hard months he spent in Massachusetts jail. Nevertheless, with time and reflection, Lucha El can appreciate that his unwanted and unsanctioned letters were neither appropriate nor an accurate reflection of who he is and how he believes others should be treated.

> I would like to apologize for the words that I used in frustration towards you. Words that I regret because, they are not a representation of who I am as a man nor of how I was raised. As I have said before my mother taught me to love not to hate and, the words I used were not of love.

Ex. H (*Final* Letter to the Court from Lucha El).

---

[7] *See* also letters from his sister, Alexandria Perez (Ex. L) and longtime friend Taneesha Zuniga (Ex. K).

Honorable Jed S. Rakoff  January 5, 2024
United States District Judge  Page 15 of 16

Lucha's letter expresses genuine remorse over his conduct and his understanding that he is not, nor does he feel "above the law." *Id.* at 2. As he expresses in his letter, his only desire is to be an example for his son. He ends his letter with an acknowledgment of his past mistakes. "I am a loving man Mr. Rakoff, who wears his heart on his sleeve. A man who is still willing to learn and a man who accepts and recognizes when I have done wrong. I am embarrassed of my actions and truly apologize, Mr. Rakoff." *Id.* at 4.

### G. Lucha El's Future Plans Support a Significant Variance.

*"I love my boy Mr. Rakoff and I want to be an example for him of what a man should be." Ex. H.*

For Lucha, the next stage of his life will be committed solely to being the example his son ▇▇▇ deserves. More than anything in the world he wants to be present for his son. Thirteen months in jail have taken him away and damaged his relationship with his son and his child's mother. He is eager to make up for lost time and his absences.

To this end, upon his release, Lucha El is focused on reconnecting with ▇▇▇ and establishing a career so that he can support himself and ▇▇▇ His dream is to work in the field of masonry, building homes with his own hands, as part of a union. Lucha El experienced the joy of building while working on a remodeling project for his neighbor's multi-family home. His neighbor, Hugh Scully, describes the project in his letter to the Court: "Recently, in June of this year, I was doing a renovation on our multi-family house. Lucha saw my dad and me working on the house and he started to come by and help out. It was a complex renovation involving demolition, electrical work, reframing, taping, and drywall. I needed to gut out the whole living room and dining room, and Lucha helped me every step of the way." Ex. I (Letter from Hugh Scully). Mr. Scully is still in awe of the results:

*BEFORE*  *AFTER*

 

Lucha El loved the work and is eager to formally enter the field of masonry and receive training. He recognizes, however, that there are many steps that must be taken to get him there. The Federal Defenders of New York is ready to assist him with those steps. *See* Ex. J (Federal Defenders of New York Reentry Plan). Our social work team will help Lucha El obtain a government ID so that he can immediately start looking for work. While the Federal Defenders does not run its own work force training and job placement program it is connected to several organizations in the city that do— the Osborne Association, Exodus, and Fortune Society. Our Social Work team will help Lucha El find and enroll in a program that is the right fit. When Lucha El is not working or in job training, he will volunteer his time alongside Ms. Jimenez with her organization UpLife Foundation, a community development organization providing services and support to at-risk youth in the North Bronx.[8]

While Lucha El is eager to return home and start his reentry now, he must first face the pending state charges in Massachusetts. The Court heard extensively about the Massachusetts case at trial (and at Lucha El's bail hearings) because it was considered connected to his federal charges. He is scheduled to begin trial in Massachusetts on February 26. His co-defendants in Massachusetts who have pled guilty and been sentenced have received sentences ranging from 2 to 4 years. Any federal sentence could result in significantly more time in prison for related conduct.

The requested sentence of five months may not be the end of his time in custody, but it would allow Lucha El to fully participate in his defense in Massachusetts and return home to his community and begin rebuilding sooner rather than later.

## Conclusion

For the reasons set forth above, the only just and appropriate sentence for Lucha El Por Libertad is five months of imprisonment, with three years' supervised release and the special condition of community service.

Respectfully submitted,

/s/ Zawadi S. Baharanyi
Federal Defenders of New York
(212) 417-8735

CC:  AUSA Ashley Nicholas
     AUSA Madison Smyser

---

[8] https://uplifefoundationinc.org/