# EXHIBIT A

Dear Judge Rakoff,

My name is Maria Gonzalez and I write this letter on behalf of my son Steven Perez. I work at Montefiore Medical Center as a Project Supervisor, and I've been working in the hospital system for almost twenty years. Your Honor, no words can express the devastation that this whole ordeal has been for me. My world has been crumpled up into pieces, and even writing this letter has brought up many painful emotions for me. But I am writing with the sincere hope that you truly read the words on this page and see my son for the person he is.

When Steve was a little boy, he would come to my rescue whenever he heard his father and myself arguing about anything.  He would come in between us so that we could stop arguing.  It was then that I realized that our relationship had become too toxic and unhealthy.  I should be the one protecting my child, not him protecting me.  Steve's father and I eventually separated and co-parented as best possible. We raised Steve up to be caring for the neighbors, to be respectful to others, and treat people the way you want to be treated.

Steve and his brother spent every other weekend with their father. They were involved in sports and played baseball in a league their father coached.  They also attended Sunday school to prepare for their sacraments.  One Sunday in church Steven noticed that I had not been going up to receive communion, and he inquired, very innocently, why it was that he taking classes to prepare for his First Holy Communion and I was not receiving?  This was during the time when I had separated from his father, and I was holding on to some resentment.  What an eye-opener that was for me, since I was not practicing what I was preaching.

On another occasion, when my mother was sick in the hospital, my son was once again my voice of reason.  I was still holding on to resentment with his dad, but Steven reminded me that his father had known my mother far longer than many of the people that were around her.  It was because of my son that I was able to recognize my err, and eventually allowed their father to make peace with my mother. Steven's capacity to speak truth and make peace between people Is astoundingly special.  I know God has a special plan for him, and it is not where he is at this present time. He is meant to help people.

Steven loves with everything he has.  He would give his last dollar, coat, sneakers, meal to anyone in need – no matter who they are – it could be a complete stranger.  No matter the size, race or color of the skin.  His sense of compassion compels him to step in to protect the weak or defenseless. Since he was young, whenever he learned that someone was hungry, he would either try to bring them home with us or ask me if he could take them a plate of food. As he got older, he started having community cookouts on our block, paying out of his own pocket to buy meat to grill and passing plates to everyone who walked by who wanted one. The same whenever he would see someone in need of clothes or sneakers, he would come home to see what he could find in the closet. To know Steven is to love him. He never wants to see anyone hurting or in danger. He is very vocal when he sees something is wrong or unjust. Steve is friendly, open, social, compassionate and honest.  With Steven, what you see is what you get. You would never have to guess what he means, because he means what he says.

Steven's greatest desire is for his son to grow up in a world where all children have equal opportunity to excel in life. He loves his son more than anything in this world. Steven and his son's mother parted ways,



but whenever Steven has been allowed to, he has been the most active father imaginable. Steven is always talking about his six-year-old son ▮▮▮▮ to everyone he can, he is just the proudest father to this little boy. Steven used to take him to the park every chance he got, they shared everything together. They played baseball, Xbox, and did boxing moves together. Steve speaks to my grandson with so much honesty and love.

Before he was locked up, my son tried his very best to always stay out of trouble and respect the conditions imposed on him, such as being home before curfew and checking in with his officer. He was respectful of his officer. Steve spent his time over the past year the way he always has, as an active member of our Gun Hill Road community. He regularly helped his friend Carmen's children with their homework and did various construction projects with our neighbor Hughie. If anybody needed any kind of assistance with work, Steve was there to help with the odd jobs. He also did little barbecues in the neighborhood for the community.

We love our community but it's the Bronx, and at the end of the day you always have to be careful. Especially after COVID, there were many people losing their jobs, riots, and more news of violence. I try not to focus on the violence because it's very disturbing to my soul. But I am not blind to it. There was a young man in the neighborhood who got shot in front of my son's eyes last summer. He was just coming out of the grocery store when he got shot. We live in a community where there is frequent violence both from the cops and between people in the neighborhood. My son was always careful about protecting himself and protecting his rights.

My son's absence affects me a lot. I cry every single day. I try to stay strong and focused at work, but I'm so destroyed as a mother. They are locked down almost every weekend. The first time it happened, Steve explained that someone had gotten stabbed on his unit. I just feel so terrified and worried. I worry that his son ▮▮▮▮ will grow older without having a relationship with his father. The only thing I can say I'm thankful for is that I've felt so supported by the many people who love my son. My neighbors will always ask after him. I just hope Your Honor would know that our community is not safer or better without Steven.

After he gets out, he is interested in working in construction or masonry. He really just wants something stable like a union job to take care of himself and his son. I will be there to support him every step of the way. Thank you for your time and consideration.


Respectfully submitted,

Maria Gonzalez

# EXHIBIT B

Dear Judge Rakoff,

My name is Israel Perez, I am Lucha El's younger brother. I am 30 years old and I live in the Bronx. I have been working with Fedex for the past 5 years.

Lucha has been by my side through thick and thin. He has protected me for as long as I can remember. As a kid, I always knew that in any bad situation, Lucha was there for me. Growing up in the South Bronx as children, we saw a lot of poverty and violence. It was the good, the bad, and the ugly so to say. My mom and Lucha tried to keep my innocence as long as possible. But even as a kid you are aware. You hear the sound effects of what goes on after you close your eyes to go to sleep, you see the victims of violence, the "zombies" as we called them. We learned from an early age how unjust and dangerous this world really is. There was one time I was going to the boxing ring and I almost got jumped by a group of 10 kids. I was only in the 7th or 8th grade. It's crazy how these things can become the norm for you. There were certain blocks and corners you just didn't walk. Through it all, Lucha was my big brother, the one who told me to be careful every time we were out in the neighborhood and felt like some teenagers were following us. I always felt a comfort in him being there.

We do have a half-sister on our dad's side, but growing up it was mainly me and Lucha. Our parents did not have the best relationship and their arguments could get physical at times. Lucha definitely saw more of the violence in the house. He would tell me to stay in the room when things got bad. As the older brother, he's always been the one shielding me. I remember us saying this once when our parents were arguing: "it's you and me against the world." That's still true today.

Despite everything going on, Lucha and I would always joke around and have fun. We grew up playing video games and having pillow fights. We played sports and enjoyed watching them together. I played baseball from ages 4 to 16. Had I not broken my arm, I definitely would have kept playing. Our dad coached us, and for many of the kids we played with, this was the one chance we had to really just be kids. Baseball was everything to me. Lucha quit earlier because boxing was more so his thing, but he always encouraged me. We practiced together, and he always told me to watch my diet so I could slim down. I remember how he saved up for a stickball bat one year, and in the summertime, he bought hard bagged beans from the store. He used to pitch me the beans to help me improve my coordination and eye contact.

The qualities my brother has most unique about him are that he's generous, caring, compassionate, friendly, charismatic, and charitable, to the point he would give last dollar to anyone. There are many examples I can give, but one stands out today. One cold winter day, I was in our neighborhood with Lucha when he saw a teenager wearing an old torn up jacket. He approached the teenager and told him, hold up I'll be right back. Lucha went upstairs to the apartment and took an old coat of mine out of the closet. He told me that the kid was in need and needed it more than me right now. I really liked this coat, despite the fact that I had already outgrown it, so I hated the fact that he was right. My brother told me, why leave the coat in the closet taking up space

when it could be useful. He went back downstairs and gave the coat to the teenager. When he came back, he told me that the teenager expressed his appreciation, which put a smile on my face.

These are the kinds of things that my brother always did for anyone in need. He doesn't think twice about helping people. Lucha has always taught me to remember those in need. You see, we all say we want to help and do right by people, but somewhere along the way we could get selfish and forget about those in worse shape than us.

To be honest, I don't even have to go far back to think of examples of his generosity. Just this past summer for his birthday, he threw a BBQ for family and friends. From the kindness of his heart he shared the food with people from the neighborhood.  Now some may say that's not that special, but there really are not many people who would actually do such a thing. To give away food to a complete stranger is not common. We were always taught to appreciate what we have. To be kind others and try to never judge a book by its cover. Lucha really took those lessons to heart.

My brother will do any favor I'll ask of him, even if it's an inconvenience for him. He is always giving me advice even when I don't want it. But I still listen. He is a very loving person. He talks to everyone which at times is very annoying because you can't go a block down the street with him without someone stopping us to say hello.

My brother is an amazing dad. He's an even better father than he is a brother, and that's saying a lot. I tell you, my brother adores his son ███ he would do anything for this kid. He would move heaven and earth to give him a toy or talk to him. They spent time together by playing video games, playing with toys, going to the playground, and boxing together. Lucha loves him. That kid is everything for him. You can see the joy in their faces when they see each other, they are best friends.

Lucha being locked up is hard for all of us – myself, our mom, and everyone in the community. There have been weeks where no one has heard from him, and it's scary. When we do talk, Lucha still manages to calm me down and encourage me and be there from me, even from in jail. I'll always love my brother and be there for him. I just hope you can see that my brother is not a dangerous person or a terrible person.


Israel Perez

# EXHIBIT C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                          :

UNITED STATES OF AMERICA,         :

                              :                22-CR-303 (JMF)

            -v-              :

                              :

GUSTAVO CHAVEZ,          :        OPINION AND ORDER

                              :

                     Defendant.      :

                              :
------------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

      For years, the conditions in the federal jails that serve this District (and the Eastern

District of New York) have been a major, growing, and widely understood problem.  The

conditions at the Metropolitan Correction Center ("MCC") in Manhattan got so bad that, in

August 2021, after a single visit by the Deputy Attorney General, the Department of Justice

ordered the facility shuttered.[1]  Meanwhile, the only other federal detention center that serves

this District — the Metropolitan Detention Center ("MDC") in Brooklyn — has had its own

share of problems.  In the winter of 2019, a power outage left inmates without light or heat for a

full week while a polar vortex swept the East Coast.[2]  Since that time, the dockets of this Court

and the Eastern District have been filled with cases in which defendants complain about near-

perpetual lockdowns (no longer explained by COVID-19), dreadful conditions, and lengthy

---

[1]    *See* Benjamin Weiser, *Justice Dept. to Close Troubled Jail Where Jeffrey Epstein Died*,
N.Y. Times (Aug. 26, 2021), *available at* https://www.nytimes.com/2021/08/26/nyregion/MCC-
epstein-jail-closed.html.  Over two years later, the political branches have made little or no
progress to improve, let alone replace, the MCC.

[2]    *See* Steve Almasy et al., *Inmates Without Power at New York Federal Prison Shivering in
Their Cells for Days*, CNN (Feb. 3, 2019), *available at* https://www.cnn.com/2019/02/02/us/
new-york-federal-prison-no-heat/index.html.

delays in getting medical care.[3]  Contraband — from drugs to cell phones — is widespread.[4]  At

least four inmates have died by suicide in the past three years.[5]  It has gotten to the point that it is

routine for judges in both this District and the Eastern District to give reduced sentences to

---

[3]     There are far too many cases to cite.  For representative examples, however, see *United States v. Young*, No. 23-CR-475 (DLI), ECF Nos. 14-25; *United States v. Song*, No. 21-CR-89 (ARR), 2023 WL 6626151, at *1-2 (E.D.N.Y. Oct. 11, 2023); *United States v. Stewart*, No. 21-CR-42 (WFK), 2023 WL 2599668, at *7 (E.D.N.Y. Mar. 22, 2023); *United States v. Boyd*, No. 21-CR-486 (SHS), 2022 WL 790771, at *2 (S.D.N.Y. Feb. 3, 2022); and *Gautier v. United States*, No. 21-CV-7198 (CM), 2021 WL 5282209, at *4 (S.D.N.Y. Nov. 10, 2021).  *See also Scott v. Quay*, 338 F.R.D. 178 (E.D.N.Y. 2021); *Crespo v. Hurwitz*, No. 17-CV-6329 (RRM), 2020 WL 7021658 (E.D.N.Y. Nov. 30, 2020).

[4]     *See, e.g.*, *Santos v. Pullen*, No. 22-CV-704 (SVN), 2023 WL 5394617, at *1 (D. Conn. Aug. 22, 2023) ("During [an] investigation, Petitioner admitted to running a store [for drugs at the MDC]."); *United States v. Smith*, 660 F. Supp. 3d 210, 219 (S.D.N.Y. 2023) (noting the defendant's argument that "given the availability of contraband cellphones in MDC, he likely could have intimidated witnesses from there if he had wanted to" and finding that "he may have done just that"); Trial Tr. at 2139, *United States v. Blondet*, No. 16-CR-387 (JMF) (S.D.N.Y. Apr. 6, 2022), ECF No. 733 (defense counsel stating during summation that "every witness had an illegal cellphone" at the MDC, based on trial testimony); Sent'g Tr. at 15, *United States v. Morgan*, No. 19-CR-209 (RMB) (S.D.N.Y. May, 5, 2020), ECF No. 90 (Judge Berman stating about the MDC: "They are dirty.  They are infested with drugs.  You can get drugs and other contraband at the drop of a hat."); *see also* Noah Goldberg, *Feds Launched Emergency Search for Gun at Brooklyn Federal Jail*, N.Y. Daily News (Oct. 15, 2021) ("[A] firearm was discovered on the 6th floor of the [MDC] . . . . [and] numerous contraband cellphones were also recovered."), *available at* https://www.nydailynews.com/2021/10/15/feds-launched-emergency-search-for-gun-at-brooklyn-federal-jail.  Just last year, two correctional officers at the MDC were arrested for accepting bribes to smuggle contraband into the facility.  *See* Press Release, Dep't of Justice, Brooklyn Federal Correctional Officer Charged with Bribery (Apr. 18, 2023), *available at* https://www.justice.gov/usao-edny/pr/brooklyn-federal-correctional-officer-charged-bribery; Press Release, Dep't of Justice, Ex-Federal Correction Officer Pleads Guilty to Taking Bribes in Exchange for Smuggling Contraband into the Metropolitan Detention Center in Brooklyn (Mar. 20, 2023), *available at* https://www.justice.gov/usao-edny/pr/ex-federal-correction-officer-pleads-guilty-taking-bribes-exchange-smuggling.

[5]     *See* Fola Akinnibi & Marie-Rose Sheinerman, *Beleaguered Brooklyn Jail Blasted by Candidates in Crowded N.Y. Congressional Race*, Bloomberg (Aug. 16, 2022), *available at* https://www.bloomberg.com/news/articles/2022-08-16/ny-10-democratic-candidates-call-on-feds-to-fix-brooklyn-jail.

defendants based on the conditions of confinement in the MDC.[6]  Prosecutors no longer even put up a fight, let alone dispute that the state of affairs is unacceptable.

There are surely many reasons for these problems, but the one cited most often by the Government — publicly and privately, by both officials from the MDC and lawyers from the U.S. Attorney's Office — is a severe staffing shortage.  No doubt, there is considerable truth behind that explanation.  Data provided by the Government (at the Court's direction) confirms that there have been severe staffing shortages at the MDC for years.  *See* ECF No. 28, at 2.  As of November 2023, only 200 of 301 "authorized, non-supervisory correctional officer positions" at the MDC were filled and, of those 200 officers, thirty-four were either on extended leave or about to be transferred.  *See* ECF No. 28, at 1-2.  In other words, as of November 2023, *the MDC was operating at only about 55% of its full correctional officer staffing level*.  Nor is it a surprise that the MDC has had trouble recruiting and retaining employees.[7]  The starting salary for federal correctional officers in the New York area is barely above $45,000 — only about half of the Area Median Income for a single-person household in New York City.[8]  And it goes without

---

[6]    *See, e.g.*, Sent'g Tr. at 19-21, *United States v. Days*, No. 19-CR-619 (CM) (S.D.N.Y. Apr. 29, 2021), ECF No. 35 ("It is the finding of this Court that the conditions to which [the defendant] was subjected are as disgusting, inhuman as anything I've heard about any Colombian prison, but more so because we're supposed to be better than that. . . .  I think you've suffered triply as a result . . . .  I am convinced that no good would be served by keeping you incarcerated for one minute more than I am required to do by law."); Sent'g Tr. at 37, *United States v. Morgan*, No. 19-CR-209 (RMB) (S.D.N.Y. May, 5, 2020), ECF No. 90 (imposing a below-Guidelines sentences on account of "the conditions of the MDC," among other things).

[7]    The retention problem is not limited to the ranks of corrections officers.  Since June 2019, the MDC has had (no doubt in part because of the problems discussed above) a total of *eight* Wardens and Acting Wardens, with no one staying more than a few months at a stretch.

[8]    *See Correctional Officer Series 0007*, U.S. Office of Personnel Mgmt., *available at* https://www.opm.gov/policy-data-oversight/classification-qualifications/general-schedule-qualification-standards/0000/correctional-officer-series-0007 (explaining that annual salaries for federal correctional officers start at the GS-5 level, which is $46,494 at Step 1); *Area Median*

3

saying that the working conditions are challenging.[9]  Any first-year economics student would

know that the primary way to improve this situation is to raise salaries and improve working

conditions.  But there is no reason to believe that the political branches are likely to do either any

time soon.

      In the meantime, the only other way to mitigate the ongoing tragedy is to improve the

ratio of correctional officers to prisoners by reducing — or at least not adding to — the prisoner

population.  Enter this case.  Defendant Gustavo Chavez was arrested in April 2022 for

distributing or possessing with the intent to distribute 400 grams or more of mixtures and

substances containing a detectable amount of fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and

841(b)(1)(A).  He was released on bail conditions and has been compliant with those conditions

in every respect.  On November 27, 2023, Chavez pleaded guilty to the lesser-included offense

of distributing and possessing with intent to distribute mixtures and substances containing a

detectable amount of fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and 831(b)(1)(C).  In

general, 18 U.S.C. § 3143(a)(2) mandates detention of any criminal defendant who, like Chavez,

was convicted of such an offense — even where, as here, there is no suggestion of a risk of flight

or danger to the community and no mandatory minimum term of imprisonment.[10]  Another

---

*Income*, N.Y.C. Dep't of Housing Preservation and Dev., *available at* https://www.nyc.gov/site/hpd/services-and-information/area-median-income.page.

[9]    The union representing the MDC's correctional officers has long complained about unsafe working conditions at the facility.  In June 2023, for example, Rhonda Barnwell, the local's president, complained to the Regional Director of the Bureau of Prisons ("BOP") that the MDC's "staffing crisis" requires one correctional officer to "maintain 3 housing units in a single shift" with "little to no sleep."  *See United States v. Irizarry*, 23-CR-60 (JMF) (S.D.N.Y. Oct. 30, 2023), ECF No. 47-3, at 3.  "Would you want to work under these conditions? . . . What are you waiting for, another loss of inmate life?"  *Id.*

[10]    Some commentators have questioned the wisdom and justice of that mandate.  *See, e.g.*, Mark I. Cohen, *Congress Should Amend 18 U.S.C. § 3143*, 47 Hofstra L.R. 983 (2019).  The

statute, however, provides a safety valve of sorts: Under 18 U.S.C. § 3145(c), a district court has authority to order the release of someone otherwise subject to mandatory detention pursuant to Section 3143(a)(2) if, among other things, "it is clearly shown that there are exceptional reasons why such person's detention would not be appropriate." For the reasons that follow, the Court concludes that the conditions in the MDC qualify as "exceptional reasons" justifying Chavez's continuing release. Accordingly, the Court grants his motion to continue his conditions of release through the date of his sentencing.

## APPLICABLE LAW

The Court starts with a summary of the applicable law. The Bail Reform Act, as amended, governs whether a recently convicted defendant is eligible for release pending sentencing. *See* 18 U.S.C. §§ 3143(a)(2), 3145(c). For a defendant found guilty of certain offenses — including drug offenses carrying maximum sentences of ten or more years in prison (a category that includes almost all federal drug convictions, at least in this District) — Section 3143(a)(2) provides that the court "*shall* order" that the defendant "be detained unless":

> (A)(i) the judicial officer finds there is a substantial likelihood that a motion for acquittal or new trial will be granted; or
>
> (ii) an attorney for the Government has recommended that no sentence of imprisonment be imposed on the person; and
>
> (B) the judicial officer finds by clear and convincing evidence that the person is not likely to flee or pose a danger to any other person or the community.

18 U.S.C. § 3143(a)(2) (emphasis added); *see also id.* § 3142(f)(1)(A)-(C) (defining the offenses to which Section 3143(a)(2) applies). These conditions are almost impossible to meet. It is the rare case indeed where the presiding judge finds that there "is a substantial likelihood that a

---

issues discussed here lend some weight to those arguments, but whether and how Section 3143 should be amended is ultimately a policy question for the political branches, not this Court.

motion for acquittal or new trial will be granted" — especially where the defendant was convicted following a guilty plea.  And the Court is not aware of a single case, at least in this District, where the Government has recommended — let alone at the time of conviction — that no sentence of imprisonment be imposed on a defendant subject to Section 3143(a)(2).

But there is a limited safety valve from this general rule of mandatory detention.  Under 18 U.S.C. § 3145(c), a defendant subject to detention pursuant to Section 3143(a)(2) "may be ordered released, under appropriate conditions," if two requirements are met.  *See also United States v. Lea*, 360 F.3d 401, 403 (2d Cir. 2004).[11]  First, the district court must find "by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released" (whether subject to bail conditions or otherwise).  18 U.S.C. § 3143(a)(1); *see id.* § 3145(c).  Second, it must be "clearly shown that there are exceptional reasons why such person's detention would not be appropriate."  *Id.* § 3145(c).

The Supreme Court has never addressed the meaning of the "exceptional reasons" provision, and the Second Circuit has addressed it only sparingly.  The Court of Appeals first confronted the statute in *United States v. DiSomma*, 951 F.2d 494 (2d Cir. 1991).  The *DiSomma* Court began by observing that "[n]either the statute nor case law defines the circumstances which may qualify as exceptional reasons permitting release" and that "[t]he legislative history on the issue is sparse and uninformative."  *Id.* at 497.  "The only useful historical document," the Court continued, "is a letter from the Justice Department" to the Senator who sponsored the legislation "proposing the 'exceptional reasons' provision and suggesting two hypothetical

---

[11]    Section 3145(c) is titled "Review and appeal of a release or detention order" and, in at least some respects, "concerns actions taken by appellate courts."  *United States v. Garcia*, 340 F.3d 1013, 1014-15 n.1 (9th Cir. 2003).  Nevertheless, courts, including the Second Circuit, have held that the provision gives district courts authority to order a defendant otherwise subject to remand under Section 3143(a)(2) released pending sentencing.  *See id.*; *Lea*, 360 F.3d at 403.

situations where it might apply." *Id.* "The examples given" in the letter, the Court noted, "present a unique combination of circumstances giving rise to situations that are out of the ordinary." *Id.* Notably, however, the Court explicitly held that Justice Department's examples did not define the metes and bounds of what can qualify as "exceptional": "As in many things," the Court explained, "a case by case evaluation is essential, and it is not our intention to foreclose district judges from the full exercise of discretion in these matters. That discretion certainly is not limited by the examples contained in the Justice Department letter. It is constrained only by the language of the statute: 'exceptional reasons.'" *Id.*

The Circuit's only other published decision addressing the meaning of "exceptional reasons" in Section 3145(c) is *Lea*. There, the district court had found "'exceptional circumstances' warranting release" because the defendant was "a student enrolled in community college, . . . employed full time and [with] no prior convictions." 360 F.3d at 403. On appeal, the Court of Appeals held that this ruling was clearly erroneous:

> Exceptional circumstances exist where there is "a unique combination of circumstances giving rise to situations that are out of the ordinary." *DiSomma*, 951 F.2d at 497; *see also United States v. Lippold,* 175 F. Supp. 2d 537, 540 (S.D.N.Y. 2001) (collecting cases and noting that "circumstances that are 'purely personal' do not typically rise to the level of 'exceptional' warranting release"). The test under § 3145(c) is necessarily a flexible one, and district courts have wide latitude to determine whether a particular set of circumstances qualifies as "exceptional." *DiSomma,* 951 F.2d at 497. But the circumstances in this case do not approach being "exceptional." There is nothing "exceptional" about going to school, being employed, or being a first-time offender, either separately or in combination.

*Id.* at 403-04;[12] *see also United States v. Colon*, 821 F. App'x 39, 42 (2d Cir. 2020) (summary order) (observing that the district court's "findings . . . — that [the defendant]

---

[12]    One could argue that the *Lea* Court misread *DiSomma* to require "a unique combination of circumstances giving rise to situations that are out of the ordinary." After all, the *DiSomma* Court used that language merely to describe the two examples given in the Justice Department's letter *and*, as noted, explicitly held that a district court's discretion is "certainly is not limited by"

7

supports his family, is employed, and was in compliance with his conditions of
supervision — were plainly not adequate" to support release under Section 3145(c)).

## DISCUSSION

Several issues are not in dispute here. First, it is undisputed that Chavez is subject to
Section 3143(a)(2), as he was convicted of a drug offense for which the maximum sentence is
twenty years' imprisonment. *See* 21 U.S.C. § 841(b)(1)(C). Second, it is undisputed that
Chavez fails to satisfy the nearly-impossible-to-satisfy conditions for release set forth in Section
3143(a)(2). Given that he was convicted following a guilty plea, he wisely does not even attempt
to argue that it is likely a motion for acquittal or new trial would be granted. *See* 18 U.S.C.
§ 3143(a)(2)(A)(i). And, consistent with the norm, the Government has not recommended that
no sentence of imprisonment be imposed. *See id.* § 3143(a)(2)(A)(ii). Finally, it is undisputed
that Chavez "is not likely to flee or pose a danger to the safety or any other person or the
community" if he is left on bail subject to the release conditions to which he has been subject to
date. *Id.* § 3143(a)(1). That is for good reason. Chavez is a seventy-year-old man, with no prior
criminal record and serious health problems, and he has complied in every respect with the
conditions of his release in this case to date. *See* ECF No. 29 ("Plea Tr."), at 29-32, 35.

Thus, whether the Court has authority to leave Chavez out on bail turns on whether there
are "exceptional reasons why" his "detention would not be appropriate." 18 U.S.C. § 3145(c).
At his plea hearing, Chavez argued that his age and various medical conditions — including "a
neurocognitive disorder, an intellectual disability, and a panic disorder"; "a possible reemergence

---

the two examples. *DiSomma*, 951 F.2d at 497. (On top of that, it is questionable whether, by
today's standards, the Justice Department's letter is the kind of secondary source that a court
may even consult in construing the meaning of statutory language.) Be that as it may, this Court
is obviously bound by the Second Circuit's decision in *Lea*.

of prostate cancer"; as well as hypertension, type 2 diabetes, and sciatica — rise to the level of "exceptional reasons."  Plea Tr. 31-32.  There is considerable force to that argument.  *See, e.g.*, *Garcia*, 340 F.3d at 1019-20 (observing that, in evaluating whether circumstances rise to the level of extraordinary reasons, a district court may "consider circumstances that would render the hardships of prison unusually harsh for a particular defendant.  Chief among such circumstances is a sufficiently serious illness or injury. . . .  District judges may consider such factors as the desirability of maintaining an uninterrupted course of treatment while a defendant remains in the care of a particular physician who is providing individual medical supervision to the patient.").  But the Court need not and does not decide whether that argument would suffice on its own because it concludes that the conditions at the MDC are themselves "exceptional reasons" why Chavez's detention pending sentencing "would not be appropriate."

The conditions at the MDC are dreadful in many respects, but three warrant particular emphasis.  First, inmates at the MDC spend an inordinate amount of time on "lockdown" — that is, locked in their cells, prohibited from leaving for visits, calls, showers, classes, or exercise.  (In Orwellian fashion, the Bureau of Prisons does not refer to these periods as "lockdowns"; instead, it refers to them as "modified operations."  *See* Bureau of Prisons, Annual PREA Report CY 2022 (2023), at 1-2.  But there is no mistaking what the practice entails.)  As of the date of this Opinion and Order, inmates at the MDC have reportedly been on lockdown for much or all of the last three weeks following an assault on staff, with a maximum of "two hours outside their cells each day" during a short reprieve.  Def.'s Letter 2, *United States v. Zeitlin*, No. 23-CR-419 (LAK) (S.D.N.Y. Jan. 2, 2024), ECF No. 58; *see also* Dec. 2023 Mem. for Inmate Population from Captain Rodriguez, *Zeitlin*, No. 23-CR-419 (LAK) (S.D.N.Y. Jan 2. 2024), ECF No. 58-1.  For far longer, lockdowns have been especially common on weekends and holidays.  *See* Plea Tr.

9

38-39 ("[P]eople who are detained at the MDC are not allowed out of their cells pretty much at a minimum three days of the week, Friday, Saturday, Sunday . . . ."). One defendant who kept a log of these lockdowns recently reported that he had been "locked down for 137 of [the] 245 days" he was detained at the MDC, or "more than 50% of his time at the facility." Sentencing Mem. at 7, *United States v. Jacobs*, 23-CR-413 (VB) (S.D.N.Y. Nov. 7, 2023), ECF No. 25. Confining inmates to their cells in this manner may have been justified during the height of the COVID-19 pandemic to prevent the spread of a deadly disease. *See, e.g.*, *Chunn v. Edge*, 465 F. Supp. 3d 168, 179-80, 183, 201 (E.D.N.Y. 2020) ("The MDC's response to COVID-19 has been aggressive and has included, among other steps, massively restricting movement within the facility, enhancing sanitation protocols, and creating quarantine and isolation units. And the data — though limited — suggests that these measures have been quite effective in containing COVID-19 . . . ."). But that is no longer the case — and the Government does not suggest otherwise. Regardless, confining inmates to their cells is, for at least some inmates, tantamount to solitary or near-solitary confinement, a practice that is increasingly viewed as inhumane. *See Johnson v. Prentice*, 144 S. Ct. 11, 12 (2023) (Jackson, J., dissenting from denial of certiorari) ("As Members of this Court have recognized, the practice of solitary confinement 'exact[s] a terrible price.'" (quoting *Davis v. Ayala*, 576 U.S. 257, 289 (2015) (Kennedy, J., concurring))); *Porter v. Pa. Dep't of Corr.*, 974 F.3d 431, 441-43 (3d Cir. 2020) (considering a "comprehensive meta-analysis of the existing literature on solitary confinement" that concluded that solitary confinement is "psychologically painful, can be traumatic and harmful, and puts many of those who have been subjected to it at risk of long-term . . . damage").

Second, the MDC is notoriously and, in some instances, egregiously slow in providing necessary medical and mental health treatment to inmates — especially where such care requires

10

the attention of outside providers. *See, e.g.*, Women in Prison Comm., Nat'l Ass'n of Women Judges, Second Visit to BOP's Metropolitan Detention Center (MDC), Brooklyn, New York 2 (2016) (finding that inmates at the MDC were denied essential gynecological care).[13]  It has become common for defense counsel to require court intervention to ensure that inmates receive basic care — and, even more shocking, not uncommon for court orders to go unheeded.  In one recent case, for example, the MDC repeatedly defied court orders to transfer a defendant with a MRSA infection to a medical facility; the defendant was instead "mistake[nly]" sent to the segregated housing unit.  *See* Dec. 15, 2023 Hr'g Tr. at 3-5, 17, *United States v. Young*, No. 23-CR-475 (DLI) (E.D.N.Y. Dec. 15, 2023); Dec. 20, 2023 Hr'g Tr. at 5, 9, *Young*, No. 23-CR-475 (DLI) (E.D.N.Y. Dec. 20, 2023); *see also* John Annese, *Brooklyn Judge Calls Sunset Park Federal Jail 'an Abomination' After Staff Ignore Order to Send Ailing Inmate to Medical Facility*, N.Y. Daily News (Dec. 20, 2023), *available at* https://www.nydailynews.com/2023/12/20/brooklyn-judge-calls-sunset-park-federal-jail-an-abomination-after-staff-ignore-order-to-send-ailing-inmate-to-medical-facility.[14]  In another, the MDC defied an order to transport a defendant for surgery to repair his cheek, which had been broken by another inmate at a previous facility; the defendant was eventually informed that his cheek would have to be rebroken before the surgery because it had healed improperly on its own.  *See* Initial Medical Evaluation Request,

---

[13]     Critical mental health treatment is similarly lacking.  In 2020, for example, Jamel Floyd, an inmate who was placed in solitary confinement despite his known "bipolar disorder and schizophrenia," died upon being pepper sprayed during a manic episode.  Office of the Inspector General, Dep't of Justice, Report of Investigation Regarding the Circumstances Surrounding the Death of Inmate Jamel Floyd at the Metropolitan Detention Center (MDC) Brooklyn 7 (2023).

[14]     Notably, when Judge Irizarry ordered, as a remedy for the MDC's "blatant disregard . . . of a very explicit order," that the defendant be transferred to a medical facility "forthwith, by no later than tomorrow," an MDC attorney responded that doing so would be an "impossibility" because "[o]ur staffing capabilities are currently — are extremely low."  Dec. 15, 2023 Hr'g Tr. at 3, 15, *Young*, No. 23-CR-475 (DLI) (E.D.N.Y. Dec. 15, 2023).

*United States v. Acosta*, No. 23-CR-376 (JLR), ECF No. 5 (Sealed) (S.D.N.Y. July 19, 2023);

*see also* Def.'s Bail Mem. 8, *United States v. Irizarry*, No. 23-CR-60 (JMF), ECF No. 47

(S.D.N.Y. Oct. 30, 2023).  And in yet another, it was the "position of MDC legal" to defy a court

order "to provide the defendant with a special diet . . . appropriate for . . . diabetes."  Conf. Tr. at

3, 9, *United States v. Palos-Garcia*, No. 21-CR-340 (JGK) (S.D.N.Y. Jan. 5, 2022), ECF No. 57.

Less extreme, but still problematic, denials or delays of needed care have reportedly become

commonplace.[15]

Finally, the MDC's physical conditions have long been problematic.  *See generally*

Order, *United States v. Espinal*, No. 11-CR-537 (JMA) (CLP) (E.D.N.Y. Oct. 17, 2016), ECF

No. 39 (collecting "letters relating to the conditions at the Metropolitan Detention Center,"

which reported visible mold on walls and ceilings, contaminated drinking water, vermin

infestation, mouse droppings falling through HVAC vents, and roaches and flies in showers); *see*

*also* John Marzulli, *Judge Refuses to Send Women to Brooklyn Jail with "Third World"*

---

[15]    Once again, there are far too many cases to cite.  For representative examples, however,
see Def.'s Letter at 5-6, *United States v. Little*, No. 20-CR-57 (GBD) (S.D.N.Y. Jan. 6, 2022),
ECF No. 416 (reporting that the MDC had neglected to transport an inmate with a twisted bowel
to an emergency surgery for more than three months, even though she was vomiting daily and
unable to defecate for weeks at a time); Def.'s Letter at 1, *United States v. Martinez-Diaz*, No.
16-CR-387-10 (JMF) (S.D.N.Y. Nov. 8, 2021), ECF No. 564 (reporting that an inmate with
obstructive sleep apnea had not been able to use his CPAP machine for over eighty-five days
because the MDC had failed to provide him with an extension cord); Def.'s Sentencing Mem. at
12, *United States v. Velez*, No. 23-CR-325 (JMF) (S.D.N.Y. Nov. 22, 2023), ECF No. 31
("Because the MDC lacks sufficient staff to meet Mr. Velez's medical needs of 8 mg of
Suboxone 3 times a day, he receives only two-thirds of his required dose. . . .  Some days, Mr.
Velez does not even receive the prescribed dose."); Def.'s Sentencing Mem. at 7, *United States
v. Rivers*, No. 18-CR-192 (WFK) (E.D.N.Y. Feb. 23, 2022), ECF No. 155 (explaining that it took
two years for the MDC to provide the defendant with hearing aids despite multiple requests);
Def.'s Letter at 1-2, *United States v. Philips*, No. 20-CR-317 (BMC) (E.D.N.Y. Oct. 21, 2021),
ECF No. 18 (explaining that the MDC neglected to refill the defendant's asthma inhaler despite
multiple requests, and even after the defendant had "a coughing fit, gasping for air and
wheezing," leading his cellmate to "scream[] for help").

*Conditions*, N.Y. Daily News (Oct. 7, 2016), *available at* https://www.nydailynews.com/2016/ 10/07/exclusive-judge-refuses-to-send-women-to-brooklyn-jail-with-third-world-conditions.

These problems came to the fore in the winter of 2019, when a power outage left inmates without light and heat for a full week. Following that well-publicized incident, Judge Torres held a hearing at the MDC. She witnessed "abundant water damage . . . like wet tissues hanging from a ceiling" and "black blotchy mold" covering light fixtures. Feb. 5, 2019 Hr'g Tr. at 167, 172, *United States v. Segura-Genao*, 18-CR-219 (AT) (S.D.N.Y. Feb. 5, 2019), ECF No. 211. One inmate told her that he felt as though he was "sleeping under a waterfall." *Id.* at 169. (Judge Torres also spoke with an inmate who said the dressing on a gunshot wound had not been changed for so long that he was beginning to have "flashes in [his] eyes," and another who said he was told by a corrections officer that a bleeding rash was "above [the officer's] pay grade." *Id.* at 176, 180.) Such problems have persisted. In 2021, the MDC carried out "planned maintenance" on the electrical system by enforcing a lockdown "over the course of four nights" with no power and no water. Conf. Tr. at 8-9, *Federal Defenders of NY, Inc. v. Federal Bureau of Prisons*, No. 19-CV-660 (MKB) (E.D.N.Y. Oct. 15, 2021). During this time, inmates' toilets were reportedly "overflowing because . . . officers did not come by with buckets of water," and inmates "were sitting with water on the cell of their floor in the dark with feces on it." *Id.* at 10-11; *see also* Conf. Tr. at 7, *United States v. Rivers*, No. 18-CR-192 (WFK) (E.D.N.Y. July 30, 2021), ECF No. 151 (reporting that an inmate had been left "without toilet facilities" because "the officers had refused to either have his toilet repaired" or "allow him to use other toilet facilities and to take him there when necessary"). More recently, the Court was advised that many, if not most, of the emergency call buttons in the MDC's main building are not working — even though those buttons are the only way (other than yelling and banging) to call an officer in

emergency situations during a lockdown.  *See* Letter from Loretta E. Lynch at 4, *Federal*

*Defenders of New York, Inc.*, No. 19-CV-660 (MKB) (E.D.N.Y. Nov. 30, 2023), ECF No. 403

(reporting that the buttons remained "broken" as of November 30, 2023).

      As noted, the reason most often given for many, if not all, of these problems is

understaffing.[16]  That may be so, but it is not an acceptable excuse.  Moreover, recent efforts to

address the staffing shortage aside, *see, e.g.*, Defs.' Letter at 2 n.3, *Federal Defenders of New*

*York, Inc. v. Federal Bureau of Prisons*, 19-CV-660 (MKB) (PK) (E.D.N.Y.), ECF No. 384

(noting that the BOP has offered higher-than-normal recruitment and retention incentives for

new correctional officers at the MDC); *see also* Advisory Grp. of DOJ Components, Report and

Recommendations Concerning Access to Counsel at the Federal Bureau of Prisons' Pretrial

Facilities (2023), *available at* https://www.justice.gov/d9/2023-07/2023.07.20_atj_bop_access_

to_counsel_report.pdf, the situation appears to be getting worse, not better.  As noted, the

MDC's current staffing levels — approximately 55% of full correctional officer staffing — are

the worst in at least three years.  *See* ECF No. 28, at 2.  Meanwhile, excluding the brief period

following closure of the MCC (when hundreds of new prisoners were transferred to the MDC),

the inmate population at the MDC, at 1,611, is the largest it has been in three years.  *Id.* at 1.  The

resulting ratio of correctional officers to prisoners — ten to one — is untenable, and there is no

---

[16]     A recent memo by Rhonda Barnwell, the president of the union local representing the
MDC's correctional officers, helps explain why the MDC's staffing shortage translates directly
into its inhumane conditions of confinement.  *See United States v. Irizarry*, 23-CR-60 (JMF),
ECF No. 47-3 (S.D.N.Y. Oct. 30, 2023).  According to her memo, "[o]n a daily basis housing
units . . . are left . . . unmanned by staff[] and locked down, with the expectation . . . that a single
[] Officer is to make rounds, feed, and perform additional correctional duties" on three units
during a single shift.  *Id.* at 1-2.  The frequency of lockdowns "angers the inmates and heightens
the inherent danger for staff," but "[c]overage is so minimal that at times there are only 6 staff
members available to respond to body alarms, staff assists, and[/]or inmate medical
emergencies."  *Id.* at 2.

reason to believe that the staffing side of the equation will change any time soon.  It is for that reason that the only option is to reduce — or at least not add unnecessarily to — the prisoner population.

For these reasons, the Court holds that the conditions at the MDC constitute "exceptional reasons" why detention of most defendants who do not pose a risk of flight or danger to the community, including Chavez, "would not be appropriate."  18 U.S.C. § 3145(c).  Notably, that decision accords with the decisions of at least two other judges of this Court.  First, in *United States v. Boyd*, No. 21-CR-486 (SHS), 2022 WL 790771 (S.D.N.Y. Feb. 3, 2022, Judge Stein continued a similarly situated defendant's bail pursuant to § 3145(c), citing the MDC's "staffing issues, quarantines due to COVID-19, and lockdowns due to security issues" that "make it impossible for attorneys to visit their clients to prepare strategy . . . for sentencing."  *Id.* at *2. [17] Second, in May 2023, Judge Engelmayer continued a defendant's bail pursuant to § 3145(c) in light of the MDC's "unacceptable," "inhospitable, [and] terrible" conditions — despite the fact that "[t]he pandemic is now on the wane."  Plea Tr. at 33, *United States v. Arias*, No. 22-CR-495 (PAE), ECF No. 34 (S.D.N.Y. May 5, 2023).  Judge Engelmayer concluded, as the Court does here, that "until the . . . Bureau of Prisons really can get its act together . . . , where a defendant is not a risk of flight, is not a danger to the community, and there aren't special reasons for them to be remanded, avoiding putting a defendant in conditions like that qualifies as an exceptional reason under 3145(c)." *Id.*[18]  More broadly, the Court's decision accords with decisions that

---

[17]     Granted, Judge Stein's reasoning relied in part on the circumstances presented by COVID-19 and those circumstances have improved.  In some ways, however, the conditions at the MDC are even worse now.  At the time of Judge Stein's decision in *Boyd*, the ratio of inmates to correctional officers was only eight to one; now, as noted, it is ten to one.

[18]     The Court surmises that many other judges in this District and the Eastern District of New York have relied on the conditions at the MDC in permitting defendants subject to remand

have held that a potential impact of a defendant's detention on third parties can justify continuing release pursuant Section 3145(c). *See, e.g.*, *United States v. Sabhnani*, 529 F. Supp. 2d 377, 383 (E.D.N.Y. 2007) (finding exceptional reasons existed for a defendant who was "solely responsible for operating his business and ha[d] various employees who [were] dependent upon [him for] their jobs, salaries and benefits"); *accord United States v. DiMattina*, 885 F. Supp. 2d 572, 589 (E.D.N.Y. 2012).

The Court's holding is also consistent with — or, at least, not inconsistent with — the Second Circuit's decisions in *DiSomma* and *Lea*. As noted, the *Lea* Court stressed that "[t]he test under § 3145(c) is necessarily a flexible one, and district courts have wide latitude to determine whether a particular set of circumstances qualifies as 'exceptional.'" 360 F.3d at 403. In a similar vein, the *DiSomma* Court granted to district judges "the full exercise of discretion in these matters" and observed that such discretion "is constrained only by the language of the statute: 'exceptional reasons.'" 951 F.2d at 497. To be sure, the Second Circuit has also held (perhaps erroneously, *see supra* note 12) that a district court must find "a unique combination of circumstances giving rise to situations that are out of the ordinary" to apply Section 3145(c). *Lea*, 360 F.3d at 403. But the conditions at the MDC are certainly out of the ordinary and, taken together, constitute a unique combination of circumstances — even if they apply to more than one defendant. *But see United States v. Mostrom*, 11 F.3d 93, 95 (8th Cir. 1993) (holding that "inadequacies in the general means of transportation of prisoners from places of holding court to

---

pursuant to Section 3143(a)(2) to remain on bail pending sentencing. Judges rarely issue written opinions in this area. Instead, most judges address the issue on the record after accepting a plea, as Judge Engelmayer did in *Arias* (and as he has done in many other similarly postured cases), reaching the same result). Some judges, the Court suspects, do not address the issue explicitly at all and merely leave the defendant's bail conditions in effect without discussion.

places of detention" did not qualify as "extraordinary reasons" justifying release under Section 3145(c)). In the height of the COVID-19 pandemic, it was commonplace for courts to find that the conditions of confinement at the MDC and MCC constituted "extraordinary reasons" justifying release. It follows that the circumstances qualifying as exceptional under *DiSomma* and *Lea* need not be unique to a particular defendant.[19]

In any event, the conditions at the MDC combined with Chavez's unique circumstances plainly satisfy the Second Circuit's standard. Indeed, many district courts "have found that conditions in prisons, in combination with the personal circumstances of individual defendants, can constitute exceptional circumstances." *United States v. Campbell*, No. 20-CR-631 (AKH), 2022 WL 2209371, at *2 (S.D.N.Y. June 21, 2022) (citing cases); *see, e.g.*, *United States v. Reboux*, No. 5:06-CR-451 (FJS), 2007 WL 4409801, at *2 n.1 (N.D.N.Y. Dec. 14, 2007) ("The scant legislative history [of Section 3145(c)] indicates that . . . Congress intended that a defendant's personal circumstances *together with other unusual factual or legal issues* could constitute exceptional reasons for release" (emphasis added)). That is the case here given, among other things, Chavez's age and serious medical conditions, which require care that the MDC may not be able to provide, not to mention the lack of any mandatory minimum term of imprisonment and Chavez's lack of any prior criminal history. *See, e.g.*, *Reboux*, 2007 WL 4409801, at *2 (enumerating "personal circumstances" that "can be factors in the 'exceptional reasons' calculus," including "whether the defendant's criminal conduct was aberrational" and

---

[19] Indeed, it would be absurd to accept that the conditions at the MDC during the height of the COVID-19 pandemic could qualify as "exceptional reasons" justifying release under Section 3145(c) and to conclude that the conditions there now could not. The fact that the harsh conditions during COVID-19 have persisted and, in some ways, even worsened makes the present circumstances more "exceptional," not less.

"the length of the [anticipated] prison sentence" (citing *Garcia*, 340 F.3d at 1019-21)).  Given

those individual circumstances, it would be cruel and unjust to detain Chavez in the MDC

pending sentencing.  *See Campbell*, 2022 WL 2209371, at *2.  Accordingly, exercising its broad

discretion in these matters, *see Lea*, 360 F.3d at 403; *DiSomma*, 951 F.2d at 497, the Court has

authority to, and does, continue Chavez's bail through the date of his sentencing.

## CONCLUSION

This District and the Eastern District have, for years, made efforts — through orders in

individual cases, through bodies like the Criminal Justice Advisory Board, and through more

informal efforts — to improve conditions at the MDC, for individual inmates and more broadly.

The undersigned will continue to participate in those efforts because it is imperative that those

detained pursuant to the order of a court are treated humanely.  *Cf. Callins v. Collins*, 510 U.S.

1141, 1145 (1994) (Blackmun, J., dissenting) ("From this day forward, I no longer shall tinker

with the machinery of death.").  But the time has come to recognize that, no matter how well

intentioned officials at the MDC (and the United States Attorney's Office) may be, there is no

way the grim conditions at the jail will materially improve until the grave staffing shortages are

addressed.  And that is not going to happen unless the political branches commit considerably

more resources to the matter, which seems unlikely to happen any time soon.[20]  Until that time

---

[20]     It is ironic, to say the least, that even as the Executive Branch fails to do what needs to be
done to tend to its own house, it has — through the United States Attorney's Office — sought
the appointment of an outside receiver to address "unsafe, dangerous, and chaotic" conditions in
New York City's jail system.  *See* Letter from U.S. Attorney Damian Williams to the Honorable
Laura Taylor Swain at 1, *Nunez v. City of New York*, No. 11-CV-5845 (LTS) (JCF), ECF No.
604 (S.D.N.Y. Nov. 17, 2023); *see id.* at 6 (arguing that the outside receiver should be given
authority to, among other things, "more efficiently assign and deploy uniformed staff to
maximize coverage in housing areas" and "hire and promote staff so that there are a sufficient
number of qualified and experienced individuals to fill supervisory and other uniformed
positions").

comes, the best the courts can do is not add unnecessarily to the inmate population and thereby

avoid exacerbating the already frightening staff-to-inmate ratio. That does not mean bailing

every defendant charged with a crime in this District; due to risk of flight or danger to the

community, some defendants are rightly detained even before they are sentenced. *See* 18 U.S.C.

§ 3142. But it does mean, Section 3143(a)(2) notwithstanding, continuing the bail of a defendant

like Chavez, who has been 100% compliant with the terms of his release to date, does not pose a

danger to anyone, and does not present a risk of flight. Accordingly, and for the reasons

discussed above, the Court finds that there are "exceptional reasons" justifying Chavez's

continuing release pursuant to Section 3145(c) and thus grants his motion to continue his

conditions of release through the date of his sentencing.


       SO ORDERED.

Dated: January 4, 2024
      New York, New York

                                        JESSE M. FURMAN
                              United States District Judge

# EXHIBIT D

Dear Judge Rakoff,

My name is Daniel Jimenez, and I am 25 years old. I am an Advertising Sales Director at Ultimate Corporate Advising in Florida. I met Lucha El in 2005 as we lived in the same building. He has always been a friend and brother to me, and kind to my family. He has always been positive, outspoken, and kindhearted to the people in his life.

We grew up in Gun Hill Road in the Bronx in the early 2000s. Growing up, our neighborhood was constantly under police lights, and young people were joining gangs and selling drugs. That wasn't Lucha. He found a way to be loved in the community without doing something negative, and that was what made me respect him most. He was the example of a young man making a way for himself, and he set a precedent for me. He had a full time job, his own car, and trained to be a boxer. He had a discipline that showed me it was possible for me to become a college athlete and eventual college graduate. Representation is important on the course to achieving your goals, and seeing him be successful, stay out of trouble, and respect his mother and be a good father was huge for my development in a positive way.

Personally, Lucha has been there for me in some of my most difficult moments. While I was away in Rochester for college, I lost a few of my very close childhood friends to violence and suicide. I also had a few family members pass away. My grades were slipping and I was just having a very tough time last summer. Lucha was one of the people who was always there, showing up at my door to get me out of the house every day. He brought around a lot of people who gave me wisdom from their own lives and motivated me during a dark time in my life. Lucha was there for me during my entire process of applying for jobs and encouraged me to move out of New York last summer, something I had wanted to do but didn't have courage to do on my own. Having someone like him by my side really made the difference.

Lucha sees my mom almost as a second mom or aunt. Growing up, whenever we were out of town like on vacation or at a wedding, he would take care of our house, water the plants, feed our dog, and take her out on walks. My mom is a hardworking woman who respects herself and pays taxes. She has always trusted Lucha with the keys to our house. That's because we know he isn't a violent or dangerous person. Lucha is a God-fearing and upstanding man. He sees the good in everyone and everything, and he treats people with dignity.

To Lucha, the people in his life span further than his mother, brother, or son. Lucha is a man of the community. People in our neighborhood know him for his ability to connect with others and impact them positively. Your Honor's decision at sentencing not only affects his life, but also those of his son, his mother, his family, our neighbors, myself, and countless others who love him like family.

One example of Lucha's big impact in the community is his relationship with his boxing mentee, ███████ who is 11 years old. Lucha first encountered a woman selling icees in the park. There was no one to take care of her son ██████ while she worked. Once Lucha heard that, he committed himself to mentoring and training ██████ He would train ████████ and other kids in the community to box for little or no money multiple times a week, depending on what everyone could pay. Now ██████ has a passion for boxing, a newfound confidence, and a coach in Lucha. Lucha would always address him by saying "what up Champ?" And a great big smile would emerge from ████████ face. The impact that Lucha makes in the lives of many youth in the community is truly tremendous.

If you walk around the community with Lucha, you can get a sense for how loved he is. I remember going to the park with him, and all the dog owners knew him and his dog. They would ask him questions about their own pets, knowing how much wisdom he had, and how much he loves animals. Lucha is the type of person that addresses the elderly men as "uncle" or "pops'', and the elderly women in our neighborhood as "aunty" or "gorgeous". Those moments would brighten their day and create connections.

To me, and to those who know him, Lucha is a genuinely good person who wants to see others win. He helped one of our neighbors start a car wash business, helped renovate another neighbor's Airbnb, and even helped send our neighbor's little sister off to prom in a luxury car. This man cares about others a lot more than the average person. He is a leader who stands for love and community. The perceptions of what he stands for have been misconstrued by lack of context. Lucha is not a violent or angry person. He speaks of the importance of education and civic knowledge. I understand that this is a serious case and I don't want to undermine the legal system, however I just hope you can see that Lucha is not at all a dangerous person or someone who doesn't respect the law.

Judge Rakoff, take the overwhelming accounts of people who understand his character and consider this: our community in the Bronx has a constant potential to unravel in a negative or positive direction. Those things depend on the people present in our neighborhood, and the community we've built. Lucha is part of the solution, not the problem.

I love him as my brother, and many love him for the upstanding man he is.

Please take this into consideration.

Daniel Jimenez

# EXHIBIT E

Dear Judge Rakoff,

My name is Cheryl Jones, I go by CJ. I am writing this letter to express my unwavering support for my friend Lucha El. I first met Lucha in the neighborhood because my older brother was in a fight with another person in the community and he stepped in to break it up. He helped them to use their words to talk it out instead of resorting to violence. Over the years, I have had the privilege of getting to know Lucha on a deep and personal level, and I can confidently say that he is an exceptional individual who possesses qualities that make him truly deserving of your consideration.

First and foremost, let me emphasize the kindness and compassion that radiate from Lucha. He has such a genuine heart and a natural inclination to help others. I have witnessed countless instances where he has gone out of his way to help others, whether it be his elderly neighbor or his friends in their time of need. Lucha consistently demonstrates empathy and selflessness, and his actions inspire those around him to be better versions of themselves.

Lucha is a person of unwavering integrity. He holds himself to the highest moral standards and always strives to do what is right, even when faced with difficult choices. His honestly and transparency are qualities that I greatly admire. I have seen him take responsibility for his actions, learn from his mistakes, and actively work towards personal growth and self improvement. Lucha is a person of integrity and character.

Lucha is also an incredibly talented and hardworking man. He has an impressive work ethic and a drive for success in all aspects of his life. Whether it be his academic pursuits, professional endeavors, or personal projects, Lucha consistently puts in the time and effort necessary to achieve his goals. His determination and resilience have been a source of inspiration to me and many others who have the pleasure of witnessing his journey.

Lucha has been an invaluable member of our community. He has actively participated in various community initiatives, such as putting on cookouts in our neighborhood with me. He has dedicated his time and energy to making a positive impact by teaching kids how to box. From volunteering at community events to helping others, Lucha has consistently demonstrated his commitment to giving back and making our community a better place for all.

I understand that Lucha's charges are serious and I don't wish to undermine the importance of the legal process. However, I firmly believe that it is crucial to consider the entirety of a person's character when making judgments.


Thank you for your time,

Cheryl Jones

# EXHIBIT F

December 26, 2023

The Honorable Judge Rakoff
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

Dear Judge Rakoff,

My name is Bernardine Brown. I am 33 years old, and I live in the South Bronx, around the corner from where Steve Perez and his mom live. I work as a cashier at BJ's, and I live with my grandmother and two children. I am writing this letter on behalf of my entire family to express our support and love for Steve. I personally have known Steve for over 20 years. We met in the first grade and have kept in contact ever since. We consider each other as family.

As a person, Steve is very outgoing and helpful. He's honest and will do anything he can for a friend in need. There's really nothing bad I can say about Steve. He always checks up on my grandmother, Bernardine Reyes, who is 91 years old. She has lived in this community now for over 30 years, since 1993. Sometimes I will come back to my apartment and see him in my grandmother's room. He has a special bond with her. He calls her Grandma and always asks if she needs anything from the supermarket. She tries to give him money and sometimes succeeds in forcing it in his pocket but he always leaves the money right on the table as he leaves. Steve tells her never to cross the street without him there. He will carry her bags, walk her to the store, walk her to get her nails done. Steve also cooks for her. He cooks her favorite foods—fish with potatoes and rice, shrimp—and brings it to her. My grandma is really picky. He is the only one besides me who can cook for her. She prays for him every single night.

There's another grandma in our neighborhood that everyone calls Grandma too, and Steve helps her all the time. If we lose Steve, all of us on this block are losing. Two older people in the neighborhood that Steve used to help out have passed away in the 4 months since Steve has been gone. That really broke us. It's sad, but no one was there for them in the way Steve was. Always getting them their medicines and checking on them.

Steve always listens to my problems and helps me. My kids look up to him. My daughter is 7 and my son is 12. Whenever he sees them, he makes sure they are happy and takes them to the store. He uplifts them. He calls my daughter a beautiful princess. My son is autistic and gets picked on a lot at school. Steve gives him lots of courage. He used to help pick up my son from school. Now my kids are always asking about him. He is really, really missed.

It's hard to explain how important he is to our community. Every Saturday, Steve would be at Oval Park boxing with the kids. He trained about 12 different kids and taught them different moves. In the mornings before training, he went knocking building to building to gather all the kids. He also did cookouts in Oval Park with hot dogs, cheeseburgers, rice, beans. He organized who would bring what, got everyone together to play dominos. Now, nobody goes to the park like that. No one else does what he does.

Steve is very respected in the community. Once, my brother and his friend got into an argument and they were on the verge of getting into a fight. Steve came in the middle and kept talking to them until he finally convinced them to go their separate ways without a fight. Everyone was surprised, but that's Steve. He has this ability because he's just so lovable and everyone knows he does want the best for the community. He has always taught everyone to talk and not fight.

There are so many other examples I can give. Steve used to bring all these little girls who were 9, 10, 11 years old to me and my grandmother. They were girls who didn't have money to get their hair done nicely before the first day of school. He would beg us to help them, and of course we would. When we were done with their hair, he would walk the little girls back home, talk to them. He has a beautiful heart. I just want you to see that Steve has a good heart, that he is missed. He is an integral part of our community here, and someone who does good. What he teaches and lives out is love for ourselves and each other.

Thank you for your time and consideration of this letter.

Bernardine Brown

# EXHIBIT G

December 29th, 2023


Dear Judge Rakoff,


     I am Jacqueline Jimenez and have known Lucha most of his life as neighbors at our residence at 3318 Perry Ave, Bronx NY 10467. I have worked in the social services field for over 20+ years, mostly as a Vocational Evaluator, where I assist individuals with finding employment, who are on public assistance with a range of mental, physical, and learning disabilities. I am currently a graduate student at the Hunter College Silberman School of Social Work, where I am pursuing a master's in social work. I also volunteer as an administrative assistant with a non-profit organization called UPLIFE foundation where we organize back-to-school giveaways, toy drives and food giveaways for the holidays and several other fun-filled, family-oriented activities to serve the community. It is my plan to involve Lucha in our events when he is released, as we also offer volunteer opportunities to formerly incarcerated individuals so that they can give back to our communities.

     It has been difficult putting words to paper about Lucha. Not because I have nothing to say, but because I ask myself, how do you sum up the life of someone you love into a few sentences and paragraphs. In choosing adjectives to describe him, I think of him as being dynamic, passionate, kind, caring, loving, daring and brave. A man who stands up for his beliefs even when they go against the grain.

     I met Lucha almost 20 years ago as a young boy because he was my neighbor who lived in the apartment right under mine. I saw him heading to the park often with his father and brother to play baseball. He was a playful, spirited boy who was athletic and ambitious, even at a young age. I was like an older sister/auntie figure to him at the time as I was older and had a child of my own. Every chance I got I would take my son, Lucha, and other children that lived in our building to the park. As time went on, I watched Lucha become a young man, trying to find his way. He boxed, played baseball, went to school, worked, socialized, just as any young boy would that is trying to walk into manhood. As he got older, I came to know and trust him more as the man he is today. Lucha is one the only people that I would trust with the keys to my home to watch and feed my animals if I was away. I could also always depend on him to offer help carrying my bags, moving a couch, painting a room; there was no limit to the help he would be willing to offer me. I can't think of one time he did not come through for me when I needed him, and that is a rare quality to find in people. It may seem cliché, but in the neighborhood, Lucha was that guy that would help old ladies with their bags or crossing the street. I would always find him in spirited and passionate conversations at any given time in the neighborhood about current events, knowledge of themselves or life in general.

     In the community he is very well known and loved for being who he is. He is a teacher, encouraging people to learn more about themselves and their roots, a friend, a jokester, a mediator and more. He was a peacemaker, putting together cook-outs, or random basketball games at our local park, in the hopes of taking people off the block or the corner. His idea was to engage people

in doing something more constructive and in uniting people that usually might even be rivals. I vividly recall a big fight that was going on on Gunhill road and seeing Lucha in the middle of the two parties that were having the altercation, trying to diffuse and mediate the situation. This was just his nature. On any given day you could walk outside and see Lucha helping someone fix their car or move out of their apartment. Lucha is one of a kind. He is a gentleman. He is a valuable part of our community, and his absence is felt.

One of the things that I will forever be grateful for is the support he offered my son during a very difficult time in his life. Even though Lucha himself was enduring some very challenging things in his life, he put that aside and took the time to come knock on my door every single day and push my son to go outside and exercise or just lent an ear or just simply sat there in silence with him. Lucha's support had a huge impact on my son's life and his ability to get past this hardship.

It pains me to see Lucha in this current predicament because I know him and can see beyond his charges; I see the dynamic man and all he has to offer this world. It is so important to see the intersectionality and the total sum of the parts that make him who he is. Doing so will help people see beyond what is on paper. He is a mentor, a friend, a father. A valuable member of our community.

Seeing him as a father solidified for me what a stand-up man he is. Despite the challenges he faced with the child's mother, he strived to be the best father he could be under the circumstances. His son is his pride and joy, he is his world and when he is with him, I know that each time it made him a better man.

I'd like you to understand that this young man is a bright light. He is a kind, humble man that just strives to be better each day. I can honestly say that he's contributed to my life in many positive ways. He is more than my neighbor. He is my friend. He is my family. My hope is that you are moved to understand that the value of his life and his contributions to his community surpass what is written on paper.


Thank you for your time,


Jacqueline Jimenez

# EXHIBIT H

Mr. Rakoff you can be my grandfather and I have always respected my elders. I would like to apologize for the words that I used in frustration towards you. Words that I regret because, they are not a representation of who I am as a man nor, of how I was raised. As I have said before my mother taught me to love not to hate and, the words I used were not of love.

Mr. Rakoff I am not a bad man and, I am defiantely not a radical. I was raised by an uncle whom was a United States Marine, a proud no nonsense man. A man who taught me respect, courage, integraty and, patriotism. My uncle who I love dearly taught me that, there is nothing more honorable than being a man who loved and, cared for his family as well as his community. My uncle always told me that, there was honor and pride in being an American.ment that you

That being an American

2

were free. Mr. Rakoff I took that to heart, not only do I love my family, I love being an American. I love all the different cultures and, people that make this land the greatest place in the world. I tried to serve my country, to make my uncle proud, to continue the tradition of military men in my family but, I wasn't given the chance because, when I tried to enter the military, they weren't accepting men who had visible tattoos but, more than anything Mr. Rakoff I wanted it for myself. I wanted to wear that uniform with honor, to serve with the rest of the men who were willing to stand for his fellow American, for the American way of life. As a young boy my uncle would sit me on his lap and, talk to me about the constitution and, the declaration of independence. He would tell me about the honor he felt to serve in the protection of these sacred documents that, made this country what it is, that, ~~made~~ gave people a sense of security knowing their rights were secure and protected.

Mr. Rakoff I'm just a proud American, I meant no harm nor, malice with what I wrote you prior to this letter. I do not feel that, I am above the law, to my understanding I was in

3

honor of the law. Mr. Rakoff, I have always been a respectful, solid man that, my family and, community can count on. I am not violent, I have no history of violence nor, do I have any intention of being violent. Mr. Rakoff, I am no monster. I am just a man, I love, I feel, I make mistakes. I made the mistake of using ugly words to judge you, when I didn't want you judging me. I wish we could have met under different circumstance's. I wish we could have met like in a library or coffee shop. We would have probably had some interesting conversations, would have probably understood eachother alot better. It's just a thought that, ran through my mind. Mr. Rakoff, I was out of line for writing you the words I wrote, in the manner in how I described you. You are my elder before anything and, I should have not expressed myself the way I did. I truly wish I could take those words back because, I would be pissed if my boy would have expressed himself with an elder the way I did with you. I love my boy Mr. Rakoff and I want to be an example for him of what a man should be. I want him to represent me with dignity

4

and respect. Talking about my son Mr. Rakoff, I miss him. I yearn to feel his hands touch my cheek. I pray to feel his lips kiss my face. My love for him is pure and never ending. My boy fills me up, he bring's me the greatest joy a man can feel. He is a boy with a big heart, I am proud of him Mr. Rakoff. Once we were in the park and, he saw these two children, who were shy standing by a tree watching him play with his action figures and, he went grabbed them by their hands and said come on guy's come play with me. I was so proud of him, I came to tears as I am now writing you and, those moments are the ones I don't want to miss. I am a loving man Mr. Rakoff, who wears his heart on his sleeve. A man who is still willing to learn and, a man who accepts and, recognizes when I have done wrong. I am embarrassed of my actions and truly apologize, Mr. Rakoff I am sincere in my apology to you sir.

A proud Father and loving son, A man still growing, A Man yearning for his boys love. J. El

# EXHIBIT I

Dear Judge Rakoff,

My name is Hugh Scully. I am 23 years old, and I live at 3324 Perry Avenue in the Bronx, New York. Lucha is my next door neighbor and someone I consider my brother. I've known him for over 20 years.

Lucha's been a big part of my life in many ways. He's someone I can honestly look at as a big brother for his many great qualities. He's very tight with my family, my son loves him, and he's a person I can always count on. Lucha has always been there to help my family with anything that's needed, whether that's shoveling snow from our driveway, helping us organize our family events, or even staying after to clean up with us. Beyond just that, at every event, he's the person making everyone laugh and keeping the peace. Lucha always helped from his heart and never really asked for anything in return. My son is 4 years old and he is shy with many people, but whenever my son saw Lucha down the block, he would go running to him. They have a special bond. Lucha often played with him and gave him toys.

Recently, in June of this year, I was doing a renovation on our multi-family house. Lucha saw my dad and me working on the house and he started to come by and help out. It was a complex renovation involving demolition, electrical work, reframing, taping, and drywall. I needed to gut out the whole living room and dining room, and Lucha helped me every step of the way. The project took over 30 days, and he was always there and on time. I couldn't have done it without him. Lucha has also helped me with prior renovations and he's someone I trust.

 

Before and After

There's not too many people in the community like Lucha. From the bottom of his heart, he's a genuine person who helps people in any way he can. I haven't really seen people in my neighborhood who take care of older people the way he always did. There's a lot of times that I would see Lucha stop what he's doing to help little old ladies struggling with the bags or to shovel snow from their driveways. It wasn't a one time thing. I find it really amazing because in this community there aren't that many people like that who help people in need. He would do cookouts to help people who don't have food at the end of the night get plates. He didn't have much himself and he was still doing that. I always loved how he brought people together and made them laugh. Lucha would also give boxing classes to the kids in Oval Park in his spare

time, including kids who couldn't afford to pay anything. I know because I worked out with him sometimes in Oval Park and I saw him stay after to train the kids.

Lucha is not just my neighbor but he is family. He's someone I consider my big brother. He gives me advice on life and helps me be a better person and dad. He's been nothing but kind, respectful, and trustworthy as a person, never causing trouble and setting an example for the community. Your Honor, I hope that you will consider this letter when you decide Lucha's sentence because our community really needs him.

Sincerely,

Hugh Scully

# EXHIBIT J

# Federal Defenders
## OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

Barry D. Leiwant
*Interim Executive Director
and Attorney-in-Chief*

*Southern District of New York*
Jennifer L. Brown
*Attorney-in-Charge*

December 27, 2023

The Honorable Jed S. Rakoff
United States District Judge
Southern District of New York
United States Courthouse
500 Pearl Street
New York, NY 10007

Re:   *United States v. Lucha El,*
      22-CR-644 (JSR)

My name is Angel Bosques, and I am one of three social workers with the Federal Defenders of New York. The social work department engages with clients at various stages of their legal cases to offer supportive services, including reentry assistance and case management. I write on behalf of Mr. Lucha to provide details regarding reentry planning for his eventual return to the community. Mr. Lucha was forthcoming and identified the needs he feels will allow him to avoid any further entanglements with the justice system. The following is information regarding the services provided by the social work department to our clients, as well as employment services that are available to Mr. Lucha. He can also receive case management support from the social work department to facilitate his reentry into the community.

## Employment/Vocational

Although Mr. Lucha intends to pursue a career being a member of a labor union, he also recognizes the need for support in pursuing employment and job training. There are several reentry programs in New York City that focus on dismantling the barriers to obtaining employment for individuals with a prior conviction history. Mr. Lucha can receive a referral from our office or from his probation officer to connect with the following resources.

- Exodus Transitional Community: Exodus is a reentry program that provides comprehensive transitional support to individuals returning to the community following incarceration. Exodus provides workforce development training, alternative-to-incarceration programming, and

trauma informed clinical support to individuals impacted by the criminal justice system. Participants are assigned a mentor and job coach who works closely with them and connects them to soft skills training, mock interviewing, resume revision and prospective job interviews.[1]

- The Osborne Association: Osborne offers stabilizing services to individuals impacted by criminal justice involvement, including training and academic support, to build participants' skills, stability, and readiness for employment. They offer paid internships, transitional employment in their own ventures, a pathway to union membership, and ongoing support to ensure success on the job. They have a career center that participants can access for additional support.[2]

- The Fortune Society: The Fortune Society provides an array of services and support specifically geared towards supporting justice involved participants throughout the reentry process. They offer employment, education, mental health treatment, substance abuse treatment, housing and primary health care services.[3]

## Social work support via Federal Defenders

The social work department offers reentry support for individuals such as Mr. Lucha as they return home from incarceration. We help connect our clients with community resources in order to strengthen their reentry and reduce the risk of recidivism. One major goal for Mr. Lucha is to obtain a personal document or an ID card.. Currently, he does not have an ID which has created a barrier to securing formal employment. We can work alongside Mr. Lucha in navigating the process and assisting when necessary.

Mr. Lucha is motivated to put his involvement with the criminal justice system behind him. He wants to focus on himself and improving his circumstances when he returns home. He wants to re-establish his relationship with his son and be a positive father figure to him. Mr. Lucha is moving towards becoming a fully engaged and productive member of society. With the assistance of the social work department and his support network, I believe he can obtain the goals he has set for himself.

---

[1] https://www.etcny.org
[2] https://www.osborneny.org/our-services
[3] https://fortunesociety.org/services-that-build-lives/

Respectfully submitted,

/s/
Angel Bosques Jr., MA, LCSW
Client & Mitigation Services
Federal Defenders of New York, Inc.
52 Duane Street, 10th floor
New York, NY 10007
(212) 417-8779
Angel_bosques@fd.org

# EXHIBIT K

December 26, 2023

Dear Judge Rakoff,

My name is Taneesha Zuniga, and I work at an animal hospital. Steven Perez is one of my really, really close friends. I've known him for over 10 years and I know his family well. His mom is a pillar in the church. I live in the house right across from his building.

It really hurts that Steven isn't around right now because he is someone that I depend on a lot, both to help me with things around the house and to be there to listen to me the way he always has. As a neighbor, he is very helpful. He takes in my packages when I'm of town, fixes things around my house, even moves around heavy objects or throws things out for me since I injured my back 4 years ago. If I need him to help me get my laundry, he does.

Steven and I have a very humorous relationship, but underneath all of our jokes, we really do trust each other and are honest with one another. We talk about our goals for ourselves. Steven wants to buy a home one day – a home with a backyard for his son to play in. He wants to get his mom out of that building. Steven is someone I always leaned on when I went through difficulties, such as breakups. We would take long morning walks together, sometimes even 2 hours, and just talk. He was always a shoulder for me to cry on. Steven used to try hard to get me to wake up earlier so that I could walk and stay active because I was struggling to lose weight. He nagged me to quit smoking cigarettes.

Everyone in the community knows him. He is a standup guy in the neighborhood, always there for people when they need him. He did these little community barbecues. He teaches kids how to do boxing, how to play baseball and basketball. He wanted to always show kids how to get on the right path. Something I remember from our morning walks is how he would frequently tell all the neighborhood kids we came across to go to school. I have never seen him do anything violent or express anything but respect towards people. He has strong opinions and he wants to get his thoughts across, but he is really a good person and father, a genuine person and great listener.

I thank you for taking the time to read this letter and I hope that you be lenient on my friend Steven.


Yours sincerely,

Taneesha Zuniga

# EXHIBIT L

12/27/23

Your Honour,

I am writing this letter on behalf of my brother, Steven Perez who is currently in the Metropolitan Detention Center in Brooklyn awaiting sentencing.

My name is Alexandria Perez and I am Steven Perez's younger sister. I am turning 24 years old in just a few days. I've known Steven since I was a little girl. We didn't spend too much time together as kids because I lived with my dad and he lived with his mom, but we definitely got closer as I got older. He has been nothing but the best older brother anyone could ever ask for. For as long as I could remember my brother has been nothing but protective, supportive, & encouraging all my life and he has never turned his back on me not once while growing up together. For example, I started playing softball when I was a kid and played all the way up to college softball. Steven always pushed me to work hard and made me feel better when I was down on myself because I made a mistake. I remember when he came to my college graduation barbecue, that was really special. Basically, my brother always showed up for me and if he couldn't make it to something he called or texted me. He always made sure I was okay and safe.

What I want you to know about my brother is that he's a great dad. He and his son ███ are really close. Steven likes to play games with him and take him to the park. He's very protective of ███ and loves him with all his heart. They used to come visit me together and we would go on Dunkin runs or call on Facetime. What's holding him together now and what will help him when he gets out is his desire to be a good father.

When the family heard about this case, we were all very shocked and upset. Everybody's very emotional, and we worry about him being in the MDC because it's so dangerous there. I went to go visit him earlier this month, and it was hard because we were just crying. As any other family member who has had loved one in a detention facility may know, it is difficult to see a family member on scheduled times and dates. His time there has been very punishing. He just lost his childhood best friend earlier this month due to a car accident. We didn't want to tell him but we knew he would want to know.

You may know him as some malicious criminal but my brother has never been the type of person to hurt others. He's very loving. I hope you will consider the person that he is and be lenient in his sentence. Thank you for taking the time to read this letter.


Sincerely,

Alexandria Perez